USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: **AUG 3 0 2013**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ X

UNITED STATES OF AMERICA

        -v-              :        04 Cr. 356-1 (KBF)

MOSTAFA KAMEL MOSTAFA,    :       OPINION & ORDER
                    Defendant.  :

------------------------------------------------------------------ X

KATHERINE B. FORREST, District Judge:

In 2004, Mostafa Kamel Mostafa, also referred to in this action as Abu
Hamza and Abu Hamza al-Masri, was indicted on eleven separate counts.
(Indictment ("Ind."), ECF No. 1.) He was arrested in England in 2004 and, after
facing charges there, was extradited to the United States in 2012. Trial is
scheduled to commence March 31, 2014. Currently before the Court is defendant's
motion to dismiss all counts in the indictment, for a bill of particulars, and to strike
surplusage. For the reasons set forth below, defendant's motion to dismiss and for a
bill of particulars is denied. Defendant's motion to strike surplusage from the
indictment is denied with leave to renew.

I.    THE COUNTS

The indictment contains eleven counts:

    <u>Count One</u>: Conspiracy to Take Hostages in violation of 18 U.S.C. § 1203[1];

    <u>Count Two</u>: Hostage-Taking in violation of 18 U.S.C. §§ 2[2], 1203;

---

[1] 18 U.S.C. § 1203 makes it a crime for anyone, whether inside or outside the United States, to, <u>inter
alia</u>, take a U.S. national as a hostage.

1

<u>Count Three</u>: Conspiracy to Provide and Conceal Material Support and Resources to Terrorists (The Bly, Oregon Jihad Training Camp), in violation of 18 U.S.C. §§ 956[3] and 2339A[4];

<u>Count Four</u>: Providing and Concealing Material Support and Resources to Terrorists (The Bly, Oregon Jihad Training Camp), in violation of 18 U.S.C. §§ 2, 956 and 2339A;

<u>Count Five</u>: Conspiracy to Provide Material Support and Resources to a Foreign Terrorist Organization (The Bly, Oregon Jihad Training Camp), in violation of 18 U.S.C. §§ 2339B[5];

<u>Count Six</u>: Providing Material Support and Resources to a Foreign Terrorist Organization (The Bly, Oregon Jihad Training Camp), in violation of 18 U.S.C. §§ 2, 2339B;

---

[2] 18 U.S.C. § 2 provides that "whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal." In other words, this provision encompasses "aiding and abetting" liability.

[3] 18 U.S.C. § 956 provides for criminal penalties for whomever, within the United States, conspires with another, regardless of where such other person is located, to commit at any place outside the United States an act that would constitute the offense of murder, kidnapping, or maiming, if committed within the territorial jurisdiction of the United States, if any of the co-conspirators commits an act within the jurisdiction of the United States to effect any object of the conspiracy.

[4] 18 U.S.C. § 2339A makes it a criminal offense to provide material support or resources to terrorists. "Material support or resources" is defined as "any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials". 18 U.S.C. § 2339A(b)(1).

[5] 18 U.S.C. § 2339B makes it a criminal offense to provide material support or resources to designated foreign terrorist organizations. Subpart (d) explicitly provides for extraterritorial jurisdiction.

Count Seven: Conspiracy to Provide and Conceal Material Support and Resources to Terrorists (Facilitating Violent Jihad in Afghanistan), in violation of 18 U.S.C. §§ 956, 2339A;

Count Eight: Providing and Concealing Material Support and Resources to Terrorists (Facilitating Violent Jihad in Afghanistan), in violation of 18 U.S.C. §§ 2, 2339A;

Count Nine: Conspiracy to Provide Material Support and Resources to a Foreign Terrorist Organization (Facilitating Violent Jihad in Afghanistan), in violation of 18 U.S.C. §§ 2339B;

Count Ten: Providing Material Support and Resources to a Foreign Terrorist Organization (Facilitating Violent Jihad in Afghanistan), in violation of 18 U.S.C. § 2339B; and

Count Eleven: Conspiracy to Supply Goods and Services to the Taliban (IEEPA Violations), in violation of 18 U.S.C. § 371,[6] 50 U.S.C. § 1705(b),[7] 31 C.F.R. §§ 545.204, 545.206(b).[8]

---

[6] 18 U.S.C. § 371 makes it a crime to conspire to commit any offense against the United States or any agency thereof.

[7] 50 U.S.C. § 1705(b) sets criminal penalties for violations of the International Emergency Economic Powers Act ("IEEPA"). This statute was used as the basis for the Office of Foreign Assets Control ("OFAC") regulations at 31 C.F.R. §§ 545.204 and 545.206(b).

[8] 31 C.F.R. §§ 545.204 and 545.206(b) codified Executive Order 13129, enacted on July 4, 1999. In this Executive Order, the "President determined that the actions and policies of the Taliban in Afghanistan, in allowing territory under its control in Afghanistan to be used as a safe haven and base of operations for Usama bin Ladin and Al-Qaida, constituted an unusual and extraordinary threat to national security." On June 1, 2011, OFAC announced that it was removing the regulations in Part 545 as the national emergency declared in Executive Order 13129 had been withdrawn. See Taliban (Afghanistan) Sanctions Regulations, 76 FR 31470-01 (June 1, 2011). The OFAC rule made clear that "removal of this part does not affect ongoing enforcement proceedings or prevent the initiation of enforcement proceedings based on an act committed prior to the date of Executive Order 13268 where the relevant statute of limitations has not run." Id.

II.    CONDUCT ALLEGED IN THE INDICTMENT[9]

The indictment alleges that from in or about December 23, 1998, up to and including December 29, 1998, defendant conspired to detain U.S. nationals.  (Ind. ¶ 1.)  As part of this conspiracy, in late 1998, defendant is alleged to have provided a co-conspirator ("Co-Conspirator 1"), the leader of the Abyan faction of the Islamic Army of Aden, and a group of other co-conspirators with a satellite phone.  (Id. ¶ 3(a).)  On December 27, 2004, defendant is alleged to have received three telephone calls at his home from this satellite phone.  (Id. ¶ 3(b).)  On or about December 28, 1998, the co-conspirators took sixteen tourists hostage by use of force, including two U.S. nationals.  (Id. ¶ 3(c).)  That same day, while the hostage taking was in progress, defendant spoke with Co-Conspirator 1 on the satellite phone and gave advice relating to the hostage-taking.  (Id. ¶ 3(d).)  He also agreed to act as an intermediary.  (Id.)

On December 29, 1998, defendant ordered five hundred British pounds worth of additional airtime for the satellite phone being used by the hostage-takers.  (Id. ¶ 3 (e).)  That same day, the Yemeni military attempted to rescue the hostages; during the rescue attempt, hostages were used as human shields; four of the hostages were killed and several others wounded.  (Id. ¶ 3 (f).)

From in or about October 1999 to early 2000, defendant and others are alleged to have conspired to provide material support to terrorists.  (Id. ¶ 5.)  In this

[9] For purposes of this motion, the allegations in the indictment are accepted as true.  United States v. Goldberg, 756 F.2d 949, 950 (2d Cir. 1985).

4

regard, on several occasions in October 1999, defendant discussed with Co-Conspirator 2 creating a jihad training camp in Bly, Oregon. (Id. ¶ 7 (a).) On October 25, 1999, Co-Conspirator 2 communicated with defendant that he and other co-conspirators were stock-piling weapons and ammunition in the United States. (Ind. ¶ 7 (b).) On that same day, defendant received a fax proposal regarding the creation of the Bly, Oregon jihad training camp. (Id. ¶ 11 (a).) Defendant is alleged to have concealed the nature, location, source and ownership of material support and resources, knowing and intending that they were to be used by a foreign terrorist organization (al Qaeda, led by Osama Bin Laden) in preparation for, and in carrying out, killing, maiming and injuring persons and property in a foreign country. (Id. ¶¶ 10, 12.)

In June 2000, defendant is alleged to have conspired with Co-Conspirator 2, a U.S. national, to provide and conceal material support to terrorists by raising money for an individual to travel to Afghanistan to wage violent jihad. (Id. ¶¶ 13, 15.) Co-Conspirator 2 traveled through Manhattan, New York, en route to attempt to collect money in Long Island, New York. (Id. ¶ 15 (a).) Co-Conspirator 2 did collect money which was then added to a "migration" or "hijrah" fund maintained by the Finsbury Park Mosque in England. (Id.)

In November 2000, defendant requested that Co-Conspirator 2 accompany another co-conspirator, Co-Conspirator 3, from London, England, to a jihad training camp in Afghanistan. (Id. ¶ 15 (b).) Defendant introduced Co-Conspirator 2 to Co-Conspirator 4, to arrange safehouses and lodging in Pakistan, and safe passage and

travel into Afghanistan. (<u>Id.</u> ¶ 15 (d).) Money from the Finsbury Park Mosque's hijrah fund was used for certain travel expenses thereafter incurred by Co-Conspirators 2 and 3. (<u>Id.</u> ¶ 15 (c).) Later that month, Co-Conspirators 2 and 3 did in fact travel to Afghanistan. (<u>Id.</u> ¶ 15 (e).)

In late 2000, at the request of defendant, Co-Conspirator 2 delivered compact discs containing defendant's statements to individuals located in the territory of Afghanistan controlled by the Taliban. (<u>Id.</u> ¶ 26 (c).)

In March or April 2001, defendant directed Co-Conspirator 3 (who was still in Afghanistan), to seek out a front-line commander of al-Qaeda. (<u>Id.</u> ¶ 19 (a).) During the period from March through September 6, 2001, defendant and Co-Conspirator 2 discussed plans to set up a computer lab to be located in Kandahar, Afghanistan to service Taliban officials. (<u>Id.</u> ¶ 26 (d).) Defendant gave Co-Conspirator 2 six thousand British pounds in furtherance of this project. (<u>Id.</u> ¶ 26 (e).)

On September 6, 2001, defendant, assisted by Co-Conspirator 2, posted messages on a website "Supporters of Shariah" or "SOS", urging defendant's followers to donate money, goods and services to Taliban-sponsored programs in the area of Afghanistan controlled by the Taliban. (<u>Id.</u> ¶ 26 (a).)

III.    DEFENDANT'S ARGUMENTS

Defendant makes the following arguments in support of dismissal of all counts in the indictment:

1. Counts One and Two and Seven through Eleven must be dismissed because there is an insufficient nexus between the conduct alleged and the United States to warrant extraterritorial application, denying defendant his due process rights as guaranteed by the Fifth Amendment to the U.S. Constitution.

2. All counts should be dismissed because none states an offense.

3. Counts Three, Four, Seven and Eight should be dismissed because each fails to identify key elements of a conspiracy under 18 U.S.C. § 956.

4. Multiplicitous counts must be dismissed as a violation of the Fifth Amendment's prohibition on double jeopardy.

In addition, defendant seeks an order requiring the Government to provide a bill of particulars and to strike what he characterizes as "irrelevant and prejudicial surplusage" from the indictment.

## IV. EXTRATERRITORIAL REACH

Defendant argues that there is an insufficient jurisdictional nexus between defendant and the United States to support Counts One, Two, and Seven through Eleven. He further asserts that applying the statutes underlying these counts to his conduct would violate his Fifth Amendment due process rights.

As to Counts One and Two (the Yemeni hostage-taking), defendant states there are no allegations that he intended to involve the United States. (Def.'s Mem. in Suppt. of Mot. to Dismiss Ind. ("Def.'s Br.") at 6, ECF No. 175.) Similarly, defendant asserts that Counts Seven through Ten also fail to allege a sufficient

nexus between the conduct charged and the United States. (Id. at 9.) While defendant acknowledges that these counts allege that Co-Conspirator 2 travelled to the United States to raise money for the Finsbury Mosque's hijrah fund (id. at 9), the "allegations central to this charge, that of facilitating violent jihad in Afghanistan, all took place outside of the United States and exclusively involved and/or were aimed at London, Pakistan and Afghanistan." (Id. at 9-10.)

Finally, with respect to Count Eleven, defendant argues that all of the overt acts alleged were directed at an area of Afghanistan controlled by the Taliban. (Id. at 13-15.)

Defendant misconstrues the now well-established law relating to the extraterritorial application of criminal statutes.

As an initial matter, criminal statutes may have extraterritorial reach. See, e.g., United States v. Siddiqui, 669 F.3d 690, 700 (2d Cir. 2012); United States v. Al Kassar, 660 F.3d 108, 118 (2d Cir. 2011); United States v. Yousef, 327 F.3d 56, 86 (2d Cir. 2003). Courts first look to the text of a criminal statute to determine whether Congress intended extraterritorial application. Al Kassar, 660 F.3d at 118. However, when a statute is silent courts look to the nature of an offense to determine whether to infer extraterritorial application. Id.

In addition, a statute may be applied extraterritorially when to do so would not violate due process. Id. Whether extraterritorial application violates due process depends on whether there is a sufficient nexus between defendant and the United States such that application would be neither arbitrary nor fundamentally

unfair. Id.; see also Yousef, 327 F.3d at 111. In instances in which charged conduct involved non-U.S. citizens and occurred entirely abroad, "a jurisdictional nexus exists when the aim of that activity is to cause harm inside the United States or to U.S. citizens or interests." Al Kassar, 660 F.3d at 118; Yousef, 327 F.3d at 112.

In Al Kassar, the Second Circuit found a sufficient jurisdictional nexus where, as here, the conduct alleged occurred outside of the United States. The Al Kassar court upheld the convictions of the non-U.S. citizen defendants on account of their plans to sell arms to FARC to be used to kill Americans and destroy U.S. property. Al Kassar, 660 F.3d at 118. There, the Court found that the geographical location of the undercover sting operation at issue was "irrelevant" to the sufficiency of the jurisdictional nexus. Id. "If an undercover operation exposes criminal activity that targets U.S. citizens or interests or threatens the security or government functions of the United States, a sufficient jurisdictional nexus exists notwithstanding that the investigation took place abroad and only focused on foreign persons." Id. The Court rejected defendants' argument that the application of the statutes at issue to their actual conduct was so tangential to any real U.S. persons or interests as to be fundamentally unfair and violative of due process. Id. at 119.

Al Kassar leaves no doubt that defendant's arguments regarding the sufficiency of a jurisdictional nexus are without merit. There is no requirement that the indictment contain allegations of defendant's presence in the United States, actual communications into or out of the United States, or transaction of business

within the United States. Rather, the determinative issue is whether defendant's actions were calculated to harm American citizens and interests.

Counts One and Two charge violations of § 1203. As stated in that section and recited above, where the conduct alleged occurred outside the United States, there is no violation <u>unless</u> the person seized or detained is a U.S. national. Here, it is alleged that two of the hostages were American citizens. Defendant argues that while this may be true, there is no allegation that he intended to harm the United States or its citizens. However, Defendant's specific intent to harm Americans is not what the law requires. <u>See</u> <u>United States v. Yousef</u>, No. S3 08 CR. 1213 (JFK), 2010 WL 3377499 (S.D.N.Y. Aug. 23, 2010); <u>United States v. Yunis</u>, 924 F.2d 1086, 1096 (D.C. Cir. 1991)("The statutory language [of the Hostage Taking Act] suggests no intent requirement other than that the offender must act with the purpose of influencing some third person or government through the hostage taking."). Rather, Courts have found a sufficient nexus to exist based upon factors such as the "defendant's citizenship or residency, the location of the acts allegedly giving rise to the suit and whether those acts could be expected to or did produce an effect in the United States." <u>Id.</u> (quoting <u>Goldberg v. UBS AG</u>, 690 F.Supp.2d 92, 106 (E.D.N.Y.2010)). It is also unnecessary that defendant had any expectation that he would be prosecuted in the United States. <u>Al Kassar</u>, 660 F.3d at 119. The facts alleged in the indictment are therefore plainly sufficient.

Counts Seven and Eight both allege violations of 18 U.S.C. § 2339A. Both counts allege conduct that occurred in the United States (a co-conspirator raising

funds in the United States, used to pay travel expenses for personnel to travel to a jihad training camp in Afghanistan). This is a sufficient nexus at this stage.

Counts Nine and Ten both allege violations of 18 U.S.C. § 2339B. That statute has an explicit provision allowing for extraterritorial application. In addition, both counts allege that defendant was involved in providing material support to al Qaeda – an organization that the United States had declared presented an unusual and extraordinary threat. There is no doubt that clear statements by al Qaeda to harm the United States made it foreseeable that defendant anticipated that his actions in supporting that organization could harm U.S. persons and interests.

Count Eleven prohibits conduct of goods or services to the Taliban from the United States or from a United States person, wherever located. Co-Conspirator 2 is alleged to be a U.S. national.

In short, each of the counts alleged to have an insufficient nexus between defendant and the United States all concern or relate to terrorists (members of al Qaeda) or the al Qaeda organization. At the time that the conduct is alleged to have occurred, there was no doubt that the United States considered al Qaeda a security threat, and that al Qaeda had made public its desire to bring harm to U.S. interests and people. Defendant also worked with Co-Conspirator 2 – both with respect to raising money in the United States and in terms of providing other goods and services to the Taliban. That defendant is not himself alleged to have set foot in the United States is irrelevant to extraterritorial application.

Nor do the challenged counts violate defendant's due process rights. It is sufficiently clear that the conduct alleged is criminal to eliminate any concerns regarding whether defendant had fair notice that such acts could subject him to criminal prosecution. See United States v. Chestman, 947 F.2d 551, 564 (2d Cir. 1991)("The purpose of the 'fair notice' requirement of due process is 'to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute.'")(quoting United States v. Harriss, 347 U.S. 612, 617 (1954)). In addition, the only cases to have found violations of due process on jurisdictional nexus grounds have done so where there was no allegation of harm to U.S. persons or interests. See United States v. Perlaza, 439 F.3d 1149, 1168 (9th Cir. 2006) (due process clause violated in prosecution of foreign crew of foreign flagged vessel where Government presented no evidence that crew, vessel or narcotics had any connection to the United States); United States v. Ali, 885 F. Supp. 2d 55, 61 (D.D.C. 2012)(same where defendant charged with hostage-taking of a foreign flagged ship and only U.S. connection was presence of American-owned cargo). That is not the case here. In a more analogous case, United States v. Ahmed, No. 10 Cr. 131 (PKC), 2011 WL 5041456, at *1 (S.D.N.Y. Oct. 21, 2011), the designation of the Al Shabaab by the U.S. Secretary of State as a terrorist group was sufficient to satisfy due process, given that the defendant either knew it was so designated or knew that it engaged in terrorist activity that targeted U.S. persons and interests. Defendant here is alleged to stand in a similar relationship to al Qaeda; as in Ahmed, defendants alleged knowledge that al Qaeda is a terrorist organization that

targets U.S. persons and interests makes his prosecution here neither arbitrary nor fundamentally unfair.

## V.    FAILURE TO STATE AN OFFENSE

Defendant argues that all counts should be dismissed due to a lack of factual particularity. (Def.'s Br. At 17.) Such particularity is necessary to inform him of the nature and cause of the accusation or to constrain the Government to the facts considered by the grand jury. (Id.) At oral argument on this motion, defendant's counsel conceded that each count faithfully tracks the language of the statute to which it refers (Tr. of May 30, 2013, Hear'g ("Tr.") at 15; see also Def.'s Reply Br. at 12, ECF No. 186), but argued that there are insufficient facts to make out the crimes charged.[10]

Defendant relies on United States v. Pirro, 212 F.3d 86 (2d Cir. 2000), for the proposition that in instances in which an indictment is generic, it must nonetheless set forth sufficient particulars to put defendant on notice and to charge a crime.[11] (Tr. at 15.)

Defendant's arguments as to sufficiency of the indictment lack merit. As an initial matter, it was long ago established that an indictment need do little more

---

[10] Defendant's counsel also conceded, as he must, that the Government is not required to allege every overt act that is part of a conspiracy. (Tr. at 27.)

[11] Pirro is readily distinguishable. The Second Circuit in Pirro found that the indictment failed to state a particular tax-related offense. Pirro, 212 F.3d at 90-95. Acknowledging that federal tax law is peculiarly "esoteric", the Pirro court found a lack of clarity in the law as to whether the filer of a tax return for an S corporation must list any individual with an "ownership interest" on that return, despite the fact that the relevant statutes only mandate the disclosure of "shareholders". Id. As there was no allegation that the person whom Pirro failed to disclose was a shareholder, the court held that the indictment failed to state an offense. Id. The case against defendant here is dissimilar; rather than involving the intricacies of tax law, the offenses here allege material support to terrorists and terrorism. There can be little doubt that defendant's assistance to members of al Qaeda, including hostage takers in Yemen and aspiring jihadist training camp founders, would have been known to defendant to constitute criminal activities.

than track the statutory language.  United States v. Tramunti, 513 F.2d 1087, 1113 (2d Cir. 1975)("An indictment need only provide sufficient detail to assure against double jeopardy and state the elements of the offense charged."); United States v. Cohen, 518 F.2d 727, 732 (2d Cir. 1975); United States v. Salazar, 485 F.2d 1272, 1277 (2d Cir.), cert. denied, 415 U.S. 985 (1974).

The counts in the indictment provide sufficient detail.  First, Counts One and Two clearly relate to defendant's participation in hostage taking in Yemen and a conspiracy relating to the same.  Defendant's argument that the allegation that he was on the telephone and advising the hostage takers in the midst of their criminal acts fails to identify his participation in the crime is simply wrong.  Even so, defendant is alleged to have done more: to have equipped the hostage takers with a means of communication – which, for hostage taking to achieve its purposes can be a critical tool – and have purchased additional minutes so that the hostage takers could succeed in their criminal activities (that is, defendant provided additional communications opportunities for the hostage-takers).  These assertions more than adequately support the charges under § 1203 in those counts.

Nor is there ambiguity as to the conduct charged in Counts Three and Four: namely, that in October 1999, defendant and Earnest James Ujaama (Co-Conspirator 2) discussed setting up a jihad training camp in Bly, Oregon, and that Co-Conspirator 2 communicated to defendant that he was stockpiling weapons and ammunition in the United States.  Defendant argues that these allegations are insufficient to identify any "material support" or criminal conduct.  (Def.'s Br. at 19-

20.) Rather, he suggests, the mere creation of a jihad training camp may be perfectly lawful. (Id.)

In the context of the conduct alleged in the indictment, the Court disagrees. Indictments are to be read as a whole. As such, acts that may themselves be lawful are punishable if performed in furtherance of a conspiracy (or, here, if they constitute material support). See Braverman v. United States, 317 U.S. 49, 53 (1942)("The overt act . . . need not be itself a crime.") There is thus no serious doubt that the creation of a jihad training camp in 1999 and 2000 by a supporter of al Qaeda (an organization which had been designated as a "foreign terrorist organization"), and the stockpiling of weapons in connection with the same, are sufficient to state a claim for the provision of material support and resources to terrorists under 18 U.S.C. §§ 2 and 2339A.

For the same reasons, Counts Five and Six are also sufficient; the only difference is that they are stated in terms of providing support to al Qaeda, a foreign terrorist organization, rather than in terms of providing support to terrorists (as in Counts Three and Four). The support defendant is alleged to have provided was equally applicable to the terrorist organization, al Qaeda, as it was to the individual terrorists.

Counts Seven and Eight quite clearly allege providing and concealing material support and resources to terrorists; they allege defendant engaged in a conspiracy to raise money for a "hijrah" or migration fund. The alleged intent of raising that money was to withdraw it from the fund and to pay for others to travel

to Afghanistan, where they would join with a follower of defendant and undergo training at a jihadist camp. Counts Nine and Ten (as with Five and Six) allege the same conduct provided material support and resources to a foreign terrorist organization, al Qaida.

At oral argument, the Court and counsel discussed whether the material support alleged was the currency raised or the personnel sent (that is, the money raised in the United States and added to the hijrah fund or the individuals who were tasked to go to Afghanistan to join the jihad training camp). The statute allows for both to constitute material support, and the Government stated in argument that it was asserting both. (Tr. at 23.)

Defendant's counsel argued that because money is fungible, once it is added to the hijrah fund, it can no longer be determined whether that money was used to provide material support to terrorism or for a legitimate purpose. (Tr. at 18-19.) Therefore the indictment's allegations that defendant participated in the fundraising cannot be connected to the criminal act – i.e., funding travel of personnel to Afghanistan. (Id.)

However, again reading the indictment as a whole, the conduct charged can be read to allege that the purpose of those funds was to further the conspiracy. The specific facts relating to how the cash was raised and used – and how the hijrah fund may have been handled – are therefore fact issues properly left for trial. In addition, the provision of personnel is an entirely separate basis for material support from the provision of currency – either one of which is sufficient to support

the charges. At this stage, the indictment sufficiently alleges conduct which could, if proven, constitute criminal violations.

Count Eleven charges defendant with conspiring to violate 50 U.S.C. §1705(b), the International Emergency Economic Powers Act ("IEEPA"), which proscribes conduct including the provision of funds, goods, and services to entities whose property has been blocked by Executive Order. Specifically, the indictment alleges that from the Spring of 2000 through September 6, 2001, defendant and his coconspirators used a website to urge followers to donate money, goods and services to Taliban-sponsored programs in Afghanistan and that defendant provided funds for the creation of a computer lab for the Taliban in Afghanistan. At this time, a Presidential Executive Order had blocked the Taliban under IEEPA upon a finding that the Taliban constituted an unusual and extraordinary threat to the national security and foreign policy of the United States. There can be little real doubt that the conduct set forth in the indictment fairly notifies defendant of the criminal conduct in which he is alleged to have engaged with respect to the statutes at issue in Count Eleven – he is alleged to have provided direct and indirect monetary assistance and goods to an IEEPA-blocked entity, the Taliban.

VI.   ELEMENTS OF 18 U.S.C. § 956

Defendant argues that Counts Three, Four, Seven and Eight, which all charge violations of 18 U.S.C. § 2339A, should be dismissed because each count fails to articulate the underlying § 956 conspiracy that constitutes an element of the offense charged. (Def.'s Br. at 29.) Defendant's argument is without merit.

17

Each of Counts Three, Four, Seven and Eight are adequately pled; the statutory elements necessary to be set forth are set forth. To the extent that defendant is really complaining about the lack of additional factual description, that is, as discussed throughout this opinion, also without merit. Each of the conspiracy counts clearly charges a conspiracy relating to the substantive conduct in the following count – that is neither unusual nor improper.

United States v. Sattar, 314 F. Supp. 2d 279 (S.D.N.Y. 2004), the sole case cited by defendant in support of this argument, actually undermines defendant's position. In that case, the court rejected a similar vagueness argument in the context of a § 2339A and § 956 claim. Id. at 303. There, the court stated the long established proposition that an indictment need do little more than track the statute, and that it had been done there. Id. Here, as well, the conspiracy and substantive charges track the statutory language and are sufficient to apprise defendant of the charges against him and to prevent double jeopardy.

VII.   MULTIPLICITY

Defendant argues that a number of counts are paired and multiplicitous – and that the Government must therefore elect which to pursue. In particular, he asserts that Counts Three and Five, Four and Six, Seven and Nine, and Eight and Ten are multiplicitous. (Def.'s Br. at 61.)

As set forth in the description of the counts above, in each instance, the paired count charges a conspiracy to do the substantive act charged in the following count. Thus, for instance, Count Three charges "Conspiracy to Provide and Conceal

18

Material Support and Resources to Terrorists (The Bly, Oregon Jihad Training Camp)", in violation of 18 U.S.C. §§ 956 and 2339A. Count Four charges "Providing and Concealing Material Support and Resources to Terrorists (The Bly, Oregon Jihad Training Camp)", in violation of 18 U.S.C. §§ 2, 956 and 2339A. The other "pairings" are similar in nature.

A multiplicity challenge is based on the Fifth Amendment's prohibition against double jeopardy. U.S. Const. Amend. V. The Double Jeopardy clause provides that no person shall "be subject for the same offense to be twice in jeopardy of life or limb." Id. This provision prohibits a second prosecution for the same offense following an acquittal, a second prosecution for the same offense following a conviction, and against the imposition of multiple punishments for the same offense. See Illinois v. Vitale, 447 U.S. 410, 415 (1980).

In Blockburger v. United States, 284 U.S. 299, 304 (1934), the Supreme Court established that the test of multiplicity is whether "there is an element in each offense that is not contained in the other". The Blockburger test looks to the language of the statute itself, recognizing that "a single transaction can give rise to distinct offenses under separate statutes without violating the Double Jeopardy Clause." Albernaz v. United States, 450 U.S. 333, 344 n.3 (1981); see also Harris v. United States, 359 U.S. 19 (1959). "The appropriate inquiry under Blockburger is 'whether each provision requires proof of a fact which the other does not.'" Ball v. United States, 470 U.S. 856, 861 (1985)(citing United States v. Woodward, 469 U.S. 105, 107 (1985).) "The assumption underlying the Blockburger rule is that

Congress ordinarily does not intend to punish the same offense under two different statutes." Id.

It is well established that the Double Jeopardy clause does not prohibit simultaneous prosecutions for the same offense; it prohibits duplicative punishment. See United States v. Josephberg, 459 F.3d 350, 355 (2d Cir. 2006); see also United States v. Ghavami, No. 10 Cr. 1217 (KMW), 2012 WL 2878126, at *10-11 (S.D.N.Y. July 13, 2012); United States v. Jahedi, 681 F.Supp. 2d 430, 436-37 (S.D.N.Y. 2009). Accordingly, multiplicity is properly addressed by the trial court at the sentencing stage. Ball, 470 U.S. at 864-65.[12] At that time, the district court would be required to vacate one of the two convictions. Id. at 865.

Ball presented a classic example of multiplicity. There, a previously convicted felon was charged in separate counts with receipt and possession of a firearm. Id. at 857. After the defendant was convicted on both counts, the Supreme Court remanded to the district court with instructions to vacate one of the two convictions. Id. at 865.

---

[12] In the context of successive conspiracy prosecutions or counts, the Second Circuit has stated that the inquiry is whether the second is distinct from the first. United States v. Estrada, 320 F.3d 173, 180 (2d Cir. 2003). Courts in Court in this district apply the factors articulated in United States v. Korfant to determine distinctiveness. 771 F.2d 660, 662 (2d Cir. 1985)(per curiam). Those factors include:

(1)     The criminal offenses charged;
(2)     The overlap of participants;
(3)     Temporal overlap;
(4)     Similarity of operations;
(5)     The existence of common overt acts;
(6)     The geographic scope of the alleged conspiracies or where the overt acts occurred;
(7)     Common objectives;
(8)     The degree of interdependence between the charged conspiracies.

Id. No single factor is determinative. Estrada, 320 F.3d at 180-81.

This Court will not engage in a multiplicity inquiry at this time. In accordance with Second Circuit precedent, any such issues may be raised post-trial.

## VIII.  BILL OF PARTICULARS

Defendant moves for an order requiring the Government to provide a bill of particulars. (Def.'s Br. at 32.) Defendant argues that in the absence of additional factual detail, not contained in the indictment, he will be unable to prepare his defense and would have an insufficient basis to make double jeopardy challenges to potential future charges. (Id. at 33.) In particular, defendant argues that a bill of particulars is necessary to distinguish between the multiplicitous counts and to describe the manner, content and parties involved in the communications and acts alleged so that he may conduct an investigation of the charges against him. (Id. at 34.) Defendant argues that the volume of discovery, geographical scope and temporal nature of the conduct are factors weighing in favor of a bill of particulars. (Def.'s Br. at 14; Tr. at 36-37.)

Defendant then provides a 16-page list consisting of 42 paragraphs and dozens of subparts, which makes specific requests for information. (Id. at 38-54.)

Rule 7(f) of the Federal Rules of Criminal Procedure provides that:

> A court may direct the filing of a bill of particulars. A motion for a bill of particulars may be made before arraignment or within ten days after arraignment or at such later time as the court may permit.

Fed. R. Crim. P. 7(f). "A bill of particulars is required 'only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused.'" United States v. Walsh, 194 F.3d 37, 47 (2d Cir.

1999)(quoting United States v. Torres, 901 F.2d 205, 234 (2d Cir. 1990), cert. denied, 498 U.S. 906 (1990).)

A bill of particulars is also unnecessary when the Government has produced materials in discovery concerning the witness and other evidence. Id. In Torres, the Second Circuit affirmed the district court's denial of a bill of particulars in part because the defendants were provided with considerable evidentiary detail outside of the indictment. Torres, 901 F.2d at 234; see also United States v. Panza, 750 F.2d 1141, 1148 (2d Cir. 1984). Thus, in determining whether to order a bill of particulars, a court must examine the totality of the information available to defendant, both through the indictment and through pre-trial discovery. United States v. Bin Laden, 92 F. Supp. 2d 225, 233 (S.D.N.Y. 2000). The purpose of the bill of particulars is to avoid surprise at trial and give defendant sufficient information to meet the charges against him. Id. (quoting Torres, 901 F.2d at 234).

In Bin Laden, the court granted the defendants' motion for a bill of particulars. There, however, the indictment charged 15 named defendants with 267 discrete criminal offenses, it charged certain defendants with 229 counts of murder, it covered a period of nearly ten years, and it alleged overt acts in 12 countries. Bin Laden, 92 F. Supp. 2d at 234. The court noted that the "geographical scope of the conspiracies charged in the indictment is unusually vast." Id. At oral argument on this motion, defense counsel cited Bin Laden as supportive of ordering a bill of particulars here because, in Bin Laden, there was far more detail in the 144 count indictment than exists here. (Tr. at 64.) This Court disagrees.

At numerous conferences in this case, the Court and counsel have discussed the nature and volume of discovery. (See, e.g., Hear'gs of Oct. 9, 2012; Oct. 26, 2012; Dec. 14, 2012; Jan. 14, 2013; Mar. 7, 2013; Mar. 15, 2013; May 30, 2013.) That discovery includes a large number of audio recordings of defendant's speeches, computer hard drives, documents in English and in Arabic, and other physical evidence. The Government also noted at oral argument on this motion that the transcript of the testimony of one of defendant's alleged co-conspirators, Earnest James Ujaama (referred to in the indictment here as "Co-Conspirator 2"), at the trial in United States v. Kassir[13] would also provide defendant and his counsel with a readily accessible way to obtain additional factual detail. (Tr. at 45-46, 50.) The transcript of that trial outlines the conduct relating to the Bly, Oregon training camp in Counts Three through Six, explains the contents of the October 25, 1999 fax, describes communications with defendant regarding taking a third individual (Co-Conspirator 3) to Afghanistan and reveals the identity of that individual, and discusses defendant's provision of six thousand British pounds. (See Gov't Mem. in Opp. ("Gov. Br.") at 25-27.)

As set forth above, the indictment itself alleges a limited set of events and a relatively narrow timeframe. The charges against defendant are not comparable to the broad scope of those at issue in the Bin Laden case. While the discovery in this case has been voluminous, at the end of the day, there are only a few events really

---

[13] Kassir and defendant here were previously charged in the same indictment. (Superseding Indictment, United States v. Kassir, No. 04 Cr. 356-3(KBF), ECF No. 6.) Kassir was arrested and tried in 2009 – but he is alleged to have been a co-conspirator of defendant's in the same conduct relating to, inter alia, the Bly, Oregon training camp. Id.

at issue. There is no provision in the Federal Rules of Criminal Procedure for the type of broad, sweeping discovery defendant seeks. Nothing about the nature of this indictment or the produced discovery is particularly unusual to require a bill of particulars. That this case has a high profile and involves allegations of material support to terrorists does not change the general rules that this court is to apply.

IX. SURPLUSAGE

Defendant argues that references to al Qaeda as being led by Osama Bin Laden and broadening phrases such as "others known and unknown," "among others," and "elsewhere" should be stricken from the indictment as surplusage both irrelevant and prejudicial to defendant. (Def.'s Br. at 55.) At oral argument on this motion, counsel agreed that "we have a significant amount of time before trial to iron this out." (Tr. at 9.)

Defendant correctly notes that rule 7(d) of the Federal Rules of Criminal Procedure provide that, upon motion by defendant, the Court may strike extraneous matter or surplusage from an indictment. (Def.'s Br. at 56.) However, "'[m]otions to strike surplusage from an indictment will be granted only where the challenged allegations are not relevant to the crime charged and are inflammatory or prejudicial.'" United States v. Mulder, 273 F.3d 91, 99 (2d Cir. 2001)(quoting United States v. Scarpa, 913 F.2d 993, 1013 (2d Cir. 1990)).

Courts have held that statements providing background are relevant and need not be struck. Id. at 100 (in action charging extortion relating to labor

coalitions, upholding district court's decision not to strike background on tactics and purposes of labor unions).

In United States v. Kassir, S2 Cr. 04 Cr. 356 (JFK), 2009 WL 995139 (S.D.N.Y. Apr. 9, 2009), the defendant was also charged with conspiring and providing material support to al Qaeda. Id., at *1. He similarly moved to strike what he characterized as surplusage from the indictment that included language referring to Usama Bin Laden as the leader of al Qaeda. Id. Kassir also objected to the same broadening phrases as those used in the indictment here. Id., at *1 (moving as to "with others known and unknown", "and elsewhere", "and others," and "among other things.") In Kassir, the Court denied the motion to strike, holding that references to al Qaeda being led by Bin Laden were relevant to the leadership and organization of the entity for which the defendant was charged with providing support, and was also admissible as background information. Id., at *2. In addition, the court found that "the Government plans to offer evidence that Defendant committed the charged conduct with the intent to support Bin Laden, which is relevant to the inference that Defendant also intended to support al Qaeda." Id. The court further found that "Defendant's express intent to support al Qaeda's leader would lend a strong inference of support for the organization itself and would not be unfairly prejudicial in the least." Id. The Court finds the same rationale applies here.

As to broadening phrases, surplusage may be struck if it impermissibly expands the charge. Id., at *3 (citing United States v. Pope, 189 F. Supp. 12

(S.D.N.Y. 1960).) In <u>Pope</u>, the court found that broadening phrases in charging paragraphs can enlarge specific charges. <u>Pope</u>, 189 F. Supp. at 25. However, sections of the indictment which go to means and methods do not create the same issue. <u>Kassir</u>, 2009 WL 995139, at *3; <u>see also</u> <u>United States v. Mayo</u>, 230 F. Supp. 85, 86 (S.D.N.Y. 1964).

In support of his motion, defendant does no more than assert that broadening language appears in the indictment. (<u>See, e.g.</u>, Def.'s Br. at 60-61.) He does not address the issue at all in his reply brief. In <u>Kassir</u>, the court declined to strike all but one challenged phrase. 2009 WL 995139, at *4. The court found that the fact that the defendant was charged with having committed the charged offenses with others "known and unknown" was relevant and not inflammatory, and noted that there is no prohibition to an indictment referring to unindicted, unnamed co-conspirators. <u>Id.</u> In terms of the phrase "among others," the court noted that the law does not require that an indictment set forth every act committed by the conspirators in furtherance of the conspiracy. <u>Id.</u> (citing <u>United States v. Cohen</u>, 518 F.2d 727, 733 (2d Cir. 1975)). The Government consented to remove one phrase ("among other things"), but that phrase was not used in the same manner as in the indictment here. <u>Id.</u>

These surplasage issues need not be fully addressed at this time, however. Courts in this district routinely await presentation of the Government's evidence at trial before ruling on a motion to strike. <u>See, e.g.</u>, <u>Scarpa</u>, 913 F.2d at 1012; <u>Ahmed</u>,

2011 WL 5041456, at \*3; United States v. Persico, 621 F. Supp. 842, 861 (S.D.N.Y. 1985).

In Ahmed, defendant's motion to strike surplusage related to background information regarding civil and sectarian violence in Somalia and the anti-American animus of Al Shabaab, which was designated by the Secretary of State as a "foreign terrorist organization." Ahmed, 2011 WL 5041456, at \*2. The court held that it would await presentation of the Government's evidence at trial, and stated further that the Government would have some latitude to "demonstrate the nexus between defendant's conduct and American interests, as well as the background of others who are members of the charged conspiracies." Id., at \*3. The Court noted that denial of the motion without prejudice to renew might also allow the parties to reach a pre-trial stipulation, as had occurred in United States v. Yousef, 2011 WL 2899244 (S.D.N.Y. June 30, 2011). Ahmed, 2011 WL 5041456, at \*3. Here, as in Ahmed, the Court will await the Government's presentation at trial.

CONCLUSION

For the reasons set forth above, defendant's motion to dismiss the indictment, or any count thereof, is denied. Defendant's motion for a bill of particulars is denied. Defendant's motion to strike surplasage is denied with leave to renew.

The Clerk of Court is directed to terminate the motion at ECF No. 31.

SO ORDERED.

Dated:    New York, New York
           August **30**, 2013

/< B. Forrest

KATHERINE B. FORREST
United States District Judge