UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| - v. - | : | 04 Cr. 356 (KBF) |
| MOSTAFA KAMEL MOSTAFA, a/k/a "Abu Hamza al-Masri," | : | **DECLARATION OF IAN MCGINLEY** |
| | : | |
| Defendant. | | |
| | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

IAN MCGINLEY, pursuant to 28 U.S.C. § 1746, declares the following under penalty of perjury:

1.    I am an Assistant United States Attorney in the office of Preet Bharara, United States Attorney for the Southern District of New York, and I am one of the prosecutors assigned to the prosecution of Mostafa Kamel Mostafa, a/k/a "Abu Hamza al-Masri," the defendant.

2.    I have met with the witness who is the subject of the Government's January 29, 2014 motion to take testimony via live closed-circuit television during the trial or, alternatively, via Rule 15 of the Federal Rules of Criminal Procedure (the "Witness").[1]  I have personally met with the Witness in the United Kingdom.  In addition, I have met and spoken with United Kingdom law enforcement officials, and spoken to others who have themselves spoken to United Kingdom law enforcement officials, including New Scotland Yard and the Crown Prosecution Service.  Some of these British officials have been involved with the Witness for years.  I have also met and spoken with U.S. law enforcement officials and prosecutors who have been

---

[1] Due to concerns regarding the Witness's personal safety, the Government has elected in this filing not to refer to the Witness by name.  Should the Court grant the Government's motion, the Government will of course provide the Witness's true name to defense counsel, and anticipates that the Witness will testify under his true name.

involved with the Witness for years.  This declaration is based on my knowledge from those meetings and conversations, as well as my review of the Witness's prior statements and prior testimony, taken via Federal Rule of Criminal Procedure 15 in a 2012 trial in this Circuit.

3. The Witness is a citizen of and is resident in the United Kingdom.

4. In 2004, the Witness was indicted in the District of Massachusetts and charged with offenses related to an al Qaeda plot to detonate shoe-borne explosives while on a transatlantic airplane flight.  That indictment remains pending, and I have been informed (as has the Witness) that he would be arrested pursuant to that indictment if he traveled to the United States.

5. The Witness has, for years, consistently refused to travel to the United States to testify or for any other purpose.  For example, in the course of his 2012 Rule 15 deposition, the Witness testified under oath regarding his willingness to travel to the United States:

> AUSA: And in advance of this proceeding, have you been asked by the U.S. Government if you would voluntarily travel to the United States to appear at this trial?
>
> WITNESS: I've been asked.
>
> AUSA: And what have you responded?
>
> WITNESS: My response was, uh, no, I would not be willing to travel.
>
> AUSA: And why would you not be willing to travel to the United States?
>
> WITNESS: Uh, uh, because I know that, uh, upon arrival in the United States, I would be arrested.

6. On January 10, 2014, I and another attorney with the United States Department of Justice met with the Witness, who was located in the United Kingdom.  We explained to the Witness that we sought his testimony at a trial in New York.  We explained to the Witness that,

as with any witness, the Government would pay his travel cost and a daily *per diem*, and thus he would not incur any travel expenses to travel to the United States to testify. We then asked him to travel to testify. He refused. We asked him for his reason for not traveling to the United States, and he explained that he feared that he would be arrested if he chose to travel to the United States.

7.     Based on the proceedings surrounding the Rule 15 deposition of the Witness in a 2012 trial in this Circuit, and the Government's representations in *United States* v. *Abu Ghayth*, S14 98 Cr. 1023 (LAK), I understand that the United States Marshals Service does not have authority to maintain custody of a prisoner in a foreign country, and the United Kingdom authorities would very likely not permit the defendant to enter the United Kingdom while not in custody (or perhaps at all).

8.     I understand, based on conversations with law enforcement officials with knowledge of the law of the United Kingdom: that, if the Witness testifies falsely, he could be held in violation of his cooperation agreement with United Kingdom authorities, pursuant to the Serious Organized Crime and Police Act; that false testimony could subject the Witness to prosecution in the United Kingdom for the crime of "perversion of the course of justice"; and that the Witness currently receives witness protection from British authorities and his failure to testify truthfully could result in termination of that protection.

9.     Based on my interview of the Witness, my review of his prior Rule 15 testimony, my review of his prior statements, and my conversations with others, I believe that the Witness will testify, in substance and in part, as set forth in the accompanying memorandum of law and as follows:

    a.  The Witness is a citizen and resident of the United Kingdom.  He will testify that, in or about 1999, he traveled to Afghanistan, where he received military-type training at jihadist training camps, including camps affiliated with al Qaeda.  From approximately 2000 through late 2001, the Witness was himself associated with al Qaeda.

    b.  After the September 11, 2001 attacks, the Witness agreed to participate, along with convicted co-conspirator Richard Reid, in al Qaeda's so-called "Shoe Bomb" plot by carrying explosives in his shoes with the intent to detonate them while on a transatlantic airplane flight.  After being provided with the explosive shoes necessary for the attack, and traveling back to the United Kingdom in late 2001 in order to undertake the attack, the Witness ultimately decided not to follow through with the plot.

    c.  In November 2003, the Witness was arrested, and ultimately convicted in the United Kingdom of offenses relating to the plot.  Sometime after his conviction, the Witness entered into a cooperation agreement with the British government, and continues to cooperate pursuant to that agreement.  The Witness is currently at liberty in the United Kingdom where he is considered to be a protected witness.

    d.  Based on the Witness's first-hand knowledge, he will be able to testify about the existence of al Qaeda in Afghanistan during the time period relevant to this case, and al Qaeda's leadership structure and membership.   The Witness can also testify about locations relevant to the case, such as al Qaeda training camps and guesthouses, all located in Afghanistan.  In addition to explaining how these facilities were used by al Qaeda, the Government anticipates that the Witness's testimony would be that, due to al Qaeda's intensive security practices, many of these locations were only accessible to trusted insiders.

    e. With respect to Feroz Abassi ("Abassi"), the witness will testify, in sum and substance, as follows:

      i. In early 2001, he met Abassi, who was accompanied by Ibn Sheik, at an al Qaeda affiliated religious institution in Kandahar, Afghanistan.  Ibn Sheik asked the Witness to look after Abassi.  The Witness took Abassi to a guesthouse across the street from the religious institution that was also run by al Qaeda.

      ii. After this initial meeting with Abassi, the Witness saw Abassi again in Afghanistan, this time while the both of them were receiving jihad training at the al-Faruq training camp run by al Qaeda.  The course Abassi took at the al-Faruq camp included training in, among other things, weapons, such as AK 47s, explosives, and navigation.

      iii. The Witness was present, and acting as a translator, when Abbasi was asked by al Qaeda senior leaders, Mohamed Atef, a/k/a "Abu Hafs al-Masri," and Saif al-Adl whether he (Abbasi) would be willing to engage in attacks against U.S. and Jewish targets outside of Afghanistan, and Abbasi responded affirmatively.

    f. With respect to  Saif al-Adl, Ibn Sheik, and Abu Khaba, the witness will testify, in sum and substance, as follows:

      i. When the Witness first arrived in Kandahar, Afghanistan, in 1999, he met with senior al-Qaeda leader Saif al-Adl.  The purpose of the meeting, as the Witness understood it, was for al-Adl to size-up the Witness to determine whether the Witness was suitable for jihad training.  Upon learning that the Witness was British, al-Adl asked whether the Witness knew Abu Hamza and stated that Abu Hamza's son had recently been arrested in Yemen.

        ii.        Ibn Sheik was the head of the Khalden jihad training camp in Afghanistan, which was shut down by the Taliban in around the spring or summer of 2000.  The Khalden training camp provided military-style training.

        iii.        Abu Khabab was an explosives expert and responsible for a jihad training camp at Derunta, in Afghanistan, which camp the Witness attended in February or March 1999.  Khabab oversaw explosives training that the Witness received while at this camp, and the Witness also received multiple days of training in explosives and poisons directly from Abu Khabab.

10.     Neither live testimony at trial via closed-circuit television or a Rule 15 deposition should have any effect on the trial date.  Should the Court grant the Government's motion, the Government will provide all the relevant material to the defendant well in advance of the Witness's testimony.  The Government will not make any motion for an adjournment on this basis, and would oppose any such defense motion.

I declare under penalties of perjury that the foregoing is true and correct, pursuant to 28 U.S.C. § 1746.

Dated:       January 29, 2014
               New York, New York

                                                /s/ Ian McGinley
                                           Ian McGinley
                                           Assistant United States Attorney
                                           Tel.: (212) 637-2257