USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 04/12/2014

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ X
:
UNITED STATES OF AMERICA  :
:
-v-  :   04 Cr. 356 (KBF)
:
MOSTAFA KAMEL MOSTAFA  :   OPINION & ORDER
   a/k/a "Abu Hamza al-Masri,"  :
:
               Defendant.  :
:
------------------------------------------------------------------ X

KATHERINE B. FORREST, District Judge:

     Defendant Mostafa Kamel Mostafa was indicted in 2004 for, <u>inter alia</u>, conspiracy to take hostages, hostage taking, conspiracy to provide and conceal material support and resources to terrorists (the Bly, Oregon jihad training camp), providing and concealing material support to terrorists (the Bly, Oregon jihad training camp), conspiracy to provide material support and resources to a foreign terrorist organization (the Bly, Oregon jihad training camp), providing material support and resources to a foreign terrorist organization (the Bly, Oregon jihad training camp), conspiracy to provide and conceal material support and resources to terrorists (facilitating violent jihad in Afghanistan), providing and concealing material support to terrorists (facilitating violent jihad in Afghanistan), conspiracy to provide material support and resources to a foreign terrorist organization (facilitating violent jihad in Afghanistan),  providing material support and resources to a foreign terrorist organization (facilitating violent jihad in Afghanistan), and conspiracy to provide goods and services to the Taliban in violation of the

International Emergency Economic Powers Act. (ECF No. 1.) Trial is scheduled to commence on April 14, 2014.

One of the witnesses whom the Government intends to call, Saajid Badat, has refused to come to the United States to testify. (ECF No. 291.) He has agreed, however, to provide testimony under oath by live closed-circuit television ("CCTV").

The Government has moved pursuant to Federal Rules of Criminal Procedure 2 and 15 for an order allowing Badat to testify by live CCTV or by deposition. (ECF No. 238.) The Government contends that Badat is unavailable to testify in person and that his testimony is material. Defendant has opposed the motion, primarily on the basis that the Government has been complicit in maintaining such unavailability.[1]  (See, e.g., Mem. of L. in Opp. to Gov't's Mot. ("Def.'s Opp."), ECF No. 245.)

The Court has thoroughly explored the issue of unavailability and whether circumstances here justify allowing Badat to testify by live CCTV. The Court has held at the forefront of its analysis the defendant's Sixth Amendment right to confront witnesses against him. The Court has carefully considered defendant's arguments regarding the Government's complicity and/or good faith. Based on what has been an elaborate process relating to this issue, the Court grants the Government's motion. Badat will be allowed to testify by live CCTV from the United Kingdom. Defense counsel may be present in person to cross-examine him;

---

[1] Defendant does not dispute Badat's unavailability (using the colloquial meaning of the term), inasmuch as Badat has refused to come to the United States to testify in this trial. His counsel conceded as much at the final pretrial conference on April 9, 2014.

2

the jury shall watch Badat's direct testimony and cross-examination by live CCTV from the courtroom.

I.   APPLICABLE LEGAL PRINCIPLES

The Sixth Amendment to the U.S. Constitution states, in part, "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. Such a right traces its origins back to Roman times and the English common law. Crawford v. Washington, 541 U.S. 36, 43 (2004). "The common-law tradition is one of live testimony in court subject to adversarial testing." Id. While testimony taken outside of the courtroom was at times presented at trial in 16th- and 17th-century England, courts developed strict rules of "unavailability" to limit such instances. Id. at 44–45. The Sixth Amendment reflects a goal to eliminate ex parte examination offered as evidence against the accused. Id. at 50. "[T]he Framers would not have allowed admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." Id. at 53–54; see also United States v. Gigante, 166 F.3d 75, 81 (2d Cir. 1999). The Supreme Court has instructed that the Sixth Amendment right to confrontation must be "interpreted with this focus in mind." Crawford, 541 U.S. at 50.

The Supreme Court has also stated that the confrontation right is a functional one: to promote reliability in criminal trials. Lee v. Illinois, 476 U.S. 530, 540 (1986). "[T]he mechanisms of confrontation and cross-examination advance the

3

pursuit of truth in criminal trials." Id. The Court identified three factors that promote this truth-finding function: the oath that the witness must take, cross-examination of the witness, and the jury's ability to evaluate the witness's demeanor. Id. (quoting California v. Green, 399 U.S. 149, 158 (1970)).

While in Coy v. Iowa, 487 U.S. 1012, 1016 (1988), the Supreme Court made the broad statement that the Confrontation Clause "guarantees the defendant a face-to-face meeting with witnesses appearing before the trier of fact," in Maryland v. Craig, 497 U.S. 836, 850 (1990), which involved the use of one-way CCTV, the Court indicated that this requirement was "not absolute." In Craig, the Supreme Court noted, "The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." Id. at 845. Nevertheless, an accused's Sixth Amendment right to confrontation may be satisfied absent a physical, face-to-face confrontation at trial "where denial of such confrontation is necessary to further an important public policy" (there, the state interest in preventing trauma to child witnesses), and "where the reliability of the testimony is otherwise assured." Id. at 850.

A. <u>Depositions Under Rule 15</u>[2]

The Federal Rules of Criminal Procedure have provided for depositions of certain witnesses since 1975. That rule provides that a court may grant a motion to take a deposition on notice and "because of exceptional circumstances." Fed. R.

---

[2] The Court discusses depositions under rule 15 only to set forth the relevant standard; defendant has stated that, while he objects to Badat testifying by either deposition or live CCTV, if the Court allows remote testimony, he prefers CCTV.

4

Crim. P. 15(a)(1). As amended in 2012, the rule requires that, if a deposition is to occur outside the United States and without the defendant's presence, the Court must make five case-specific findings: (1) the witness's testimony could provide substantial proof of a material fact; (2) there is a substantial likelihood that the witness's attendance at trial cannot be obtained; (3) a deposition of the witness in the U.S. cannot be obtained; (4) for an in-custody defendant, secure transportation and continuing custody cannot be assured at the witness's location; and (5) the defendant can meaningfully participate in the deposition through reasonable means. Fed. R. Crim. P. 15(c)(3).[3]

The Second Circuit has held that "exceptional circumstances" exist if the witness's testimony is material and the witness is unavailable. United States v. Johnpoll, 739 F.2d 702, 709 (2d Cir. 1984); United States v. Singleton, 460 F.2d 1148, 1154 (2d Cir. 1972), cert. denied, 410 U.S. 984 (1973). "Unavailability is to be determined according to the practical standard of whether under the circumstances the Government has made a good-faith effort to produce the witness to testify at trial." Johnpoll, 739 F.2d at 709 (citing Ohio v. Roberts, 448 U.S. 56, 74 (1979); California v. Green, 399 U.S. 149, 189 n.22 (1970) (Harlan, J., concurring)). "The lengths to which the prosecution must go to produce a witness before it may offer

---

[3] Defendant argues that this amendment is unconstitutional as applied to him, because it permits the taking of witness testimony outside his presence and without his consent. (Def.'s Opp. 28.) That argument is without merit. The Supreme Court has made it clear that, if certain criteria are met, a procedure other than face-to-face testimony does not violate an accused's confrontation rights. See Craig, 497 U.S. at 860. Moreover, in Crawford, the Supreme Court also directed courts to review confrontation rights against the backdrop of the Sixth Amendment's origin and purposes. 541 U.S. at 42–59. The 2012 Amendment to Rule 15 is simply a codification of case law following the Court's directive.

evidence of an extra-judicial declaration is a question of reasonableness." Green, 399 U.S. at 189 n.22 (Harlan, J., concurring).

In Johnpoll, the Second Circuit affirmed a district court's admission of deposition testimony of four Swiss nationals in Switzerland when one flatly refused to come to the United States and three others refused unless the Government agreed to certain conditions. 739 F.2d at 709. The Court stated that "the government's refusal to accede to their demands (after the Assistant U.S. Attorney on the case unsuccessfully sought authority from the Attorney General) was not unreasonable." Id. Moreover, "submission to these conditions would establish a precedent that could have extensive harmful repercussions." Id.

Numerous decisions have also authorized depositions and admission of similar testimony on a sufficient factual record. See, e.g., United States v. Salim, 855 F.2d 944, 952 (2d Cir. 1988) (unavailability due to the witness's imprisonment in a foreign country); United States v. Sindona, 636 F.2d 792, 803–04 (2d Cir. 1980) (unavailability because the witnesses were not subject to subpoenas and either had refused to come to the United States or lacked the necessary travel documents; the Government had offered to pay the witnesses' travel expenses). Other circuits have allowed Rule 15 depositions under similar circumstances.[4]

---

[4] See, e.g., United States v. Abu Ali, 528 F.3d 210, 240–42 (4th Cir. 2008) (affirming a district court's authorization of depositions when the witnesses could only testify in Saudi Arabia and the defendant could not attend because he was incarcerated in the United States, and finding that Rule 15 requirements were met because the Saudi witnesses testified under oath and the defendant was able to watch the deposition via two-way video link as defense counsel cross-examined him in person overseas). In Abu Ali, the Fourth Circuit noted that "district judges are sometimes challenged to make the best of unprecedented circumstances." Id. at 243.

6

The Second Circuit has also affirmed the denial of a deposition in certain instances.  See, e.g., United States v. Spencer, 362 F. App'x 163, 165 (2d Cir. 2010) (affirming the district court's determination that the witness's testimony was not material); United States v. Cohen, 260 F.3d 68, 78 (2d Cir. 2001) (same).

B.      CCTV

Courts have approved testimony via CCTV both for depositions, e.g., Abu Ali, 528 F.3d at 240 (with the defendant observing and participating in depositions by CCTV), as well as for trial proceedings, e.g. Craig, 497 U.S. at 860; Gigante, 166 F.3d at 82.

In some regards, CCTV provides more of the characteristics that the Supreme Court has deemed significant to the Confrontation Clause.  For instance, the demeanor of a witness is apparent for the trier of fact to see live.[5]

In 2002, the Supreme Court rejected a proposed revision to Rule 26 that would have allowed trial testimony via two-way videoconferencing.  United States v. Banki, No. 10 Cr. 08 (JFK), 2010 WL 1063453, at *1 (S.D.N.Y. Mar. 23, 2010).  Notably, however, the Supreme Court allowed the use of CCTV in Craig in 1990.  It has not abrogated or retreated from that ruling.

Various courts have evaluated the use of CCTV or similar procedures and its impact on a defendant's confrontation rights.  In Coy, the Supreme Court ruled that

---

[5] The Court has spent considerable time reviewing whether the case law speaks to physical courtroom as having a material bearing on a witness's demeanor.  The Supreme Court's statements in Lee, 476 U.S. 530, and the Fourth Circuit's statements in Abu Ali, 528 F.3d 210, are useful in this regard.  In the context of this motion, the Court raised with the parties the question of whether physical presence adds to the truth-finding function in some manner and invited both parties to bring forward an expert to provide any information deemed useful in that regard.  (ECF No. 266.) Both the Government and defendant declined.

7

allowing children witnesses to testify behind a screen, which enabled the witnesses to avoid viewing the defendant, violated the defendant's right to face-to-face confrontation. 487 U.S. at 1022. The Court noted, "It is always more difficult to tell a lie about a person 'to his face' than 'behind his back.'" Id. at 1019. It also noted the "profound effect upon a witness of standing in the presence of the person the witness accuses." Id. at 1020. However, the Court explicitly left "for another day" the question of whether any exceptions existed to its ruling. Id. at 1021. Two years later, in Craig, the Supreme Court revisited the issue and addressed the question of when such exceptions to its ruling in Coy might exist. In Craig, the Court affirmed the use of one-way CCTV in proceedings involving child victims based on the fact that the use was pursuant to statute based on public policy considerations by the Maryland legislature. 497 U.S. at 850.

In Gigante, the Second Circuit affirmed Judge Weinstein's determination following an evidentiary hearing that a witness could testify via live two-way CCTV. 166 F.3d at 79–80. There, the witness was ill, and the district court held an evidentiary hearing to determine whether he in fact was too sick to travel to New York and thus met the standard of "unavailable." Id. at 79–81. After hearing from several doctors, the court concluded that there was "clear and convincing proof[] that the witness could not appear in court." Id. at 80. Judge Weinstein based his determination that testimony could proceed via live CCTV on Federal Rules of Criminal Procedure 2 and 57(b) governing his "inherent power" and discretion to structure a criminal trial in a just manner. Id. at 80.

8

In reviewing and affirming the use of CCTV in Gigante, the Second Circuit stated that, in light of the procedures that the district court had followed, the defendant had "forfeited none of the constitutional protections of confrontation." Id. at 80. The court compared testimony via CCTV to depositions taken pursuant to Rule 15(a) in "exceptional circumstances." Id. at 81. The court noted that Judge Weinstein could certainly have allowed the witness to testify via Rule deposition, and that CCTV actually afforded the defendant "greater protection of [his] confrontation rights than would a deposition." Id.

Notably, the Second Circuit also made it clear that testimony via CCTV "should not be considered a commonplace substitute for in-court testimony by a witness." Id. The court referred to "intangible elements of the ordeal of testifying in a courtroom that are reduced or even eliminated by remote testimony." Id.

The holding of Gigante provides, "Upon a finding of exceptional circumstances . . . a trial court may allow a witness to testify via two-way closed-circuit television when this furthers the interests of justice." Id. For this Court, testimony via CCTV is allowed as a substitute for in-person trial testimony only when (1) the witness's testimony is material; (2) the Government has made good-faith and reasonable efforts to obtain the witness's presence and is unable to do so (that is, that the witness is "unavailable" within the meaning of the case law); and (3) allowing testimony by such means furthers the interests of justice.

II.   DISCUSSION

In connection with the Government's motion, the Court first inquires into the relevance and materiality of Badat's testimony. According to the Government, Badat would testify, <u>inter alia</u>, on the following subjects:

1. His travel in or about 1999 to Afghanistan, where he received military-type training at jihadist training camps, including camps affiliated with al Qaeda;

2. His association with al Qaeda from approximately 2000 through late 2001;

3. The existence of al Qaeda in Afghanistan during the period relevant to this case;

4. Al Qaeda's leadership structure and membership;

5. Locations in Afghanistan relevant to this case, such as training camps and guesthouses, and access to such places.

(Declaration of Ian McGinley ("McGinley Decl.") ¶ 9.)

The Government asserts that this testimony is probative and material to the charges against the defendant here. The Court agrees. Defendant is charged with conspiracies as well as the substantive crimes of providing support and resources to al Qaeda through the Bly, Oregon jihad training camp and facilitating violent jihad in Afghanistan. Thus, Badat's testimony regarding the structure and membership of al Qaeda and his knowledge of and participation in jihad training is plainly material and relevant to these charges. Because defendant is charged with

facilitating violent jihad in Afghanistan, testimony regarding training camps and guesthouses in Afghanistan is also material and relevant to these charges.

The Court then turns to whether Badat is unavailable.  The Court bases its determination on the facts regarding Badat's willingness and ability to attend the trial in person in the United States, as well as whether the Government has made reasonable and good-faith efforts to secure his attendance.  See Johnpoll, 739 F.2d at 709; Green, 399 U.S. at 189 n.22 (Harlan, J., concurring).  The Court finds that, based on the facts as they have been now developed, Badat is unavailable.

Badat is a citizen and resident of the United Kingdom.  (McGinley Decl. ¶ 3.) He was a co-conspirator of Richard Reid, the so-called "shoe bomber."  (Id. ¶ 9(b).) Like Reid, he wore sneakers containing explosives with the intent to detonate them while on a commercial airplane.  (Id.)  Reid boarded a plane and failed in his attempt; Badat backed out and did not board a plane.  (Id.)  In 2003, Badat was arrested and convicted in the U.K. of offenses relating to the plot; he ultimately signed a cooperation agreement with the British government.  (Id. ¶ 9(c).)  In 2004, Badat was indicted in the District of Massachusetts for his role in this conspiracy. (Id. ¶ 4.)  That indictment remains pending.  (Id.)  The Government asserts that Badat will be arrested if he travels to the U.S.  (Id.)

The Government has previously sought and obtained authorization to have Badat testify remotely in a prior trial and a prior sentencing.  See United States v. Ahmad, No. 04 Cr. 301 (JCH) (D. Conn. Mar. 17, 2014), ECF No. 125; United States v. Abu Ghayth, No. 98 Cr. 1023 (LAK), 2014 WL 144653, at *4 (S.D.N.Y. Jan. 25,

11

2014). In both instances, Badat asserted that he would not travel to the U.S. because he understood that, if he did so, he would be arrested.

In connection with its initial filings in support of the instant motion, the Government asserted that Badat had told them that was not willing to travel to the U.S. because of his same concern that he would be arrested. (McGinley Decl. ¶ 6.) The Government has offered to pay Badat's travel costs and a per diem. (Id.)

Defendant has argued strenuously that the Government is complicit in Badat's unavailability. In sum, defendant argues that the Government has long known of the relevance of Badat's testimony; the 3500 materials relating to this witness demonstrate the U.S. government's involvement in interviews and proffers reaching back a number of years. In addition, according to the defendant, the Government has tools at its disposal that it has not fully explored, including extradition, safe passage, and a bail package. Defendant argues that, if the Government truly wanted Badat to appear in person, it could have arranged for that to occur. According to the defendant, there is a serious question regarding whether the Government has acted in good faith and whether its efforts to obtain Badat's presence have been reasonable.

One of the primary concerns of the Confrontation Clause is the reliability of testimony. Lee, 476 U.S. at 540. On March 3, 2014, while this motion was pending, the Court ordered that the Government provide information supporting the reliability of Badat's proffered testimony. (ECF No. 256.) The Government produced several thousand pages of 3500 material demonstrating that Badat's

proffered testimony is consistent with statements that he has made in interviews over a number of years. Defendant has not disputed that Badat has the firsthand knowledge to provide the proffered testimony or suggested that such testimony would be fabricated or unreliable.

Rather than a lack of reliability, defendant's main contention is that, if the witness testifies remotely, defense counsel will be unable to use a common tool against a cooperator: probing the benefits that the witness may have obtained or been promised. Nothing, of course, prevents defense counsel from probing the cooperation agreement with the U.K. authorities and any related benefits that Badat may have received or may be receiving.

Among the 3500 materials that the Government produced is an undated document authored by the London Metropolitan Police. The document states that, as part of his cooperation agreement, Badat agreed to testify in the U.S. in various terrorist trials. At a hearing on this motion on March 21, 2014, the Government conceded that it had not placed that document—or the cooperation agreement itself, which the U.S. authorities apparently have read but do not have—in front of Badat or pressed him on the agreement he had made. (ECF No. 299.)

In light of this, the Court scheduled an evidentiary hearing regarding Badat's unavailability on April 4, 2014.[6] (ECF No. 279.) The Court placed Badat under oath and questioned him regarding whether he had in fact agreed to a cooperation

---

[6] In light of the Government's concession that it had not pressed Badat on his cooperation agreement and defendant's strong assertion that the Government was complicit in his unavailability, the Court took the unusual step of ordering the Government not to speak to Badat in advance of the April 7, 2014 hearing on the topic of unavailability. The Government moved for reconsideration of this order, and the Court denied that request. (ECF Nos. 280, 282.)

13

agreement that obligated him to come to the U.S. to testify, and whether, in light of that agreement, he would.  (ECF No. 297.)  The witness acknowledged that his agreement required testimony in the U.S., but stated that he preferred not to testify in the U.S.  (Id.)  The Court pressed Badat again, and he responded that he needed to speak to his counsel.  (Id.)  Following such consultation, on April 9, 2014 and pursuant to instructions of this Court, Badat informed the Court by letter of his final position.  (ECF No. 291.)  He stated that he would not come to the U.S. to testify because he would be arrested, and that he understood that the U.S. Government would not provide safe passage; Badat's counsel confirmed that he took this position.  (Id.)  The Court has also received a letter from the Government stating that it will not provide Badat with safe passage to the U.S.  (ECF No. 292.)

The Court turns next to the questions of whether the Government has made good-faith and reasonable efforts to obtain the witness's presence.

Based on this record, the Government's efforts to obtain Badat's presence are reasonable and in good faith.  The Court does have lingering questions as to why the Government seemed not to want to press Badat too directly or too hard to come to the U.S. to testify in light of his agreement.  The Court also finds it unfortunate that this issue arose so close to trial, when Badat has been in custody and known to be a possible witness for some years.

The Court cannot know when or why the Government made particular decisions to proceed or not proceed with certain possible courses of action.  For instance, it is possible that the Government decided that it was so clear that Badat

would not come that pressing him hard was wasted effort, or that the Government believes that Badat is so valuable a witness that maintaining him outside a U.S. jail is advantageous.  The Government may also understand that, if it were successful in extraditing Badat, he could end up in Massachusetts at a time and place not of their choosing, and he might be rendered unavailable for the ironic reason that the Government had tried to secure his presence here. These questions and possibilities do not amount to a lack of good faith.

The Government has said that it will not grant Badat safe passage.  That is a decision for the Government to make.  The Court will not second-guess that decision.  In any event, it is unclear whether the American public is better or worse off with an admitted would-be shoe bomber testifying from the U.K.  It would be reasonable for the public to have concerns if Badat, an admitted would-be shoe bomber, were physically present in the U.S.  Additionally, the Court notes that, as the Second Circuit has stated, making deals to obtain physical presence may have unintended consequences and ultimately "could have extensive harmful repercussions."  Johnpoll, 739 F.2d at 709.

Having reviewed the Gigante factors and considered the evidentiary record on this motion, the Court finds that the Government has established Badat's unavailability by a preponderance of the evidence through its good-faith and reasonable efforts to obtain the witness's presence.  The Government has also met the Gigante requirement of "exceptional circumstances."  166 F.3d at 81.

Finally, granting the Government's motion "furthers the interests of justice." <u>Id.</u>  It is important that the Government be able to present the material and relevant evidence in its search for truth.  The Government has characterized Badat's testimony as critical to its truth-seeking function.  This evidence therefore furthers the process of a fair trial and is therefore plainly in the interests of justice.

III.   CONCLUSION

For the reasons set forth above, the Government's motion to have Badat testify by CCTV is GRANTED.  The Government must confirm that Badat agrees to be bound by an oath that subjects him to the penalty of perjury in the United States.  The cameras shall be positioned such that the jury can see Badat's face at all times and such that Badat can see the faces of the jurors, defendant, and the questioner as he testifies, as he would in a courtroom.

The Clerk of the Court is directed to terminate the motion at ECF No. 238.

SO ORDERED.

Dated:      New York, New York
            April 12, 2014

_____
KATHERINE B. FORREST
United States District Judge