USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 04/15/2014

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------- X
                               :

UNITED STATES OF AMERICA         :
                               :
         -v-                     :           04 Cr. 356 (KBF)
                               :
MOSTAFA KAMEL MOSTAFA      :        OPINION & ORDER
      a/k/a "Abu Hamza al-Masri,"      :
                               :
              Defendant.     :
                               :
------------------------------------------------------------------- X

KATHERINE B. FORREST, District Judge:

        Defendant Mostafa Kamel Mostafa, a/k/a Abu Hamza al-Masri, a/k/a Abu

Hamza, is charged in an eleven-count Indictment with various crimes, including a

hostage-taking conspiracy, hostage taking, conspiring to provide material support to

terrorists and terrorist organizations, and providing such support, including

establishing a jihad training camp in Bly, Oregon and facilitating violent jihad in

Afghanistan. Opening statements are scheduled to occur on April 17, 2014.

        The Court assumes familiarity with the prior proceedings and factual

background of this matter as set forth in the Indictment and prior opinions of the

Court. (ECF Nos. 1, 199, 216, 305.) Before the Court are various objections by the

defendant to certain evidence that the Government intends to offer at trial. The

objections to proposed evidence are so extensive that certain rulings must be made

in advance of opening statements in order to allow the parties to appropriately

adjust trial strategy.[1] The Court held argument on the evidence to which the defendant has objected during two lengthy hearings on April 9 and 10, 2014. The Court also invited the parties to make any additional legal submissions supportive of their positions. (Hr'g Tr., Apr. 8, 2014; Hr'g Tr., Apr. 9, 2014.)

The proposed evidence at issue generally shares many of the same characteristics: they are audio- and videotapes, photographs, or documentary evidence that does not explicitly refer to the charged conduct; whether they implicitly do so, and whether that is even necessary, is discussed below. In general, the proposed evidence relates to potential acts of violence towards non-Muslims through training for or waging violent jihad and justifying jihad. Certain evidence also refers to the defendant's views regarding Osama bin Laden, the events of September 11, 2001, and the bombing of the U.S.S. Cole. The defendant argues that this evidence is not relevant to the offense conduct, and that it is inflammatory and unduly prejudicial.

## I.     APPLICABLE LEGAL PRINCIPLES

### A.     Relevant Evidence

Rule 401 defines relevant evidence as that which "has any tendency to make a fact more or less probable than it would be without the evidence," so long as "the fact is of consequence in determining the action." Fed. R. Evid. 401; see also Old Chief v. United States, 519 U.S. 172, 178 (1997). "The fact to which the evidence is

---

[1] As the Court stated to the parties during the two sessions together constituting the final pretrial conference, evidentiary rulings made in advance of trial are subject to change based on whether an appropriate foundation can in fact be laid for certain evidence, and the many variables that occur during the course of a trial that may impact a court's ruling at the time evidence is offered. Accordingly, these rulings are preliminary and subject to change based on developments at trial.

directed need not be in dispute." Id. at 650 (citing Fed. R. Evid. 701 advisory committee's note).

To be relevant, evidence need not constitute conclusive proof of a fact in issue, but only have "'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" McKoy v. North Carolina, 494 U.S. 433, 440 (1990) (quoting New Jersey v. T.L.O., 469 U.S. 325, 345 (1985)); see also United States v. Abu-Jihaad, 630 F.3d 102, 132 (2d Cir. 2010).

In Abu-Jihaad, the defendant was charged, inter alia, with having communicated national defense information to unauthorized persons and providing material support to terrorists. 630 F.3d at 108, 117. In 2001, the defendant used his position with the Navy to convey information regarding the position and movements of Navy ships destined for the Persian Gulf. Id. at 109. The authorities first discovered the leakage in December 2003, in connection with an individual connected to Azzam Publications, an organization that maintained websites that glorified martyrdom in the name of jihad and the violent exploits of the mujahideen. Id. An Azzam employee was linked to the creation of a document (the "Battlegroup Document") using information that the defendant had transmitted either directly or indirectly to Azzam. To prove that the defendant had transmitted the information in the Battlegroup Document (or the document itself), the Government relied on evidence showing the defendant's access to such information, his communications with Azzam expressing support for jihad, and a recorded statement in 2006

3

implicitly admitting to having disclosed national security information while in the Navy. Id. at 112. In recorded conversations between the defendant and a friend occurring in 2006—nearly five years after the alleged transmission of information to Azzam—the defendant made statements demonstrating familiarity with Azzam and its websites. Id. at 115.

The Second Circuit affirmed the district court's admission of the defendant's 2006 recorded statements regarding Azzam as relevant to the charged conduct occurring five years prior. Id. at 132. The Court stated that the recorded conversations demonstrated the defendant's familiarity with Azzam's websites and with Azzam as an organization sympathetic to jihad. Id. at 131. The Court also found that the defendant's statements confirmed the defendant's own communication with Azzam, specifically in an email discussing the bombing of the U.S.S. Cole in Yemen. Id. at 131. The Court found that, although these conversations did not specifically mention the Battlegroup Document and took place almost five years after the charged crime, "they were undoubtedly relevant to a jury's assessment of [the defendant's] guilt." Id. at 132.

The defendant's communications "were relevant because they linked him to the recipient [Azzam] of the Battlegroup Document" and made it more probable that he was the source of the unauthorized disclosure of the information. While the defendant disputed that the recorded conversation connected him to the charged crime by offering evidence that the Navy's transit plan information was more widely available than the Navy maintained, the Court determined that this evidence went

only to the weight and not the admissibility of the recorded conversations. Id. at 132; see also United States v. Schultz, 333 F.3d 393, 416 (2d Cir. 2003) ("[F]actors which make evidence less than conclusive affect only weight, not admissibility."). In addition, the Court found that the defendant's conversations in 2006, which displayed an obsession with secrecy, were relevant to his consciousness of guilt and to explaining why there was no evidence on the Azzam websites about the transmission of the Battlegroup Document. Abu-Jihaad, 630 F.3d at 132.

In United States v. Rahman, 189 F.3d 88, 118 (2d Cir. 1999), the Second Circuit affirmed the conviction of a Muslim cleric charged with, inter alia, seditious conspiracy, soliciting the murder of Egyptian President Hosni Mubarak, soliciting an attack on American military installations, and a bombing conspiracy. Id. at 103–04.[2] One object of the conspiracy was the bombing of the World Trade Center, which occurred in 1993. Id. at 107–08. The cleric, Rahman, had preached violent jihad; he had instructed his followers to "do jihad with the sword, with the cannon, with grenades, with the missile . . . against God's enemies." Id. at 104. His role in the conspiracy was allegedly overall supervision and direction of the membership. Id.[3] "According to his speeches and writings, Abdel Rahman perceives the United

---

[2] In opposition to the Government's citation of Rahman in support of the admissibility of evidence at issue here, defendant distinguishes the case on the basis that "the defendant in that case was charged with seditious conspiracy in which language itself is the offense." (ECF No. 301 at 1 (emphasis in original).) That is an incorrect statement of the conspiracy charged. A seditious conspiracy must conspire to use force—not just conspire to advocate the use of force. Rahman, 189 F.3d at 115.

[3] The Second Circuit affirmed the sufficiency of the evidence and stated, "While there is no evidence that Abdel Rahman personally participated in the performance of the conspiracy, when conspiracy is charged, the Government is not required to show that the defendant personally performed acts in its furtherance: it is sufficient for the defendant to join in the illegal agreement. The evidence showed

States as the primary oppressor of Muslims worldwide, active in assisting Israel to gain power in the Middle East, and largely under the control of the Jewish lobby." Id.

Rahman objected to the admissibility of his speeches, writings, and preachings that did not themselves constitute the crimes of solicitation or conspiracy. Id. at 117–18. The Second Circuit found that the district court had acted properly in admitting such materials, because they made motive for the crimes charged more probable. "The Government was free to demonstrate Abdel Rahman's resentment and hostility to the United States in order to show his motive for soliciting and procuring illegal attacks against the United States . . . ." Id. at 118.

In United States v. Stuckey, in an appeal from the defendant's conviction for murdering a would-be informant, the Sixth Circuit affirmed the district court's admission of rap lyrics discussing murdering a "snitch." 253 F. App'x 468, 482 (6th Cir. 2007). In finding relevance, the district court stated, "You can certainly not say when somebody writes about killing snitches, that it doesn't make the fact that they may have killed a snitch more probable." Id.; see also United States v. Foster, 939 F.2d 445, 455 (7th Cir. 1991) (affirming the district court's admission of a poem that used code words used in the drug trade as relevant to showing knowledge of those words as used in the drug trade).

---

that Abdel Rahman was in constant contact with other members of the conspiracy . . ., and that . . . he encouraged his co-conspirators to engage in violent acts against the United States." Id. at 124.

Rule 402 provides that all relevant evidence is admissible, except as otherwise provided by the Constitution, by Act of Congress, or by applicable rule. Fed. R. Evid. 402; see also United States v. Abel, 469 U.S. 45, 51 (1984). Rule 403 and the rules relating to the exclusion of hearsay are among the exceptions anticipated by Rule 402. See, e.g., Old Chief, 519 U.S. at 180.

B.     "Other Act" Evidence

"It is well established that evidence of uncharged criminal activity is not considered other crimes evidence under Fed. R. Evid. 404(b) if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial." United States v. Gonzalez, 110 F.3d 936, 942 (2d Cir. 1997) (alterations and internal quotation marks omitted); United States v. Kassir, No. 04 Cr. 356 (JFK), 2009 WL 976821, at *2 (S.D.N.Y. Apr. 9, 2009), aff'd, United States v. Mustafa, 406 F. App'x 526 (2d Cir. 2011). Such evidence is direct evidence of a crime. See Kassir, 2009 WL 976821, at *2. A Rule 404(b) analysis is, however, prudent where it is not manifestly clear that the evidence in question is proof of the charged crime. Id.

Rule 404(b) provides:

(1) Prohibited Uses. Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.
(2) Permitted Uses; Notice in a Criminal Case. This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. . . .

Fed. R. Evid. 404(b). The Supreme Court has stated, "Extrinsic acts evidence may

be critical to the establishment of the truth as to a disputed issue, especially when

that issue involves the actor's state of mind and the only means of ascertaining that

mental state is by drawing inferences from conduct." United States v. Huddleston,

485 U.S. 681, 686 (1988).

The Second Circuit evaluates 404(b) evidence under an inclusionary approach

that allows evidence for any purpose other than to show a defendant's criminal

propensity. United States v. McCallum, 584 F.3d 471, 475–76 (2d Cir. 2009)

(finding that the district court's admission of the defendant's prior drug convictions,

offered to show his intent to deal drugs and his knowledge of drug dealing, was

error because the district court had failed to conduct a Rule 403 analysis; the

Second Circuit stated, "evidence of prior convictions merits particularly searching,

conscientious scrutiny," because such evidence can lead to "generalized reasoning

about a defendant's criminal propensity"); United States v. Paulino, 445 F.3d 211,

221–23 (2d Cir. 2006); United States v. Garcia, 291 F.3d 127, 136, 138–39 (2d Cir.

2002) (finding the district court abused its discretion in admitting evidence of a 12-

year-old prior drug conviction whose only proffered similarity was that it involved

cocaine). Courts may therefore admit evidence of other acts by the defendant if the

evidence is relevant to an issue at trial other than the defendant's character and if

the risk of unfair prejudice does not substantially outweigh the probative value of

the evidence. United States v. Morrison, 153 F.3d 34, 57 (2d Cir. 1998); see also

Garcia, 291 F.3d at 136.

This inclusionary approach does not invite the Government "to offer, carte blanche, any prior acts of the defendant in the same category of crime." McCallum, 584 F.3d at 475 (quoting Garcia, 291 F.3d at 137).

In considering the admissibility of evidence pursuant to Rule 404(b), a court must consider the following:

- Is the evidence offered for a proper purpose—that is, does it go to something other than the defendant's character or general criminal propensity?

- Is the evidence relevant?

- Does the probative value of the evidence substantially outweigh the danger of unfair prejudice?

- Has the court administered an appropriate limiting instruction?

Garcia, 291 F.3d at 136.

Among the "proper purposes" for presenting evidence of extrinsic acts are knowledge and intent. See McCallum, 584 F.3d at 475; United States v. Teague, 93 F.3d 81, 84 (2d Cir. 1996); Hynes v. Coughlin, 79 F.3d 285, 290–93 (2d Cir. 1996) (acknowledging that knowledge and intent may be proper purposes, but reversing the district court decision, because intent was not an issue before the trial court); United States v. Caputo, 808 F.2d 963, 968 (2d Cir. 1987) ("Where intent to commit the crime charged is clearly at issue, evidence of prior similar acts may be introduced to prove that intent."). The Second Circuit has approved the use of such evidence where a defendant does not contest that he was present during the commission of a crime but denies that he himself engaged in any wrongdoing. United States v. Colon, 880 F.2d 650, 659–60 (2d Cir. 1989) (collecting cases); see

also United States v. Zackson, 12 F.3d 1178, 1182 (2d Cir. 1993) ("Where a defendant claims that his conduct has an innocent explanation, prior act evidence is generally admissible to prove that the defendant acted with the state of mind necessary to commit the offense charged.").

Another "legitimate purpose for presenting evidence of extrinsic acts is to explain how a criminal enterprise developed; this sort of proof furnishes admissible background information in a conspiracy case" and can assist the jury in understanding the relationship of trust between the coconspirators. United States v. Pipola, 83 F.3d 556, 566 (2d Cir. 1996); see also United States v. Rosa, 11 F.3d 315, 334 (2d Cir. 1993).

Completing the story of the crimes is also a legitimate use of prior act evidence. United States v. Williams, 585 F.3d 703, 707 (2d Cir. 2009) (citing United States v. Reifler, 446 F.3d 65, 91–92 (2d Cir. 2006)).

Once the Government has proffered a proper purpose for "other act" evidence, the Court must then determine whether the other act is in fact probative of the crimes charged. In this regard, the Government must identify the similarity or connection between the act at issue and an element of the crime charged. McCallum, 584 F.3d at 475; United States v. Brand, 467 F.3d 179, 197 (2d Cir. 2006); United States v. Pitre, 960 F.2d 1112, 1119 (2d Cir. 1992); Foster, 939 F.2d at 455. If the Government cannot identify some similarity or connection between the other acts and charged conduct, then evidence of such other acts cannot be probative of knowledge and intent. Garcia, 291 F.3d at 137–38; United States v.

Tubol, 191 F.3d at 96 (finding that the admission of a prior act was error where Government failed to show any similarity between a hoax bomb and an Israeli bomb).

The similarity or connection between the charged crime and the prior event goes to the question of relevance. To be relevant, the other act must be sufficiently similar to the conduct at issue to permit the jury reasonably to draw an inference from the act that the state of mind of the actor is as the proponent of the evidence asserts. United States v. Curley, 639 F.3d 50, 57 (2d Cir. 2011). The court abuses its discretion if the "chain of inferences" necessary to connect the "other act" evidence with the charged crime is "unduly long." Id. (affirming a conviction involving domestic abuse after finding that four prior acts of abuse were sufficiently similar to that charged that it was probative of intent to harass or intimidate); see also United States v. Peterson, 808 F.2d 969, 974 (2d Cir. 1987). While the duration of elapsed time between two events can detract from the probative value of the prior event, Garcia, 291 F.3d at 138, "temporal remoteness of . . . acts does not preclude their relevancy." Curley, 639 F.3d at 59. In Curley, although some of the "other act" evidence predated the charged conduct by as much as 15 years, "collectively they demonstrate[d] a pattern of activity that continued up to the time of the charged conduct." Id.

It is, however, improper to receive evidence ostensibly as probative of knowledge and intent when it is in reality "propensity evidence in sheep's clothing." McCallum, 584 F.3d at 477. The Government may not use Rule 404(b) to "parade

11

past the jury a litany of potentially prejudicial similar acts that have been established or connected to the defendant only by unsubstantiated innuendo." Huddleston, 485 U.S. at 689. Under Rule 404(b), similar act evidence is only admissible if it is relevant, and it is only relevant if the jury could reasonably conclude that the act occurred and that it is connected to the defendant. Id.[4]

### Temporal Proximity

In this case, much of the objected-to evidence is undated and may have occurred before (even well before) or up to several years after the period in which the charged conduct is alleged to have occurred. This is not a novel issue; other courts have confronted this question. See, e.g., United States v. Hassan, 742 F.3d 104, 135 (4th Cir. 2014); Curley, 639 F.3d at 59; Abu-Jihaad, 630 F.3d at 131–32. In a number of cases, the fact that "other act" evidence occurred well before a charged crime or even well after the crime did not defeat the required finding of similarity and connection. See Hassan, 742 F.3d at 135 (affirming the admission of a cell-phone video made two years after the defendant ceased having contact with a co-conspirator); Curley, 639 F.3d at 59 (subsequent acts may be admitted for state of mind when the subsequent act is so closely parallel to the charged conduct that it is probative, regardless of temporal difference); United States v. Farhane, 634 F.3d

---

[4] The fact that evidence may be in the form of speech does not require its exclusion pursuant the First Amendment. The First Amendment's protections are not absolute, and the Supreme Court has approved restrictions on the content of speech when, for instance, it incites violence or is speech integral to criminal conduct. United States v. Stevens, 559 U.S. 460, 468–69 (2010). Nor does the First Amendment prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent. Wisconsin v. Mitchell, 508 U.S. 476, 489 (1993); United States v. Hassan, 742 F.3d 104, 127 (4th Cir. 2014); United States v. Hashmi, No. 06 Cr. 442 (LAP), 2009 WL 4857608, at *2 (S.D.N.Y. Dec. 11, 2009). Supporting evidence of a crime may therefore include a defendant's speech. Hassan, 742 F.3d at 127; Rahman, 189 F.3d at 117–18.

127, 144 (2d Cir. 2011) (allowing testimony regarding a defendant's preaching jihad and support for Osama bin Laden in the late 1990s, a number of years prior to the charge that between 2003 and 2005 he conspired to provide material support to "the terrorist organization al Qaeda"); Abu-Jihaad, 630 F.3d 102 at 132 (the district court's admission of recorded conversations made four years after the charged conduct was not error); see also United States v. Rutkoske, 506 F.3d 170, 177 & n.3 (2d Cir. 2007); Howard Opera House Assocs. v. Urban Outfitters, Inc., 322 F.3d 125, 128–29 (2d Cir. 2003).

    C.    Rule 403

Rule 403 authorizes the exclusion of relevant evidence when its "probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403; see also Old Chief, 519 U.S. at 180. "[W]hat counts as the Rule 403 'probative value' of an item of evidence, as distinct from its Rule 401 'relevance,' may be calculated by comparing evidentiary alternatives." Old Chief, 519 U.S. at 184. "If an alternative were found to have substantially the same or greater probative value but a lower danger of unfair prejudice, sound judicial discretion would discount the value of the item first offered and exclude it if its discounted probative value were substantially outweighed by unfair prejudicial risk." Id. at 182–83 (explaining that this analytical method is preferred over one that weighs only probative value against

prejudice).[5] In making this assessment, a court should take into consideration the "offering party's need for evidentiary richness and narrative integrity in presenting a case." Id. at 183.

Rule 403 is concerned with "some adverse effect . . . beyond tending to prove the fact or issue that justified its admission into evidence." United States v. Gelzer, 50 F.3d 1133, 1139 (2d Cir. 1995) (quoting United States v. Figueroa, 618 F.2d 934, 943 (2d Cir. 1980)).

Several courts have found that "other act" evidence is not unfairly prejudicial where it is not "any more sensational or disturbing than the crimes" with which the defendant has been charged. United States v. Roldan-Zapata, 916 F.2d 795, 804 (2d Cir. 1990); see also Curley, 639 F.3d at 59 (finding that the district court did not err in finding that the probative value of prior acts of domestic violence with similar characteristics to the charged conduct outweighed the potential prejudicial effect when the prior acts were no more sensational than the charged conduct); Abu-Jihaad, 630 F.3d at 133 (finding that conversations referring to support of jihad were no more inflammatory than the charges in the indictment); United States v. Mercado, 573 F.3d 138, 142 (2d Cir. 2009) (upholding a Rule 403 determination where the challenged evidence was "not especially worse or shocking than the transactions charged" and where the district court instructed the jury as to what inferences could properly be drawn from such evidence); see also United States v.

---

[5] At the final pretrial conference, the Court questioned the Government regarding evidentiary alternatives. The Government has represented that it has already culled the proffered evidence from a much larger set and that there are no evidentiary alternatives without the same or greater prejudice issues.

Smith, 727 F.2d 214, 220 (2d Cir. 1984) (inquiring whether other crimes evidence involved "violence or conduct likely to arouse irrational passions").

In United States v. York, 933 F.2d 1343, 1346–47 (7th Cir. 1991), overruled on other grounds, Wilson v. Williams, 182 F.3d 562 (7th Cir. 1999), the defendant was charged with killing his partner in an explosion and collecting on her life insurance policy. The district court allowed evidence that his first wife had been murdered a number of years prior and he had also collected on her insurance policy; he had never been charged with that crime, but a number of facts supported an inference of his involvement. Id. at 1348–49. On appeal, the defendant argued that the admission of such evidence was irrelevant and unduly prejudicial. Id. at 1348. The Government maintained that the evidence was properly admitted under Rule 404(b), because it tended to show intent to defraud an insurance company by killing his partner. Id. at 1349.

The Seventh Circuit found that the evidence was relevant, went to the issues of plan and intent, and was prejudicial. Id. at 1349 ("There is little doubt that the [prior] murder evidence helped convince the jury of both propositions: that [the defendant] was someone predisposed to commit murder and that he was planning all along to kill [his partner] and collect on her insurance policy . . . .") (emphasis in original). The court noted, "Almost any bad act evidence simultaneously condemns by besmirching character and by showing one or more of 'motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident,'" and stated that "the strength of this forbidden inference is at least roughly

15

correlated to the infamy of the extrinsic act." Id. (emphasis in original). While the jury in York could have reasoned that the defendant was so evil as to murder his partner, the jury could also legitimately infer the defendant's intent to defraud. Id. at 1350. Because the evidence increased the probability that the defendant had committed the fraud charged, it was relevant. Id. at 1351. Thus, the Seventh Circuit affirmed the district court's admission of the evidence because it was not unduly prejudicial in light of the pending charges and because the district court limited the admission of extraneous details. Id. at 1352–53.

## II.  TAPED STATEMENTS[6]

The Government seeks to introduce a number of audio- or videotaped interviews, speeches, sermons, and/or commentary (together, the "Taped Statements"), made by the defendant at various points prior to his arrest and incarceration in 2004. Most of the Taped Statements are undated. Neither the Court nor the Government can be certain whether most were made prior to, during, or after the timeframe of the charged conduct.[7] In general, the Taped Statements discuss the defendant's views on waging jihad, acceptable conduct toward non-Muslims, justifications for violent and homicidal acts toward non-Muslims, bin Laden and the events of September 11, and the bombing of the U.S.S. Cole in Yemen. The Government argues that the Taped Statements are probative of the charged conduct either directly or as "other act" evidence offered to prove

---

[6] All of the Taped Statements are statements of the defendant and connected to the defendant. All are probative (save one) of his state of mind similar to that at issue in the charged conduct.

[7] Defendant would likely have general knowledge regarding the dates of these statements, but he bears no burden of proof and is under no obligation to provide such information proactively.

defendant's knowledge, intent, plan, and lack of mistake. (Hr'g Tr., Apr. 9, 2014.) The Government argues that this evidence tends to show that defendant was motivated by a jihadist agenda, shared the aims of al Qaeda, was knowledgeable regarding jihad training, knew that his conduct would benefit al Qaeda or members of that group, and did not mistakenly engage in the charged conduct. (Id.)

Defendant argues that the undated and non-contextualized Taped Statements are necessarily irrelevant to the charged conduct. (Id.) Even if the Taped Statements have some arguable probative value, defendant argues that they are inflammatory, will result in a jury making a decision based on emotion, invite a jury to speculate, and are unduly prejudicial.

The Court discusses each of the Taped Statements in turn below.[8]

GX 101: In this statement recorded on June 29, 2002, Mostafa was interviewed with respect to his views of Osama bin Laden. During the interview, he refers to bin Laden as a reformer, a victim of American policies, and a good-hearted person.

The defendant is accused of conspiracy to provide and providing material support and resources to al Qaeda, led by bin Laden. (Indict. ¶¶ 10, 18.) He is also accused of conspiring to supply goods and services to the Taliban, which was allegedly providing a safe haven for bin Laden and al Qaeda. (Id. ¶ 23.)

The defendant's 2002 statements supporting bin Laden are probative of his state of mind with respect to these charged crimes. That is, he knows who bin

---

[8] The Government provided the Court with digital copies of each of the Taped Statements. The Court has reviewed each of the statements proffered.

Laden is, supports bin Laden, and views him as a hero; the statement is therefore probative of the defendant's motive, knowledge, and intent. It is admissible as direct evidence of charged crimes. Rahman, 189 F.3d at 117–18. To the extent that Mostafa's statements, occurred after the period of the charged conduct, that concern goes to the weight of the evidence. Abu-Jihaad, 630 F.3d at 132; Schultz, 333 F.3d at 416. To the extent that the temporal discrepancy suggests that these statements cannot be direct evidence, they are nonetheless admissible as "other act" evidence pursuant to Rule 404(b).

As set forth above, Rule 404(b) requires that this Court find that the statement is relevant, that is, probative of the charged crimes. As discussed above, it is probative of his knowledge, motive, and intent with respect to bin Laden. It therefore increases the likelihood that he is guilty of certain of the charged conduct relating to bin Laden and/or al Qaeda. Curley, 639 F.3d at 59; Farhane, 634 F.3d at 144. In addition, the statement is offered for a purpose other than propensity—to wit, the defendant's state of mind: his knowledge, motive, and intent with respect to bin Laden and al Qaeda. The Court turns to Rule 403 and asks whether the statement's prejudicial effect outweighs its probative value. Defense counsel have argued that any mention of bin Laden is prejudicial and inflammatory. However, defendant is charged with crimes relating directly to supporting bin Laden and al Qaeda. The statements are therefore no more disturbing than the crimes charged. Curley, 639 F.3d at 59; Abu-Jihaad, 630 F.3d at 133; Mercado, 573 F.3d at 142 (upholding a Rule 403 determination where the challenged evidence was "not

especially worse or shocking than the transactions charged"); Roldan-Zapata, 916 F.2d at 804.

In addition, the Court notes that the defendant has informed the Court that he intends to testify and himself mention bin Laden. (ECF Nos. 252, 267.) Thus, this evidence is also useful to complete the story of the crimes charged. Williams, 585 F.3d at 707; Reifler, 446 F.3d at 91–92.

In sum, the evidence that the defendant knows of bin Laden and approves of him is highly probative of his state of mind with respect to charged conduct. While any mention of viewing bin Laden approvingly carries prejudicial impact, that impact is no worse than the charges in the Indictment and does not outweigh its probative value. (See, e.g., Indict. ¶¶ 10, 12, 18, 20.)

GX 101 is therefore admissible.

GX 102: This is an undated statement made, as with all the undated statements, prior to the defendant's incarceration in 2004. In it, the defendant states that Allah requires fighting, and that it is obligatory. He states further that, while all fighting is jihad, not all jihad is fighting; waging jihad can sometimes occur through stating the truth in front of the "tyrant leader." Mostafa continues that jihad training is therefore an obligation to prepare one for a role in fighting, and that one must learn not to be afraid of the unknown or of the sound of weapons. He also states that "sometimes you are allowed to lie to the kafirs" (infidels).

The defendant is accused of conspiring to provide and providing material support to a terrorist organization and terrorists by, inter alia, creating a jihad

training camp in Bly, Oregon and facilitating violent jihad in Afghanistan. (Indict. ¶¶ 5–20.)

The defendant's statements regarding the importance of violent jihad, the use of words as a method of waging jihad, and training for jihad are directly relevant to numerous counts of charged conduct. They are probative of the defendant's knowledge of jihad, motive to support jihad, absence of mistake in taking actions that might be construed as supporting jihad, and intent to support jihad. They are direct evidence of the crimes charged. Rahman, 189 F.3d at 117–18; see also Gonzalez, 110 F.3d at 942 (explaining that evidence is not "other act" evidence if it is "inextricably intertwined with the evidence regarding the charged offense"). The unknown timeframe of the statement does not eliminate its probative value, though it may go to weight. Farhane, 634 F.3d at 144 (finding that testimony regarding a defendant's preaching jihad and support for Osama bin Laden a number of years prior to the charged conduct was sufficient to support his conviction); Abu-Jihaad, 630 F.3d at 132 (finding that the admission of recorded conversations made four years after the charged conduct was not error); Schultz, 333 F.3d at 416.

If analyzed as "other act" evidence under Rule 404(b), the result is no different. As set forth above, the statement is probative of the defendant's state of mind with respect to charged conduct, and offering it for that purpose is proper. Because he is accused of supporting and furthering violent jihad, the evidence that he spoke in support of that very conduct, even if earlier or later, is, in fact, highly probative.

With regard to a Rule 403 analysis, the statement's potentially prejudicial impact does not outweigh its high probative value. While it is prejudicial that the defendant has stated that he supports violent jihad, this is similar to, and no more prejudicial than, the crimes with which he has been charged. Curley, 639 F.3d at 59; Abu-Jihaad, 630 F.3d at 133. (See, e.g., Indict. ¶¶ 7, 11, 15, 26.)

GX 102 is therefore admissible.

GX 103: In this statement, similar to GX 101, the defendant voices his support for bin Laden and discusses why bin Laden must give "Bayat" (allegiance) to the Taliban. This statement is different from GX 101 in that, in this statement, Mostafa directly connects bin Laden to the Taliban and to Afghanistan.

Using the analysis set forth above with respect to GX 101, GX 103 is admissible. In addition to the charged conduct referred to in connection with GX 101, Count Eleven also involves providing support to the Taliban. This is an additional basis for establishing relevance. (Indict. ¶¶ 21–26.)

GX 104: In this undated statement, the defendant states that a Kafir (a non-Muslim) is "booty" and that it is acceptable to sell him in the market—that "[t]his is what Islam says." He also states that it is also "okay" to kill a Kafir.

The defendant is charged with conspiracy to take hostages and hostage taking in Yemen. (Indict. ¶¶ 1–4.) During the kidnapping, four of the hostages were killed, and several others were wounded. Mostafa is also charged with conspiring to kill, kidnap, maim, and injure persons in a foreign country. (Id. ¶¶ 6,

8, 14, 16.) Additional counts charge supporting violent jihad in Afghanistan and supporting a training camp for such purposes. (Id. ¶¶ 13–20.)

Plainly, the defendant's own admission that it is "okay" to sell and to kill infidels is relevant to whether he intended to do so and was motivated to do so; intended to support the training of those who would do so; had knowledge of training in jihad; and was motivated to support jihad. The statement is directly relevant to charged conduct. Rahman, 189 F.3d at 117–18; Gonzalez, 110 F.3d at 942. It remains probative despite the unknown date of its creation, because the fact that the defendant stated such views prior to or following the conduct certainly is probative of whether he would engage in such conduct. See, e.g., Hassan, 742 F.3d at 135; Curley, 639 F.3d at 59; Farhane, 634 F.3d at 144; Abu-Jihaad, 630 F.3d at 131–32.

If analyzed under Rule 404(b) as "other act" evidence, the statement is relevant to the defendant's state of mind and provides a proper purpose.

This statement also passes muster under Rule 403. It is highly probative of the defendant's willingness to use kidnapping or other violent means to further a jihadist agenda. Rule 403 is concerned with some adverse effect beyond tending to prove that the act or issue that justified its admission. Gelzer, 50 F.3d at 1139. The statement is no doubt prejudicial. However, all evidence is by definition prejudicial; the question is whether that prejudice outweighs its value. See Mercado, 573 F.3d at 142; York, 933 F.2d at 1349. Here, the defendant is charged with precisely the type of conduct described in this—his own—statement. His statement is no more

prejudicial than that with which he has already been charged.  See Abu-Jihaad, 630 F.3d at 133; Mercado, 573 F.3d at 142.

GX 104 is therefore admissible.

GX 105: This is an undated interview of the defendant by a British news service.  There are video images paired with the voice.  While the words that the defendant utters are certainly his, there is no indication that he had any input into the selection or matching of the video with his words.  In the absence of some connection between the defendant and the images, they are not probative of the conduct with which he is charged.  Accordingly, the Court excludes the video images involving individuals or events other than the defendant or the individual conducting the interview.

The audio portion of the statements consists of the defendant's own words.  He defines a "terrorist" as an "Islamist" under "oppression from their own government," and states that terrorism "is a reaction for oppression."  He also states that military and jihad training are for Muslims to defend themselves and their principles.

As set forth above, the Indictment charges the defendant with various conspiracies and actions to provide material support to terrorists and terrorist organizations and to support the Taliban.

The defendant generally objects to the relevancy of this evidence, but also specifically argues that references during the interview to past events in Bosnia and events "right now" in Kosovo indicate that it was created outside the period of the

charged conduct. The Court accepts that, given the timeframe referenced internally in the statement and given that the Kosovo War occurred in 1998 to 1999, the defendant must have made this statement several years prior to the charged conduct. While that fact is not fatal to its admission as direct evidence, Rahman, 189 F.3d at 117–18; Kassir, 2009 WL 976821, at *2, the Court finds it prudent to also analyze the statement under Rule 404(b). The Court therefore analyzes this statement as "other act" evidence.

The defendant's own statements justifying terrorism are relevant to his state of mind with respect to terrorism and actions taken by those who may be deemed terrorists. In light of the conduct with which he has been charged, the statements are probative of, <u>inter alia</u>, motive, knowledge, intent, and lack of mistake. That is sufficient to establish relevance and to ensure that they are offered for a proper purpose. The Court turns to a Rule 403 analysis.

Expressing clear and unequivocal support for terrorism is no doubt prejudicial. However, the defendant is charged with just those sorts of crimes. As set forth above, the law supports admissibility when the inflammatory nature of the "other act" is no more prejudicial than the crime charged. <u>See, e.g., Abu-Jihaad</u>, 573 F.3d at 142; <u>Mercado</u>, 573 F.3d at 142. In terms of balancing, the Court notes that, here and with respect to the other Taped Statements, there appears to be no evidentiary alternative that makes the same point but is less prejudicial. <u>Old Chief</u>, 519 U.S. at 184. This statement is highly probative of the complex state of mind of an individual who believes that terrorism is acceptable and who is being prosecuted

for crimes relating, <u>inter alia</u>, to conspiring to provide support and providing support for terrorists and a terrorist organization. The high degree of relevance of this statement outweighs its prejudicial effect.

GX 105 is therefore admissible.

<u>GX 106</u>: This undated statement discusses jihad training and contains an internal reference to Chechnya, suggesting that it dates back to the First Chechen War in approximately 1994–1996 and the Second Chechen War that began in 1999. The statement consists of a video image of the defendant speaking over images of training exercises; the defendant's words demonstrate his familiarity with what is occurring in the videos. The defendant supports Muslim brothers receiving appropriate training before embarking on jihad or providing financial support to a "Mujahid" (fighter). During part of the video, a weapon is fired and a plane is blown up. Various statements of the defendant approving of the act, including, "In the name of Allah, God is great, he destroyed one of the first airplane" (<u>sic</u>), accompany the video.

As discussed above, despite its timeframe, the statement may be admitted as directly relevant to charged conduct and probative of defendant's motivations with regard thereto. <u>Rahman</u>, 189 F.3d at 117–18. However, prudence dictates a Rule 404(b) analysis. <u>Kassir</u>, 2009 WL 976821, at *2.

As set forth in connection with GXs 102, 104, and 105, jihad training is relevant to various counts in the Indictment. In addition, in Count Eleven, the defendant is accused of providing funds to be used in support of the Taliban, and

here there is a discussion of raising funds to support a "Mujahid"; in Count Seven, he is accused of having conspired to raise money to send an individual to Afghanistan to a jihad training camp.

Statements showing the defendant's knowledge of jihad training and providing a motive for supporting jihad training are probative of the defendant's state of mind, and increase the probability that he engaged in the crimes with which he is charged. They are therefore relevant. The statements are also offered for Mostafa's state of mind and therefore for a proper purpose. The Court's Rule 403 analysis is similar to that with respect to GXs 102, 104, and 105; the evidence is more probative than prejudicial. However, GX 106 is different from and additive to GX 102 and other statements referring to jihad and training, because it refers to raising money for those purposes. As described above, the fact that defendant may have issued the statement well before the charged conduct is not fatal to admissibility, but may go to its weight. See, e.g., Hassan, 742 F.3d at 135; Curley, 639 F.3d at 59; Farhane, 634 F.3d at 144; Abu-Jihaad, 630 F.3d at 131–32.

GX 106 is therefore admissible.

GX 107: This is an undated video with an audio overlay entitled "The Importance of Training." The video states that it is created by the "Supporters of Shariah" ("S.O.S."), an organization with which, the Government has proffered it will be able to demonstrate, the defendant was affiliated. This statement generally refers to jihad training. However, it contains extreme language, such as "these dirty Jews, Christians, most of them homosexual persons" whom the Muslims have

26

been taught to watch and keep quiet; the defendant also admonishes parents to send their children to be trained in jihad so that they can be sent to the "front lines." He also states, "You can't live without the gun these days," and that "we also want financial help for the front lines."

The Court has set forth above the crimes with which the defendant has been charged that relate to jihad training and raising money to facilitate jihad. In addition, the Court notes that Count Three alleges that the defendant took the overt act of stockpiling weapons. (Indict. ¶ 7.) No other offered statement refers in the same manner (approvingly and in the jihad context) to firearms.

For the reasons already discussed above, this evidence is relevant whether analyzed as direct evidence or whether analyzed as "other act" evidence. It is offered for the proper purpose of showing the defendant's state of mind.

The Government has also argued that, because battling non-Muslims is part of the object of al Qaeda, the defendant's statement supporting battling non-Muslims increases the probability that he knew the goals of al Qaeda and supported them. The Court does not find that this particular argument supports admission of this statement. The statement does not refer to al Qaeda in particular, although it refers to jihad repeatedly. Nevertheless, it is sufficiently probative of other aspects of the charged conduct to be relevant. For example, the statement indicates that the defendant believed in a Muslim agenda in which Jews, Christians, and homosexuals are Kafirs. Whether that agenda is equivalent to al Qaeda's agenda is a connection not made in this video. (Of course, a piece of evidence does not need to

prove the entirety of any given issue.) In any event, the statement is probative of the defendant's state of mind with respect to his view of a jihadist agenda and appropriate actions.

In terms of Rule 403, the Court's analyses above regarding other statements about jihad training (see, e.g., GXs 102, 104, 105, 106, and 107) are applicable here. The Court has considered whether the specific language relating to "Jews, Christians and homosexuals" is necessary, whether it should be excised, and whether its probative value outweighs its obvious prejudicial effect. The language's value does outweigh its prejudicial effect. First, it is not more disturbing than the crimes charged. Roldan-Zapata, 916 F.2d at 804. In addition, the statement uses these words as a partial explanation for what follows—stating that Christians, Jews, and homosexuals surround Muslims and that therefore "we" need "your" support, and requesting that the listeners join the "Mujahidin" with both words and money. As a result, these references provide context for what follows; they complete the story. Accordingly, the Court does not find that the prejudicial effect of these references outweighs the probative value in keeping them in.

GX 107 is therefore admissible.

GX 109: This undated statement also refers at the outset to its being a "production" of S.O.S. This statement preaches jihad as an obligation; it urges listeners to "prepare for the enemies of Islam." For substantially those reasons (including the Rule 403 analysis) set forth with respect to GXs 102, 104, 105, and

28

106, it is admissible either as direct or "other act" evidence. GX 109 is therefore admissible.

GX 110: This undated statement discusses allegiance given by bin Laden and states that bin Laden is an example to all mujihadeen. Mostafa refers approvingly to bin Laden's use of his personal resources in support of the Taliban. For substantially the reasons set forth above in other statements referring to bin Laden (GXs 101 and 103) and in support of the Taliban (GXs 105 and 106), this statement is admissible. GX 110 is therefore admissible.

GX 111: In this undated statement, the defendant urges others to "train your children" and states that "the victorious party people are the people of the front lines. And they need support." Mostafa also states that, "if you guard, you have guarded all Muslims . . . . If you fight, you are paying charity for all Muslims and for all generations to come." For substantially the same reasons as those set forth above with respect to jihad training and fighting (GXs 102 and 104–107), this statement is admissible as either direct or "other act" evidence. GX 111 is therefore admissible.

GX 112: This undated statement is entitled "Never Feel Sorry for Wicked America." In it, the defendant states, inter alia, that "war is war. And those, they're evil, cannot be stopped except by killing them, let it be it." The statement generally discusses Muslims fighting infidels "until the whole earth is ruled by Allah." The defendant argues, "And yet some hypocrites are saying don't even fight them to retaliate for yourself. Is that logic? Is that Islamic?"

As set forth above, waging jihad is relevant to a number of the charged crimes. This statement is probative of state of mind—to wit, defendant's motive, knowledge, and intent. While it is undated, it is relevant as direct or "other act" evidence. Rahman, 189 F.3d at 117–18; see also Farhane, 634 F.3d at 144; Abu-Jihaad, 630 F.3d at 132. In terms of a Rule 404(b) analysis, because this statement is offered to demonstrate the defendant's state of mind, it is offered for a proper purpose.

The Court's Rule 403 analysis with respect to this document is similar to that with respect to the other "jihad training" statements (GXs 102 and 104–107). The statement's clear statement of view as to the need and appropriateness of waging jihad provides strong evidence of motive to do the very acts he is charged with doing. Its language, while prejudicial, is not more inflammatory than the charged conduct, Curley, 639 F.3d at 59; Roldan-Zapata, 916 F.3d at 804, and that prejudice does not outweigh the statement's probative value.

GX 112 is therefore admissible.

GX 113: This undated statement is an interview with the defendant by a British television service. The defendant is asked whether he approved of the attack on the U.S.S. Cole in Yemen, and responds, "Of course. I agree with it." When asked why, he states that it is a justified response to an act of occupation and humiliation. He also refers to his "boys" being imprisoned in Yemen. He states that "it is okay to kill" people acting against the Muslim holy war "by slitting their throats, or by shooting them. Any way which deterred them or others like them to

do such a thing; this is an Islamic thing . . . [T]his is an Islamic principle." Later in the interview, Mostafa states that he approves of using airplanes to kill and states, "Everybody was happy when the planes hit the World Trade Center. Anybody who tell [sic] you he was not happy, they are hypocrites, for the Muslim Nation." He then justifies targeting the World Trade Center based on the evils of globalization and "making other countries poor."

This statement fundamentally justifies fighting and terrorist acts in the name of furthering a political agenda. This is plainly relevant to the defendant's motive to engage in conduct associated with the acts with which he is charged, his intent, and an absence of mistake. All of the charges in the Indictment relate in one way or another to the defendant's support of a political agenda, and this statement most clearly describes that agenda.

This statement is thus relevant as direct or "other act" evidence. Abu-Jihaad, 630 F.3d at 132; Rahman, 189 F.3d at 117–18; see also Farhane, 634 F.3d at 144. If analyzed under Rule 404(b), offering the statement offered to demonstrate the defendant's state of mind demonstrates a proper purpose. The Rule 403 analysis is more complicated.

This statement touches on very sensitive issues for Americans: the bombing of the U.S.S. Cole and the events of September 11, 2001. To most Americans, these were unjustified and unjustifiable acts of aggression. Yet in this statement, defendant forthrightly approves of these acts and provides his view as to a

justification. It is difficult to understand how a juror listening to such statements could do so without having his or her emotions stirred.

On the other hand, jurors in criminal trials are asked to listen to justifications for all sorts of conduct that they cannot understand and do not condone; yet they are instructed at the conclusion of the trial to determine whether, element by element, the prosecution has met its burden of proof. They are presumed to follow such instructions. Francis v. Franklin, 471 U.S. 307, 324 n.9 (1985). The question here is whether the nature of the evidence is so extreme that a juror would vote in favor of conviction based on emotion rather than dispassionate evaluation of the elements of the crime charged. The defendant here is not charged with being part of the events of September 11 or the bombing of the U.S.S. Cole.

The Government has represented that it has parsed through the literally thousands of the defendant's recorded audio- and videotaped statements; those listed as Government Exhibits are but a tiny fraction. Of the relatively modest number of statements which the Government seeks to introduce is this one. The Court asked the Government what this statement added. The Government argues that it demonstrates familiarity with and support of the political agenda, motivations, and beliefs of al Qaeda. The Court agrees. In this regard, these statements refer to what are, to Americans, the most public of all of al Qaeda's acts against America and its people. The references are not, therefore, gratuitous. They are defendant's own words supporting the agenda of a terrorist and terrorist organization directly at issue in the charged conduct. The references provide direct

and clear evidence of the defendant's state of mind as to al Qaeda and its agenda. In addition, in this statement, Mostafa clearly states his view as to possible motives for acts of terrorism, which are relevant to his motives for the charged conduct here (e.g., globalization and making other countries poor).

This statement is prejudicial. However, as to this defendant, in the context of the actions of which he is accused in this case, including the people whom he is charged with having supported and how, it is not underlined prejudicial. Curley, 639 F.3d at 59; Abu-Jihaad, 630 F.3d at 133.

It bears noting that the defendant himself stated in two separate letters to the Court his intent to testify and to mention the events of September 11 in that testimony. (ECF Nos. 252, 267.) As a result, his references to September 11 are also part of his own offer of evidence at trial.

For these reasons, and after careful consideration, the Court will allow GX 113. GX 113 is therefore admissible.

GX 114: This undated statement is entitled "The Believers vs. the Kufr of America." In it, the defendant states, "Terrorism is a tool for everybody to get his way. And it has also been a tool for Islam. . . [I]t's a weapon. . . [W]hen Allah gives you a weapon to win, and you throw it away, don't cry much when you are slaughtered."

For substantially the same reasons as set forth above with respect to GX 105, this statement supporting acts of terrorism is relevant. The statement, while undated, is probative of the defendant's state of mind and increases the likelihood

that he committed the acts with which he is charged. His support of terrorism is probative of his knowledge, his motive, his intent, and lack of mistake. The statement is relevant both as direct and "other act" evidence. Offering the statement as probative of the defendant's state of mind demonstrates a proper purpose.

The Court's Rule 403 analysis here is similar to that with regard to GXs 105, 112, and 113. For the same reasons, it is not unfairly prejudicial. However, the Court also considers whether the cumulative nature of this statement tips the balance toward preclusion under Rule 403. The statement is short—shorter than almost all the others. It is also a particularly clear statement of a point of view regarding terrorism as a God-given tool and weapon. No other statement makes this connection, suggestive of a cleric's motive. In addition, it suggests an acknowledgement that terrorism has, in fact, been used. This statement is different from the others that refer to terrorism in general. The Court therefore finds that it is not unnecessarily cumulative.

GX 114 is therefore admissible.

GX 116: In this undated statement entitled "Victory of Usama Bin Laden," the defendant states that the Americans waged a war and bin Laden gave them war; bin Laden said, "Here it comes," and "everybody on the planet heard this."

This statement is generally relevant to the defendant's support for al Qaeda and its political agenda. It is also among several statements that the Government proposes to offer with respect to bin Laden. (See, e.g., GXs 101, 103, 110.) This

statement is different from the others, however. This statement goes beyond merely stating support for bin Laden, but also announces that bin Laden has himself declared war on America. This is the clearest statement of actions by bin Laden and al Qaeda suggestive of the defendant's motive, knowledge, and intent to perform acts related to conspiring to provide support, supporting terrorists and terrorist organizations for the purpose of killing Americans, and supporting the Taliban.

The Court's Rule 403 analysis is similar to that with regard to the other bin Laden-related statements. The Court has also analyzed whether the statement is cumulative; because this statement has important additional scope, and (similar to GX 114) is short, the Court will allow its admission.

GX 117 is therefore admissible.

GX 119: Defense counsel has represented that this statement likely dates back to 1995 or earlier; that places its origin several years prior to the charged conduct. The portion shown is described as a production by S.O.S. In the statement, the defendant argues that suicide bombing is wrongly named, and that it is a legitimate form of sacrifice. Mostafa also prays that God will be against the Jews, Christians, Communists, and Shiites.

The Court analyzes this document as direct and "other act" evidence. It is relevant to the defendant's state of mind with regard to his support of the terrorists and terrorist organizations—his knowledge of, and motivation to use, various

violent means, including suicide bombing, to further a political agenda. <u>Farhane</u>, 634 F.3d at 144; <u>Rahman</u>, 189 F.3d at 117–18.

However, the statement's particular focus on suicide bombing is further afield from the charges in the Indictment than the other statements discussed above. Moreover, under a Rule 403 analysis, the Court must weigh its probative value against the highly prejudicial impact of suicide bombing as a focus of the statement. It is important to the Court's consideration that it is currently unaware of any allegation connected to charged conduct that makes the use of suicide bombing probative. Suicide bombing also conjures frightening images. On balance, the lower probative value of this statement as compared to other statements, combined with its prejudicial impact of associating the defendant with suicide bombing, suggests exclusion.

On this record, GX 119 will not be admitted.

<u>GX 122</u>: This statement appears to be dated (on the tape itself) October 20, 2002. In it, the defendant argues that Muslims need to fight and to resist, and states that the people need to be trained. He discusses the thoughts and emotions that a person would feel if he fought without training; his manner of delivery is suggestive of firsthand experience with fighting. He discusses support, or lack thereof, for al Qaeda. He also refers to the attack on the U.S.S. Cole and choosing targets that accompany a message.

As stated repeatedly above, jihad training and support for al Qaeda are topics at issue in the charged conduct. However, this statement also suggests firsthand

experience by the defendant as well as a more general discussion of choosing targets to fit a message. This statement is therefore not merely cumulative of other statements referencing jihad training or al Qaeda.

The statement provides direct or "other act" evidence of the defendant's knowledge, plan, intent, and motive. Abu-Jihaad, 630 F.3d at 132; Rahman, 189 F.3d at 117–18. If it is analyzed as "other act" evidence, offering it as probative of state of mind is a proper purpose. The Court's Rule 403 analysis supports the statement's admission. While he does refer to the attack on the U.S.S. Cole, that is not a gratuitous reference, but contextualizes his references to choosing targets; that statement is inextricably intertwined with other evidence probative of plan, motive, and intent. See Gonzalez, 110 F.3d at 942. The statement is not more inflammatory than the charges of which the defendant stands accused. Curley, 639 F.3d at 59; York, 933 F.2d at 1346–47. The statement's prejudicial effect does not outweigh its probative value.

GX 122 is therefore admissible.

GX 126: In this undated interview, the defendant describes three stages of jihad and defeating the Kafirs. He states, "Destruction is the destruction of the new purpose." He then describes someone who "fought courage, many battles, bleeding them from sides, their sides, their heads, their economy, everything, until they surrender." The defendant then states, "This is now. We ask Muslims to do that. To be capable to do that. To be capable to bleed the enemies of Allah. Anywhere by any means." In addition, he states that, while the jihadists are called terrorists

now, they will be respected later. He states that there is "no security for the Kafirs anymore." Mostafa continues, "If you fear them, you should fear Allah more. . . . It's a bloody way, I told you. It's not easy." He states, "We have reached a point that brothers are convinced that Jihad is the only way to establish the Khilafa" (a caliphate or an Islamic community ruled by the Shariah). The defendant continues, "The first thing to do it, is, number one—to be trained. . . Number two, to monitor the targets . . . . You will not hear these things again. So you must understand it. . . . Whether you work alone. You work with a group. Or you work with your own family. Work has to be done." Toward the end of the clip, Mostafa states, "The places which upset the enemies of Allah. Tease them, fear, make them afraid."

This statement refers to the defendant's views—his state of mind—regarding the need and justification for violent jihad, appropriate targets of jihad, his approval of those who may be called terrorists, and the means which may be used. This statement is probative of Mostafa's knowledge, motive, intent, plan, and lack of mistake with respect to training for and conducting violent jihad. The Indictment clearly charges the defendant with various crimes relating to conspiring to provide and providing material resources and support for violent jihad. The statement is relevant as direct and "other act" evidence. Farhane, 634 F.3d at 144; Abu-Jihaad, 630 F.3d at 132; Rahman, 189 F.3d at 117–18.

Because the statement is undated, as with other undated statements, the Court considers whether that fact diminishes its probity to a point where its prejudicial effect outweighs the diminished probity. It does not. See, e.g., Abu-

Jihaad, 630 F.3d at 132; Schultz, 333 F.3d at 416. It is certainly true that the statement would be more probative if it had been made during the period of the charged conduct rather than well before or after. However, the statement is probative even if made at times other than the period in question. See, e.g., Hassan, 742 F.3d at 135; Curley, 639 F.3d at 59; Farhane, 634 F.3d at 144; Abu-Jihaad, 630 F.3d at 131–32; Rahman, 189 F.3d at 118. Because the statement goes to the defendant's state of mind, it is relevant and, even if offered as "other act" evidence, it is offered for a proper purpose.

The Court then turns to Rule 403. There is no doubt that the defendant's words in this interview are strong and prejudicial. However, they are no more prejudicial than the acts with which he is charged, involving a conspiracy to provide support to the very types of activities about which he speaks here. Curley, 639 F.3d at 59; Abu-Jihaad, 630 F.3d at 133; Roldan-Zapata, 916 F.2d at 804.

The statement does refer to subject matter included in other statements discussed; the Court has therefore examined whether it is unnecessarily cumulative and should be excluded as such. It is not. While the statement does discuss similar topics, it does so with new reference to targets, making the Kafir afraid, and using "any means" to "bleed the enemies of Allah." These new statements are not found elsewhere and are probative of the defendant's knowledge, intent, plan and motive potentially to use or conspire with others to use a wide array of means to achieve his jihadist agenda.

Accordingly, while this statement is prejudicial, it is highly probative despite its temporal ambiguity; its prejudicial effect does not outweigh that probity.

GX 126 is therefore admissible.

<u>GX 127</u>: In this undated statement, the defendant provides a philosophical view of the difference between a Muslim and Kaffir. The "bottom line for a Muslim" is that his blood, money, and honor are preserved. However, a Kaffir's blood, money, and honor are "Hallal" (defined as any object or action that is permissible to use or engage in, according to Islamic law). Mostafa states that, because Kaffir blood is Hallal, a Kaffir can be killed and his money can be taken.

This short statement repeats prior versions of the defendant's statements that Kaffir can be killed. While it is worded differently from other versions of this statement, it makes the same points and no additional ones. While the statement is relevant and offered for a proper purpose, it is unnecessarily cumulative. Unless the Government can proffer a specific reason why this is not cumulative, or, if it is cumulative, why it nonetheless serves a valid purpose, it shall not be admitted. The Court notes that it is possible that this, along with other evidence, may collectively demonstrate a pattern of activity, and therefore that, even if cumulative, it may not be unnecessarily so, <u>Curley</u>, 639 F.3d at 59; that is an argument for the Government to make. The Court will await further argument, if any, by the Government.

On the current record, GX 127 will not be admitted.

GX 128: This undated statement indicates that it is a production of S.O.S. In it, the defendant again discusses the obligation of Muslims to wage jihad, and states that, if they fail to fight, "Allah will torture you severely." The defendant then states that Jews and Christians deserve the anger of Allah because they are misguided; both Jews and Christians are Kaffirs, but Jews are worse. Mostafa continues, "What about Jews? The most apparent thing is that they deserve the anger of Allah. And you can see everybody wants to kill them. Hitler wants to kill them. The dogs run after them. Everything. They are killing each other, they grasping each other [sic]. Every one wants to swear, somebody says: 'you are a Jew.'"

This statement reprises two themes that appear in other statements: the obligation to wage violent jihad (though here, the defendant adds that failure to do so can result in torture), and Christians and Jews as Kaffirs and deserving targets.

The statement is relevant to the defendant's motive and intent regarding violent jihad. It justifies such actions and is probative of his knowledge and lack of mistake as to the aims of jihad. The statement is therefore direct evidence or relevant "other act" evidence of the charged crimes. Farhane, 634 F.3d at 144; Rahman, 189 F.3d at 117–18.

The question for this Court is whether this statement is so inflammatory that it tips the balance on a Rule 403 analysis. The Court also analyzes whether the statement is unnecessarily cumulative.

The language and sentiments expressed in this statement are certainly prejudicial. It is one of a number of the defendant's statements regarding his views on infidels and justifications for killing them. It is unnecessarily cumulative (unless the Government proffers a reason why it is not). Less prejudicial statements make the same points. While it is true that this particular statement makes these points using different words than in the other statements, certain of those references are even more inflammatory here than elsewhere. The Court does not perceive additional inferences that a juror can properly draw from this statement not already contained in other statements that the Court has found admissible.

On the current record, GX 128 will not be admitted.

GX 129: This undated statement also indicates that is a production of S.O.S. The defendant apparently refers to a possible raid of a home by law enforcement, and states that freedom of speech is not for "us" but only for gays and lesbians; he also refers to many websites that exist but are ineffective. He states that none of them are as useful as "a person with a Kalashnikov" standing on a mountain and stating, "You are not allowed to pass here. Go home."

This statement's reference to violent acts makes it probative of whether the defendant had the state of mind to engage in the charged conduct. However, the statement is only weakly probative; it is neither as direct nor as clearly linked to jihad as other statements discussed above.

In addition, its discussion of freedom of speech being only for gays and lesbians is irrelevant except in an attenuated way, and unduly prejudicial under

Rule 403. The low probative value of this statement when weighed against its prejudicial effect tips the balance against admission.

On the current record, GX 129 will not be admitted.

GX 130: In this undated statement, the defendant justifies taking money from Kaffirs. He also refers to certain principles by which a Muslim must live or risk being stoned to death or being killed as an apostate. If a Muslim does not violate certain principles, then his blood and honor are preserved, but not so for the Kaffir. Anyone can take a Kaffir, capture him, and enslave him, or "even sell him in the market." Mostafa states, "That is the reality about, about, about the Kaffirs when they enter the Muslim land—or when they are not in covenant with Muslims."

This statement is relevant not only to the various counts alleging conspiring to provide support and providing support to terrorists and terrorist organizations, but also to Counts One and Two relating to hostage taking. The statement is relevant as either direct or "other act" evidence of the defendant's state of mind. Farhane, 634 F.3d at 144; Rahman, 189 F.3d at 117–18. For instance, the statement suggests a justification for hostage taking, as well as a possible intent, plan, and knowledge.

Rule 403 does not suggest preclusion. While the statement is no doubt prejudicial, it is no more prejudicial than the conduct charged. Curley, 639 F.3d at 59; Abu-Jihaad, 630 F.3d at 133. It is not cumulative because it provides a unique statement regarding a justification for, comfort with, and acceptance of hostage

taking. Its probative value in this regard is high and not outweighed by undue prejudice.

GX 130 is therefore admissible.

GX 131: This undated statement indicates that it is a production of S.O.S. and is concerned with suicide bombing. For substantially the same reasons as set forth in connection with GX 119 above (also relating to suicide bombing), the prejudicial effect of its statement outweighs any marginal relevance. GX 131 will therefore not be admitted.

III.    OTHER PHOTOGRAPHIC AND DOCUMENTARY EVIDENCE

The Government has also proffered photographic and documentary evidence obtained from three primary sources: (1) a search of the residence and computer of co-conspirator, Oussama Kassir;[9] (2) a search of the residence of a coconspirator, Semi Osman, who allegedly attended the Bly, Oregon training camp and was an imam at the Dar-us-Salaam mosque in Seattle, Washington; and (3) a search of the defendant's residence and the Finsbury Park Mosque in London, as well as associated computers.

Defendant has argued that these undated materials are highly prejudicial, and that admission of these materials would invite the jury to speculate about the defendant's plans. The Court has discussed the limitations of such a challenge above. The fact that evidence predates or postdates the charged conduct does not

---

[9] In 2008, Kassir was tried and convicted for, inter alia, his role in the some of the same conspiracies in which the defendant here is alleged to have participated. See United States v. Mustafa, 406 F. App'x 526 (2d Cir. 2011).

alone predetermine its relevance or admissibility. See, e.g., Hassan, 742 F.3d at 135; Curley, 639 F.3d at 59; Farhane, 634 F.3d at 144; Abu-Jihaad, 630 F.3d at 133.

As set forth below, the parties have stipulated to the authenticity of the documents and photographs at issue, but not to their admissibility.

In Kassir, Judge Keenan overruled objections to materials similar to those contained in GX 4[10] (a stipulation relating to materials obtained from a guesthouse located in Pakistan); GXs 7 and 8[11] (relating to materials obtained from Kassir's residence and used at trial in connection with his participation in conspiratorial conduct with which the defendant is charged here); GX 10[12] (relating to materials associated with Osman); GX 23[13] (relating to materials seized from the Dar-us-Salaam mosque); and GX 24[14] (also relating to Osman). See Kassir, 2009 WL 976821. The Second Circuit has affirmed those rulings. Mustafa, 406 F. App'x 526.

The Court adopts the rationale set forth in Judge Keenan's opinion, as affirmed by the Second Circuit. Specific rulings on these materials shall await trial. However, the parties should assume that this Court's views of relevance are as set forth above, and that the Court agrees with Judge Keenan's rationale where applicable to this defendant and the conspiratorial conduct in which he is alleged to have been a participant.

---

[10] GX4 refers to GXs 1101–1111-A.
[11] GX7 refers to GXs 401-A–404-OO; GX8 refers to GXs 405–408-F, 410, 410-A, 126–130-C, and 416–437.
[12] GX10 refers to GX 312–312-D.
[13] GX23 refers to GXs 346 and 347.
[14] GX24 refers to GXs 348 and 349.

That leaves the last category of information: materials seized from this defendant's home and the Finsbury Park Mosque. The Court has reviewed each of these proffered exhibits. Given the significant guidance on the Court's views provided herein, the Court will generally not make early individual evidentiary rulings on these documents. Defendant's arguments are largely relevance, prejudice, and hearsay. As to hearsay, if evidence is not offered for the truth (such as documents regarding how to make bombs), it is not hearsay. Defendant also points again to the lack of specific date as further support for a lack of relevance. The Court's view of relevance and the appropriate analyses under Rules 404(b) and 403 are as set forth above. The parties should look to the Court's rulings above for guidance in the first instance.[15]

The Court does, however, believe that it is appropriate to provide guidance on the so-called "Cole video" at GX 807. That video was located on a computer associated with the defendant. It consists of a series of images of men carrying weapons and running, accompanied by singing in Arabic. As an initial matter, jihad training, and fighting are highly relevant to charged conduct, as discussed above. Also as discussed above, temporal remoteness (in open court on April 14, 2014, the defendant referred to the clip as being from or taken in Bosnia, whereas the Government contended that evidence would show it is Afghanistan) is not itself

---

[15] As stated in Court on April 14, 2014, the graphic clip of the World Trade Center towers falling and oil tanks stating "Iraq" (GX 511-D) are precluded under Rule 403. Their prejudicial effect outweighs any probative value, which is attenuated given the reference to Iraq and what this clip is supposed to suggest.

fatal, but rather goes to the weight of the evidence.  Abu-Jihaad, 630 F.3d at 132;
Schultz, 333 F.3d at 416.

In terms of Rule 403, this video is not more disturbing than the crimes
charged.  Curley, 639 F.3d at 59; Abu-Jihaad, 630 F.3d at 133; Roland-Zapata, 916
F.2d at 804.

Subject to the Government's laying a proper foundation for this evidence at
trial, and other variables that may impact the Court's rulings at the time of
introduction, the proffered excerpts from the Cole video (GXs 509-E--509-G) are
admissible.

IV.    CONCLUSION

The Court's preliminary rulings as to the objected-to evidence are set forth
above.  To preserve any objections, the defendant must make an oral objection if
and when a particular piece of evidence is in fact offered at trial.  If the defendant
does not object, the Court will assume that the defendant agrees with the Court's
rationale as set forth herein and withdraws his objection.

SO ORDERED.

Dated:        New York, New York
              April 15, 2014

                              _____
                                    KATHERINE B. FORREST
                                    United States District Judge