

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

April 16, 2014

**BY E-MAIL**

The Honorable Katherine B. Forrest
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007
ForrestNYSDChambers@nysd.uscourts.gov

  Re: <u>United States</u> v. <u>Mustafa Kamel Mustafa, a/k/a "Abu Hamza"</u>
     04 Cr. 356 (KBF)

Dear Judge Forrest:

  We write respectfully on behalf of the Government in the above-referenced case. At trial, the Government intends to offer testimony regarding statements made by the defendant and his co-conspirators in furtherance of multiple conspiracies. The Government submits that all of the statements are admissible pursuant to Federal Rule of Evidence 801(d)(2)(E) and sets forth herein the grounds for admissibility to assist the Court and avoid any unnecessary delay during trial.

  A. **Applicable Law**

  Pursuant to Rule 801(d)(2)(E), a statement is not hearsay if "[t]he statement is offered against an opposing party and . . . was made by the party's coconspirator during and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). Thus, in order to admit a statement under Rule 801(d)(2)(E), the court must find that: (a) there was a conspiracy, (b) its members included the declarant and the party against whom the statement is offered, and (c) the statement was made during the course of and in furtherance of the conspiracy. *See Bourjaily* v. *United States*, 483 U.S. 171, 175 (1987). The party offering the statement must prove these preliminary facts by a preponderance of the evidence. *See id.* at 176. The Supreme Court has made clear that the proffered statement may itself be considered in making the Rule 801(d)(2)(E) determination. *See id.* at 181; *United States* v. *Padilla*, 203 F.3d 156, 161 (2d Cir. 2000); *United States* v. *Broussard*, 80 F.3d 1025 (5th Cir. 1996).

Hon. Katherine B. Forrest
April 16, 2014
Page 2

"Co-conspirator statements may be found to be 'in furtherance' of the conspiracy . . . if they 'prompt the listener to respond in a way that facilitates the carrying out of criminal activity.'" *United States* v. *Beech-Nut*, 871 F.2d 1181, 1199 (2d Cir. 1989) (quoting *United States* v. *Rahme*, 813 F.2d 31, 35 (2d Cir. 1987)). As the Second Circuit has explained:

> In addition to the more obvious types of communications to implement a conspiratorial operation, statements between co-conspirators that may be found to be in furtherance of the conspiracy include statements that provide reassurance, or seek to induce a coconspirator's assistance, or serve to foster trust and cohesiveness, or inform each other as to the progress or status of the conspiracy.

*United States* v. *Maldonado-Rivera*, 922 F.2d 934, 959 (2d Cir. 1990); *accord Padilla*, 203 F.3d at 161; *United States* v. *Diaz*, 176 F.3d 52, 85 (2d Cir. 1999) (narrative statement several days after murders, describing who shot whom and with what weapons, was in furtherance of overarching RICO and narcotics conspiracies, since designed to foster cohesiveness); *Rahme*, 813 F.2d at 35-36; *United States* v. *Zandstra*, No. 00 Cr. 209 (RWS), 2001 WL 26211, at *3 (S.D.N.Y. Jan. 10, 2001); *United States* v. *Ammar*, 714 F.2d 238, 252 (3rd Cir. 1983); *see also United States* v. *Paone*, 782 F.2d 386, 390 (2d Cir. 1986) ("'in furtherance' requirement of Rule 801(d)(2)(E) is satisfied when a co-conspirator is apprised of the progress of the conspiracy, or when the statements are designed to induce his assistance"); *United States* v. *Burton*, 126 F.3d 666, 675 (5th Cir. 1997) (a statement that identifies the role of one co-conspirator to another is in furtherance of the conspiracy); *United States* v. *Flores-Rivera*, 56 F.3d 319, 329 (1st Cir. 1995) (since members of narcotics organization "need to know the identities of the players in the organization . . . statements to this end are certainly in furtherance of the conspiracy").

Furthermore, the statements of a conspirator are admissible even against one who joins the conspiracy after the statement was made. *See United States* v. *Badalamenti*, 794 F.2d 821 (2d Cir. 1986); *United States* v. *Jackson*, 757 F.2d 1486 (4th Cir. 1985); 2 Wright & Miller, Federal Practice and Procedure (Criminal) § 413, at 502.

It is not necessary that the declarant be formally charged as a co-defendant, nor is it even necessary that the predicate conspiracy be charged in the indictment. *See United States* v. *Cambindo Valencia*, 609 F.2d 603 (2d Cir. 1979); *United States* v. *Jones*, 542 F.2d 186 (4th Cir. 1976); *United States* v. *Doulin*, 538 F.2d 466 (2d Cir. 1976); *United States* v. *Layton*, 855 F.2d 1388 (9th Cir. 1988). Moreover, the co-conspirator declarant need not be present in court or subject to cross-examination as a prerequisite for the admission of his or her out-of-court statement. *See United States* v. *Inadi*, 475 U.S. 387 (1986); *United States* v. *Caputo*, 791 F.2d 37 (3rd Cir. 1986).

Similarly, the statements need not have been made to a co-conspirator. *See, e.g.*, *United States* v. *James*, 712 F.3d 79, 106 (2d Cir. 2013) ("[T]here is no requirement that the person to whom the statement is made also be a member.") (quoting *In re Terorrist Bombings of U.S.*

*Embassies in E. Africa*, 552 F.3d 93, 137 (2d Cir. 2008)); *United States* v. *Tracy*, 12 F.3d 1186, 1196 (2d Cir. 1993) (noting that "in furtherance" include statements that "prompt[] the listener—who need not be a coconspirator—to respond in a way that promotes or facilitates the carrying out of a criminal activity").

Whether a statement is made "in furtherance" of a conspiracy is a preliminary question of fact to be determined by the trial court by a preponderance of the evidence. *See Beech-Nut*, 871 F.2d at 1198; *United States* v. *DeJesus*, 806 F.2d 31, 34 (2d Cir. 1986). That the evidentiary standard for proving the "in furtherance" element is a low one and that the standard of appellate review is deferential is in keeping with the more general principle that "[t]he in furtherance requirement of Rule 801(d)(2)(E) is construed broadly." *United States* v. *Escobar*, 50 F.3d 1414, 1423 (8th Cir. 1995); *United States* v. *Limones*, 8 F.3d 1004, 1008 (5th Cir. 1993).

**B. Statements in Furtherance of the of the Conspiracies to Establish a *Jihad* Training Camp in Bly, Oregon**

Counts Three and Five of the Indictment charge the defendant with conspiring to establish a *jihad* training camp in Bly, Oregon, the purpose of which was to train men to fight in Afghanistan and with al Qaeda. With respect to these two counts, the Government contends the defendant conspired with James Ujaama, Oussama Kassir, Haroon Aswat, and Semi Osman, among others.

**1. Statements Offered by James Ujaama**

James Ujaama was a former student of the defendant's, and was in contact with the defendant regarding their plan to establish a *jihad* training camp in Bly, Oregon. In response, the defendant sent Kassir and Aswat to the United States to conduct *jihad* training. Ujaama briefly hosted Kassir and Aswat at his residence in Seattle, introduced Kassir and Aswat to other men from the Dar Us Salaam Mosque in Seattle, and brought Kassir and Aswat to the property in Bly. With respect to the conspiracies charged in Counts Three and Five, Ujaama is expected to testify, in sum and substance, about the following co-conspirator statements:

- Kassir told Ujaama that the defendant had sent him to the United States for the purpose of conducting *jihad* training for the recruits there.

- Kassir asked Ujaama for his assistance in acquiring a gun in Seattle.

- Kassir discussed his *bona fides*, explaining that he had helped the defendant take control of the Finsbury Park Mosque in London and had received *jihad* training in Afghanistan, fought on the front lines, and served as a body guard for Usama Bin Laden.

Hon. Katherine B. Forrest
April 16, 2014
Page 4

- Kassir expressed his disappointment with the training camp in Bly because it was not as well developed as he had expected and there were no recruits or weapons.

- Ujaama and Kassir argued about who should be the leader of the *jihad* training project at Bly, and Kassir indicated the he wanted to run the training facility.

All of these statements by Kassir and Ujaama are admissible as co-conspirator statements that furthered the charged conspiracies to provide *jihad* training charged in Counts Three and Five. The majority of them represent the classic type of communication intended to implement the conspiratorial operation. *See Maldonado-Rivera*, 922 F.2d at 959. Kassir's explanation for traveling to Bly from England, his desire to obtain a gun and his boasting about his prior training all speak to his *bona fides* as a leader of the camp and his views about how goals of the conspiracies—the jihad training camp—should be achieved. Ujaama's responsesive statements are admissible for the same reason, as they reveal Ujaama's view of how to implement their "conspiratorial operation." *Id.* In addition, these statements also serve to inform fellow co-conspirators regarding the "progress or status of the conspiracy." *Id.* Kassir's expressions of frustration, and Ujaama's response, were made in furtherance of the charged Bly conspiracies pursuant to that basis as well.

### 2. Statements Offered By Angelica Morris

From approximately the Fall of 1999 to early 2000, Angelica Morris lived at a property in Bly, Oregon, with members of her family, including her husband at the time, Semi Osman, her daughter, and her younger brother Daniel McClenahan. Other residents of the property at Bly included Eva Hatley, a/k/a "Ayat Hakimah," and her husband, Ivan Rule. Shortly after Morris had moved to Bly, Kassir and Aswat arrived at the property. Both men subsequently left Bly prior to Morris' departure. The Government will prove that the defendant had previously stated to James Ujaama that he would be sending two men to assist in the efforts to establish a training camp at Bly. While at Bly, Kassir and Aswat engaged in numerous training-related activities, including shooting and knife training, in which both Osman and McClenahan participated.

The Government anticipates that Morris will testify about numerous statements made by both Kassir and Aswat to Morris, Osman, and others while they were at Bly. Morris will testify about one such conversation that occurred at Bly involving Kassir, Aswat, Osman, and Ujaama. During the course of this conversation, Kassir confronted Ujaama about the suitability of Bly as a training camp. In sum and substance, Kassir confronted Ujaama about the lack of brothers to train, the lack of guns, and the unsuitability of the property to house the defendant. As discussed above, these types of statements, which served to inform a member of the conspiracy about the lack of progress of the conspiracy, to publicly admonish a member of the conspiracy for perceived failures, and to prompt other co-conspirators to respond in a way that would promote the goals of the conspiracy, are admissible as co-conspirator statements.

The Government also expects Morris to testify that Kassir subsequently stated to Osman, in sum and substance, that he wanted to kill Ujaama. Kassir's statement, which highlighted his commitment to the conspiracy and the steps he was willing to take to achieve its goals, also constitutes a co-conspirator statement made in furtherance of the conspiracy.

Morris will also testify about various statements made by both Osman and Kassir regarding phone calls from the defendant. Morris will testify that following one such call to Morris and Osman's residence, Osman stated, in sum and substance, to Kassir and Aswat that the defendant could no longer call the residence because he was being scrutinized by law enforcement. Osman's statement to Kassir and Aswat furthered the goals of the conspiracy by serving to emphasize the need for operational security in order to avoid scrutiny of the activities at Bly.

Morris will also testify about statements made by Kassir to Aswat and Osman following a phone call he had with the defendant. Kassir's statements, in which he informed Aswat and Osman about what he and the defendant had discussed regarding the status of efforts at Bly, served to inform other co-conspirators about "the status of the conspiracy" and therefore fall within Rule 801(d)(2)(E). *James*, 712 F.3d at 106 (quoting *United States* v. *Diaz*, 176. F3d, 52, 85 (2d Cir. 1999)).

Morris will also testify that, at various times at Bly, both Kassir and Aswat made statements regarding their purpose at Bly, as well as their tasking by the defendant. In sum and substance, Morris will testify that:

- Kassir stated to Osman, Morris, and others that he and Aswat had received money from the defendant to travel to the United States.

- Kassir and Aswat stated to Osman, Morris, and others that the defendant had sent them to Bly to train brothers for *jihad*.

- Kassir expressed to Osman and Morris his frustration that brothers were not coming to Bly to train. During their conversation, Kassir urged Osman to find ways to bring the brothers to Bly.

- Kassir spoke with Osman, Morris, and others about night patrols and said he had become familiar with the concept of these patrols from his time spent at overseas training camps.

- Aswat stated to Osman, Morris, and others that he had been in Afghanistan in a camp and had been trained by Usama bin Laden.

Hon. Katherine B. Forrest
April 16, 2014
Page 6

These statements were plainly made in furtherance of the conspiracy to conduct *jihad* training in Bly, Oregon. First, Kassir and Aswat's statements related to who had sent them and funded them served to, among other things, establish their *bona fides* to other members of the conspiracy. Their statements about their prior experience served a similar function. By cloaking themselves in the mantle of the defendant's approval and by informing others of their *jihad*-related experience, Kassir and Aswat positioned themselves to direct other members of the conspiracy.

Morris will testify that, shortly after her departure from Bly, she saw Kassir again at the Dar Us Salaam Mosque in Seattle on multiple occasions. On one such occasion, Kassir was delivering a guest lecture to the congregation of the mosque, in which he stressed the importance of training, fighting, and dying in the cause of *jihad*. The Government will prove that, after Kassir and Aswat left Bly, they went to the Dar Us Salaam Mosque in an effort to conduct *jihad* training there. Kassir's exhortations to the congregation were clearly intended to motivate his audience to participate in violent *jihad*, and thus constitute statements made in furtherance of the conspiracies intending to train men to fight in Afghanistan and with al Qaeda.

### 3. Statements Offered By Eva Hatley

As set forth above, Hatley also resided at the property in Bly, and was at the time married to Ivan Rule, the owner of the property. In addition, Hatley was residing at the property in Bly when Kassir and Aswat arrived. Between the time of the arrival of Kassir and Aswat at Bly, and Hatley's departure, Hatley heard both Kassir and Aswat making numerous statements, including ones similar to the statements set forth above, about which Morris also will testify. For instance, Hatley will testify that both Kassir and Aswat made numerous statements in the presence of Osman and others regarding the purpose of their presence at Bly, the fact that they had been sent to Bly by the defendant, and their prior *jihad* training experience.

The Government also anticipates that Hatley will testify that, on one occasion, Kassir showed her a fax that appeared to have been sent by Ujaama to the defendant. During their conversation, Kassir angrily referenced the fax, expressed his frustration with the situation at Bly, and stated that the conditions at Bly were not what he had been told to expect. As discussed, Kassir's statements furthered the conspiracy by reinforcing his plans for the property. Moreover, the statements—directed at the wife of the property owner—were implicitly designed to establish Kassir's control over what would happen at Bly.

### 4. Statements Offered By David Smith

David Smith worshipped at the Dar Us Salaam Mosque in Seattle in the late 1990s, and was living at the mosque at around the time when Oussama Kassir and Haroon Aswat arrived in Seattle in late 1999. As explained above, the Government expects that the evidence at trial will establish that the defendant sent Kassir and Aswat from London to the United States, for the

Hon. Katherine B. Forrest
April 16, 2014
Page 7

purpose of establishing *jihad* training in the United States. After Kassir and Aswat visited the property in Bly, they returned to Seattle where Kassir proceeded to provide training to men from the Dar Us Salaam Mosque in the use of an AK-47 and tried to motivate the men to participate in violent *jihad*.

First, Smith is expected to testify about a presentation that Kassir made to men at the Dar Us Salaam Mosque regarding the use of an AK-47. During this presentation, at which Smith was present, Kassir demonstrated for the men how to assemble and disassemble the firearm, explained how an AK-47 is used, and instructed the men on how to construct silencers for the AK-47. In particular, Smith is expected to testify that Kassir discussed his experience in fighting in *jihad* and instructed the men that use of an AK-47 is one of the most important things a *mujahid* (holy warrior) needs to know before he goes to the mountains of Afghanistan to fight. Kassir explained to the men how an AK-47 differs from other weapons in terms of the path and accuracy of the discharged bullets, as well as the impact of the bullets when it strikes another person. In addition to explaining to the men how to make a silencer for an AK-47 with materials that are easy to obtain, he further informed the men that an AK-47 can be modified to be able to shoot grenades.

Second, Smith is also expected to testify about another presentation that Kassir made at the residence of another man who worshipped at the Dar Us Salaam Mosque. During his speech, which was made to several men from the mosque, Kassir attempted to motivate the men to fight in violent *jihad* and made the following statements to the men in his audience, in sum and substance:

- Kassir's purpose for coming to the United States was only to please Allah. He was not there to play games, but he was very serious and came to destroy and get stuff started.

- If anyone wanted to leave if their faith was not strong enough or if they were not ready, they could leave.

- People were going to get hurt, some of the men (in his audience) were going to point the finger at Kassir and blame him. Some of the men (in his audience) were going to die, and some were going to be martyred.

The statements made by Kassir during these two presentations were plainly made in furtherance of the conspiracy to provide support to terrorism and violent *jihad* in Afghanistan. The purpose of Kassir's statements at the Dar Us Salaam Mosque was to train the men in the use of weapons—training these men were expected to put to use when they engage in *jihad* fighting. Kassir's discussion of his experience fighting in *jihad* were made to establish his *bona fides* to other members of the conspiracy and potential members of the conspiracy, so they would follow his guidance and direction, and further provided context for the training he provided. The

purpose of Kassir's statements at the residence was to motivate the men to participate in violent *jihad* and to ensure that everyone was committed to the cause of fighting, including to the point of giving their lives for the cause. For all these reasons, all of the statements described above are admissible as co-conspirator statements in furtherance of the conspiracy charged in Counts Three and Five.

### C. Statements in Furtherance of the of the Conspiracies to Send Ferroz Abbasi to Afghanistan for *Jihad* Training

Counts Seven and Nine focus on the defendant's alleged participation in a conspiracy to provide material support to al Qaeda in Afghanistan from June 2000 to December 2001, namely by sending Feroz Abbasi to Afghanistan to fight for al Qaeda.

#### 1. Statement Offered by James Ujaama

In 2000, the defendant directed Ujaama to deliver Feroz Abassi to a front-line commander in Afghanistan named Ibn Sheikh, for the purpose of Abassi receiving military-style training, and further directed Ujaama to deliver various items (four envelopes with money, some CDs containing the defendant's recitation of the Koran, and a letter to a Taliban official). In connection with Ujaama's testimony regarding these matters, he is expected to testify about the following co-conspirator statements:

- In advance of their trip from London, Abassi told Ujaama that he wanted to travel to Afghanistan for the purpose of receiving *jihad* training.[1]

- Ujaama left Abassi behind in Quetta, Pakistan, but later encountered Abassi again in Afghanistan at a Taliban compound in Kandahar. When Ujaama encountered Abassi, Ujaama gave Abassi advice as to where he should stay while in Kabul.

- After Ujaama returned to London, Abassi called the Finsbury Park Mosque and Ujaama answered the phone. Abassi informed Ujaama that he wished to stay at a particular guest house in Kabul, where he wanted to learn Arabic and study the Koran. Ujaama conveyed this message to the defendant, who was at the mosque at the time, and the defendant directed Ujaama to tell Abassi that he should go to Ibn Sheikh. Ujaama delivered this message to Abassi as directed.

These statements all were made in furtherance of the defendant's conspiracy to support terrorism and al Qaeda by directing Ujaama to deliver Abassi to Ibn Sheikh. Abassi's statement

---

[1] In addition to being admissible as a co-conspirator statement under Rule 801(d)(2)(E), this statement is admissible as a statement of Abassi's then-existing state of mind, to show motive and intent, pursuant to Rule 803(3).

of his desire to receive *jihad* training furthered the conspiracy to in fact arrange for him to receive that training. Ujaama's conversations with Taliban officials to gain entry into Afghanistan furthered the various conspiracies by enabling Ujaama to travel to achieve the goals. Ujaama's guidance to Abassi about what he should do in Afghanistan—which statements are not being offered for the truth of the matter asserted—similarly furthered the objectives of the conspiracy to send Abassi to Afghanistan for *jihad* training and fighting. Similarly, to the extent Ujaama's relay of statements by the defendant to Abassi directing Abassi to travel to Ibn Sheikh are offered for the truth of the matter asserted, these statements plainly were in furtherance of the conspiracy for Abassi to receive *jihad* training from Ibn Sheikh.

### 2. Statements Offered By Saajid Badat

From 1999 until 2001, Saajid Badat lived in Afghanistan and, for a large portion of that time, was working for al Qaeda. Badat will testify that in early 2001, he met Abbasi, who was accompanied by Ibn Sheik, a man associated with al Qaeda, in Kandahar, Afghanistan. Ibn Sheik, who is identified as a co-conspirator in the Indictment, asked Badat to look after Abbasi, who, like Badat, was also from the United Kingdom. Badat took Abbasi to a "guesthouse" run by al Qaeda. Ibn Sheikh's statements to Badat, made at the time he delivered Abbasi for al Qaeda training and within the timeframe of the conspiracies charged in Counts Seven and Nine, were made in furtherance of those conspiracies, because the purpose of the statements was to provide material support to al Qaeda in the form of Abbasi.

Badat will also testify to numerous statements made to him by al Qaeda leadership during his time in Afghanistan, the purpose of which were to recruit men to fight for al Qaeda. Through evidence independent of the co-conspirator statements that the Government seeks to admit, the Government will demonstrate that since at least 1996, when Usama bin Laden issued his "Declaration of War," al Qaeda leadership engaged in a conspiracy to provide material support to the al Qaeda organization in the form of recruits and personnel. The defendant joined this conspiracy at some point, no later than 1999, when he established a *jihad* training camp in Bly Oregon, the goal of which the Government alleges was to provide material support to al Qaeda in the form of trained fighters. The defendant also demonstrated his participation in this conspiracy by sending Abbasi to Afghanistan to training with al Qaeda in 2000. The Government will also offer evidence at trial of the defendant's speeches and writings in support of al Qaeda, and the need to support the *mujahideen* in Afghanistan, which is further evidence of the defendant's participation in a conspiracy to provide material support to al Qaeda.

Badat will also testify that he was present, and acted as a translator, when Abbasi was asked by two of al Qaeda's most senior leaders, Mohamed Atef, a/k/a "Abu Hafs al-Masri," and Saif al-Adl, whether he (Abbasi) would be willing to engage in attacks against U.S. and Jewish targets outside of Afghanistan. These statements by senior al Qaeda leadership—made to a co-conspirator listed in the Indictment (Abbasi) during the timeframe of the conspiracies charged in Counts Seven and Nine—were for the purpose of convincing Abbasi to kill for al Qaeda.

Hon. Katherine B. Forrest
April 16, 2014
Page 10

      Badat will further testify that when he first arrived in Kandahar, Afghanistan, in 1999, he met with senior al-Qaeda leader Saif al-Adl. Al-Adl asked if Badat was interested in committing attacks against American and Jewish targets. Because Badat had just met al-Adl, Badat declined at that time. Upon learning that Badat was British, al-Adl asked whether Badat knew that Abu Hamza's son had recently been arrested in Yemen.[2] The purpose of the statement, the Government will argue, was to establish a rapport with Badat, who like the defendant is from the United Kingdom, in hopes of getting Badat to join al Qaeda. Thus, the statement was in furtherance of the overarching conspiracy to provide material support to al Qaeda through new recruits.

      Finally, Badat will testify about speeches by al Qaeda leadership at al Qaeda training camps in Afghanistan, and statements by al Qaeda leadership to him to inspire him to commit terror attacks. Again, these speeches and statements, which were designed to motivate Badat and new recruits to join al Qaeda and participate in violent *jihad*, were in furtherance of the conspiracy to provide material support to al Qaeda.

      **3.  Statements Offered by David Smith**

      Smith also is expected to testify about co-conspirator statements that were made to him at the Finsbury Park Mosque in London that furthered Abu Hamza's conspiracy to support violent *jihad* in Afghanistan charged in Counts Seven and Nine of the Indictment. Following Kassir and Aswat's travel to Seattle in late 1999, Smith himself traveled to London to meet with the defendant. During this trip, Smith spent time at the Finsbury Park Mosque, met with the defendant, and attended the defendant's Friday prayer at the mosque. While at the mosque, Smith spoke with some of the defendant's students, who informed Smith that, were he interested in traveling to fight in the *jihad*, the defendant would be able to give Smith the permission—called *ijaaza*—to travel for the purpose of *jihad* fighting. These assurances that the defendant would be able to arrange Smith's travel to fight in *jihad* were made in furtherance of the conspiracy to support violent *jihad*. Indeed, Count Five of the Indictment particularly relies on the defendant's sending of one of his followers, Feroz Abassi, to Afghanistan to receive *jihad* training from a front-line commander and to fight with al Qaeda, just as the defendant's students told Smith that the defendant could arrange for him.

    **D.  Statements in Furtherance of the of the Conspiracy to Take Hostages in Yemen**

---

    [2] This statement is also admissible on the grounds that it is not being offered for the truth, but rather to show al-Adl's familiarity with the defendant. The defendant will not be prejudiced by this statement, either, because the parties have stipulated that the defendant's son was in fact arrested in Yemen.

Hon. Katherine B. Forrest
April 16, 2014
Page 11

Count One of the Indictment charges the defendant with participating in a hostage taking conspiracy in Yemen in December 1998. The Government alleges that the defendant conspired with, among other people, Abu Hassan, the leader of the group that physically held the hostages in Yemen.

### 1. Statements Offered by Mary Quin and Margaret Thompson

Mary Quin and Margaret Thomspon will testify to being held hostage in Yemen by an organized group of armed men. The Government will prove that one of the defendant's motivations in participating in this hostage was to pressure the Yemeni Government to release five British men that had been arrested five days earlier, including the defendant's stepson.

The Government currently anticipates offering several co-conspirator statements through Quin and Thompson. For instance, during the kidnapping, the lead hostage taker, Abu Hassan, addressed the hostages and explained the reasons for the hostage taking. He said, in sum and substance, that the kidnappers were *mujahideen* and that the hostages had been taken because the hostage takers' friends were in prison in Yemen. In addition, Hassan stated, in sum and substance, that the hostages were not responsible for the fact that their countries had bombed Iraq. These statements—made while the hostage taking was underway—furthered the conspiracy in a number of ways. First, the statements were designed to calm the hostages by giving them an impression that they would be released, thereby making the hostages more likely to be compliant and, ultimately, increasing the likelihood of the success of the hostage taking. The statements also emphasized to the hostages that the kidnappers were in control of the situation.

Similarly, the Government expects Thompson to testify that, as soldiers began to engage with the hostage takers in a firefight, Thompson heard one of the hostage-takers say good-bye to the hostages. Whether this statement meant that the hostages would be released shortly or killed, the hostage-taker's statement furthered the conspiracy by either calming the hostages or instilling sufficient fear that the hostages would obey their captors.

### E. Statements in Furtherance of the of the Conspiracy to Provide Goods and Services to the Taliban

In Count Eleven, the defendant is charged with conspiring with Ujaama, among others, to violate the International Emergency Economic Powers Act ("IEEPA"), which prohibited the provision of goods and services to the Taliban, and within Taliban controlled territory.

### 1. Statements Offered by James Ujaama

In 2000, the defendant directed Ujaama to hand deliver various items (four envelopes with money, some CDs containing the defendant's recitation of the Koran, and a letter to a

Hon. Katherine B. Forrest
April 16, 2014
Page 12

Taliban official, Mutuwakkil) from England to Afghanistan.  In connection with Ujaama's testimony regarding these matters, he is expected to testify about:

- Numerous discussions with individuals in Afghanistan regarding his delivery of four envelopes with money and the CDs at the direction of the defendant.  These discussions involved arranging for his delivery of these items to their recipients.

- Discussions with officials of the Taliban in Quetta, Pakistan, and Kandahar, Afghanistan, primarily in connection with the facilitation of his travel.

The statements by Ujaama, the recipients of the items, and Taliban officials, regarding items that Ujaama was supposed to deliver to Afghanistan furthered the conspiracy in Count Eleven to support the Taliban, because the money and CDs that Ujaama delivered in Afghanistan were brought to Taliban-controlled regions of that country.

Then, in 2001, the defendant again directed Ujaama to deliver money to an individual in Afghanistan, which was under Taliban control at the time.  During Ujaama's travel, he again coordinated with a Taliban official to try to gain entry into Afghanistan.  The events of 9/11 prevented Ujaama from entering Afghanistan, but he continued to have conversations with others regarding to whom the money should be delivered.  These statements likewise were made in furtherance of the Count Eleven conspiracy to support the Taliban.

Hon. Katherine B. Forrest
April 16, 2014
Page 13

* * * *

      For the reasons set forth above, the statements summarized in this letter made by the defendant and his co-conspirators are not hearsay because the predicate conspiracies have been established, the declarant of each statement was a member of at least one of the relevant conspiracies along with the defendant, and each statement was made during the course of, and in furtherance of, the relevant conspiracy or conspiracies.  Because there is a sufficient basis to support the admission of each statement above, the Government submits that all of the statements should be admitted as co-conspirator statements pursuant to Rule 801(d)(2)(E).

                                      Respectfully submitted,

                                      PREET BHARARA
                                      United States Attorney

By:      /s/                    
      John P. Cronan
      Edward Y. Kim
      Ian McGinley
      Assistant United States Attorneys
      (212) 637-2779 / 2401 / 2257

cc:    Jeremy Schneider, Esq. (by hand)
        Joshua Dratel, Esq. (by hand)