UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------X

UNITED STATES OF AMERICA,

       - against -                  04 Cr. 356 (KBF)

MUSTAFA KAMEL MUSTAFA,
a/k/a Mostafa Kamel Mostafa,

               Defendant.

--------------------------------------------------X

# DEFENDANT MOSTAFA KAMEL MOSTAFA'S
# SENTENCING MEMORANDUM

SAM A. SCHMIDT, ESQ.         MICHAEL K. BACHRACH, ESQ.
111 Broadway, Suite 1305      276 Fifth Avenue, Suite 501
New York, New York 10006     New York, New York 10001
(212) 346-4666              (212) 929-0592

*Attorneys for Defendant Mostafa Kamel Mostafa*

                 Also on the brief: Lindsay A. Lewis, Esq.

## **Table of Contents**

Table of Authorities ................................................................................. iii

I       Introduction................................................................................1

II.     Charge and Conviction .................................................................2

III.    Objections to the Pre-Sentence Report ...........................................4

IV.     The Sentencing Guidelines Calculation .........................................16

V.      Post-<u>Booker</u> Sentencing Framework ...........................................16

    A.      Introduction ........................................................................17

    B.      The history and characteristics of Mr. Mostafa and the need to
        impose medical care in the most effective manner suggest
        that Mr. Mostafa should be designated directly to a Federal
        medical center, not Florence ADX, and this Court should
        recommend minimal conditions of confinement, medical
        treatment, and care, that must be provided in order to
        comply with the requirements of 18 U.S.C. §§ 3553(a)(1)
        and (a)(2)(D), as well as to comply with the Eighth
        Amendment to the United States Constitution and Article 3
        of the Convention for the Protection of Human Rights and
        Fundamental Freedoms ..................................................20

        1.      Mr. Mostafa's Accommodations and Medical Care at the
                MCC suggest that direct placement into a Federal
                medical center and specific recommendations regarding
                the conditions of his confinement and necessary medical
                care and daily assistance is warranted ......................21

        2.      Representations made during Mr. Mostafa's extradition
                proceedings further support the need for direct placement
                into a Federal medical center and specific
                recommendations regarding the conditions of his
                confinement and necessary medical care and daily
                assistance................................................................28

VI.     Conclusion ................................................................................37

## Exhibits

Letter, dated, March 7, 2013, from Lindsay A. Lewis, Esq., to the
Hon. Katherine B. Forrest ..........................................................................Exhibit A

Letter, dated, March 13, 2013, from MCC Warden Catherine A.
Linaweaver to the Hon. Katherine B. Forrest ............................................. Exhibit B

Letter, dated, March 21, 2013, from Lindsay A. Lewis, Esq.,
to Adam Johnson, Esq.................................................................................. Exhibit C

Dr. Benjamin Kligler, M.D., M.P.H., dated, December 15, 2014 ..............Exhibit D

United States v. Abu Hamza, City of Westminster (U.K.)
Magistrate's Court, Senior District Judge Tim Workman,
Order, dated, November 15, 2007................................................................ Exhibit E

United States v. Abu Hamza, City of Westminster (U.K.)
Magistrate's Court, Declaration of ADX Warden R. Wiley,
dated, October 3, 2007 ................................................................................Exhibit F

Mustafa Kamel Mustafa (Otherwise Abu Hamza) v.
the Government of the United States and the Secretary of State
for the Home Department, Case No. CO/1748/2008,
[2008] EWHC 1357 (Admin), High Court of the United Kingdom,
Queens Bench Division, Order, dated, June 20, 2008 ................................Exhibit G

Mustafa Kamel Mustafa (Abu Hamza) v. United Kingdom,
Application No. 26742/08, European Court of Human Rights,
Observations of the Government of the United Kingdom on
Admissibility and Merits, dated, November 13, 2008................................Exhibit H

Case of Babar Ahmad and Others v. the United Kingdom,
Application Nos. 24027/07, 11949/08, 36742/08, 66911/09,
and 67354/09, European Court of Human Rights (Fourth Section),
Order, dated, September 24, 2012 ............................................................. Exhibit I

Mitigation letters submitted to this Court by Defendant's family................ Exhibit J

Mitigation videos ..................................................Exhibit K (under separate cover).

# Table of Authorities

CASES

Bonner v. Lewis,
857 F.2d 559 (9th Cir. 1988) ........................................................................26

Case of Babar Ahmad and Others v. the United Kingdom,
Application Nos. 24027/07, 11949/08, 36742/08, 66911/09, 67354/09
(European Court of Human Rights, Fourth Section 2012).....................34, 35

Enmund v. Florida,
458 U.S. 782 (1982)......................................................................................29

Estelle v. Gamble,
429 U.S. 97 (1976)....................................................................................4, 26

Farmer v. Brennan,
511 U.S. 825 (1994)........................................................................................4

Gall v. United States,
128 S.Ct. 586 (2007)...............................................................................18, 19

Graham v. Florida,
560 U.S. 48 (2010)........................................................................................29

Hathaway v. Coughlin,
37 F.3d 63 (2d Cir. 1994) .............................................................................25

Helling v. McKinney,
509 U.S. 25 (1993)..........................................................................................4

Johnson v. Wright,
234 F.Supp.2d 352 (SDNY 2002) ................................................................25

Kaufman v. Carter,
952 F.Supp. 520 (W.D.Mich. 1996)..............................................................26

Kimbrough v. United States,
128 S.Ct. 558 (2007).....................................................................................17

King v. Frank,
371 F.Supp.2d 977 (W.D.Wisc. 2005) ........................................................26

Knop v. Johnson,
667 F.Supp. 467 (W.D.Mich. 1987) ...........................................................25

LaFaut v. Smith,
834 F.2d 389 (4th Cir. 1987) ......................................................................26

McMillan v. Pennsylvania,
477 U.S. 79 (1986).......................................................................................9

Mustafa Kamel Mustafa (Otherwise Abu Hamza) v. the Government
of the United States and the Secretary of State for the Home
Department, Case No. CO/1748/2008, [2008] EWHC 1357 (Admin)
(High Court of the United Kingdom, Queens Bench 2008)...................32, 34

Oliver v. Deen,
77 F.3d 156 (7th Cir. 1996) ........................................................................25

Onishea v. Hopper,
171 F.3d 1289 (11th Cir. 1999) ..................................................................26

Pennsylvania Department of Corrections v. Yeskey,
524 U.S. 206 (1998).....................................................................................26

Phelps v. Kapnolas,
308 F.3d 180 (2d Cir. 2002) .........................................................................4

Shariff v. Coombe,
655 F.Supp.2d 274 (SDNY 2009) ..........................................................24, 25

Torres v. Berbary,
340 F.3d 63 (2d Cir. 2003) ...........................................................................8

United States v. Baez,
349 F.3d 90 (2d Cir. 2003) .........................................................................29

United States v. Booker,
534 U.S. 220 (2005)...................................................................................17

United States v. Cavera,
550 F.3d 180 (2d Cir. 2008) ......................................................................19

United States v. Crosby,
397 F.3d 103 (2d Cir. 2005) ......................................................................19

United States v. Cruz,
Docket No. 13-2809-cr,
2014 WL 4942037 (2d Cir. Oct. 3, 2014) ....................................................7

United States v. Fatico,
603 F.2d 1053 (2d Cir. 1979) ......................................................................7

United States v. Guerra,
888 F.2d 247 (2d Cir. 1989) ........................................................................8

United States v. Abu Hamza, City of Westminster (U.K.)
(Magistrate's Court, Senior District Judge Tim Workman 2007)...........30, 31

United States v. Martinez,
413 F.3d 239 (2d Cir. 2005) ........................................................................7

United States v. Rubenstein,
403 F.3d 93 (2d Cir. 2005) ........................................................................18

Whitnack v. Douglas County,
16 F.3d 954 (8th Cir. 1994) ......................................................................26

Wilson v. Seiter,
501 U.S. 294 (1991)....................................................................................4

STATUTES AND OTHER AUTHORITIES

18 U.S.C. § 371.......................................................................................2, 3

18 U.S.C. § 1203.......................................................................................2

18 U.S.C. § 2339A ...................................................................................2, 3

18 U.S.C. § 2339B ...................................................................................2, 3

18 U.S.C. § 3553 ..............................................................1, 17, 18, 19, 20

18 U.S.C. § 3582 .......................................................................................19

18 U.S.C. § 3661 .......................................................................................19

29 U.S.C. § 794 .........................................................................................27

42 U.S.C. § 12132 .....................................................................................27

42 U.S.C. § 12182 .....................................................................................27

50 U.S.C. § 1705 .........................................................................................3

31 C.F.R. § 545.204 .....................................................................................3

31 C.F.R. § 545.206 .....................................................................................3

Fed.R.Crim.P. 32 ........................................................................................8

U.S.S.G. § 3A1.4 ......................................................................................16

U.S.S.G. § 6A1.3 .........................................................................................7

U.S.S.G. § 6A1.3, Commentary ...............................................................7, 8

Convention for the Protection of Human Rights and Fundamental
Freedoms................................................................................... *passim*

# I   <u>Introduction</u>

This memorandum of law is submitted for Your Honor's consideration with respect to the determination of Defendant Mostafa Kamel Mostafa's sentencing. After reviewing the facts set forth below, as well as the mitigations letters annexed hereto and the mitigation videos that will be provided to this Court under separate cover, it is requested that this Court fashion a fair and just sentence that complies with all of the articulated objectives of sentencing.

To that end, it is respectfully suggested that this Court impose a sentence of less than life imprisonment while also ordering, or in the alternative recommending, that the Bureau of Prisons ("BOP") designate Mr. Mostafa directly to a Federal medical center and fashion reasonable accommodations necessary to ensure that his medical needs are sufficiently tended to and that he is not treated in an unequal fashion to non-disabled inmates in United States custody.

We respectfully submit that such is necessary to achieve the statutory purposes of punishment while at the same time impose a  sentence sufficient, but not greater than necessary, to comply with the purposes set forth in 18 U.S.C. § 3553(a)(2), the Rehabilitation Act of 1973 (hereinafter, the "Rehabilitation Act"), the Americans with Disabilities Act of 1990 (hereinafter, the "ADA"), and the Eighth Amendment to the United States Constitution.  Such is also necessary to be consistent with the various promises and representations made by the United

1

States to the United Kingdom and to the European Court of Human Rights ("ECHR") during the extradition proceedings that ultimately authorized Mr. Mostafa's transfer to United States custody.

While we discuss herein Mr. Mostafa's charge and conviction, Pre-Sentence Report, and both Guideline and non-Guideline analysis, we also submit that this Court's order (and/or recommendations) regarding Mr. Mostafa's designation and conditions of confinement are as essential to – or even more important than – any other portion of these proceedings.

## II.     **Charge and Conviction**

On May 19, 2014, Defendant Mostafa Kamel Mostafa (hereinafter, "the defendant" or "Mr. Mostafa") was convicted, after a jury trial before Your Honor of eleven counts of related to the material support of terrorism, as follows:

| Count # | Description and Dates | In violation of | Statutory Maximum |
|---|---|---|---|
| 1 | Conspiracy to take hostages (12/23/1998 – 12/29/1998) | 18 U.S.C. § 1203 | Life |
| 2 | Hostage taking (12/23/1998 – 12/29/1998) | 18 U.S.C. § 1203 | Life |
| 3 | Conspiracy to provide and conceal material support and resources to terrorists (October 1999 – early 2000) | 18 U.S.C. § 371 | 5 years |
| 4 | Providing and concealing material support and resources to terrorists (October 1999 – early 2000) | 18 U.S.C. § 2339A | 10 years |
| 5 | Conspiracy to provide | 18 U.S.C. § 2339B(a)(1) | 10 years |

| | | | |
|---|---|---|---|
| | material support and resources to a foreign terrorist organization (October 1999 – early 2000) | | |
| 6 | Providing material support and resources to a foreign terrorist organization (October 1999 – early 2000) | 18 U.S.C. § 2339B(a)(1) | 10 years |
| 7 | Conspiracy to provide and conceal material support and resources to terrorists (June 2000 – December 19, 2001 | 18 U.S.C. § 2339A | 15 years |
| 8 | Providing and concealing material support and resources to terrorists (June 2000 – December 19, 2001) | 18 U.S.C. § 2339A | 15 years |
| 9 | Conspiracy to provide material support and resources to a foreign terrorist organization (June 2000 – December 19, 2001) | 18 U.S.C. § 2339B(a)(1) | 15 years |
| 10 | Providing material support and resources to a foreign terrorist organization (June 2000 – December 19, 2001) | 18 U.S.C. § 2339B(a)(1) | 15 years |
| 11 | Conspiracy to supply goods and services to the Taliban (Spring 2000 – late 2001) | 18 U.S.C. § 371, 50 U.S.C. § 1705(b), and 31 C.F.R. §§ 545.204, 545.206(b) | 5 years |

There are no statutory minimum sentences for any of Mr. Mostafa's counts of conviction, and, as shown in the charge above, his statutory maximum sentence ranges from 5 years to life, depending on the count.

For purposes of sentencing, we do not dispute the jury's findings or in any way intend to diminish the severity of the defendant's offenses. Regardless of the severity of his offenses, however, the Eighth Amendment prohibits the imposition of cruel and unusual punishment. For the reasons that follow, we respectfully submit that due to the unique characteristics of *this defendant*, Mr. Mostafa's sentence must be fashioned in such a way that acknowledges the severity of his crimes but also the challenges that he will face that will make each day in custody significantly worse for him than for nearly any other criminal defendant. <u>See</u> <u>Phelps v. Kapnolas</u>, 308 F.3d 180, 185 (2d Cir. 2002) ("The conditions of a prisoner's confinement can give rise to an Eighth Amendment violation."), <u>citing,</u> <u>inter alia</u>, <u>Farmer v. Brennan</u>, 511 U.S. 825, 828 (1994) (" 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment"); <u>see also</u> <u>Helling v. McKinney</u>, 509 U.S. 25 (1993); <u>Wilson v. Seiter</u>, 501 U.S. 294 (1991); <u>Estelle v. Gamble</u>, 429 U.S. 97 (1976).

## III.   <u>Objections to the Pre-Sentence Report</u>

On December 19, 2014, defense counsel submitted a letter to the Probation Department objecting to certain aspects of Mr. Mostafa's Pre-Sentence Report ("PSR"). The areas of Mr. Mostafa's PSR that remain of concern are as follows:

- Page 2 of the defendant's PSR lists Mr. Mostafa's education as "Unknown", however, Mr. Mostafa "earned a bachelor's degree in civil engineering with honors" at the University of Brighton in Brighton, England, in 1989, and also completed post-graduate courses at Brunel

4

University in Uxbridge, England, from 1989 to 1991.  See PSR at ¶¶ 138, 139.  As such, page 2 should be corrected accordingly.

- Para. 42, which discusses the involvement of Feroz Abbasi in the allegations contained in Counts 7-10 of Mr. Mostafa's Indictment, explains that "Abbasi was subsequently taken into custody by United States forces in December 2001."  This statement is correct, however, it omits that Mr. Abbasi was subsequently transferred to the custody of the United Kingdom in 2005 and thereafter released.  Additionally, Mr. Abbasi has not been prosecuted by either country.  We respectfully submit that these facts should be inserted into Mr. Mostafa's PSR in order to complete the discussion of Mr. Abbasi's capture as well as his involvement in Mr. Mostafa's counts of conviction.

- Para. 15 of the defendant's PSR states, "During his incarceration [at the Metropolitan Correctional Center ('MCC")], Mostafa refused to obey an order on both June 5, 2013, and August 1, 2014."  Mr. Mostafa denies these allegations and objects to their inclusion in his PSR.  The defendant also notes that his sanction related to the August 1, 2014, allegation remains under administrative appeal.

- Para. 94 discusses Mr. Mostafa's incarceration at HMP Belmarsh in the United Kingdom from May 2004 to 2012, and states, "Records indicated that during this time, he repeatedly attempted to circumvent prison security measures, abused legal privileges and participated in disruption/disturbances of the prison regime."  Mr. Mostafa denies the characterization of these allegations and objects to their inclusion in his PSR.  According to Mr. Mostafa, the allegations contained in para. 94 are either inaccurately summarized, were reached without an adjudication that comports with Due Process (under either U.S. or U.K. law), or are misplaced.

Defense counsel has requested that the Government disclose to the defense the prison disciplinary records underlying para. 94, and/or any other documentation that supports the allegations contained in para. 94 of Mr. Mostafa's PSR.  In response, the Government provided the last two pages of a 14-page document.  The two pages purport to summarize Mr. Mostafa's disciplinary records, but do not contain sufficient detail to determine the accuracy of the summaries let alone the accuracy of the allegations themselves.  Defense counsel requested disclosure of the first

12 pages of said document as well as any related disciplinary reports in the Government's possession, assuming such is not contained in those first 12 pages, however the Government refused counsel's requests. It appears, therefore, that the Government may not possess the formal reports or complaints relating to those allegations.

Indeed, we have been informed by Mr. Mostafa's U.K. attorneys that much of the allegations appear to be "intelligence" material that is gathered on inmates in various ways, including by rumor and innuendo, and is frequently wrong.

Since allegations of misconduct at HMP Belmarsh will have a significant impact on Mr. Mostafa's designation and treatment within the Bureau of Prisons if the allegations are included in his PSR, the defense objects to the inclusion of the entirety of para. 94 unless or until competent evidence is presented that establishes the accuracy of the allegations contained therein.

Assuming that the Probation Department has not ceded to the above objections, we respectfully submit that they must be addressed by this Court. The Bureau of Prisons ("BOP") will rely upon Mr. Mostafa's Pre-Sentence Report when determining which facility to designate him to and what conditions of confinement and accommodations to impose. As a result, any misstatement regarding Mr. Mostafa's prior custodial conduct could detrimentally prejudice the BOP's decisions.

Indeed, as is well established, a sentencing court cannot simply accept any claim or allegation found in a defendant's Pre-Sentence Report. The Due Process Clause "is plainly implicated at sentencing," even though it does not require at sentencing "all the procedural safeguards and strict evidentiary limitations of the

criminal trial itself." <u>United States v. Martinez</u>, 413 F.3d 239, 244 (2d Cir. 2005),
<u>citing</u>, <u>United States v. Fatico</u>, 603 F.2d 1053, 1054 (2d Cir. 1979) (internal
quotation marks and citation omitted).  For example, hearsay may be considered
but it must have "sufficient indicia of reliability to support its probable accuracy."
<u>United States v. Cruz</u>, Docket No. 13-2809-cr, 2014 WL 4942037, at *1 (2d Cir.
Oct. 3, 2014), <u>quoting</u>, U.S.S.G. § 6A1.3 & cmt.  Here, we respectfully submit that
there is no indication as to the source of the allegations nor its reliability.

With respect to para. 94, for example, we note that we have contacted
several of Mr. Mostafa's prior attorneys in England.  His most recent barrister,
Lorna Elliot, and prior solicitor, Simon Creighton, informed us that when
disciplinary charges are brought in Her Majesty's Prisons ("HMP") there is a
formal procedure followed that includes documentation describing each
disciplinary charge and providing the accused with a means of contesting the
allegations, not merely a conclusory two-page summary of all alleged offenses; yet
the Government has not provided the undersigned with any of this material.

We were also informed by Mr. Mostafa's prior U.K. attorneys that much of
the disciplinary allegations contained in para. 94 appear to relate to "intelligence"
material that is gathered on inmates in various ways, including by rumor and
innuendo, which is frequently wrong.  Ms. Elliot offered an example of the
unreliability of "intelligence" reports: she was accused of selling intelligence files

to the media, an allegation that would threaten her livelihood as a prison and human rights barrister.  She immediately challenged the allegation and demanded documentation.  In response, the allegation was withdrawn.

These allegations of misconduct at HMP Belmarsh will have a great effect on Mr. Mostafa's designation and treatment within the Bureau of Prisons.   In making the determination of which facility an inmate will be designated to serve his sentence, the BOP calculates a numerical score.  The higher the score the more secure facility is necessary.   Points are added to the score for prior conduct including verbal threats, prison disturbances, and serious telephone abuse.  See Bureau of Prisons Program Statement P5100.08.  Further, these same allegations may impact on the need for continued Special Administrative Measures ("SAMs") placed on Mr. Mostafa.  Thus, our objections must be resolved.

Rule 32(i) of the Federal Rules of Criminal Procedure does not specifically state which standard of proof is required during sentencing proceedings, although courts and commentary clearly support the reliance upon *at least* a preponderance of the evidence.  See United States v. Guerra, 888 F.2d 247, 251 (2d Cir. 1989); Torres v. Berbary, 340 F.3d 63, 71 (2d Cir. 2003) ("due process in sentencing requires *at least* a showing by a preponderance of the evidence to resolve disputed factual issues") (emphasis added); U.S.S.G.  §  6A1.3, Commentary ("The commission believes that use of a preponderance of the evidence standard is

appropriate to meet due process requirements and policy concerns in resolving disputes regarding application of the guidelines to the facts of a case."); see also McMillan v. Pennsylvania, 477 U.S. 79, 88 (1986) (preponderance standard sufficient where there is no allegation that the sentencing enhancement is "a tail which wags the dog of the substantive offense").

Here, however, we have received no evidence that could support a preponderance finding relating to the allegations contained in para. 94 – nor anything even close to sufficient to support that standard of proof.

Indeed, some of the allegations contained in para. 94 are simply nonsensical. For example, para. 94 alleges that in 2011 Mr. Mostafa's U.K. "legal team "attempted unsuccessfully to smuggle a passport application" to him; such could not be farther from the truth.

Mr. Mostafa had successfully contested the British government's attempt to strip him of citizenship.  After winning his citizenship appeal and during the pendency of the extradition proceedings, Mr. Mostafa requested that his U.K. attorneys help him procure a U.K. passport so that he would be able to return to the England without difficulty in the event that he was found not guilty of the instant U.S. prosecution.  As such, in June 2011, one of his U.K. attorneys brought with him a passport application to be signed during his legal visit.  No attempt was made to conceal the application, but when his attorney went through security at

HMP Belmarsh one of the guards saw the application form and asked what it was. Mr. Mostafa's attorney explained exactly what it was for without hesitation or disguise.  The guard refused to allow his attorney to bring the application into the prison, believing them to be "escape aids", *but the warden of HMP Belmarsh later overrode the guard's misguided conclusion and specifically granted permission for counsel to provide Mr. Mostafa with the passport application.*

The English press learned of Mr. Mostafa's passport and caused a stir in the tabloids when the passport was issued care of the warden of HMP Belmarsh. Ultimately, the incident was reviewed as part of the extradition process and Mr. Mostafa was permitted to retain his passport; in fact for the very purpose of using it to return to the U.K. should his U.S. charges ever get dismissed.  As such, it is simply absurd to allege that Mr. Mostafa's U.K. attorneys "attempted unsuccessfully to smuggle a passport application" to him.  Mr. Mostafa's U.K. attorneys were being open and honest about their attempts to help Mr. Mostafa procure a passport at all times, and succeeded in the process with the assistance of the warden of HMP Belmarsh and the ultimate approval of the British courts.

Other allegations contained in para. 94 are conclusory and are based upon unreliable and unsubstantiated "intelligence."  Examples of these are the allegations that in 2009 he "negatively influenced other terrorist and Muslim prisoners within the facility, and "in 2010, and again in 2012, the defendant

attempted to influence other prisoners, including trying to convert at least one (from Christianity)."

Some allegations contained in para. 94 are incomplete. For example, though standard risk Category A prisoners are not required to change cells, Mr. Mostafa was asked to move because he was located in the high risk unit.  At first he had been in a cell that had modifications and accommodations for his disabilities, but twice he was placed into a cell without the accommodations after having been incorrectly promised that the second cell had been modified.  In one instance he refused to go to the unmodified cell, after which he was taken to the segregation unit.  Mr. Mostafa then remained in the segregation cell not as a punishment but in response to his own request since it better accommodated his disabilities.  Notably, during this time his counsel was seeking to obtain the promised modifications to non-segregated cells.

Further, some allegations contained in para. 94 do not even make sense.  For example, all of Mr. Mostafa's telephone calls and visits were monitored so we do not understand how Mr. Mostafa and other inmates could prevent such monitoring, or how he could prevent staff from attending a social visit.

Similarly, in England Mr. Mostafa was classified as a "Category A standard risk inmate", even though he was housed, due to his disabilities, in a "high risk" dorm.  As such, notwithstanding the classification of the dormitory that he was

being detained in, as a "standard risk inmate" he was entitled to speak in Arabic on visits so long as the visits were monitored or recorded, which, upon information and belief, they were.   Indeed, we can conclude that the conversations were monitored since he had telephone calls that were ended by the prison staff after he used the term, "Inshallah," a word commonly used and understood to mean "god willing".

Further, the statement that Mr. Mostafa received correspondence from Cageprisoners.com (now called CAGE) should be stricken, especially since it is included under the section that describes attempts to allegedly circumvent prison security measures, abuse legal privileges, and disrupt prison routine.   The website is run by a former Guantanamo Bay detainee who was released and repatriated to England *without being charged with any crime*.   As such, it is wholly inappropriate to assume nefarious activity simply through Mr. Mostafa's contact with that website.   Similarly, the fact that Mr. Mostafa may have been receiving financial disbursements "from an unnamed sender who provides financial aid to terrorist prisoners" is similarly misleading and irrelevant to his sentencing.

First, the Government has not disclosed any information to the defense regarding the "unnamed sender".   Second, CAGE is a lawful and open non-governmental organization, which has worked in conjunction with respected organizations,          including,          Amnesty          International.          See

12

http://www.amnesty.org/en/news-and-updates/news/amnesty-international-on-its-work-with-moazzam-begg-cageprisoners-20100211.  The stated goal of CAGE is to work "to empower communities impacted by the War on Terror.  The organization highlights and campaigns against state policies, striving for a world free from oppression and injustice."[1]

Moreover, it should not go unnoticed that not everyone that was detained in Guantanamo Bay was necessarily a terrorist, so a mere connection to an organization founded by a former Guantanamo Bay detainee should be insufficient to establish wrongdoing.   Indeed, the United States Senate Intelligence Committee's report on the CIA's detention and interrogation program has revealed that "at least 26" detainees were later determined to have been "wrongfully held". See Mark Mazzetti, *Panel Faults C.I.A. Over Brutality and Deceit in Terrorism Interrogations*, NY Times (Dec. 9, 2014) (available at <http://www.nytimes.com/2014/12/10/world/senate-intelligence-committee-cia-torture-report.html>) (last accessed, December 22, 2014).  And many pundits are

---

[1]    Its website states: "CAGE has been campaigning against the War on Terror for more than a decade. Its work has focused on working with survivors of abuse and mistreatment across the globe. Its website is one of the leading resources documenting the abuse of due process and the erosion of the rule of law in the context of the War on Terror. CAGE has delivered more than 750 lectures across the UK, produced cutting edge reports and provided a voice to survivors of the War on Terror through its media work."  Moazzam Begg, a former Guantanamo detainee never charged with a crime, is the founder of the organization.  He noted that the organization would not "be forced into determining a person's guilt outside a recognized court of law." <http://www.andyworthington.co.uk/2010/02/10/defending-moazzam-begg-and-amnesty-international/#sthash.jElfBMJd.dpuf>.

calling for an independent prosecutor to investigate and prosecute all those involved in the CIA's detention and interrogation program.  See NY Times Editorial Board, *Prosecute Torturers and Their Bosses*, NY Times (Dec. 21, 2014) (available at <http://www.nytimes.com/2014/12/22/opinion/prosecute-torturers-and-their-bosses.html?hp&action=click&pgtype=Homepage&module=c-column-top-span-region&region=c-column-top-span-region&WT.nav=c-column-top-span-region&_r=0>) (last accessed, December 22, 2014).  As such, any link between Mr. Mostafa and CAGE, absent evidence that establishes a nefarious connection, should be stricken from his PSR so that it does not taint his sentencing proceedings or any aspect of what we expect to be a lengthy term of imprisonment.

Additionally, the Government has not disclosed to the defense sufficient information to adequately respond to the allegations of what "others did", which also appear in para. 94.  Unless proved by a preponderance of the evidence that Mr. Mostafa participated in such conduct, the act of his daughter-in-law or the person who sought to post a telephone conversation on YouTube should not be included in his PSR.  Nor have we received sufficient information relating to the allegation that Mr. Mostafo's prior U.K. legal team "attempted to smuggle

religious books to him within legal papers and documents," and, regardless, Mr. Mostafa should not be held responsible for the acts of others.[2]

Similarly, it is alleged that in 2012 Mr. Mostafa "made threats toward the staff because of his contention that 'illegal orders' were being imposed on him." This allegation provides no information of what the threats were alleged to have been, nor has the Government disclosed any evidence related to these alleged treats in order to put us in a position to adequately respond to the allegations – except to flatly deny that Mr. Mostafa ever made any "threats" directed at HMP staff.

Suffice it to say, the defense respectfully submits that before para. 94 is retained in Mr. Mostafa's PSR, the Government must be required to establish the existence of every allegation contained therein; must do so by at least a preponderance of the evidence; and subject to a full and fair hearing that comports with the requirements of Due Process.[3]

Finally, the defense also has two more minor corrections to Mr. Mostafa's PSR that we believe should be addressed prior to the imposition of his sentence:

---

[2]     Because we do not have more information relating to this allegation, we cannot determine whether the "religious books" were actually related to his cases, as was the passport application.

[3]     Indeed, it is worth noting that Mr. Mostafa's need to challenge the findings contained in para. 94 goes beyond merely the effect on the instant proceedings.  It appears that these allegations have been shared with the BOP and that they have already impacted the conditions of his confinement at the MCC.  Upon information and belief, for example, two other defendants extradited from the United Kingdom to the United States at the same time as Mr. Mostafa (Khaled Al-Fawwaz and Adel Abdel Bary) have both been removed from the 10-South dorm of the MCC and have been transferred instead to general population.  Additionally, unlike in Mr. Mostafa's case, Special Administrative Measures ("SAMs") have never been instituted against Mr. Bary or Mr. Al-Fawwaz.

- Para. 157 explains that Mr. Mostafa's owes U.K. "court costs of $1,000,000 to $2,000,000, including interest."  Said paragraph should refer to English pounds, not United States dollars.  As such, it should read, "court costs of £1,000,000 to £2,000,000, including interest."

- Para. 158 explains that the defendant's family contributes $120 to $150 per month towards his inmate commissary account.  Mr. Mostafa asks that it also be noted that his entire family lives outside of the United States, and as such $120-$150/month does not carry as far as if they lived in the United States (e.g., cost of phone calls and postage is much greater).

While these final two corrections will have no impact on Mr. Mostafa's designation or conditions of confinement, we respectfully submit that they should also be addressed since they could impact any monetary penalties that this Court might impose.

## IV.   The Sentencing Guidelines Calculation

We do not dispute the Probation Department's calculations that Mr. Mostafa's total adjusted offense level is 59 with a Criminal History Category ("CHC") of VI, increased from CHC II after applying the terrorism enhancement recommended in U.S.S.G. § 3A1.4(b) (see PSR at ¶ 59, 97).  Under the United States Sentencing Guidelines the corresponding range of incarceration for a total offense level of 59 with a Criminal History Category of VI is a term of life imprisonment.

Mr. Mostafa insists that he testified truthfully during his trial and objects to an enhancement for obstruction of justice. The defense acknowledges, however,

that an obstruction of justice enhancement will have no impact on Mr. Mostafa's recommended Guideline range, or the BOP's determination of his designation and conditions of confinement.

## V.     Post-Booker Sentencing Framework

### A.     Introduction

As is now well known, in Kimbrough v. United States, 128 S.Ct. 558, 570 (2007), the Supreme Court re-affirmed the sentencing regime announced in United States v. Booker, 534 U.S. 220 (2005), which requires District Courts to view the Guidelines as merely advisory, and instructs District Courts to tailor a sentence in light of all of the statutory concerns set forth in 18 U.S.C. § 3553(a). Under 18 U.S.C. § 3553(a), District Courts are directed to impose the minimally-sufficient sentence to achieve the statutory purposes of punishment – justice, deterrence, incapacitation, and rehabilitation – by imposing a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in 18 U.S.C. § 3553(a)(2). See Kimbrough, 128 S.Ct. at 570. This "parsimony provision" is "an overarching provision," representing a cap above which a District Court is statutorily prohibited from sentencing above, even when a greater sentence is recommended by the advisory Sentencing Guidelines. To put it another way, pursuant to 18 U.S.C. § 3553(a), the Guidelines are to be viewed as statutorily subordinate to the parsimony clause. See Kimbrough, 128

S.Ct. at 570.

Thus, after properly calculating the advisory range under the Sentencing Guidelines, a factor which serves as only the "starting point" or "initial benchmark," District Courts must then consider each of the § 3553(a) factors to impose a sentence sufficient, but not greater than necessary, to fulfill the purposes of sentencing. See Gall v. United States, 128 S.Ct. 586, 596-97 (2007). To that end, the Supreme Court has also explained that District Courts may not presume the advisory Guidelines range to be reasonable. See Gall, 128 S.Ct. at 596. Further, the advisory Guidelines range is to be given no greater weight than any other § 3553(a) factor, id. at 602, including, therefore, 18 U.S.C.§ 3553(a)(2)(D), which requires this Court to impose a sentence that takes into consideration "the need for the sentence imposed … to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner" (emphasis added).

Thus, as explained by the Second Circuit, a sentencing judge is "required to consider the relevant Guideline provisions in determining a reasonable sentence," United States v. Rubenstein, 403 F.3d 93, 98-99 (2d Cir. 2005), but unless a sentencing judge considers *all* of the factors set forth in 18 U.S.C. § 3553(a), as well as the applicable Guideline range, it cannot be concluded that the resulting

sentence is "reasonable."   See United States v. Crosby, 397 F.3d 103 (2d Cir. 2005).  Moreover:

> A district court may not presume that a Guideline sentence is reasonable; it must instead conduct its own independent review of the sentencing factors, aided by the arguments of the prosecution and defense.  District judges are, as a result, generally free to impose sentences outside the recommended range.   When they do so, however, they "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of variance."  [Gall, 128 S.Ct.] at 597.  In this way, the district court reaches an informed and individualized judgment in each case as to what is "sufficient, but not greater than necessary" to fulfill the purposes of sentencing.  18 U.S.C. § 3553(a).

United States v. Cavera, 550 F.3d 180, 189 (2d Cir. 2008).

Similarly, other statutory provisions also give the District Court direction in sentencing.   Under 18 U.S.C. § 3582, imposition of a term of imprisonment is subject to the following limitation: In determining whether and to what extent imprisonment is appropriate based on the Section 3553(a) factors, the court is required to "recogniz[e] that imprisonment is not an appropriate means of promoting correction and rehabilitation" (emphasis added).   Further, under 18 U.S.C. § 3661, "no limitation shall be placed on the information concerning the background, character, and conduct of [the defendant] which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence" (emphasis added).  As such, Mr. Mostafa presents the following for this

Court's consideration relative to the factors outlined in 18 U.S.C. §§ 3553(a) and

3661.

> **B.    The history and characteristics of Mr. Mostafa and the need
> to impose medical care in the most effective manner
> suggest that Mr. Mostafa should be designated directly
> to a Federal medical center, not Florence ADX, and this
> Court should order (or, in the alternative, recommend)
> minimal conditions of confinement, medical treatment,
> and care, that must be provided in order to comply with
> the requirements of 18 U.S.C. §§ 3553(a)(1) and
> (a)(2)(D), as well as to comply with the Eighth
> Amendment to the United States Constitution and
> Article 3 of the Convention for the Protection of Human
> Rights and Fundamental Freedoms**

Sentencing memorandum generally discuss where within the Sentencing

Guidelines a defendant should be sentenced or how far the court should depart or

vary from the "starting point".  Here, however, Mr. Mostafa is 56 years old and has

been convicted of 11 counts of terrorism-related offenses.  As such, the defense is

under no illusion that Mr. Mostafa will ever freely return to his family even under

the most lenient realistically conceivable non-life sentence.

That being said, we respectfully submit that this Court's determination of

Mr. Mostafa's sentence should go beyond merely a period of months or years, and

instead should contain a significant focus on his designation, conditions of

confinement, and the quality of life that will be provided, to ensure that any

sentence – regardless the length – is sufficient, but not greater than necessary, to

satisfy the purposes of sentencing.

1. **Mr. Mostafa's Accommodations and Medical Care at the MCC suggest that direct placement into a Federal medical facility and specific recommendations regarding the conditions of his confinement, necessary medical care, and daily assistance, is warranted**

As the Court is well aware, the level of care and accommodations that were supposed to be provided to Mr. Mostafa by the Bureau of Prisons for his unique and severe disabilities were of tantamount importance during his extradition proceedings, and has also been a central issue in his case since his pretrial detention at the MCC commenced more than two years ago.

Since his extradition, Mr. Mostafa has documented his specific needs and required accommodations through letters to this Court and the MCC legal department. See e.g., Letter, dated, March 7, 2013, from Lindsay A. Lewis, Esq., to the Hon. Katherine B. Forrest (annexed hereto as Exhibit A); Letter, dated, March 21, 2013, from Lindsay A. Lewis, Esq., to Adam Johnson, Esq., Supervising Attorney, MCC Legal Department (annexed hereto as Exhibit C).  In response to these concerns, in March 2014 the BOP appointed a prosthetist to craft new prosthetic devices and an occupational therapist to advise the MCC staff and legal department as to necessary accommodations and to make related recommendations.   The MCC, in turn, has provided Mr. Mostafa with medical care and accommodations for his disabilities *to the best of its ability*.  See, e.g.,

Letter, dated, March 13, 2013, from MCC Warden Catherine A. Linaweaver to the Hon. Katherine B. Forrest (annexed hereto as Exhibit B).

In that regard, the accommodations that were ultimately provided to Mr. Mostafa demonstrate the limitations in the ability of the MCC – or any standard, non-medical, BOP facility – to properly provide for Mr. Mostafa's disabilities, and highlight the need for Mr. Mostafa to be placed in a Federal medical facility where he will have daily access to medical care, a designated "home" health aide (or a reasonable equivalent), and proper accommodations for a double arm amputee, as recommended by the report of Dr. Benjamin Kligler, M.D., M.P.H., dated, December 15, 2014 (annexed hereto at as Exhibit D).

Notably, in the more than two years Mr. Mostafa has been detained at the MCC, and despite obvious necessity, he has never been provided with a handicapped toilet, shower, or sink, but has instead been offered makeshift fixes – such as paddle attachments – to improve upon existing facilities.  The inadequacy of these facilities is demonstrated by the fact that Mr. Mostafa is unable to accomplish the tasks associated with daily living on his own, and without repeated injury.  Nor has he been outfitted to date with two properly functioning prosthetic devices to assist him (despite repeated efforts by the assigned prosthetist), or been given required assistance in toileting and showering, among other areas, in the

alternative.  Mr. Mostafa's current accommodations only exemplify the need for true disability accommodations suited to his precise needs.

Records and litigation from the United Kingdom reflect the shortcomings of even those significantly more suitable accommodations, in light of the severity of Mr. Mostafa's disabilities and the corresponding level of accommodation and care that they require.   Nonetheless, even providing Mr. Mostafa care and accommodations akin to what he had in England, where he had daily access to nursing and/or doctor care (including, 4-5 medical visits/week) as well as visits from a home health aide at least once per day, would be a substantial improvement over the level of care and accommodations he has thus far received in the Bureau of Prisons, and would be closer to what Dr. Kligler believes is necessary given Mr. Mostafa's level of disability.

Specifically, after a thorough review of Mr. Mostafa's medical records, coupled with a detailed medical examination conducted at the MCC, Dr. Kligler concluded "that the lack of adequate accommodation for his disability in his current location, as well as inadequate prostheses and/or health aide assistance to accomplish tasks associated with daily living, *is putting him at significant risk for additional complications related to his condition and potentially at risk of the need for further amputation as well*. I believe he should be held in quarters that allow for adequate accommodation and assistance to obviate the need for him to use his

stumps for activities of daily living as he is currently required to do."  Exhibit D at

4 (emphasis added).

As a result, Dr. Kligler offers the following recommendations, which the

undersigned wholeheartedly adopt:

- "In light of the fact that Mr. Mostafa is unable to accomplish the tasks associated with daily living under his present level of accommodation and given his present prosthetic devices without putting himself at a significant risk of further complications and infection or even amputation, Mr. Mostafa should be transferred to a facility where he will have the daily assistance of a "home" health aide [or a reasonable equivalent]."  Exhibit D at 4.

- "He should also be provided proper accommodations for his unique disabilities, which would include, among other items, a shower, toilet and sink suited to the needs of a double upper extremity amputee, in the event that he is ever left to accomplish tasks of daily living without the assistance of an aide."  Id.

- "An occupational therapist familiar with the needs of double upper extremity amputees should be appointed to review the accommodation and medical issues unique to Mr. Mostafa that are raised herein and to advise Bureau of Prisons staff as to the nature and construction of the accommodations required."  Id.

- "Even if Mr. Mostafa is provided with sufficient accommodations for his disabilities and the assistance of a "home" health aide [or a reasonable equivalent], he must nonetheless have daily access to medical attention and care."  Id.

Notably, the accommodations sought herein are not without precedent.  In

Shariff v. Coombe, 655 F.Supp.2d 274 (SDNY 2009), the Honorable Barbara S.

Jones recognized that the Eighth Amendment extends to conditions of confinement

and the effect those conditions have on disabled prisoners.  In doing so Judge Jones

held that the inability of disabled prisoners who depended on wheelchairs for mobility to access restrooms while incarcerated constituted an objective violation of the Eighth Amendment, where prisoners soiled themselves up to several times per week; sheer frequency with which those incidents occurred, not to mention physical injuries that at least some prisoners had suffered in attempting to use inaccessible restrooms, indicated that prisoners had been denied minimal civilized measure of life's necessities and there was an unreasonable risk of serious damage to their future health.  See Shariff, 655 F.Supp.2d at 298-99; see also Knop v. Johnson, 667 F.Supp. 467, 479 (W.D.Mich. 1987) ("Exposing an inmate to a situation where he may be forced to defecate or urinate in his own cell without the presence of proper toilet facilities or a washbasin violates the basic human dignity the Eighth Amendment protects.").

Moreover, as Magistrate Judge Gorenstein pointed out in Johnson v. Wright, the mere "fact that a [prisoner] received regular medical care does not preclude a finding of deliberate indifference where the 'course of treatment was largely ineffective and [prison officials] declined to do anything more to attempt to improve [the prisoner's] situation.' "  Johnson v. Wright, 234 F.Supp.2d 352, 360 (SDNY 2002), quoting, Hathaway v. Coughlin, 37 F.3d 63, 68 (2d Cir. 1994); see also Oliver v. Deen, 77 F.3d 156 (7th Cir. 1996) (prison officials must ensure that inmates receive adequate food, clothing, shelter, protection and medical care);

Whitnack v. Douglas County, 16 F.3d 954 (8th Cir. 1994) (reasonably adequate sanitation and ability to eliminate and dispose of one's bodily wastes without unreasonably risking contamination are basic identifiable human needs of prisoner protected by Eighth Amendment); King v. Frank, 371 F.Supp.2d 977 (W.D.Wisc. 2005) (condition of inmate's confinement violates Eighth Amendment's prohibition against cruel and unusual punishment if it denies inmate civilized measure of life's necessities); Estelle v. Gamble, supra, 429 U.S. 97 (1976) (deliberate indifference to prisoners' serious medical needs constitutes cruel and unusual punishment); LaFaut v. Smith, 834 F.2d 389 (4th Cir. 1987) (prison officials violated Eighth Amendment by failing to provide disabled inmate with needed physical therapy and adequate access to facilities).

Beyond the Eighth Amendment, Congress, in enacting the Rehabilitation Act of 1973 and the Americans with Disabilities Act of 1990, recognized that the need to accommodate the needs of disabled persons extends not merely to those that are at liberty but to those incarcerated as well.  See Pennsylvania Dep't of Corrections v. Yeskey, 524 U.S. 206 (1998) (ADA); Onishea v. Hopper, 171 F.3d 1289 (11th Cir. 1999) (Rehabilitation Act); Bonner v. Lewis, 857 F.2d 559 (9th Cir. 1988) (Rehabilitation Act); Kaufman v. Carter, 952 F.Supp. 520, 523-24 (W.D.Mich. 1996) (failure to provide accommodations so that bilateral amputee could gain equal access to bathrooms and showers while incarcerated implicated

Rehabilitation Act, the ADA, and the Eighth Amendment); see also 29 U.S.C. § 794(a) ("No otherwise qualified individual with a disability in the United States, as defined in section 705[20] of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service."); 42 U.S.C. § 12132 ("Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity"); 42 U.S.C. § 12182(b)(2)(A)(ii) (explaining that, for purposes of the ADA, discrimination in public accommodations includes: "a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations").

Mr. Mostafa simply requests that he be provided the accommodations necessary to provide him with a civilized measure of life's necessities. He does

not seek the moon; he merely seeks imposition of the minimal recommendations proposed by Dr. Kligler.   We respectfully submit that incorporation of Dr. Kligler's recommendations into Mr. Mostafa's Judgment Order would provide Mr. Mostafa with a sentence that is sufficient, but not greater than necessary, to serve the purposes of sentencing.   Failing to do so, however, would violate the Constitution, Acts of Congress, and, as will be discussed next, the assurances and representations made by the United States government during the extensive litigation that ultimately resulted in Mr. Mostafa's extradition from the United Kingdom to the United States for purposes of the instant prosecution.

> ### 2. Representations made during Mr. Mostafa's extradition proceedings further support the need for direct placement into a Federal medical facility with specific directions regarding the conditions of his confinement, necessary medical care, and daily assistance

Similar to the discussion above, Article 3 of the Convention for the Protection of Human Rights and Fundamental Freedoms (hereinafter, "Human Rights Convention") prohibits inhuman and degrading treatment of prisoners. While the Human Rights Convention is not, by itself, binding on this Court, since it was the subject of Mr. Mostafa's extradition proceedings, and since the United States government made numerous representations that it would comply with the requirements of the Human Rights Convention if Mr. Mostafa's extradition was ordered, we respectfully submit that the doctrine of specialty, coupled with the

specific circumstances of this case, require this Court to do all in its power to ensure compliance with Article 3.  See United States v. Baez, 349 F.3d 90, 92 (2d Cir. 2003) (per curiam) ("Based on international comity, the principle of specialty generally requires a country seeking extradition to adhere to any limitations placed on prosecution by the surrendering country."); see also Graham v. Florida, 560 U.S. 48 (2010) ("The judgments of other nations and the international community are not dispositive as to the meaning of the Eighth Amendment.  But '[t]he climate of international opinion concerning the acceptability of a particular punishment' is also 'not irrelevant.' "), quoting, Enmund v. Florida, 458 U.S. 782, 796 n.22 (1982).

Mr. Mostafa challenged his extradition from the United Kingdom to the United States on a number of grounds including, as is relevant here, that extradition would result in inhuman and degrading treatment by his long-term imprisonment within the United States Bureau of Prisons at USP Florence ADMAX (also referred to as "Florence ADX", or simply, "ADX").  Mr. Mostafa's lack of success challenging extradition due to the possibility of incarceration at ADX is directly attributable to sworn statements, concessions, and promises made by the United States government during those extradition proceedings.  However, it is upon those same sworn statements, concessions, and promises made by the United States government that we respectfully request that your Honor order the

Bureau of Prisons to require that Mr. Mostafa be held in an appropriate Federal medical facility (i.e., a BOP facility designated as either a Federal Medical Center ["FMC"] or Medical Center for Federal Prisoners ["MCFP"]).

Senior District Judge Tim Workman of the City of Westminster (U.K.) Magistrate's Court was the first judge to hear this matter and issued his decision on November 15, 2007. See Exhibit E.[4]  Judge Workman reviewed a report submitted on behalf of Mr. Mostafa that was prepared by "an experienced United States Attorney," Bruce Malloy (Exhibit E at para. 40), and a sworn statement by ADX Warden R. Wiley (Exhibit F).

Judge Workman described the conditions of confinement at Florence ADX and noted that the standard conditions of Florence ADX could, if "applied for a lengthy indefinite period" "properly amount to inhuman and degrading treatment which would violate Article 3" of the Human Rights Convention (Exhibit E at para. 43).  Judge Workman noted, however, that Warden Wiley explained under oath that after consultation with the Chief of Health Programs that it would be "highly unlikely" for a person with Mr. Mostafa's conditions and disabilities (i.e., "type 2 diabetes, raised blood pressure, psoriasis, loss of sight in one eye and bilateral amputation of both forearms," that "required assistance with the activities

---

[4]     While we have sought to gather all of the submissions by the parties to all courts, we have not yet been able to obtain some of the submissions made by the United States or on their behalf.

of daily living" [Exhibit F at page 3 para. 5]) to be placed in Florence ADX, and as a result Judge Workman expected that Mr. Mostafa would instead be designed to a Federal medical facilty (see Exhibit E at para. 43-44).

Indeed, Judge Workman only agreed to order the extradition of Mr. Mostafa because he accepted the representations of Warden Wiley that Mr. Mostafa could not be permanently housed at Florence ADX, noting:

> On the basis of his evidence I am satisfied that the defendant would not be detained in these conditions [i.e., ADX] indefinitely, that his undoubted ill health and physical disabilities would be considered and, at worst, he would only be accommodated in these conditions [i.e., ADX] for a relatively short period of time.  Whilst I find these conditions offensive to my sense of propriety in dealing with prisoners, I cannot conclude that, *in the short term*, the incarceration in a supermax prison would be incompatible with his Article 3 Rights.

Exhibit E at para. 44 (emphasis added).  Notably, the conditions of confinement that Mr. Mostafa has been subjected to in the 10-South dorm of the Metropolitan Correctional Center ("MCC") are even more severe than the conditions imposed at Florence ADX.

The appeal to the High Court of Justice, Queen's Bench Division, dealt with the same issues raised before Judge Workman, but then more clearly set forth Mr. Mostafa's medical conditions and needs.[5]  The High Court noted that the United

---

[5]     The conditions included "type 2 diabetes and raised blood pressure, ... extensive psoriasis, hyperhydrosis (excessive sweating provoked by a neurological condition) which

States government had no dispute with the description of Mr. Mostafa's medical conditions or needs. (see Exhibit G para. 65).   The High Court examined an additional report by Professor Andrew Coyle relating to the conditions at ADX and noted that "a common thread" that ran through the report was the "potential adverse effect on the mental health of inmates of long term social isolation." Id. at 20, paras. 65-67.

The High Court dismissed Prof. Coyle's concern because of the United States government's commitment to properly treat Mr. Mostafa's medical and disability needs, stating that "unless ADX Florence regime ignores appellant's medical condition, and his need for nursing assistance," there would not be a risk of isolation because of the amount of time that a nursing assistant would be assisting in Mr. Mostafa's activities of daily living.   Ibid.   However, we know, and there can be no meaningful dispute before Your Honor, that ADX is simply not designed to provide the type of medical care and assistance in daily living that was contemplated by the High Court of the United Kingdom.   By stating that there was no real risk that the United States would leave Mr. Mostafa's medical needs untreated, the High Court affirmed Judge Workman's finding that there was little risk of Mr. Mostafa spending any significant time at ADX.

---

requires him to shower and change his clothes at least twice daily, blindness in the right eye, with poor vision in the left, and bilateral traumatic amputation of the distal third of both forearms for which prostheses are fitted. The stumps in both arms are subject to regular outbreaks of infection, which have been increasing in severity."  Exhibit G at para. 7.

That being said, the High Court affirmed the decision to extradite Mr. Mostafa with two caveats.  First, if Mr. Mostafa was held in ADX "a full and objective medical evaluation of the appellant's condition, and the effect of his disabilities on the ordinary daily living and his limited ability to cope with conditions at ADX Florence[,] would indeed be carried out."  Id. at para 69.  To that end, the High Court took the United States government's assurances that the delay that occurred with Sheikh Rahman would not happen again. Ibid.

The second caveat repeated Judge Workman's concerns but with even greater force. The High Court was also "troubled" by the conditions of confinement at supermax facilities.  However, because it viewed the commitments and promises made by the United States government as assurance that Mr. Mostafa would not be incarcerated at ADX, or if he was, it would be for a very short period of time, the High Court left for another day the final decision as to whether the conditions of confinement in supermax prisons would be viewed as torture or ill treatment that violated Article 3 of the Human Rights Convention.  The High Court made clear, however, that such confinement "may well be" torture in violation of Article 3.  As explained by the High Court:

> Naturally, the most dangerous criminals should expect to be incarcerated in the most secure conditions, but even allowing for a necessarily wide margin of appreciation between the views of different civilized countries about the conditions in which prisoners should be detained, confinement for years and years in what effectively

> amounts to isolation may well be held to be, if not
> torture, then ill treatment which contravenes Article 3.

(Exhibit G at para. 70).

The next step in Mr. Mostafa's appeal was to the European Court of Human Rights. On behalf of the United States government, the Foreign and Commonwealth Office of the United Kingdom filed a submission (annexed hereto as Exhibit H) repeating that there was no dispute about Mr. Mostafa's medical condition and the needs described in paragraph 7 of the High Court's decision. See Exhibit H para. 28; see also Exhibit H para. 29-34; see also Decision of the European Court of Human Rights, dated, September 24, 2012 (annexed hereto as Exhibit I) at para. 25.[6]

The Foreign and Commonwealth Office, acting as a conduit for the United States, asked the ECHR to affirm the lower courts' decision on the basis that "the likelihood is the applicant will not be detained in a 'supermax' detention at all"; if he was, "such detention would be for a relatively short period given the extent and nature of the applicant's ill health and physical disabilities." Exhibit H at para 29. The Foreign and Commonwealth Office also adopted *as fact* that if Mr. Mostafa is held at ADX for a short period of time he will not suffer social isolation because of

---

[6]      Unfortunately, Judge Workman and the High Court did not consider the conditions that Mr. Mostafa would be held pretrial. He received almost none of the accommodations or daily living assistance he received in HMP Belmarsh, which the United States had acknowledged was appropriate and necessary.

the care he will receive due to his disabilities.  Id. at para. 31. The Foreign and Commonwealth Office further noted that if Mr. Mostafa is held at ADX it would be for a "relatively short time pending a medical evaluation, and [he] would then be transferred to a medical centre." Id. at para 30.   Notwithstanding their confidence, we respectfully submit that this Court should not assume the accuracy of the Foreign Office's prior assurances.

Indeed, despite denying Mr. Mostafa's appeal, the European Court of Human Rights recognized that both parties agreed on a need for a comprehensive health and social care plan, as well as regular daily support for Mr. Mostafa, and that such a plan or regular support would not be possible at Florence ADX. See Exhibit I at para. 217.[7]   The Court recognized that Mr. Mostafa's disabilities were even greater than that of Sheikh Rahman, and that the amputations "alone would appear to make detention at ADX impossible" (Exhibit I at 67).

Additionally, a review of Mr. Mostafa's medical records from HMP Belmarsh present a clear picture why designation to ADX Florence would violate the terms of the extradition order vis-à-vis by violating the United States Constitution's Eighth Amendment prohibition against cruel and unusual

---

[7]    For example, the United States government acknowledged that Mr. Mostafa's extensive psoriasis and hyperhydrosis required him to be able to shower and change clothes at least twice daily, but Associate Warden Louis Milusnic noted that inmates at the Special Security Unit would be escorted to a community shower only three times *per week*. See Exhibit I at para. 84.

punishment as well as by violating the Human Rights Convention's Article 3 prohibition against inhuman and degrading treatment of prisoners.

At HMP Belmarsh Mr. Mostafa was visited by a health care aide daily, and a nurse and/or physician approximately 4-5 times a week.  The health aide attended to Mr. Mostafa's hygiene needs. The aide cleaned the cell, washed the dishes, made the bed, prepared hot drinks, and made sure he had adequate fluids to drink from a container provided to him.  Similarly, either the health aide or the nurse applied medication to Mr. Mostafa's stumps on a daily basis.[8]  Additionally, while detained at HMP Belmarsh, Mr. Mostafa was permitted to spend approximately six hours per day comingling with other inmates from his unit rather than isolated in his cell, and those inmates were permitted to assist Mr. Mostafa with his daily living we well.  None of that will occur at Florence ADX.[9]

To ensure that Mr. Mostafa receives the medical care and assistance expected as a prerequisite to extradition by the U.K. and European courts, we respectfully submit that Mr. Mostafa must be transferred directly to a Federal

---

[8]     Notably, Mr. Mostafa's medical visits, including both his nurse/doctor visits and the visits of his home health aide, occurred in the privacy of his cell, outside the presence of prison guards.

[9]     Indeed, "general population" at Florence ADX has a different meaning than elsewhere in the BOP system.  At ADX, inmates in "general population" are still confined in isolation for the duration of their incarceration.  The main difference between a general population inmate and a SHU inmate at ADX is that general population inmates are permitted to recreate in adjoining – yet still separate – cells to other general population inmates, whereas SHU inmates are not even provided that minimal level of civility.

medical facility, not ADX, and that this Court should make specific recommendations regarding the required minimal level of treatment that he should receive once transferred from his current confinement at the MCC.

## VI. <u>Conclusion</u>

The sentence imposed upon Mr. Mostafa must be one that is sufficient, but not greater than necessary to satisfy the purposes of sentencing. It is respectfully submitted that although Mr. Mostafa has been convicted for his participation in terrible crimes, the mitigating circumstances outlined herein outweigh the aggravating circumstances when considering what sentence to ultimately impose. To that end, we respectfully submit that a sentence of less than life imprisonment is appropriate in this case and that this Court should incorporate the following recommendations into Mr. Mostafa's Judgment Order:

- Mr. Mostafa's significant and extensive medical disabilities require that he be incarcerated in a Federal medical facility, and as such he should be directly designated to either a Federal Medical Center (FMC) or a Medical Center for Federal Prisoners (MCFP);

- In light of the fact that Mr. Mostafa is unable to accomplish the tasks associated with daily living under his present level of accommodation (and given his present prosthetic devices) without putting himself at a significant risk of further complications and infection or even amputation, Mr. Mostafa should be transferred to a facility where he will have the daily assistance of a "home" health aide (or a reasonable equivalent);

- He should also be provided proper accommodations for his unique disabilities, which would include, among other items, a shower, toilet and sink suited to the needs of a double upper extremity amputee, in

the event that he is ever left to accomplish tasks of daily living without the assistance of an aide;

- An independent occupational therapist familiar with the needs of double upper extremity amputees should be appointed to review the accommodation and medical issues unique to Mr. Mostafa that are raised herein and to advise Bureau of Prisons staff as to the nature and construction of the accommodations required; and

- Even if Mr. Mostafa is provided with sufficient accommodations for his disabilities and the assistance of a "home" health aide (or a reasonable equivalent), he must nonetheless have daily access to medical attention and care.

We thank Your Honor for your consideration in this matter.

Dated:  New York, New York
        December 26, 2014

                         Respectfully submitted,

                         /S/

                         Michael K. Bachrach
                         Sam A. Schmidt
                         Lindsay A. Lewis

                         *Attorneys for Defendant*
                         *Mostafa Kamel Mostafa*