UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X

UNITED STATES OF AMERICA,

      - against -                           04 Cr. 356 (AT)

MUSTAFA KAMEL MUSTAFA,
a/k/a Mostafa Kamel Mostafa,

                    Defendant.

-----------------------------------------------------X

**DEFENDANT MOSTAFA KAMEL MOSTAFA'S
MOTION FOR COMPASSIONATE RELEASE AND/OR REDUCTION IN SENTENCE**

SAM A. SCHMIDT, ESQ.          MICHAEL K. BACHRACH, ESQ.
29 Broadway, Suite 1412        224 West 30th Street, Suite 302
New York, New York 10006     New York, New York 10001
(212) 346-4666             (212) 929-0592

*Attorneys for Defendant Mostafa Kamel Mostafa*

**<u>Table of Contents</u>**

Table of Authorities ..................................................................................................... iii

I.  Preliminary Statement.........................................................................................1

II. The Relevant Law .................................................................................................2

III. Mr. Mostafa's Current Sentence and Time in Custody ......................................4

IV. Extraordinary and compelling circumstances exist that warrant granting Mr. Mostafa either compassionate release or a substantial reduction in his sentence ...............5

    A.    Mr. Mostafa has been in custody for 19 years since his arrest in this case ............5

    B.    Justification for Mr. Mostafa's release begins with his U.K. and European Court Extradition Proceedings...................................................................6

    C.    Conditions of Confinement...............................................................14

        1.    Her Majesty's Prison Belmarsh .............................................15

        2.    Metropolitan Correctional Center of New York .........................16

        3.    Federal Medical Center Springfield.........................................20

        4.    Background of ADX .............................................................22

        5.    Mr. Mostafa's Incarceration in ADX .......................................25

            a.    Mr. Mostafa's cell............................................................31

            b.    Religious Limitations.....................................................41

            c.    Solitary Confinement and Limitations on Communications with Others..................................................................42

            d.    Availability of Administrative Remedies ......................43

    D.    Mr. Mostafa does not present a continuing or future danger to the community ..................................................................50

        1.    Mr. Mostafa's offense conduct should be viewed in context – his role and his conduct .....................................................52

2.      Restrictions Upon Return to England ........................................................58

3.      Mr. Mostafa has the support of his family ................................................61

V.   Granting compassionate release or a reduction in sentence for Mr. Mostafa would
     *not* be an outlier ........................................................................................................65

VI.  Conclusion ........................................................................................................69

# Table of Authorities

CASES

Cunningham v. Fed. Bureau of Prisons,
Docket No. 12 Cv. 1570 (RPM) (MEH),
2016 WL 8786871 (D.Colo. Dec. 29, 2016) ...................................................................23

Davis v. Ayala,
135 S.Ct. 2187 (2015) .......................................................................................................24

Estelle v. Gamble,
429 U.S. 97 (1976)............................................................................................................48

Hathaway v. Coughlin,
37 F.3d 63 (2d Cir. 1994) .................................................................................................47

In re Medley,
134 U. S. 160 (1890).........................................................................................................24

Johnson v. Wright,
234 F.Supp.2d 352 (SDNY 2002).....................................................................................47

Kaufman v. Carter,
952 F.Supp. 520 (W.D.Mich. 1996) .................................................................................48

King v. Frank,
371 F.Supp.2d 977 (W.D.Wisc. 2005)..............................................................................48

Knop v. Johnson,
667 F.Supp. 467 (W.D.Mich. 1987) .................................................................................47

LaFaut v. Smith,
834 F.2d 389 (4th Cir. 1987) ...........................................................................................48

Oliver v. Deen,
77 F.3d 156 (7th Cir. 1996) .............................................................................................48

Onishea v. Hopper,
171 F.3d 1289 (11th Cir. 1999) .......................................................................................48

Pennsylvania Dep't of Corrections v. Yeskey,
524 U.S. 206 (1998)..........................................................................................................48

Ruiz v. Texas,
137 S.Ct. 1246 (2017)...................................................................................24

Shariff v. Coombe,
655 F.Supp.2d 274 (SDNY 2009)..................................................................47

Whitnack v. Douglas County,
16 F.3d 954 (8th Cir. 1994) ..........................................................................48

United States v. Abel Abdel Bary,
2020 WL 5946985 (SDNY Oct. 7, 2020)........................................................68

United States v. Brooker,
976 F.3d 228, (2d Cir. 2020)........................................................................2, 3

United States v. Mustafa,
753 Fed.App'x 22 (2d Cir. 2018).....................................................................5

FOREIGN CASES

Abu Hamza, et al. v. Secretary of State for the Home Department, [2012] EWHC
2736 (Admin) (High Court, Queens Bench Div. May 10, 2012) (available at
https://www.judiciary.uk/wp-content/uploads/JCO/Documents/Judgments/abu-
hamza-full-judgment.pdf) ..............................................................................14

Case of Babar Ahmad and Others v. United Kingdom,
Appl. Nos. 24027/07, 11949/08, 66911/09, 67354/09
(European Court of Human Rights) (April 10, 2012)
(available at A.97-A.178) ..............................................................9, 10, 11, 13,
                                                                                      14, 17, 42

Mustafa Kamel Mustafa (Otherwise Abu Hamza) v. United States, [2008] EWHC
1357 (High Court, Queen's Bench Div.) (June 20, 2008)
(available at A.32-A.62) ..............................................................8, 9, 10, 11,
                                                                                    20, 33, 41, 43

United States v. Abu Hamza (City of Westminster (U.K.) Magistrate's Court)
(Workman, S.DJ.) (November 15, 2007) (available at A.3-18) ................................7, 8, 43

United States v. Julian Assange (City of Westminster (U.K.) Magistrate's Court)
(Baraitser, DJ.) (January 4, 2021)
(available at https://www.judiciary.uk/judgments/usa-v-julian-assange)............................8

STATUTES

18 U.S.C. § 371 ...............................................................................................2

18 U.S.C. § 1203 .............................................................................................2

18 U.S.C. § 2339A ..........................................................................................2

18 U.S.C. § 2339B ...........................................................................................2

18 U.S.C. § 3553 ...................................................................................2, 3, 50

18 U.S.C. § 3582 .......................................................................................2, 65

18 U.S.C. § 3583 .............................................................................................2

29 U.S.C. § 794 .............................................................................................47

42 U.S.C. § 12182 .........................................................................................48

U.S. Const., 8th Amend. ...........................................................14, 47, 48, 49

U.S.S.G. § 1B1.13 ...........................................................................................3

U.S.S.G. § 1B1.13, Application Note 1 .........................................................3

American with Disabilities Act of 1990 ...........................................47, 48, 49

Rehabilitation Act of 1973 ...............................................................47, 48, 49

TREATIES

Convention for the Protection of Human Rights and Fundamental Freedoms (also referred to as the European Convention on Human Rights) (1953) (available at https://www.echr.coe.int/documents/d/echr/Convention_ENG) ........................6, 7, 9, 10, 11, 15, 25, 43

OTHER AUTHORITIES

BOP's Program Statement 1330.18, "Administrative Remedy Program" (January 6, 2014) (available at https://www.bop.gov/policy/progstat/1330_018.pdf) ....................46

BOP Program Statement 5310.16, "Treatment and Care of Inmates With Mental Illness" (May 1, 2014), at 11 (available at http://bit.ly/2BKlUDS) ...................................24

BOP Program Statement 5100.08, "Inmate Security Designation and Custody Clarification," Ch. 7, p.18
(available at https://www.bop.gov/policy/progstat/5100_008.pdf) ...................................25

"The Darkest Corner," *Center for Constitutional Rights and Lowenstein International Human Rights Clinic* (September 2017) (available at https://bit.ly/3i0WuT4) ..............................................................................16, 24, 46

*Supermax: A Clean Version of Hell*, CBS News (October 14, 2007, updated June 19, 2009) (available at https://www.cbsnews.com/news/supermax-a-clean-version-of-hell/) ............................................................................................................50

Mark Binelli, "Inside America's Toughest Federal Prison," *New York Times*, March 26, 2015, (hereinafter "*America's Toughest Prison*") (available at http://nyti.ms/1D1rbRa) ..............................................................................22, 23

Lancaster, "Kidnapping in Yemen is Hospitality" (available at https://www.washingtonpost.com/wp-srv/inatl/mideast/may/22/kidnap.htm) .................56

Definition of Erythema, Drugwatch, (available at https://www.drugwatch.com/health/rash-and-skin-disorders/erythema/).........................29

Dr. Michael Warshaw, *Debridement vs Trimming*, TLO Systems (November 17, 2020) (available at https://www.tldsystems.com/debridement-vs-trimming) ..................38

*Factsheet: Desistance and Disengagement Programme*, UK Home Office (February 2023)
(available at https://homeofficemedia.blog.gov.uk/2019/11/05/fact-sheet-desistance-and-disengagement-programme/). ...............................................................60

I.   **Preliminary Statement**

On January 12, 2023, the undersigned counsel, acting on behalf of Defendant Mustafa Kamel Mustafa (a/k/a Mostafa Kamel Mostafa), submitted a letter by U.S. mail and email to the Warden of ADX Florence in Florence, Colorado, requesting Mr. Mostafa's compassionate release/reduction in sentence based upon "numerous compelling and extraordinary circumstances" including that:

> He is a sixty-four-year-old [now 65] double-arm amputee, who is blind in one eye, limited vision in the other eye, and suffers from diabetes, hypertension, sever psoriasis and hyperhidrosis, a serious skin condition. He has also suffered through two debilitating infections of the COVID-19 virus during his incarceration at your facility.  His health has continued to deteriorate [and] while held in custody of the Bureau Mr. Mostafa's cell was not designed for his disability.
>
> In seeking extradition [from] the United Kingdom, the United States government and the Bureau of Prisons made promises and commitments that he would not be designated to ADX Florence and if he spent some time there, it would be for a very short period of time. The British courts and the European Court Human Rights relied on these promises and commitments in ordering his extradition.
>
> At the extradition proceedings the United States government agreed that Mr. Mostafa's medical conditions included "type 2" diabetes and raised blood pressure, extensive psoriasis, hyperhydrosis (excessive sweating provoked by a neurological condition) which requires him to shower and change his clothes at least twice daily, blindness in the right eye, with poor vision in the left, and bilateral traumatic amputation of the distal third of both forearms for which prostheses are fitted and that the stumps in both arms are subject to regular outbreaks of infection, which have been increasing in severity. The government promised to provide adequate accommodations but have not.

Letter, dated, January 12, 2023 (A.1-A.2).[1]  Counsel also noted, "Should [Mr. Mostafa] be released, he will return to England and reside with his wife and some of his children.  [And b]ecause of the nature of

---

[1]     Because of the number of documents that will be attached in support of this motion an appendix will be used.  The appendix page(s) will be cited instead of exhibits and will be preceded in their citations by, "A.__" for the Appendix, and by "SA.__" for the Special Appendix (Filed Under Seal), which primarily contains medical records governed by the E-Government Act of 2002 and this District's ECF Privacy Policy.  With respect to the public Appendix, the only redactions are of handwritten notes that are not part of the document, and, in one instance, an email address governed by this District's ECF Privacy Policy.

his conviction, he will be monitored by the British security services" (A.2).  No response to our request was ever received.[2]

More than 30 days having since passed, the undersigned counsel now move this Court under 18 U.S.C. § 3582(c)(1)(A)(i), for compassionate release and/or a reduction in Mr. Mostafa's sentence. Specifically, we ask the Court to modify Mr. Mostafa's sentence to time-served plus the imposition of a five-year term of supervised release on Counts 1 and 2, which is the maximum term of supervised release permissible for Mr. Mostafa's two most severe charges.  See 18 U.S.C. § 3583(b)(1).[3]  Five years of supervised release should be more than enough time to cover the period of any immigration hold placed on Mr. Mostafa, particularly given that he is willing to sign any document necessary to waive his right to fight deportation so that he may return to the United Kingdom expeditiously.

## II.    <u>The Relevant Law</u>

Mr. Mostafa brings this motion for reduction in sentence pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), which allows defendants to seek a sentence reduction for extraordinary and compelling reasons.  See First Step Act of 2018 § 603(b), 18 U.S.C. § 3582(c).

As amended by the First Step Act, 18 U.S.C. § 3582 provides that the Court "may reduce" a defendant's term of imprisonment "if it finds that ... extraordinary and compelling reasons warrant such a reduction" and that "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission" and the sentencing factors set forth in 18 U.S.C. § 3553(a). U.S.C. § 3582(c)(1)(A)(i); see also United States v. Brooker, 976 F.3d 228, 233-37 (2d Cir. 2020).

---

[2]      BOP records also reflect that on September 16, 2020, and November 3, 2020, Mr. Mostafa filed administrative remedy forms requesting a "RIS" (reduction in sentencing), which were denied.  See Administrative Remedy Generalized Retrieval (A.289); Mr. Mostafa's Remedy List dated November 22, 2022 (Remedy No. 13) (A.262).

[3]      Supervised release was not incorporated into Mr. Mostafa's original Judgment, presumably because he had received a life sentence under Counts 1 and 2.  No other count carried a potential sentence of more than 15 years imprisonment and 3 years of supervised release.  See Pre-Sentence Report, dated, December 30, 2014 (hereinafter cited as, "PSR"), at ¶¶ 168-173, 175-176; see also 18 U.S.C. §§ 1203, 371, 2339A, 2339B(a)(1), 3583(b)(1), 3583(b)(2).

The Sentencing Commission's definition of "extraordinary and compelling," as codified in U.S.S.G. § 1B1.13, does not apply "to compassionate release motions brought by defendants," rather than by the BOP, and "cannot constrain district courts' discretion to consider whether any reasons are extraordinary and compelling" in such cases.  Brooker, 976 F.3d at 236 (internal quotation marks omitted); see also id. at 237 ("Neither Application Note 1(D), nor anything else in the now-outdated version of Guideline § 1B1.13, limits the district court's discretion.").

Thus, when assessing a motion brought by an imprisoned defendant and not the BOP, the Court *may consider* U.S.S.G. § 1B1.13's enumeration of extraordinary and compelling reasons *but is not constrained* by it; indeed, this Court may "consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before [it] in motions for compassionate release." Booker, 976 F.3d at 237.

Here, even under U.S.S.G. § 1B1.13, Mr. Mostafa's physical impairments qualify as "a serious physical or medical condition ... that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he ... is not expected to recover." U.S.S.G. § 1B1.13, Application Note 1(A)(ii).  Moreover, the BOP's inability to effectively accommodate Mr. Mostafa's physical impairments, coupled with its stark violation of the assurances made by the United States government, and the expectations clearly stated by the British and European courts before assenting to Mr. Mostafa's extradition from the United Kingdom to the United States, present a complete picture that is uniquely extraordinary and compelling the likes of which this Court most likely has not previously faced.

As will be discussed in great detail below, we respectfully submit that this Court should conclude that the totality of Mr. Mostafa's Section 3553(a) factors support a reduction of his sentence to time-served and his immediate release from BOP to ICE custody.

3

### III.     Mr. Mostafa's Current Sentence and Time in Custody

Charges were initially brought against Mr. Mostafa in a sealed indictment, dated, April 19, 2004, with an arrest warrant being issued on May 26, 2004.  Because Mr. Mostafa is a British citizen who was living in London at the time, he was arrested in England on May 27, 2004, pursuant to a provisional arrest request and was immediately remanded into U.K. custody pending extradition.  He was charged on October 19, 2004, on separate but related English charges.[4]  Mr. Mustafa's detention continued after his conviction on the English charges until he was extradited to the United States on October 6, 2012, where he has remined incarcerated in solitary confinement ever since.  As a result, Mr. Mostafa has thus far served 8 years in U.K. custody and over 11 years in United States custody, for a total of 19 years' imprisonment.[5]

To be sure, the seriousness of Mr. Mostafa's criminal conduct provided ample grounds for the substantial sentence that he originally received.  However, Mr. Mostafa has been in United States custody in relation to this case for 11 years under extraordinary and unimaginable conditions, including 24 hour solitary confinement since his initial detention in United States custody on October 6, 2012, including the past 8 years at ADX Florence in a cell specially designed for a person with completely different physical impairments than possessed by Mr. Mostafa, and after all these years still not provided with the handicap accommodations necessary to prevent his conditions of confinement from being nothing short of a living hell.

---

[4]      The British offenses that Mr. Mostafa was held pretrial, and as a result of his convictions, were offenses resulting from his speeches, sermons, and other public exhortations against non-Muslims, and possession of a book that is useful to assist someone to commit an act of terrorism.  That said, the allegations that Mr. Mostafa faced in the U.K. would likely have been insufficient to indict him for any crime under U.S. law.

[5]      Mr. Mostafa was convicted of offenses in England that were based upon some of the same evidence that was used in the prosecution here.  Under the Guidelines, the sentencing court is permitted to credit that time towards his sentence, particularly since his arrest on the U.S. provisional warrant preceded his U.K. prosecution.  Further, Mr. Mostafa's incarceration in the U.K. continued after he completed service of his U.K. sentence solely due to the extradition request of the United States government.

**IV.    Extraordinary and compelling circumstances exist that warrant granting Mr. Mostafa either compassionate release or a substantial reduction in his sentence.**

**A.    Mr. Mostafa has been in custody for 19 years since his arrest in this case.**

We are certainly aware that Mr. Mustafa was convicted of serious charges and was sentenced to life imprisonment.[6]   However, neither such charges nor the sentence imposed are a bar to the relief requested as a result of the extraordinary and compelling reasons set forth below.   These reasons include: (1) the limited nature of his conduct in the offenses;  (2) the extreme and extraordinary harshness of his conditions of confinement generally and the effect those conditions have had on Mr. Mostafa as a result of his physical disabilities and medical impairments; (3) that he has spent the past 19 years incarcerated in the United Kingdom and the United States since being arrested in relation to this case;[7] (4) the failure of the United States government and Bureau of Prisons to adhere to the commitments and promises made to the British courts and the European Court of Human Rights in order to convince those courts to extradite Mr. Mostafa to the United States in the first place; (5) the fact that if those courts had been aware at the time of the misrepresentations made by the United States government and the resulting conditions of confinement since suffered by Mr. Mustafa, he would never have been extradited to the United States; (6) the restrictions he will still be facing if eventually returned to the United Kingdom; and (7) he presents no danger to others should he be released under the conditions required by British law, as discussed *infra*.

To be clear, Mostafa Kamel Mostafa is a 65-year-old double-arm amputee, who is blind in one eye, limited vision in the other eye, and suffers from diabetes, hypertension, sever psoriasis and

---

[6]       The Second Circuit Court of Appeals dismissed Counts 7 and 8, Conspiracy to Provide and Conceal Material Support and Resources to Terrorists and the substantive count related to it.   See United States v. Mustafa, 753 Fed.App'x 22, 28-32, 44 (2d Cir. 2018).  All other counts of conviction were affirmed.   See id. at 44.

[7]       Again, as summarized in Mr. Mostafa's Pre-Sentence Report, dated, December 30, 2014, at 3, "Release Status: Arrest warrant filed under on 4/19/2004; arrested in the U.K. on 5/27/2004 based on a U.S. provisional arrest request and remanded pending extradition; arrested on separate U.K. charges on 10/19/2004 and detention continued; extradited to the U.S. on 10/06/2012, and remanded."

hyperhidrosis, a serious skin condition.  He has also suffered through two debilitating infections of the COVID-19 virus during his incarceration at USP Florence ADMAX (also referred to as, "ADX Florence" or simply, "ADX"), in Florence, Colorado.

With the exception of COVID-19, which had not yet developed, Mr. Mustafa suffered from the same disabilities and similar medical conditions when he was first arrested in England on May 27, 2004, though those medical conditions have only worsened over time and then been compounded by his 24 hour per day isolation, multiple infections of COVID-19, lack of accommodations, and inadequate medical treatment.

**B.** **Justification for Mr. Mostafa's release begins with his U.K. and European Court Extradition Proceedings.**

Mr. Mostafa challenged his extradition from the United Kingdom to the United States on a number of grounds including, as is relevant here, that extradition would result in inhuman and degrading treatment by his long-term imprisonment within the United States Bureau of Prisons at ADX Florence and would violate Article 3 of the Convention for the Protection of Human Rights and Fundamental Freedoms (also referred to as the European Convention on Human Rights) (1953) (hereinafter, "Article 3"), which provides in full, "No one shall be subjected to torture *or to inhuman or degrading treatment or punishment*" (available at https://www.echr.coe.int/documents/d/echr/Convention_ENG) (emphasis added).  Undoubtedly, the conditions under which Mr. Mostafa is imprisoned clearly violate Article 3 and are in many ways cruel and unusual under United States Constitutional law once considered in the context of his physical impairments and the BOP's lack of adequate – or even appropriate – accommodations.

Moreover, Mr. Mostafa's lack of success challenging extradition due to the possibility of incarceration at ADX is directly attributable to misrepresentations in sworn statements, concessions, and promises made by the United States government during his extradition proceedings.  Accordingly, an

understanding of the extradition proceedings and assurances which led to Mr. Mostafa's extradition, as well as the subsequent positions and actions taken by the U.S. government once Mr. Mostafa was in U.S. custody, is critical to an understanding of why his current circumstances are so compelling and extraordinary that they warrant his immediate release.[8]

Senior District Judge Tim Workman of the City of Westminster (U.K.) Magistrate's Court was the first judge to hear this matter and issued his decision on November 15, 2007.  See United States v. Abu Hamza (City of Westminster (U.K.) Magistrate's Court) (Workman, S.DJ.) (November 15, 2007) (hereinafter cited as, "Decision of Judge Workman") (A.3-A.18).  Judge Workman reviewed a report submitted on behalf of Mr. Mostafa that was prepared by "an experienced United States Attorney," Bruce Malloy (A.15), and a sworn statement by then-ADX Warden Ron Wiley (A.19-A.31).

After describing the conditions of confinement at ADX Florence, Judge Workman made a finding that was echoed by all of the courts that heard the case:

> [I]n my view, ***if such a regime were to be applied for a lengthy indefinite period it could properly amount to inhuman and degrading treatment which would violate Article 3***.
>
> X        X        X
>
> On the basis of this evidence I am satisfied that the defendant would not be detained in these conditions indefinitely, that his undoubted ill health and physical disabilities would be considered and, at worst, he would only be accommodated in these conditions for a relatively short period of time. Whilst I find these conditions offensive to my sense of propriety in dealing with prisoners, I cannot conclude that, ***in the short term***, the incarceration in a supermax prison would be incompatible with his Article 3 Rights.

A.16-A.17 (emphasis added).  At the same time, Judge Workman stressed that Warden Wiley had explained under oath, after consultation with the Chief of Health Programs, that it would be "highly

---

[8]    All references to Mr. Mostafa's potential "release" refer herein to his release from BOP custody to ICE custody to await extradition back to the United Kingdom.

unlikely" for a person with Mr. Mostafa's conditions and disabilities (i.e., "type 2 diabetes, raised blood pressure, psoriasis, loss of sight in one eye and bilateral amputation of both forearms," that **required assistance with the activities of daily living**" (A.20) (emphasis added) to be designated to ADX Florence; as a result, Judge Workman expected Mr. Mostafa to be designed to a Federal Medical Center ("FMC"). See Declaration of Warden Ron Wiley (A.20); see also Decision of Judge Workman (A.16-A.17, ¶¶ 43-44). Thus, Senior District Judge Workman effectively rejected a report submitted by then defense from "an experienced United States Attorney," Bruce Malloy, which opined that "the defendant would be incarcerated at a supermax prison," in favor of Warden Wiley's account, which Judge Workman found "to be more accurate[,]" given that Warden Wiley was "more closely associated with the penal institution" (A.13-A.15,  ¶¶ 40, 43, 44).[9]

Mr. Mostafa's appeal to the High Court of Justice, Queen's Bench Division, dealt with the same issues raised before Judge Workman, but more clearly set forth Mr. Mostafa's medical conditions and needs.[10]  The High Court noted that the United States government had no dispute with the description of Mr. Mostafa's medical conditions or needs.  See Mustafa Kamel Mustafa (Otherwise Abu Hamza) v. United States, [2008] EWHC 1357 (High Court, Queen's Bench Div.) (June 20, 2008) (hereinafter cited as, "High Court Decision") ¶ 65 (A.56).  The High Court examined an additional report by Professor

---

[9]      It appears that District Court Judges in the U.K. no longer take representations of the United States Bureau of Prisons at face value, likely as a result of Mr. Mostafa's treatment in the United States.  In The Government of the United States v. Julian Assange, District Judge Vanessa Baraitser found that "[i]n my judgment there is a real risk that Mr. Assange will be designated to the ADX Florence" notwithstanding the affidavit of Gordon Kromberg, an AUSA from the Eastern District of Virginia, that stated it was " 'purely speculative' to conclude that Mr. Assange would be designated to the ADX."  Kromberg also noted that "[i]n short, sentencing and facility designations are difficult to predict, and, as a result, it is purely speculative to conclude that Assange would receive a life sentence and/or be designated to the ADX."  See Excerpt from Judge Baraitser's Opinion (A179-A.180).  The complete decision is available at https://www.judiciary.uk/judgments/usa-v-julian-assange.

[10]      The conditions included "type 2 diabetes and raised blood pressure, for both of which he is prescribed appropriate medication, extensive psoriasis, hyperhydrosis (excessive sweating provoked by a neurological condition) which requires him to shower and change his clothes at least twice daily, blindness in the right eye, with poor vision in the left, and bilateral traumatic amputation of the distal third of both forearms for which prostheses are fitted. The stumps in both arms are subject to regular outbreaks of infection, which have been increasing in severity" (A.35).

Andrew Coyle relating to the conditions at ADX and noted that "a common thread" that ran through the report was the "potential adverse effect on the mental health of inmates of long term social isolation" (A.56-A.57 ¶¶ 65-67).

The High Court dismissed Prof. Coyle's concern because of the United States government's commitment to properly treat Mr. Mostafa's medical and disability needs, stating that "unless ADX Florence regime ignores appellant's medical condition, and his need for nursing assistance," there would not be a risk of isolation because of the amount of time that a nursing assistant would be assisting in Mr. Mostafa's activities of daily living (A.57, ¶ 66).[11]

However, we know, and there can be no meaningful dispute, that ADX is simply not designed to provide the type of medical care and assistance in daily living that was contemplated by the High Court of the United Kingdom.  By stating that there was no real risk that the United States would leave Mr. Mostafa's medical needs untreated, the High Court affirmed Judge Workman's finding that there was little risk of Mr. Mostafa spending any significant time at ADX.  See Case of Babar Ahmad and Others v. United Kingdom, Appl. Nos. 24027/07, 11949/08, 66911/09, 67354/09 (European Court of Human Rights) (September 24, 2012), at ¶ 40 (A.105-A.106) (noting that "[o]n the question of the compatibility of detention at ADX Florence with Article 3, the High Court relied in particular on the understanding of

---

[11]     An example of why the High Court believed that Mr. Mostafa would not be isolated if ADX tended to his needs can be found in the medical records from HMP Belmarsh.  See SA.1-SA.6.  It must be noted that HMP Belmarsh is a category A prison, the most secure in the U.K., and Mr. Mostafa was in the High Security Unit (HSU) in HMP Belmarsh:

> 15 May 2010 13:13 Surgery: Kwaku Annang (Heathcare Assistant)
>
> History: Mr Hamza's hygiene needs were attended to this morning. His bed was made up, bin emptied, boiled water into a plastic jar, did the washing up, washed the basin, toilet (sic), cell and mopped. Parrafin cream was applied on him as well. He thanked me for coming to attend him at the right time (meaning at the time he returned from exercise and had a shower.)

SA.3.  We assume it goes without saying that *no inmate* receives that level of personal care and attention at any United States high level or supermax facility.

the prison warden, Mr. [Ron] Wiley, to the effect that if, after a full medical evaluation, it was determined that the fourth applicant [Mr. Mostafa] could not manage his activities of daily living, it would be highly unlikely that he would be placed at ADX Florence rather than at a medical centre").

That being said, the High Court affirmed the decision to extradite Mr. Mostafa with two caveats. First, if Mr. Mostafa was held in ADX "a full and *objective* medical evaluation of the appellant's condition, and the effect of his disabilities on the ordinary daily living and his limited ability to cope with conditions at ADX Florence would indeed be carried out." High Court Decision ¶ 69 (A.58) (emphasis added). To that end, the High Court took the United States government's assurances that the delay that occurred with Sheikh Rahman, would not happen again. Id.[12]

The second caveat repeated Judge Workman's concerns but with even greater force. The High Court was also "troubled" by the conditions of confinement at supermax facilities. However, because it viewed the commitments and promises made by the United States government as assurance that Mr. Mostafa would not be incarcerated at ADX, or if he was, it would be for a very short period of time, the High Court left for another day the final decision as to whether the conditions of confinement in supermax prisons would be viewed as torture or ill treatment that violated Article 3 of the Human Rights Convention. The High Court made clear, however, that such confinement "may well" violate Article 3. As explained by the High Court:

> Naturally, the most dangerous criminals should expect to be incarcerated in the most secure conditions, but even allowing for a necessarily wide margin of appreciation between the views of different civilized countries about the

---

[12]    As noted in the ECHR decision at ¶ 194 (A.158):

> The fourth applicant also submitted evidence that one Arab Muslim who had been convicted of terrorism offences, Omar Abdel Rahman, had been detained at ADX Florence, despite severe heart problems, blindness and diabetes. When his condition worsened, Abdel Rahman was transferred to the United States Medical Center for Federal Prisoners at Springfield, Missouri and thereafter to a Federal Medical Centre at Butner, North Carolina. He continued to rely on the fact that his disabilities would exacerbate any ill-treatment inherent in detention at ADX Florence.

> conditions in which prisoners should be detained, confinement for years and years in what effectively amounts to isolation may well be held to be, if not torture, then ill treatment which contravenes Article 3.

High Court Decision at ¶ 70 (A.58-A.59).[13]

The next step in Mr. Mostafa's appeal was to the European Court of Human Rights ("ECHR"). The ECHR was concerned about whether Mr. Mostafa would be sent to ADX and if so, how long he would spend there. The ECHR requested a response to its questions in 2008 and for follow-up questions in 2011. In 2008 it asked:

> (1) Is there a real risk that following any conviction the applicant would be detained in "supermax" detention facility?
>
> (2) If so, how long is such detention likely to last?
>
> (3) Would such detention be in violation of Article 3, having regard (a) to the applicant's medical condition and disabilities and/or (b) the likely length of any sentence?

Letter from the Foreign and Commonwealth Office of the United Kingdom, dated, November 13, 2008 (A.75).

On behalf of the United States government, the Foreign and Commonwealth Office of the United Kingdom repeated its position made to the lower courts that there was no dispute about Mr. Mostafa's medical condition and the needs described in paragraph 7 of the High Court's decision. See id. (A.75-A.77); see also Decision of the ECHR at ¶ 40 (A.132-A.133).

The Foreign and Commonwealth Office, acting as a conduit for the United States, asked the ECHR to affirm the lower courts' decision on the basis that "the likelihood is the applicant will not be detained

---

[13] Unfortunately, Judge Workman and the High Court also did not consider the conditions that Mr. Mostafa would be held in pretrial. While detained pretrial in the 10-South Unit of the Metropolitan Correctional Center ("MCC") in downtown Manhattan, he received almost none of the accommodations or daily living assistance he received at HMP Belmarsh, nor was his cell modified, which the United States had acknowledged was appropriate and necessary. He was also held in isolation under Special Administrative Measures ("SAMs") that will be discussed infra.

11

in a 'supermax' detention at all…."  If he was, "such detention would be for a relatively short period given the extent and nature of the applicant's ill health and physical disabilities" (A.76, ¶¶ 28-29).  The Foreign and Commonwealth Office also adopted as fact that if Mr. Mostafa was held at ADX for a short period of time he would not suffer social isolation because of the care he would receive due to his disabilities.[14]  See A.77, ¶ 31. The Foreign and Commonwealth Office further noted that if Mr. Mostafa was held at ADX it would be for a "relatively short time pending a medical evaluation, and would then be transferred to a medical centre" (A.76, ¶ 30).  Such was again not remotely the case.[15]

Because the other named applicants before the ECHR did not suffer from the disabilities and medical conditions of Mr. Mostafa and were likely to be designated to ADX, the ECHR requested answers to follow-up questions in 2011:

> i.      how long an inmate is likely to spend at ADX [Florence] before being admitted to the Step Down or Special Security Unit Program;
>
> ii.     how long an inmate is likely to spend in each phase of the respective programs; and
>
> iii.    how long an inmate is likely to spend in either program before transfer out of ADX.

Foreign and Commonwealth Office letter dated October 24, 2011 (A.90).

In its response the Office attached a letter from the United States Department of Justice dated the same date.  See A.92-A.106.  Claiming that the Federal Bureau of Prisons did a detailed analysis, the

---

[14]    The Foreign and Commonwealth Office of the United Kingdom either assumed or was told by United States representatives that Mr. Mostafa would receive similar care to what he received in HMP Belmarsh, such as a health care aide and daily nursing or doctor visits.  See n.11, supra; see also SA.1-6 (Excerpts of medical records from HMS Belmarsh).  The Office was obviously wrong.

[15]    Upon his extradition to the United States, Mr. Mostafa was detained at the MCC New York in the MCC's highest isolation 10-South Unit (more secure and isolated than the MCC New York or MDC Brooklyn's SHUs) for approximately 27 months.  After his sentencing was complete, he was briefly transferred to FMC Springfield for an alleged medical evaluation for 8 months but was thereafter transferred – as predicted by his attorneys at every stage of the way – to ADX Florence on October 8, 2015, where he has been incarcerated ever since – now 8 years and counting.

Foreign and Commonwealth Office estimated that inmates remain in ADX for "3 years" before entering the stepdown program – then less than a year each for the intermediate, transition, and pre-transfer stages, for a total of approximately five years (A.81). The Foreign and Commonwealth Office did not provide any estimation for the Special Security Unit, the unit that Mr. Mostafa was placed and remains, stating that "the U.S. authorities are unable to provide" such estimate (A.81).[16]   The ECHR issued its final decision on September 24, 2012 (A.97-A.278). In denying Mr. Mostafa's appeal, the European Court of Human Rights recognized that both parties agreed on a need for a comprehensive health and social care plan, as well as regular daily support for Mr. Mostafa, and that such a plan or regular support would not be possible at ADX Florence. See A.164, ¶ 217.[17] The Court recognized that Mr. Mostafa's disabilities were even greater than that of Sheikh Rahman, and that the amputations "alone would appear to make detention at ADX impossible" (A.164, ¶ 217).

In denying Mr. Mostafa's requests, the ECHR clearly misjudged what the Bureau of Prisons was capable of. As the ECHR explained:

> Indeed, as the letter from Professor Coyle recognises, the fourth applicant is not detained in a medical facility but is subject to a comprehensive health and social care plan and regular daily support. On the basis of the information provided by the parties as to the regime at ADX, the Court does not consider that it would be possible for such a plan, or such regular support, to be provided at ADX. It may well be that, as the fourth applicant

---

[16]    Also attached to the letter from the Foreign and Commonwealth Office is the Department of Justice's October 24, 2011, letter that demonstrates that the estimates were at best meaningless or misleading. See A.92-A.96. Only 2 of the 30 selected inmates had SAMs. The SAMs for both were removed before there was any movement out of the Special Security Unit. Mr. Mostafa has remained under a SAM since January 13, 2013. Mr. Mostafa's undersigned counsel have represented a number of defendants accused of terrorist offenses who have ended up in ADX H unit. Based upon our experience and knowledge, those who have been under SAMs have remained in H Unit at least until the SAM is lifted and, we believe, beyond the removal of the SAM. Again, based on our experience, SAMs have remained on these prisoners for more than ten years while in ADX. The Government has access ADX's complete records related to this issue. We do not, and as such we base our opinions solely upon the clients we have represented or to which we are aware.

[17]    For example, the Government acknowledged that Mr. Mostafa's extensive psoriasis and hyperhydrosis required him to be able to shower and change clothes at least twice daily, but Associate Warden Louis Milusnic noted that inmates at the Special Security Unit (H Unit) would be escorted to a community shower only three times *per week*. See ECHR decision ¶ 84 (A.144-A.145).

> submits, Omar Abdel Rahman was detained at ADX Florence, despite
> severe heart problems, blindness and diabetes. However, the fourth
> applicant's disabilities are much more severe, not least the fact that both his
> forearms have been amputated. This fact alone would appear to make
> detention at ADX impossible. The Court therefore refuses the fourth
> applicant's request.

ECHR Decision at ¶ 217 (A.164).

Interestingly, after the ECHR decision in 2012, the High Court heard renewed applications to bar extradition of Mr. Mostafa and the four other applicants to the United States. While the High Court entertained arguments relating to the four able-bodied applicants regarding the impact on the extradition requests by the United States of the possibility that they would be designated to ADX, it specifically refused to consider the impact as it related to Mr. Mostafa. The High Court stated:

> The following issues were declared inadmissible by the Court. Abu
> Hamza's complaint in respect of ADX Florence was deemed inadmissible,
> with the court finding that as a result of his medical conditions there was no
> real risk of his spending more than a short period in ADX Florence. The
> court further declared inadmissible each of the claimants' complaints based
> on Articles 6 and 8 in respect of detention at ADX Florence.

Abu Hamza, et al. v. Secretary of State for the Home Department, [2012] EWHC 2736 (Admin) (High Court, Queens Bench Div. May 10, 2012) (available at https://www.judiciary.uk/wp-content/uploads/JCO/Documents/Judgments/abu-hamza-full-judgment.pdf), at 5 ¶ 14.

### C.   Conditions of Confinement

As noted above, Mr. Mostafa was held in the High Security Unit at HMP Belmarsh, a category A prison where he sometimes complained of his conditions of confinement. However, comparison of the conditions of his confinement between HMP Belmarsh and those at Florence ADX (and MCC 10-South) present a clear picture that the government of the United States violated the commitments and promises made by it to the U.K. and European courts, as well as the expectations of Mr. Mostafa's extradition order. The conditions also violate the United States Constitution's Eighth Amendment prohibition against cruel

and unusual punishment as well as the Human Rights Convention's Article 3 prohibition against inhuman and degrading treatment of prisoners.

### 1.    Her Majesty's Prison Belmarsh

An understanding of the conditions of confinement at HMP Belmarsh is necessary to understand the nature of confinement the English courts, and what the ECHR was promised and expected from the United States government as necessary to accommodate Mr. Mostafa's disabilities and medical conditions.  In HMP Belmarsh, where Mr. Mostafa was held during his incarceration in England, the British government provided significant accommodations to account for his disabilities and medical conditions.  There, Mr. Mostafa was visited by a healthcare aide *daily* and had frequent visits by a nurse and/or physician.  As noted *supra*, the health aide attended to Mr. Mostafa's hygiene needs.  The aide cleaned the cell, washed the dishes, made the bed, prepared hot drinks, and made sure he had adequate fluids to drink from a container provided to him.  Similarly, either the health aide or the nurse applied medication to Mr. Mostafa's stumps on a *daily basis*.[18]  See SA.1-SA.6.

Additionally, while detained at HMP Belmarsh, Mr. Mostafa was permitted to spend approximately six hours per day comingling with other inmates from his unit rather than isolated in his cell, and those inmates were permitted to assist Mr. Mostafa with his daily living we well.  He had regular and frequent telephone conversations with his family and friends and was even permitted to share meals with his family during visits.

---

[18]    The noted assistance received by Mr. Mostafa continued after he had received his prosthetics.

## 2.      Metropolitan Correctional Center of New York

Once extradited to the United States, Mr. Mustafa was detained at the MCC and immediately placed in solitary confinement subjected to Special Administrative Measures ("SAMs").[19]   As will be discussed in greater detail, these measures, which include solitary confinement and isolation from the outside world, greatly limited his contact with counsel, which in many ways vastly impeded his ability to assist in the preparation of his case.[20]

Other issues resulted from the lack of disability accommodations at the MCC.   Mr. Mostafa was unable to view discovery because the computer provided by the Government, which did not comport with his disabilities.   During the more than two years Mr. Mostafa was detained in the MCC, despite repeated requests and complaints, he was never provided with an appropriate toilet, shower, or sink to accommodate his disabilities.   Nor were many of his other medical and disability needs ever adequately addressed.[21]

In Mr. Mostafa's sentencing submissions, the undersigned counsel sought to further demonstrate Mr. Mostafa's medical conditions, his need for accommodations and further evaluations as to what

---

[19]      Mr. Mostafa's SAMs are generally kept under seal, however we have included his 2021 SAMs in the Appendix since it was filed by the Government publicly in Mr. Mostafa's civil trial.   See A.196-A.213.   Upon information and belief, the 2021 SAMs are identical to earlier and later versions with only minor changes.   A sealed copy of Mr. Mostafa's 2023 SAMs or any other prior version of his SAMs can be provided to the Court upon request.

[20]      As described in "The Darkest Corner," *Center for Constitutional Rights and Lowenstein International Human Rights Clinic* (September 2017) (available at https://bit.ly/3i0WuT4), at 16, SAMs deprive defendants of the ability to participate in their own defense.   One attorney described how these measures "dehumanizes defendants and create a situation where they cannot exist in a defiant posture [to] fight the case," and ultimately "eliminate them as participants in their defense."   This is particularly problematic, the attorney said, with respect to a defendant's right to testify: "The first time [a defendant] talk[s] to anyone besides me after two and a half years in solitary confinement is the jury. There is no way to prepare [him] for it. It really discourages the client from testifying."   At Mr. Mostafa's trial, the District Court severely limited his testimony regarding the lack of communications with his attorneys (and others) pretrial and its impact on his ability to articulate himself well when he testified at trial.

[21]      As part of the discovery process in the civil case, Mr. Mostafa received a "sanitized format" list of complaints and responses that covered the period from December 2012, when he was in the MCC, to December 10, 2020, shortly before it was provided. This list can be found at A.266-A.290.  In his January 11, 2023, submission, dated November 28, 2022, in the civil case, Mr. Mostafa provided the court with a partial list of his complaints broken down by issue. See A.250-A.265.  The Fourth Amended complaint indicates 483 requests for remedies as of July 2022.  See A.350.  Mr. Mostafa has indicated that the total is now 550 requests.  A number of these complaints and responses will be cited in this submission and will be included in the appendix.  See A.291-A.338.

accommodations were needed in the hope that the United States government and the BOP would live up

to the promises and commitments it made to the courts in the United Kingdom and the ECHR, which the

United States government agreed could not be accomplished at ADX.  See, e.g., ECHR decision (A.164);

Observations of the Government by the Foreign and Commonwealth Office of the United Kingdom

(November 13, 2008), at ¶¶ 26-29 (A.75).

To assist in accomplishing that result, the defense included a letter from Dr. Benjamin Kligler

(A.181-A.184).  Dr. Kligler reviewed the medical records from the MCC and from HMP Belmarsh and

interviewed and examined Mr. Mustafa.  In his letter Dr. Kligler noted:

> This particular combination of medical conditions causes him specific
> difficulties in managing his disability which are somewhat unique.  The
> severity of his psoriasis makes it difficult for him to find prostheses that fit
> well without causing skin irritation and potential skin breakdown from
> excessive moisture.  As such he must deal with many of his activities of
> daily living including washing and toileting without the use of his
> prostheses.  When he uses his stumps for tasks such as manipulating a faucet
> or moving an object, he runs the risk of abrasion and damage to the skin on
> his arms because the skin integrity is already compromised by his psoriasis.
> If he does get such an abrasion, his risk of infection in the area is increased
> further by his inability to properly clean an area of skin infection.  Both to
> avoid infection and in light of his hyperhidrosis and psoriasis, however, he
> requires showers daily, at a minimum, and ideally as often as twice a day.
> He also requires a change of clothing twice daily.  Finally, his underlying
> diabetes puts him at risk of a mild skin infection becoming much more
> severe.  The condition of his stumps is such that the bone is extremely close
> to the skin surface, and a moderate skin infection in this area in the context
> of underlying diabetes could easily lead to an infection in the bone, which
> in turn could require further amputation. This is a particularly difficult,
> unique combination of medical circumstances which make it even more
> imperative for Mr. Mustafa to have adequate accommodation in his living
> quarters for his disability.

A.181-A.182.  Dr. Kligler further noted some specific concerns of Mr. Mustafa as a result of the lack of

disability accommodations at the MCC.  These included the inability to maintain cleanliness after relieving

himself, difficulty with showering and washing because of the difficulty in dealing with the taps with his

stumps, injuries in dressing himself and the damage to his stumps and teeth because he needs to use them

because of the inadequacy of the accommodations.  See A.182.

Doctor Kligler concluded:

> Based on my interview and evaluation of Mr. Mustafa, I feel that the lack of adequate accommodation for his disability in his current location, as well as inadequate prostheses and/or health aide assistance to accomplish tasks associated with daily living, is putting him at significant risk for additional complications related to his condition and potentially at risk of the need for further amputation as well.  I believe he should be held in quarters that allow for adequate accommodation and assistance to obviate the need for him to use his stumps for activities of daily living as he is currently required to do.

A.184.

Finally, Dr. Kligler recommended:

> Mr. Mostafa should be transferred to a facility where he will have the daily assistance of a "home" health aide.  He should also be provided proper accommodations for his unique disabilities, which would include, among other items, a shower, toilet and sink suited to the needs of a double upper extremity amputee, in the event that he is ever left to accomplish tasks of daily living without the assistance of an aide.  An occupational therapist familiar with the needs of double upper extremity amputees should be appointed to review the accommodation and medical issues unique to Mr. Mostafa that are raised herein and to advise Bureau of Prisons staff as to the nature and construction of the accommodations required.  Even if Mr. Mostafa is provided with sufficient accommodations for his disabilities and the assistance of a "home" health aide, he must nonetheless have daily access to medical attention and care.

Id.

Instead of responding to the obvious lack of accommodations at the MCC, and the request for

designation to a Federal Medical Center and appropriate care, the Government, in its sentencing

submission, simply described Mr. Mostafa's requests as "merely distractions."  See Government

Sentencing Memorandum ("GSM"), dated, January 2, 2015, United States v. Mostafa, 04 Cr. 356 (KFB)

(SDNY) (Doc. No. 459), at 49.  As the Government did during the extradition case, it simply relied upon

representations made by Bureau of Prisons employees in a letter (A.185-A.187) that only "[a]fter a medical determination regarding the most appropriate placement for him, considering the level of medical care and security controls needed, he will be designated."

The Government assured the court, "In making its designation, the BOP will consider the defendant's ability to manage daily activities and the level of medical care and assistance he requires." Id. Further the Government assured the court that the BOP's designation would be "based on both medical needs and any security concerns." Id.  Should Mr. Mostafa be designated to ADX, the Bureau of Prisons explained:

> If it is determined that the ADX is the most appropriate housing for inmate Mustafa, he would be housed in an area that can accommodate his medical needs.  The ADX has a variety of housing assignments available in order to accommodate various levels of health care needs, ***including handicap accessible cells*** and those designated for serious medical needs which are located within the health services department at the ADX.  Additionally, health care personnel make rounds in each housing unit on a daily basis at the ADX and any additional needs, such as wound care, are attended to on a daily basis or as medically indicated.  Currently there is 54 staff in the health services department at FCC Florence, consisting of 3 physicians, 5 physician assistants, 4 nurses, and numerous other health care providers. The ADX also provides on sight [sic] dental, optometry and MRI treatment. Additionally, the ADX has its own laboratory and pharmacy to provide services to inmates.  If the type of care need cannot be provided on sight, the ADX has contracted with numerous community specialists who can evaluate and treat inmates with major medical concerns in a local hospital. The Bureau also uses telemedicine when and if needed.  Finally, if the type or level of care required by an inmate cannot be provided for the inmate while at the ADX, the Bureau can and will transfer said inmate to one of its medical care facilities.

A.186-A.187 (emphasis added).

At sentencing, Judge Forrest denied Mr. Mostafa's request to be designated (or to recommend for designation) to a Federal Medical Center, but in Mr. Mostafa's Judgment the court did recommend that the BOP take into consideration the Report of Dr. Benjamin Kligler, which had been attached to

Defendant's sentencing memorandum, and that "an occupational therapist having experience with double

amputees be part of the BOP team which evaluates the defendant."  Judgment, dated, January 12, 2015,

at 3 (A.193).  She further noted:

> It is clear that what needs to occur and what will occur … before any
> designation, the defendant would get a full medical evaluation, which is
> really handled, as I understand it from my communications with the BOP,
> by a group of people with different areas of expertise, including security
> and behavioral issues along with the medical issues, and that all together the
> designation will be arrived at, which might be ADX, it could be some other
> federal facility, not a medical facility, and it could be a medical facility.

Sentencing Hearing Transcript, dated, January 9, 2015, at 47 (A.188) (The complete transcript can be

found at United States v. Mostafa, 04 Cr. 346 (KBF) (SDNY) (Doc. No. 474).)

As will be demonstrated *infra*, once Mr. Mostafa was designated to ADX, the Bureau of Prisons'

view of appropriate accommodations and proper medical care became starkly different than the assurances

given to Judge Forrest, different too than what the extradition courts were promised, different than what

our constitution requires, and different then what we as American citizens expect.

### 3.   Federal Medical Center Springfield

Before being transferred to ADX, Mr. Mostafa was transferred to the Federal Medical Center

("FMC") in Springfield purportedly to do "a full and ***objective*** medical evaluation of the appellant's

condition, and the effect of his disabilities on the ordinary daily living and his limited ability to cope with

conditions at ADX Florence…."  High Court Decision at ¶ 69 (A.58).  Or maybe it was to do what the

Government assured the District Court at sentencing, "In making its designation, the BOP will consider

the defendant's ability to manage daily activities and the level of medical care and assistance he requires"

(A.185)?  In fact, notwithstanding the sworn statements and testimony of representatives of the Bureau of

Prisons, submitted by the United States government in order to persuade the British and European courts

to extradite Mr. Mostafa, the Bureau of Prisons never had the intention to designate Mr. Mostafa to any

place other than ADX.

In its motion to dismiss Mr. Mostafa's civil lawsuit relating to his conditions of confinement at ADX, which Mr. Mostafa filed in the District Court for the District of Colorado, the Government included a declaration of Captain P. Chorosevic, the director of Rehabilitation Services at FCC Butner. In his declaration Captain Chorosevic stated that:

> In February 2015, *in preparation for Mostafa's transfer to ADX,* Mostafa was sent to the Federal Medical Center in Springfield, Missouri ("FMC Springfield") for evaluation of the fit and functionality. Bureau records show that, while Mostafa was at FMC Springfield, a Bureau prosthetist evaluated Mostafa and adjusted his new prostheses multiple times.

Declaration of Captain P. Chorosevic in Support of Defendant's Motion to Dismiss, Mostafa v. Garland, et al., Docket No. 20 Cv. 694 (D.Colo. May 28, 2021) (Doc. No. 96-5), at page 9-10 (emphasis added).[22]

The first entry in the medical records from FMC Springfield was an administrative note dated February 4, 2015, which requested a prosthesis evaluation but not an occupational therapy evaluation. See SA.42. During his February 9, 2015, prosthetics evaluation, Mr. Mostafa requested a consult with an occupational therapist (hereinafter, "OT"). See SA.43. The medical encounter report for April 24, 2015, indicates that "[h]e was sent here to have his prosthetics repaired/revised ... [h]e was not sent here for us to create a new list of special accommodations, so the info that PT/OT has already provided for ADX Florence should suffice" (SA.48-SA.49). The Administrative Note for his May 29, 2015, encounter further demonstrates that it was always the intent to designate Mr. Mostafa to ADX before any evaluation was made: "His reason for transfer here was to adjust prosthetics (already accomplished), so he is being

---

[22]     Originally the lead defendant was prior Attorney General Barr. Because of the voluminous submissions and pages of the many documents filed in the civil case, we will include in the appendix only the relevant pages. The complete documents are available on PACER, however, upon the Court's request we can forward the Court the complete filings of any document excerpted herein. Further, by citing and including documents prepared by Government employees from the civil lawsuit and medical records, Mr. Mostafa is not accepting the truth and accuracy of all of the statements in such documents. He has frequently complained of the inaccuracy and incompleteness of the information found therein.

held housed here while awaiting transfer to his long-term facility" (SA.50).   Indeed, an entry dated September 18, 2015, notes that Mr. Mostafa "was transferred here last year for a 'few weeks' to address issues with his prosthetics...." (SA.54).

Thus, notwithstanding Judge Forrest's recommendations, Mr. Mostafa was designated to ADX *prior to FMC Springfield even receiving Dr. Kligler's report*, and Mr. Mostafa was not seen by "an occupational therapist having experience with double amputees [as] part of the BOP team which evaluate[d] the defendant" (A.193) (Judgment).[23]  In fact, other than a very brief encounter with an OT on February 24, 2015, after he requested it, an OT evaluation did not take place until after Lindsay Lewis, Esq., spoke with and corresponded with BOP counsel.  See A.219.  Clearly, there was never any legitimate consideration by the BOP to designate Mr. Mostafa to any place other than ADX.

### 4.   Background of ADX

ADX Florence was built in 1994 specifically as an "expedient" method for controlling Federal prisoners with life sentences through solitary confinement. Mark Binelli, "Inside America's Toughest Federal Prison," *New York Times*, March 26, 2015, (hereinafter "*America's Toughest Prison*") (available at http://nyti.ms/1D1rbRa).  Inmates are detained in:

> 12-by-7 foot cells with thick concrete walls and double sets of sliding metal doors (with solid exteriors, so prisoners can't see one another).  A single window, about three feet high but only four inches wide, offers a notched glimpse of sky and little else. Each cell has a sink-toilet combo and an automated shower, and prisoners sleep on concrete slabs topped with thin mattresses.

Id.

The supermax was conceived to "isolate and control" inmates by routinely denying them the ability to converse for days, weeks, or months at a time, while denying them fresh air or even a view of the

---

[23]       It does not appear that anyone at FMC Springfield ever reviewed Dr. Kligler's report, and it appears unlikely that anyone at ADX Florence did either.

outdoors. Andrew Cohen, "How America's Most Famous Federal Prison Faced a Dirty Secret," The Marshall Project, December 6, 2015 (available at http://bit.ly/2Yzzymr). As the former warden of ADX Robert Hood described the prison, "This place is not designed for humanity. When it's 23 hours a day in a room with a slit of a window where you can't even see the Rocky Mountains — let's be candid here. It's not designed for rehabilitation.  Period.  End of story." Id.  As a result, people incarcerated at ADX Florence are disproportionately mentally ill, and often physically ill as well.  See *America's Toughest Prison* (http://nyti.ms/1D1rbRa).

Those inmates in the four "general population" units spend at least 22 hours per day alone in their cells. As outlined in the Complaint in Cunningham v. Fed. Bureau of Prisons, a class action lawsuit initiated several years ago in the District of Colorado by inmates at ADX Florence, the only relief from this solitary confinement comes a few days a week, when "they may be able to see and speak with a limited number of other prisoners during shared recreation periods lasting two hours."  Complaint, dated, June 18, 2012, Cunningham v. Fed. Bureau of Prisons, Docket No. 12 Cv. 1570 (RPM) (MEH) (D.Colo.) (Doc. No. 1) (hereinafter cited as, "Cunningham Complaint"), at ¶ 25; see also Cunningham v. Fed. Bureau of Prisons, Docket No. 12 Cv. 1570 (RPM) (MEH), 2016 WL 8786871 (D.Colo. Dec. 29, 2016), aff'd, 709 F. App'x 886 (10th Cir. 2017).  However, such communications are not permitted for prisoners who, like Mr. Mostafa, are also detained under SAMs, as the conditions of the SAMs themselves prevent contact with the outside world, but also, critically, with other inmates – even in the already limited moments when human contact might be possible at ADX Florence.

The physical and psychological effects of long-term solitary confinement are well-known.  Indeed, an investigation by the Center for Constitutional Rights found, "In one study of pathology among solitary prisoners, every symptom of psychological distress measured was present in more than half of the prisoners interviewed, and some symptoms were present in nearly all.  There is 'not a single published

study of solitary or supermax-like confinement in which nonvoluntary confinement lasting for longer than 10 days … failed to result in negative psychological effects.'" Center for Constitutional Rights and Lowenstein International Human Rights Clinic, "The Darkest Corner," September 2017, at 11 (hereinafter "Darkest Corner") (available at https://bit.ly/3i0WuT4).

In ADX Florence specifically, the Complaint in Cunningham alleged that "[a]fter years of isolation, with no direct, unrestrained contact with other human beings, many prisoners experience a fundamental loss of even basic social skills and adaptive behaviors, and predictably find themselves paranoid about the motives and intentions of others." Cunningham Complaint at ¶ 29.   This, however, is not the first time that such a conclusion about the effects of solitary confinement has been drawn.  In 1890, the Supreme Court found that of the inmates housed in solitary confinement in Colorado's death row, "a considerable number of the prisoners fell, after even a short confinement, into a semifatuous condition, from which it was next to impossible to arouse them, and others became violently insane; others still, committed suicide, while those who stood the ordeal better were not generally reformed."  In re Medley, 134 U. S. 160, 168 (1890).  The Supreme Court has since continued to acknowledge the dangers of solitary confinement.  See, e.g., Davis v. Ayala, 135 S.Ct. 2187, 2210 (2015) (Kennedy, J., concurring) (noting the "human toll wrought by extended terms of isolation."), Ruiz v. Texas, 137 S.Ct. 1246, 1247 (2017) (Breyer, J., dissenting from denial of certiorari) ("prolonged solitary confinement "raises serious constitutional questions.").

In a May 1, 2014 Program Statement, the BOP claimed:

> All Bureau facilities employ psychologists skilled in the screening, diagnosis, and treatment of mental disorders.   Although the Bureau concentrates mental health resources at some institutions, all institutions, regardless of care level, are expected to provide services for inmates with mental illness.

BOP Program Statement 5310.16, "Treatment and Care of Inmates With Mental Illness" (May 1, 2014),

at 11 (available at http://bit.ly/2BKlUDS).

These psychologists are supposed to ensure that mentally ill inmates are never designated to ADX Florence.  As the BOP's procedures for transferring prisoners to ADX Florence state, prisoners "currently diagnosed as suffering from serious psychiatric illnesses should not be referred for placement at … ADX." BOP Program Statement 5100.08, "Inmate Security Designation and Custody Clarification," Ch. 7, p.18 (https://www.bop.gov/policy/progstat/5100_008.pdf); see also Cunningham Complaint at ¶ 44.

As will be discussed in further detail below, all of the struggles that Mr. Mostafa faces are compounded by the fact that he spends his entire day, each day in solitary confinement.  The stress and anxiety Mr. Mostafa experiences on a daily basis are common symptoms of solitary confinement.

### 5.      Mr. Mostafa's Incarceration in ADX

After claiming – but clearly failing – to do what was promised to the High Court and the European Court of Human Rights – "a full and objective medical evaluation of [Mr. Mostafa's] condition and effect of his disabilities on the ordinary daily living and his limited ability to cope with conditions at ADX Florence" (A58) – where was Mr. Mostafa designated?  ADX, notwithstanding sworn statements that it was unlikely or there was little risk that such would occur.  Did the BOP consult with and have Mr. Mostafa seen by an occupational therapist with expertise in dealing with double amputated patients?  As is clear from his cell at ADX and lack of accommodations, undoubtedly not.

While it is undeniable that Mr. Mostafa's conditions of confinement in the 10-South Unit of the MCC were abominable, such was a temporary pretrial confinement.  The British and the ECHR extradition decisions made it clear that while short-term temporary confinement in ADX did not violate Article 3, long term or indefinite confinement in ADX was a violation of Article 3.

The United States government's broken promises are not limited to health care and disability accommodations for Mr. Mostafa.  The extreme restrictions placed upon him under SAMs and the nature

of his confinement in ADX have resulted in the conditions that the extradition courts have found to be "inhuman and degrading." Efforts to improve his conditions including accommodations for his disability, efforts to have more access to his family and to practice his religion have met with bureaucratic barriers and neglect. The result was a civil action filed by Mr. Mostafa *pro se*, later supplemented by his *pro bono* counsel appointed by the court in that case.[24]

The significance of the conditions of confinement that Mr. Mostafa must live with every day should not be minimized but it is important that the underlying purpose and impact of those conditions also be recognized.[25] The purpose of the SAMs and incarceration in the H Unit at ADX is to limit human contact as much as possible for Mr. Mostafa, which is in direct contravention of the extradition courts' main concern as well as the U.S. government's sworn commitments to those courts.

At sentencing, the Government promised that if sent to ADX, Mr. Mostafa "would be housed in an area that can accommodate his medical needs" and that "ADX has a variety of housing assignments available in order to accommodate various levels of health care needs**, *including handicap accessible cells*** ...." (A.186) (emphasis added). Did Mr. Mostafa see "an occupational therapist having experience with double amputees [as] part of the BOP team which evaluate[d]" him in order to determine what was needed to accommodate his medical and disability needs? No.

---

[24]   Even the request for *pro bono* counsel was delayed by bureaucracy and neglect. On January 27, 2021, the United States District Court for the District of Colorado granted Mr. Mostafa's request that the court's Pro Bono Program inform counsel in the program that it was seeking to assign counsel for his case. Notice of the order was not sent to the attorneys in the program until December 2021, more than ten months later. Upon receipt of notice Paul Wolf, Esq., agreed to consult with Mr. Mostafa to determine whether he would accept him as counsel. Mr. Wolf was appointed as *pro bono* counsel on December 16, 2021, but because of the SAM restrictions, Mr. Wolf's ability to speak with Mr. Mostafa was delayed until January 19, 2022, nearly a full year after the request for *pro bono* counsel had been granted.

[25]   We do not seek to litigate Mr. Mostafa's conditions of confinement lawsuit in this application. Because of the nature of incarceration in ADX, especially H Unit, and the limitations posed by the SAMs, this submission will generally rely on complaints by Mr. Mostafa in the civil suit, conversations we had with him on the telephone and notations in his medical records. To enable outside experts such as an occupational therapist and medical experts to provide opinions, we would require orders from the court to permit such experts to speak to Mr. Mostafa, review the restricted documents, and visit the facility to view the conditions.

Mr. Mostafa had been seen by occupational therapists while in England, at home and then in HMS Belmarsh, and in early 2013 at the MCC.  In the earliest report in our possession, an Occupational Therapy Report dated January 25, 2004 (SA.7-SA.18), a therapist met with Mr. Mostafa two times, the second time for 70 minutes and reviewed a previous report and statements by other relevant people (SA.8).  In the 2011 assessment review (SA.19-SA.22), the therapist reviewed a prior report and met with Mr. Mostafa twice (SA.19).  After he arrived in the MCC, the therapist met him three times before preparing a report. See 2013 Occupational Therapy Assessment (SA.23-SA.28).[26]

To demonstrate the Government's lack of concern for its assurances to the extradition courts and to Judge Forrest, one need only compare the efforts made by occupational therapists after Mr. Mostafa's convictions.  After being transferred to FMC Springfield on February 3, 2015, he immediately requested to see an OT and saw a therapist for approximately ten minutes on February 24, 2015, surrounded by other staff.  See Fourth Amended Complaint, Mostafa v. Garland, at ¶ 134 (A.365); see also id. at A.379.  After requesting to have an actual consultation with an OT during his March 17, 2015, and April 7, 2015, clinical encounters with prosthetist Rieth (SA45, SA.47), he saw an OT the next day (SA.31) (Clinical Encounter Report dated April 8, 2015).  That "consult" lasted approximately 8 minutes (A.379).[27]

Though there is no OT assigned to ADX, there was a visit by OT Chorosevic on April 26, 2016 – almost six months after arriving in ADX on October 8, 2015.  The OT interview with Mr. Mostafa was brief, inadequate, and not done professionally, see SA.33-SA.35 (Clinical Encounter Report); see also A.291-A.297 (BOP forms for requests, responses, and appeals), lasting approximately 20 minutes with 14

---

[26]     As Ms. Deats reports, at the first meeting with Mr. Mostafa, he was "cuffed on his upper arms and above his ankles" (SA.23).  Moreover, none of the visits between the OT and Mr. Mostafa were conducted in his cell where he could demonstrate his difficulties and need for accommodations.

[27]     The April 8, 2015, Administrative Note (SA.31), indicates that "recommendations to be forwarded to ADX," but neither Mr. Mostafa nor counsel have seen any indication that such recommendations were ever in fact forwarded to ADX as had been recommended.

other staff members present in his small cell.[28]  It also appears that no prior recommendations for items of accommodations were made available to the staff at ADX. Incredibly, both the medical and legal departments asked Mr. Mostafa for accommodation suggestions in November 2015, which were apparently ignored, requiring him to file for administrative remedies in September 2016.  See A.291-A.304 (remedy requests and BOP denials).

Undoubtedly, the use of his prostheses enables Mr. Mostafa to do some things he would otherwise be unable to do.  As the British jailors and the extradition courts understood, it should not, and is not, a substitute for the assistance of others for certain daily living activities. Though the prostheses do not work properly, are difficult to use because of Mr. Mostafa's age and medical condition, and cause damage to his stumps, the BOP is using the existence of the prostheses as an excuse not to provide the necessary accommodations and assistance it promised the extradition courts – accommodations required by international law and the U.S. Constitution.

Because of the condition and nature of the prostheses, the condition of his stumps, his psoriasis, hyperdrosis, discomfort, pain, and the hygienic issues, the injuries to his stumps and that the pincers on the new prostheses require substantial strength to move, which is very difficult for him; as such he limits his use of the prosthetics and wishes to avoid its use as much as possible.  See, e.g., A.360-A.361, ¶¶ 109-116. However, there are certain things that Mr. Mostafa must use the prostheses for on a daily basis. For example, due to the SAMs and his incarceration in ADX, Mr. Mostafa's communication to the outside world (i.e., his attorneys, his family, and the courts) can only be done by infrequent telephone conversations or in writing.  The BOP has been repeatedly told that he wishes to limit the use of prostheses.

---

[28]    Regardless of the quality of the evaluation, this report appears to have been misplaced and not reviewed by the medical staff at ADX for approximately *three-and-a-half years* until it was discovered by a physician conducting an exam on November 25, 2019, during Mr. Mostafa's hunger strike to obtain disability accommodations.  See SA.37.

Ms. Lewis explained this in her April 20, 2016 letter to BOP counsel (A.221-A.22), OT Chorosevic was told on April 26, 2016 (see SA.33-SA.34; see also A.306), prosthetist Rieth on December 16, 2020 (SA.57), a physician assistant in 2022 (A.306), and in numerous BOP complaints filed by Mr. Mostafa.[29] The medical staff noted the soreness, abrasions and worse to his stumps caused by the use of the prostheses a number of times.  See, e.g., SA.74 (October 13, 2015 clinical note) (indicating erythema on both stumps);[30]  SA.191 (May 4, 2016 clinical note) (noting that "[h]e states that his joints and bilateral amputated stumps hurt, but the signs of infection has cleared since 2 weeks ago") (emphasis added); see also Clinical Notes for April 15, 2022 (SA.74); Clinical Notes for April 4, 2023 (SA.86); Clinical Notes for December 16, 2020 (SA.57).  Even as early as 2013, OT Deats wrote that his "skin integrity was noted to be poor, especially toward the distal end of both his right and left limbs" (SA.25).  Mr. Mostafa was very concerned about the impact that the use of the prostheses had on his stumps because while in England he had part of his stumps amputated because of infections.  Id.

The BOP's response to this issue has been inconsistent and demonstrates its lack of concern and its incompetence. On April 26, 2016, Chorosevic saw the impact the use of the prosthesis had on Mr. Mostafa's arms, but without consulting a doctor he noted that "the redness of the bil[ateral] forearms could be a result of one or both of these [psoriasis and diabetes] and not actually wearing the prostheses" (SA.34).  Moreover, in both his 2016 and 2022 entries, Chorosevic blithely determined that "his reported lack of independence is a result of underutilization of this prostheses." Id.; see also SA.39 (Clinical Encounter with Chorosevic).

---

[29]     Mr. Mostafa lists some of his complaints about the prosthetics in his complaint list (A.260-A.261), and there are 15 entries in the BOP list ending in December 2020 (A.266-A.290).

[30]     Erythema is a broad category of skin condition that can impact any area of the skin and mucous membranes. It usually occurs in response to disease or infection in reaction to a drug. Severity of the rash ranges from mild to life threatening.  See https://www.drugwatch.com/health/rash-and-skin-disorders/erythema/.

To the contrary, however, when Mr. Mostafa first complained to the physician's assistant about the abrasions and infection in 2022, the physician's assistant provided antibiotics for two weeks that did not reduce the swelling and told him "not [to] work with my stumps or use my prosthetics" (A.360). Mr. Mostafa noted, "BUT I am disabled in solitary!" (A.306). Mr. Mostafa's attempts to seek assistance through the proper administrative channels were and continued to be repeatedly rebuffed. See A.336; see also A.303-A.304. Incredibly, when Mr. Mostafa complained of abrasions and possible infections because of the use of the prostheses on June 23, 2022, the BOP's response was "your stumps are not infected and the provider mentioned you were wearing them longer than directed." BOP response, dated, May 31, 2022 (A.306).

There have been attempts to repair the various prostheses that have been unsuccessful. Partly because of, as the prosthetist told Mr. Mostafa, the security restrictions, the prosthetist cannot come to the facility with his tools to work with Mr. Mostafa to improve his ability to use the prostheses. On a video consult on December 16, 2020, Rieth noted that the "prosthesis harness are being held together by shoe string" (SA.57). Trying to resolve the issues relating to the deficiencies of the prostheses through proper channels is met with delays and excuses. See, e.g., A.291-A.297, A305; see also A.360.

The Fourth Amended Complaint in the civil case provides more information relating to Mr. Mostafa's difficulties with the prostheses. This includes the period of time Mr. Mostafa did not have prostheses when sent for repair; that the prostheses are not waterproof; don't have adjustable holding fingers, allow different pressures to be applied, or allow different contact surfaces on the fingers; and that Mr. Mostafa is unable to hold toilet paper with prosthetics thereby contaminating the prosthetic hooks with feces. See A.360-A.361.

ADX's goal is to limit any contact for Mr. Mostafa with anyone else, including staff, and to minimize disability accommodations by claiming the lack of need or security concerns. Unlike what he

received in England and was promised by the United States government during his extradition proceedings, he receives no regular assistance from anyone for anything and does not receive daily visits from medical staff.  The result is administrative complaints, a civil lawsuit, conditions of confinement that the Government told the extradition courts would not occur, and rapid deterioration of Mr. Mostafa's health.  There are too many issues relating to his conditions of confinement to catalog.  However, some are representative of others and/or clearly in contravention of the commitments made to the extradition courts and/or violate Mr. Mostafa's rights under the Constitution or statutes of the United States. These will be discussed below.

a.   <u>Mr. Mostafa's cell</u>

As the Government noted at sentencing, the BOP has handicap-accessible cells even at ADX. Indeed, Mr. Mostafa has been housed in one of the handicap-accessible cells at ADX.  ***However, his cell was designed to be accessible for wheelchair-bound inmates, not a double-arm amputee***.  Clearly, such cells are entirely incompatible with his needs.  <u>See</u> A.348-A.349 (First Amended Complaint).

Cell 300, in which Mr. Mostafa was housed for half of the time during the first six years in ADX, is a modified large storeroom.  <u>See</u> A.366-A.368 ¶¶ 140-150.  While the cell has two windows, one is blocked by the shower that was installed and the other is an interior window. Mr. Mostafa had no natural light.  The other cell in which Mr. Mostafa has been confined does not have a proper toilet for his disabilities, nor a shower or sink with hands-free access to water, which he also requires.  <u>See</u> A.367 ¶ 143.  Diagrams prepared by Mr. Mostafa and filed in his civil litigation demonstrate the lack of accommodations that have been provided for his disabilities.  <u>See</u> A.390-A.393.

Attached to the Government's motion to dismiss the civil case, was a declaration of D. McMullen who was the general foreman and complex facilities manager for all facilities in Florence, CO, including ADX at the time of the construction of these handicap cells.  <u>See</u> A.380-A.385.  The declaration

31

demonstrates that the cells were designed for handicapped inmates in wheelchairs and not for a bilateral

amputee.   The declaration notes that the cells have wider doors and larger showers with benches and grab

bars.  See A.383 ¶ 7.  Not mentioned is that the grab bars are at the height for an inmate in a wheelchair.

The sink and shower have buttons to turn on the water, requiring the repeated painful use of Mr. Mostafa's

stumps. See A.384 ¶ 11. The showers were designed without a lip to accommodate wheelchair inmates

but because of Mr. Mostafa's difficulty using the shower, the lack of lip causes his cell to become

flooded.[31]  See  SA.39  (2/16/2022  Clinical  Encounter  Report);  A.368  ¶¶  147-148  (Fourth  Amended

Complaint).

Among other problems in Cell 300, prison staff welded sharp round metal discs to the faucets, "to

make it easy" for him, but the discs cut into his stumps and caused bleeding.  See A.366 ¶¶ 140-41.  Mr.

Mostafa repeatedly requested that Cell 300 not be used, including through both Magistrate Judge Michael

Hegarty and Ms. Lewis, until modifications where made.[32] See A.353 ¶ 7 (Letter to Judge Hergarty);

A.255 (Lindsay Lewis letter).  As Ms. Lewis noted in her April 18, 2019, letter to Krista Klett, Esq., legal

counsel to ADX, Mr. Mostafa "periodically suffers injuries in Cell 511, he suffers injuries far more

frequently in Cell 300 as a result of easily remedied, but nonetheless hazardous conditions discussed

herein" (A.243).

A memorandum issued by the warden on January 21, 2021, confirms that Cell 300 never should

---

[31]     Though the flooding was a problem since Mr. Mostafa was transferred to ADX in 2015, this problem was only dealt with recently.

[32]     Magistrate Judge Hegarty was the magistrate assigned to United States v. Cunningham, 12 Cv. 1570 (D.Colo.), a class action lawsuit relating to mental health issues in ADX.  He assisted and mediated disputes between the monitors and the BOP until at least 2019.  Judge Hegarty made many visits to H Unit during that time and sometimes spoke with Mr. Mostafa during those visits.  As a result, Mr. Mostafa sought Magistrate Judge Hegarty's assistance. See A.342-A.346.  Undoubtedly, some of the accommodations were the result of Magistrate Judge Hegarty's intervention.  In the December 29, 2016, in an order accepting the proposed settlement, Judge Matsch noted that "[t]he video recorded statements of inmates presented at the fairness hearing [December 15, 2016] gave graphic details of their experiences at the Control Unit in ADX which range from disturbing to disgusting."  Cunningham, supra (Doc. No. 391).

have been used to house Mr. Mostafa.  The memorandum indicates that Mr. Mostafa will not have to rotate cells every 90 days and that "[u]ntil such time another cell can be adapted to accommodate his specific medical requirements, Mostafa will remain in cell 511" (A.329).  Of course, this meant that Mr. Mostafa spent half of six years in a cell that even the BOP agrees was not suitable.[33]

Mr. Mostafa continues to lack a toilet that accommodates his disability.  Thus, he is unable to clean himself properly, and his hygiene has suffered.  He also does not have a table that he is able to eat or write at, and the safety railings in his cell are designed for someone in a wheelchair, and are at waist level, rather than designed for a partially sighted double-arm amputee.[34]  See A.368 ¶ 149.  All of these problems are exacerbated by Mr. Mostafa's poor vision, which makes ambulating in a small and dark cell without any natural light especially onerous.  See A.366 para 141.[35]

The extradition courts viewed the isolation of Mr. Mostafa at ADX as a potential bar.  However, the High Court noted that this was not a concern because of the U.S. government's commitments and that "unless ADX Florence regime ignores appellant's medical condition, and his need for nursing assistance," there would not be a risk of isolation because of the amount of time that a nursing assistant would be assisting in Mr. Mostafa's activities of daily living.  See A.57-A.58 ¶¶ 67-68.  However, the exact opposite is what ultimately occurred.  Mr. Mostafa's cell is isolated from other inmate cells, see A.348-A.349 ¶ 4, he receives no assistance from a nurse, aide or anyone else, cannot communicate with other inmates, and has minimal contact with the world outside of his cell.

Simple  and  necessary  accommodations  are  denied  because  of  "policy,"  "security",  or

---

[33]     When he was required to rotate cells, he had to pack his belongings and unpack his belongings without any assistance.

[34]     Mr. Mostafa has just informed the undersigned that he now has a larger table.  However, because of where it's been placed, he can use it to write with but is not able to use it to eat from.

[35]     Mr. Mostafa's vision deteriorated so much that he had cataract surgery.  As a result, his vision in his sole eye changed. He received new eyeglasses that did not fit his prescription and used an old lens that makes it difficult but possible to read.

misinformation.  For example, because of his double arm amputations and the lack of assistance, Mr. Mostafa is only able to open pouches of food by ripping them with his teeth.  See A.378, A.372 ¶¶ 118-119.  Over the course of the years that he has been incarcerated, the nerves in his teeth have become severely damaged and he has lost several teeth.  See, e.g., A. 372, A.378 ¶¶ 118-20.  Requests for accommodations have been repeatedly denied; even when requested by medical staff or ordered, they have been ignored.

The dental records confirm the mistreatment and lack of accommodations.  The dentists have repeatedly requested accommodations for Mr. Mostafa such as an electric toothbrush or water-pick and a hole puncher to open his food packets so he would not need to use his already severely damaged teeth. See Notes of various dental treatments (SA.41, SA.93, SA.103, SA.108, SA.111, SA.137, SA.154). Mr. Mostafa indicated that he lost two teeth while in custody for eight years in England, and ten teeth in the last eleven years in the United States.  See, e.g., Dental Notes for June 1, 2021 (SA.122-SA.131); Dental Notes for November 22, 2021 (SA.132-SA.140); Dental Notes for December 19, 2022 (SA.151-SA.156). These records not only show the teeth that were lost but the terrible condition of his remaining teeth.  At the end of 2022, Mr. Mostafa, a dual amputee, was given safety scissors to open the packets, which is difficult, bordering on impossible, for him to use.  See SA.153-SA.154, SA.159.

Dr. Ishteeaque noted that his "requests for aids [have] been denied for custody purposes."  Dr. Ishteeaque further noted that "[f]rom a professional standpoint, such requests are not without their merits and those items would help patient save his dentition" (SA.110).  On October 12, 2016, the dentist noted:

> Patient has no hands to perform appropriate/effective oral hygiene. Can Physical Therapy or Occupational Therapy be provided to this patient so that he can learn to better perform oral hygiene procedures? This way any dental work performed can be maintained by him longer without deterioration (that is seen when oral hygiene is ineffective).  This consult is written under guidance from Regional Dental officer.

> Provisional Diagnosis:
> Disability present due to absence of both hands. Patient requests some type
> of accommodation given his disability so that he can perform oral hygiene
> procedures.

SA.110.

On February 24, 2017, Dr. Ishteeaque further noted:

> Reason for Request: Given that this patient lacks both hands, can the process
> be reviewed again to see if he merits having an electric toothbrush or a water
> Pick to save his dentition from further wear/tear? Can a review be made
> again for a hole puncher (of sorts) so that he can use the item to tear food
> packages rather than his front teeth (that he uses as hands to detriment)?

> Provisional Diagnosis:
> lacks manual dexterity to open packages and perform proper oral hygiene.

SA.111.[36]

Notably, Mr. Mostafa has never received any physical or occupational therapy for oral hygiene

nor the disability accommodations that he requires.  Indeed, in response to Mr. Mostafa's request for teeth

and gum cleaning every six months instead of once a year, "the dentist repeatedly explained to plaintiff

… that ADX policy afford[s] no repair ... not even allowed more than once a year cleaning nor [is] plaintiff

allowed electric/flossing brush to clean his teeth" (SA.118) (Dental Note); see also First Amended

Complaint (A.375).

To repair the damage and still be able to use his teeth to open packages, and for other purposes,

Mr. Mostafa now requires dental implants.  However, BOP policy prohibits the use of implants and offers

only partial dentures. See SA.109-SA.111, A.375.  As Dr. Ishteeaque, notes:

> Patient understandably refused the extractions and denture plan. He wants

---

[36]    Part of this problem – and many others – may have resulted from the inaccurate assessment made by OT Chorosevic
in his brief encounter on April 26, 2016, that apparently was not drafted until a month later.  Chorosevic noted that "a jar of
peanut butter that had previously been opened had the lid secured on it," which caused Chorosevic to assume that it was Mr.
Mostafa who opened it.  That was incorrect.  During the time that Mr. Mostafa was in his cell with Chronosevic, Mr. Mostafa
had been shackled and was unable to reach anything, let along the peanut butter jar in question.  This and other inaccurate
assumptions resulted in Chorosevic concluding that the difficulties Mr. Mostafa had was because of his underutilization of his
prostheses.  See SA.34; See also A.257-A.258 (Mr. Mostafa's remedy list summary comments).

> options that are more suitable to his physical needs. He does not want to
> compromise on receiving dentures because, as he states, it does not meet his
> needs suitably.

SA.109-SA.110; see also SA.120 (November 18, 2016 entry by Dr. Ishteeaque) ("I understand that
practically dentures cannot serve him (too well) since he is missing hands and, therefore, inserting and
removing dentures may be difficult (or even impossible).").

The simple accommodation to open the food packets for Mr. Mostafa took years, staff ignored the
order from the doctor and still it is inconsistently done.  On January 23, 2020, the doctor issued instructions
that "[a]ll prepackaged religious food will be opened by food service workers in a certified foods kitchen
and place[d] into easy access containers" (SA.113).   Nevertheless, the order was not being followed,
requiring Mr. Mostafa to make a series of complaints beginning in September 2020 and continuing for
months later.  See A.330-A.334.  Another medical directive was issued on June 9, 2021, to have packages
opened, see A.318, yet Mr. Mostafa still has problems with his food delivery.

Not only did the opening of the food packets cause continued damage to his few remaining teeth,
during the pandemic it caused great anxiety and fear.  Using his teeth on packets handled by staff was a
guarantee that COVID would be passed on to him.  Like every other prison, both inmates and staff tested
positive for COVID.  Because of his age and numerous medical conditions, Mr. Mostafa was at very high
risk of severe consequences should he contract COVID.  He sought release, transfer, modification of the
SAMs and made complaints about the unopened food packets.  All were denied.  See A.319-A.327.[37]
Incredibly, in the denial of his request to be placed into Phase III of the step-down process, with slightly
less harsh limitations like additional telephone calls, Mr. Mostafa was urged to "demonstrate an overall
positive institutional adjustment to include, but not limited to, personal hygiene and cell sanitation"

---

[37]      Mr. Mostafa has indicated that he was not tested for COVID in 2020 and 2021. He was only tested for COVID in
2022 after his request and was tested positive. See SA.370-371. (He believes he contracted COVID in 2020 as well but was
not tested at the time.) Mr. Mostafa received COVID vaccinations in March and April 2021.

(A.335). This was somehow supposed to be accomplished without any assistance and few accommodations for his disabilities.

Due to the restrictions imposed, Mr. Mostafa cannot properly brush or cut his hair, is provided no suitable hairbrush, cannot safely shave, and is denied haircuts for months on end. See A.363 ¶ 125. In 2018, Mr. Mostafa was finally provided with a hairbrush, though the handle was removed for "security reasons." It was helpful but without assistance, it could not reach the back of his head. However, in 2020 even that was taken away from him. See A.364 ¶ 127.

For a diabetic, feet care is extremely important, otherwise amputation could become necessary. Without the ability to provide feet care on his own because of his disability, the British authorities provided regular and necessary professional footcare. Prison officials in the MCC recognized the need for professional foot care. But recognition of the need is not the same as providing adequate care, and the BOP's failures as it relates to this relatively simply medical issue is demonstrative of its failures relating to medical care and the necessary accommodations promised and required for Mr. Mostafa.

It cannot be disputed that as a bilateral amputee with diabetes and diseased toenails, he needs professionally assisted foot care. Mr. Mostafa experiences frequent bleeding in his feet from sharp or overgrown toenails and requires professional care to regularly trim his toenails. See, e.g., SA.77, SA.83; A.373 ¶ 122; A.369 ¶ 176; A.371 ¶ 187. While in the MCC, he was told by the medical staff that his nails should be cut once every four or five weeks by a podiatrist to prevent cuts, infections, and pain that could lead to amputation, Mr. Mostafa waited but it did not happen. He then made a complaint that the Bureau of Prisons acknowledged was correct and granted his request. See A.261 (Mr. Mostafa's remedy list, Remedy No. 89); see also A.371 (Fourth Amended Complaint).

Notwithstanding its failures and delays, at least the MCC did ultimately provide the services of a podiatrist for Mr. Mostafa's foot care. ADX not only ignored the original granting of the request, ADX

repeatedly denied his multiple later requests to be treated by a podiatrist.  See A.261-A.262 (Remedy List Request Prepared by Mr. Mostafa).  Moreover, although ADX later did order that Mr. Mostafa's nails be cut every 4 weeks, it ignored that order as well.  See January 13, 2020, Medical Note (SA.166).  When his toenails were cut, it was done by a non-professional that frequently caused pain, cuts, or was not done correctly, see A.261-A.262, and he was charged for the non-professional services, see A.337; see also A.279 (BOP Remedy List, Remedy No. 876246).  Thereafter, he was provided with a nail clipper to use on his own – *one that required hands to use.*  See A.338 (photograph); A.305.[38]

Finally, on July 13, 2022, after more than seven years at ADX, Mr. Mostafa was taken to see a podiatrist. The podiatrist determined that Mr. Mostafa "is in risk category 1 which is defined as loss of protective sensation with or without deformity" and recommended that "Debridement of Nails and/or Calluses [be] performed as indicated for patient due to high risk status."[39]  Podiatrist Report, dated, July 13, 2022 (SA.169).  The podiatrist further noted:

> This patient has a systemic disease resulting in severe circulatory embarrassment and/or compromise that performance of debridement procedures by an unskilled and/or nonprofessional individual would be hazardous to this particular patient increasing the danger of infection and injury putting the patient at risk.  Educated the patient to avoid self-care to preclude the risks associated with peripheral vascular disease.

Id.  The podiatrist recommended that "this patient return every 3-6 months for a foot evaluation to reduce

---

[38]     The BOP's remedy list indicates 15 complaints relating to his requests for a podiatrist, having his toenails properly trimmed, and the injuries suffered by improper trimming by non-professionals between his arrival in ADX in October 2015 and December 2020.

[39]     Nail debridement: the significant reduction in the thickness and length of the toenail with the aim of allowing the patient to ambulate without pain.  Nail debridement is a distinct service from "routine foot care".  Simple trimming of the end of the toenails by cutting or grinding is not debridement.  Reduction in the length of normal or thickened elongated toenails (whether done with an electric burr or by hand) is not debridement.  Similarly, buffing the surface or the edges of manually trimmed mycotic toenails (mycotic = fungal infection) is not debridement.  See https://www.tldsystems.com/debridement-vs-trimming.

the risk and minimize the morbidity of foot ulcers." Id.[40]

Additionally, the recreation cages at ADX do not have any place for Mr. Mostafa to sit.  Because of his disability, sitting on the floor of the cage is impractical because of the difficulty he has standing up if he is sitting on the ground.  He requested a chair but was refused.  Thus, he has not been in recreation for approximately 24 months.  Moreover, because of his disability, Mr. Mostafa is placed in a separate area than the able-bodied H Unit prisoners.  Since being incarcerated in ADX, he has been awakened every 30 minutes by the opening and closing of a gate and the frequent use of a flashlight.  His requests for an accommodation have again been denied.  See, e.g., A.254 (Mr. Mostafa's Remedy List); A.281 (BOP Remedy List, Remedy Nos. 924535-F1, 924535-R1).

Notwithstanding the recommendation of BOP's occupational therapist – made in 2013 when Mr. Mostafa was detained pretrial at the MCC – that a plate, tray, and spork designed for an upper amputee be given to Mr. Mostafa, such items have not been provided at ADX.[41]  See SA.26; see also A.364 (Fourth Amended Complaint).  In fact, few of the recommendations made by Ms. Deats in 2013 have been carried out.[42]

Because of his disability and that he suffers from hyperhidrosis, he is required to change clothing numerous times a day; the hyperhidrosis impacts on his bedding.  Because of, however, the difficulty he had in changing his bedding, Mr. Mostafa rarely does it.  See A.365 ¶ 132; see also A.378.  Mr. Mostafa is also required to clean his cell by himself.  He explained that he wets a towel, puts soap or shampoo on

---

[40]     Notwithstanding the podiatrist's recommendation and Mr. Mostafa's repeated requests, he did not see the podiatrist again until July 31, 2023. See SA.171-SA.174.  In the 2023 report, the podiatrist recommended a yearly visit for foot evaluation, not for the frequency for toenail clipping. See SA.173.  Nevertheless, this recommendation was misinterpreted by BOP medical staff to mean that nail trimming only needed to be done once per year. See SA.175 (August 24, 2023, Clinical Encounter).

[41]     The one provided in MCC did not work.

[42]     While Ms. Deats made some reasonable and useful recommendations, she incorrectly assumed that Mr. Mostafa could make his own bed, open condiment packages, required no assistance in opening or drinking fluids safely, and required no additional help or items for cleaning assistance. See A.365 ¶ 133.

the floor, and uses his feet to clean as best he can.  Not only do many areas not get cleaned, it is dangerous for a man in his condition to do this, especially because the safety railing in his cell is designed for a disabled person in a wheelchair.  See, e.g., SA.178 ("Inmate cut his arm while cleaning cell house" in 2018); SA.89 ("Inmate also c/o [complains of] burning pain of upper posterior thigh under buttock.  Inmate states that the pain started about 4 months ago when he slipped in his room during cleaning…."); see also A.253 (injuries during repeated cleaning and moves).  While incarcerated in Belmarsh, staff cleaned his cell.  See SA.1-SA.6 (Belmarsh records).  In ADX, he must do his best.[43]

While Mr. Mostafa is usually the one making reasonable requests for accommodations to staff or by administrative remedy forms, the medical staff in ADX have often recognized the need for such assistance or accommodations and have made reasonable requests on his behalf.  However, as Mr. Mostafa's extradition attorneys repeatedly made clear and the United States government said would not happen, these requests have been denied or ignored.  As also discussed, BOP dentists have recognized his dental problems and sought minor accommodations to help with Mr. Mostafa's dental care but were denied.[44]

As recognized by the medical staff on February 11, 2015 shortly after he arrived at FMC Springfield, and on October 13, 2015 shortly after arriving at ADX, though Mr. Mostafa can apply cream for his chronic psoriasis in most places by himself, he requires assistance for other places.  See SA.69 (medical order); SA.75 (medical order).  These medical directives for him to receive nursing assistance to apply cream to the lesions caused by his psoriasis were ignored or denied by ADX.  See also July 13,

---

[43]      At one point an officer threatened to take everything out of his cell if he didn't clean it.  Mr. Mostafa asked for a hand and the officer pointed to his non-functioning prostheses.

[44]      Both Mr. Mostafa's list of remedies and the BOP's list of remedies include multiple requests for accommodations for his dental health that were always denied.  See, e.g., A.259, A 267, A.268, A.278.

40

2022, Clinical Encounter (SA.84) ("Asks for a steroid injection for his psoriasis.  He has troubles getting the clobetasol ointment onto portions of his skin.").   Once again, Mr. Mostafa never received any assistance.[45]   As discussed, having ***daily assistance*** by a health care assistant or nurse was one of the factors that the extradition courts thought would occur in order to prevent the lack of human contact the court feared would ordinarily occur even for a brief incarceration in ADX.  See A.56 ¶ 5 (British District Court); A.56 ¶ 65 (High Court); A.174 ¶ 290 (ECHR).

Indeed, all of the struggles that Mr. Mostafa faces are compounded by the fact that he spends his entire day, every day, in solitary confinement without assistance from anyone.  As discussed *ante*, the stress and anxiety Mr. Mostafa experiences on a daily basis are common symptoms of solitary confinement, which was of great concern to the British courts and the ECHR, and has resulted in broken promises and commitments by the United States government.  He is depressed, stressed, and suffering as a result of the nature of his confinement. During Mr. Mustafa's entire incarceration, he has frequently suffered as a result of inadequate efforts, sometimes none, to mitigate the difficulties he has as a result of his disabilities and/or medical conditions.  Moreover, the arbitrary policies at ADX preclude Mr. Mostafa from receiving adequate medical care, and bureaucratic indifference makes fighting these conditions onerous and near impossible.

### b.      Religious Limitations

As a religious Muslim and former Imam, the practice of his religion is of great importance to Mr. Mostafa, including prayers five times day.  His incarceration in ADX and the SAMs have greatly limited his ability to practice his religion.  During his incarceration in England, he was able to worship with other inmates.  See A.353 ¶ 58.  In ADX Mr. Mostafa was prohibited from attending worship services with

---

[45]      Ironically, a medical directive was issued on February 11, 2015 (SA.71) to provide nursing assistance for putting cream on his psoriatic lesions and an entry on March 6, 2015, indicated when the assistance was to occur, but Mr. Mostafa never received any assistance other than on occasion when he was at the clinic.

other inmates.  See A.352 ¶¶ 55-56.  His request to allow group prayers while all inmates are in recreational

cages during recreation time has likewise been denied.  Id. ¶ 55.[46]  Even the simple request to have the

cages slightly turned to face Mecca has been denied.  Id.  In England he had assistance with the required

ritual cleaning and the required shaving of pubic and underarm areas.  In all facilities in the United States,

he has had no assistance or accommodations.

In its submissions to the extradition courts, the U.S. government explained that an Imam was

available to inmates four days a month and would speak to inmates at their cell door.  See A.127 ¶ 91

(ECHR decision).  In reality, the visits were for 3-4 minutes once a month until March 2020, after which

he has not had a single visit.  See A.353 ¶ 59.  While acknowledging a legal duty to provide one, ADX

cited "staffing problems" to explain why Mr. Mostafa's religious observance has been infringed.  See

A.308.  For a short time there was an Imam who spent a minute or two outside his cell once a month.  For

the last six months there has been no visits by any Imam.

### c.  Solitary Confinement and Limitations on Communications with Others

The impact of solitary confinement and lack of communications with others was rightfully of

paramount concern to the extradition courts' regarding Mr. Mostafa's incarceration in ADX and the

extreme limitations resulting from Special Administrative Measures.  See A.15-A.16 ¶¶ 40-41, 45.[47]

Judge Workman found the possibility of such isolation "offensive to my sense of propriety in dealing with

---

[46]      A recent amendment to all SAMs permits group prayers during recreation time, however, for health and disability reasons (i.e., the refusal to provide a chair in his recreation cell) Mr. Mostafa has not participated in group prayer.

[47]      In his testimony Warden Riley indicated that inmates communicate with each other by "yelling or using the air ventilation as a voice conduit" as a mitigation of solitary confinement. See A.16 ¶ 43.  However, under the SAMs for the past eleven (11) years, such communication is prohibited and sanctions can be imposed. Mr. Mostafa's SAMs prohibit such conduct, and, in fact, Mr. Mostafa was punished for speaking to another SAMs inmate in MCC on January 3, 2013.  "In addition, the USA/SDNY reports that since the SAM were imposed on January 3, 2013, and continuing through 2015, you have committed multiple violations of the restrictions. For example, on June 15, 2013, while housed at the MCC, you violated the SAM by talking to another SAM inmate" (A.198 ¶ 6).  Additionally, the location of Mr. Mustafa's cell at ADX renders such "conversations" impossible.

prisoners" and "incompatible with his Article 3 Rights." Id. at ¶ 44.  Similarly, the High Court understood the "potential adverse effect on the mental health of inmates of long-term social isolation" (A.56-A.58 ¶¶ 65-67, 69).  Agreeing with Judge Workman as to what incarceration at ADX would be like *other than in the short term,* the High Court stated that "confinement for years and years in what effectively amounts to isolation may well be held to be, if not torture, then ill treatment which contravenes Article 3" (A.57 ¶ 67).  As noted *infra*, the extradition courts' accepted the representation made by The Foreign and Commonwealth Office on behalf of the United States government that if Mr. Mostafa was held at ADX *for a short period of time* he would not suffer social isolation because of the care he would receive due to his disabilities. See A.16-A.17 ¶ 44 (District Court decision); A.57-A.58 ¶¶ 67-68 (High Court decision); A.77 ¶ 31.  Mr. Mostafa has now spent eleven years in BOP custody the past eight years in ADX – in complete isolation and under the most severe SAMs restrictions limiting his communications with others, both at ADX as well as the outside world.[48]

### d.    **Availability of Administrative Remedies**

Judge Workman believed that the potential violations of Article 3 were somehow mitigated by the fact "that the measures are open to administrative remedy and to review by the courts. In view of this defendant's disability[,] I am far from satisfied that special administrative measures would be applied" (A.17 ¶ 45).  Mr. Mostafa has now been in solitary confinement under SAMs since January 13, 2013, and has approximately 550 administrative complaints and requests. See A.250-A.265 (Mr. Mostafa's Remedy List); A.266-A.290 (BOP remedy list); A.350 ¶ 47 (Fourth Amended Complaint).  These relate to objecting to his designation to ADX, the SAMs, the need for accommodations because of his disability,

---

[48]       Notwithstanding his imprisonment under SAMs and is disabilities, Mr. Mostafa must fund much of his civil lawsuit, including copying costs, postage, and fees.  He is further impeded by his and his family's inclusion on the United Nations sanction list.

the desire to follow his religious requirements, access to mail and legal documents, medical care, the failure of staff to follow proper procedures, and other issues. The denial or failure to act on almost every single request has resulted in the civil lawsuit in the District of Colorado. A process for administrative remedies may exist but in practice it offers little solace to someone under the limitations faced by Mr. Mostafa.[49]

The administrative remedy process to challenge the SAMs and conditions of confinement in general is designed to be difficult and obstructive especially for an inmate, like Mr. Mostafa, who is not only under SAMs restrictions but is also severely disabled. Review of any restrictions imposed under SAMs must be conducted through the Administrative Remedy Program. See 28 C.F.R. §§ 501.2(d), 501.3(e). This protracted, multi-level, review process is internal to the Bureau of Prisons and prevents the courts from reviewing conditions of confinement under SAMs until after an inmate has exhausted his administrative remedies. As Lindsay Lewis researched and then explained to the extradition courts involved in the extradition of Julian Assange, "I am not aware of a single instance in which an inmate has effectively challenged imposition of his SAMs post-conviction" (A.237 ¶ 8, Addendum Report of Lindsay A. Lewis, Esq.).[50]

Mr. Mostafa was previously limited to one telephone call per month but now has three fifteen minutes calls per month to his wife, daughters, one grandchild, and his pastor friend Stephen Cole. The

---

[49]     A good example of the difficulties, frustrations and delays faced by Mr. Mostafa can be found in the administrative remedy documents that start on September 22, 2016, and ends with the Central Office Administrative Remedy appeal being denied on February 28, 2017. See A.291-A.298. The decision avoids responsibility by stating that "further intervention discussions relating to your adaptive devices will be deferred to Health Services staff at the local level" (A.297). Then when the staff makes requests, such as for an electric toothbrush or hole punch, it is denied. As the remedies lists indicate, this process and the results simply repeat themselves and the requests are continuously denied.

[50]     With her permission, much of the discussion of administrative remedies is taken from Ms. Lewis's 2020 and 2021 affidavits to the extradition courts involved in the extradition of Julian Assange. See A.232-A.233. Ms. Lewis's full 2020 Declaration is available at Mostafa v. Garland, 20 Cv. 694 (D.C. Colo) (Doc. No. 98), at 57-92. Ms. Lewis's 2021 Declaration is annexed hereto at A.234-A.249.

recipients cannot use the speaker phone thus he can only talk with one person at a time.  See A.232-A.233.
Apparently, children under nine-years-old are not permitted to speak to prisoners under SAMs on the
telephone.  He has not been permitted to speak to, or communicate with, any of his sons or his stepson.
Besides legal visits, the only people permitted to visit Mr. Mostafa are his wife and his daughter; neither
travel alone and thus none have been able to visit him even once since his transfer to BOP custody.[51]  He
is also limited to mailing three pieces of paper to one person once per calendar week.  See Mostafa v.
Garland, 20 Cv. 694 (D.C. Colo), Declaration of Lindsay Lewis, Esq. (Doc. No. 98), Excerpt (A.232).
Thus, he must choose between family members as to who he writes to or who he speaks to on the
telephone.  Due to the delays posed by the inspection of mail to and from Mr. Mostafa, "[t]he real cycle
of a letter and its answer is 6 months.  60 working days to send and 60 to receive [--] weekend and holidays
not counted [--] thus only two meaningful letters per a year for a successful informative mail" (A.372).

There have also been no meaningful changes to his SAMs restrictions in the almost eleven years
since it was first instituted, notwithstanding Government assertions that these are the least restrictive
measures that can be tolerated in light of the risks that the inmate presents.  The restrictions are designed
to prevent even contacts and communications that have no chance of leading to, or connection to, criminal
or terrorist activity, and that do not pose any risk of harm to any person or property.  This is clear from
the listed violations of SAMs protocols from the BOP in the last ten years.

For example, he was violated on June 15, 2013, because the family member he was talking to once
put the telephone call on speaker phone; he was violated because he communicated with another ADX
SAMs inmate in Arabic in 2014; and because on August 13, 2018 he wrote in a letter stating, "[D]on't tell
him that I love and miss him ... because it's against the rules" (A.198-A.199, A.328), which was viewed

---

[51]     Mr. Mostafa made requests to permit other family members to visit him but was told that the BOP never received the
appropriate documents. After filing a request under the Freedom of Information Act, he received documents that demonstrate
that the forms were indeed submitted.  See A.339-A.341.

as "an attempt to contact [a] third party" when it was simply an attempt to convey his love to his one-year-old grandson, who Mr. Mostafa is not permitted to speak to – technically a third-person but hardly warranting a disciplinary sanction.  See A.373, A.252 (Mr. Mostafa Remedy No. 24).  Such violations do not go to the purpose of SAMs, which is to prevent the client from committing, soliciting, or conspiring to engage in future criminal conduct, and namely terrorist activities which could result in death or serious bodily injuries.[52]

Because of the SAMs and his disabilities, the administrative remedy process itself creates extraordinary difficulties and substantial delays in exhaustion, and the ability to pursue a matter in court. As described in "The Darkest Corner," *Center for Constitutional Rights and Lowenstein International Human Rights Clinic* (September 2017), at 19 (available at https://bit.ly/3i0WuT4):

> [E]xhausting the [administrative remedy process] requires prisoners to (1) raise the issue of concern informally with BOP staff, (2) wait for the staff's response, (3) obtain and file a Remedy Form, (4) wait for the prison's response to the request, (5) obtain and file a Regional Appeal Form, (6) wait for the BOP Regional Office's response, and (7) obtain and submit a Central Office Appeal Form. BOP officials may return without response any filing that fails to adhere to extensive regulations concerning form and timing. Attorneys may not submit these complicated requests or appeals on the prisoner's behalf.

See also BOP's Program Statement 1330.18, "Administrative Remedy Program" (January 6, 2014) (available at https://www.bop.gov/policy/progstat/1330_018.pdf).

In Mr. Mostafa's case, this last requirement, that the inmate submit his requests himself, has been particularly challenging and has resulted in hardship for Mr. Mostafa:

> Most of the time plaintiff's remedy paperwork is rejected or returned because he cannot press the pen hard enough to fill the four pages, no photo copies allowed to be sent as replacement, no carbon papers is provided, no help and no consideration for his disability though it is well known and repeatedly mentioned to prevent rejection.

---

[52]   Mr. Mostafa had no such limitations while incarcerated in England.

Mostafa v. Garland, Docket No. 20 Cv. 694 (D.C. Colo) (Doc. No. 98), at 92 ¶ 105.

Moreover, the inadequate medical treatment that Mr. Mostafa has received is very much the result of the limitations presented by his Mr. Mostafa's designation to ADX, the failure of the BOP to obtain the services of an occupational therapist with experience with double amputees, the restrictions as a result of his SAMs, the inadequacy of the medical facilities, and the indifference of BOP staff. As noted previously, the Government has never disputed Mr. Mostafa's numerous medical conditions that require care and treatment. Further, the United States government and the Bureau of Prisons has specifically acknowledged that Mr. Mostafa's disability and medical conditions warrant incarceration at a Federal Medical Center.

Thus, not only is appropriate medical care required as a result of the representations and commitments made by the United States to various courts in the extradition process, it is also required by the American with Disabilities Act of 1990 ("the ADA"), the Rehabilitation, Comprehensive Services, and the Rehabilitation Act of 1973, 29 U.S.C. § 794(a), and the Eighth Amendment prohibition against cruel and unusual punishment.

To be clear, the Eighth Amendment to the United States Constitution affords inmates protections against cruel and unusual punishment, and this has been explicitly applied to people incarcerated with physical disabilities and to medical care. See, e.g., Shariff v. Coombe, 655 F.Supp.2d 274 (SDNY 2009) (the Eighth Amendment extends to conditions of confinement and the effect those conditions have on disabled prisoners); Knop v. Johnson, 667 F.Supp. 467, 479 (W.D.Mich. 1987) ("Exposing an inmate to a situation where he may be forced to defecate or urinate in his own cell without the presence of proper toilet facilities or a washbasin violates the basic human dignity the Eighth Amendment protects."); Johnson v. Wright, 234 F.Supp.2d 352, 360 (SDNY 2002), quoting, Hathaway v. Coughlin, 37 F.3d 63, 68 (2d Cir. 1994) (The mere "fact that a [prisoner] received regular medical care does not preclude a

finding of deliberate indifference where the 'course of treatment was largely ineffective and [prison officials] declined to do anything more to attempt to improve [the prisoner's] situation.' "); Oliver v. Deen, 77 F.3d 156 (7th Cir. 1996) (prison officials must ensure that inmates receive adequate food, clothing, shelter, protection and medical care); Whitnack v. Douglas County, 16 F.3d 954 (8th Cir. 1994) (reasonably adequate sanitation and ability to eliminate and dispose of one's bodily wastes without unreasonably risking contamination are basic identifiable human needs of prisoners protected by Eighth Amendment); King v. Frank, 371 F.Supp.2d 977 (W.D.Wisc. 2005) (condition of inmate's confinement violates Eighth Amendment's prohibition against cruel and unusual punishment if it denies inmate civilized measure of life's necessities); Estelle v. Gamble, 429 U.S. 97 (1976) (deliberate indifference to prisoners' serious medical needs constitutes cruel and unusual punishment); LaFaut v. Smith, 834 F.2d 389 (4th Cir. 1987) (prison officials violated Eighth Amendment by failing to provide disabled inmate with needed physical therapy and adequate access to facilities).

Similarly, the Rehabilitation Act of 1973 and the Americans with Disabilities Act of 1990 also recognize that the need to accommodate disabled persons extends not merely to those that are at liberty but to incarcerated persons as well.  See Pennsylvania Dep't of Corrections v. Yeskey, 524 U.S. 206 (1998) (ADA); Onishea v. Hopper, 171 F.3d 1289 (11th Cir. 1999) (Rehabilitation Act); Bonner v. Lewis, 857 F.2d 559 (9th Cir.1988) (Rehabilitation Act); Kaufman v. Carter, 952 F.Supp. 520, 523-24 (W.D.Mich. 1996) (failure to provide accommodations so that bilateral amputee could gain equal access to bathrooms and showers while incarcerated implicated Rehabilitation Act, the ADA, and the Eighth Amendment).

Along these lines, 42 U.S.C. § 12182(b)(2)(A)(ii) explains that, for purposes of the ADA, discrimination in public accommodations includes:

> [A] failure to make reasonable modifications in policies, practices, or

> procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations.

Here, the refusal to accommodate Mr. Mostafa's disability and medical needs and the consistent lack of attention paid by prison staff to such needs demonstrates that the staff at ADX Florence are unable (or unwilling) to accommodate and adequately attend to his disability and medical issues, all of which is arguably in violation of Mr. Mostafa's rights under the ADA, the Rehabilitation Act, and, most notably, the Eighth Amendment to the United States Constitution.  As a result of the lack of accommodations and care, Mr. Mostafa has lost almost all of his teeth, suffers from multiple infections, and has consistently been without the medical care considered reasonable to any civilized society.

Has the U.S. government honored the sworn promise of Warden Wiley that it was "highly unlikely" for a person with Mr. Mustafa's conditions and disabilities who "required assistance with the activities of daily living" to be designated to ADX?  Would Judge Workman have granted extradition if he had known that Mr. Mostafa would be designated to ADX on a long-term and potentially lifetime basis, and not sent to ADX merely for "a relatively short period of time" as had been proffered by the United States government at the time? Would the High Court have done the same if it found the U.S. government's commitment to properly treat Mr. Mostafa's medical and disability needs were subservient to "security" issues and that he had no one to assist him for his daily living activities?  The High Court had been persuaded by the U.S. government to believe that "unless ADX Florence regime ignores appellant's medical condition, and his need for nursing assistance," there would be no risk of isolation because of the amount of time that a nursing assistant would be assisting Mr. Mostafa with his activities of daily living.

Well, that supposedly far-fetched hypothetical, which Mr. Mostafa's attorneys have been arguing

from the beginning was not merely likely but all but guaranteed, is exactly what has now occurred. Mr. Mostafa, with his medical difficulties and disabilities has been now incarcerated in what former Warden Robert Hood described as a "cleaner version of hell."[53] Only this Court can offer any realistic hope of redress, and we respectfully submit compassionate release, or a reduction in sentence, under all of these circumstances is the only just result.

> **D.      Mr. Mostafa does not present a continuing or future danger to the community.**

Once extraordinary and compelling circumstances have been demonstrated, the next step is to determine whether these reasons outweigh other considerations under 18 U.S.C. § 3553(a), and that the defendant is not a continuing or future danger to the community.

18 U.S.C. § 3553(a), provides, in relevant part for a consideration of:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed –
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> (B) to afford adequate deterrence to criminal conduct;
>>
>> (C) to protect the public from further crimes of the defendant; and
>>
>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and sentencing range [provided for in the U.S.S.G.]...
>
> (5) any pertinent [Sentencing Commission] policy statement...

---

[53]      Former Warden Robert Hood's CBS 60 Minutes interview and other descriptions of ADX can be found at https://www.cbsnews.com/news/supermax-a-clean-version-of-hell/.

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

Today, Mr. Mostafa is not a danger to others or to the community.  There is no dispute that Mr. Mostafa was convicted of serious offenses, but the seriousness of the crimes of conviction does little to resolve whether Mr. Mostafa presents a continuing or future danger.  All defendants who were convicted of, and sentenced for, terrorism offenses received substantial punishment.  What is relevant is Mr. Mostafa's actual conduct and whether there is a real danger that he will again participate in such conduct.

Importantly, the sentencing judge in Mr. Mostafa's British case noted:

> I take very much into account that these speeches, for which I now have to sentence you, were delivered *before* the world temperature was raised by the events of September 2001, and I take into account that there is no charge of repeating any similar material since that date, which would have made it worse.

A.423-A.424 (emphasis added).  That distinction makes clear the U.K. sentencing court's opinion that Mr. Mostafa will not participate in such conduct or speech in the future.  Further, as noted *infra*, he will be supervised if your Honor grants this application.

Additionally,

> It is also notable, that in the psychological examinations conducted by the Bureau of Prisons for Mr. Mostafa while he has been incarcerated at ADX, consistently conclude that Mr. Mostafa "does not meet the criteria for a DSM-5 diagnosis."  Thus, he does not have an "Antisocial Personality Disorder," nor does he possess "a failure to conform to lawful and ethical behavior (outside of instant offense)," nor "an egocentric, callous lack of concern for others, accompanied by deceitfulness, irresponsibility, manipulativeness, and/or risk taking. Because of this, No Diagnosis will be maintained," which is indicative of Mr. Mostafa's **lack** of future dangerousness were he to be released.

BOP, Psychology Services, Diagnostic and Care Level Formulation Report, dated April 16, 2019 (SA.187); see also BOP, Psychology Services, Diagnostic and Care Level Formulation Report, dated

51

March 27, 2020 (SA.190).

      **1.**    **Mr. Mostafa's offense conduct should be viewed in context – his role and his conduct.**

Your Honor was not the presiding judge at trial so we will attempt to present a concise description of Mr. Mostafa's conduct in relation to his charges.   We do not seek to reargue the case; Mr. Mostafa was convicted of all counts of his Indictment.[54]

Mr. Mostafa is a double amputee with no hands.  Clearly, he did not commit any violent acts himself.  Of course, that neither excuses otherwise-criminal conduct nor is it a defense.  For the years that are relevant, 1998 to 2005, Mr. Mostafa made many offensive and inflammatory statements and speeches.  Much of what he said formed a very substantial basis of his convictions.[55]

Counts Three to Six related to the creation of a "training camp" in Bly, Oregon, that was the idea and goal of an individual named, James Ujaama.  Mr. Mostafa was convicted of these counts as a supporter of the creation of the training camp and for allegedly having sent co-defendants Haroon Aswat and Oussama Kassir to assist. Ujaama's goal was to attract Muslims from the UK to train in Oregon because of the availability of firearms in Oregon since firearms were unavailable for training in the UK.[56]  Kassir's view of the training was very different from Ujaama's, who ultimately left because of his dispute with Kassir.[57] Kassir's view was much more militant; he left the Bly compound because of the lack of weaponry

---

[54]     We note that Mr. Mostafa's convictions on Counts 7-8 were vacated and dismissed by the Second Circuit and as such will not be further discussed herein.

[55]     Examples include, "If a kaffir enters a Muslim land or, you know, anybody could take him, capture him, enslave him. Or even to sell him on the market. He's like a cow. He's like a pig." GX 130.  At times he praised Osama bin Laden and what he had done (though at times he criticized him). "Everybody was happy when the planes hit the World Trade Center.  Anybody who tell you he was not happy, they are hypocrites. For the Muslim Nation, I'm telling you." GX 113.  He called bin Laden "a reformer," a "victim from American policies," "a very great man." GX 101.

[56]     The defense sought to offer into evidence reports from British intelligence of Mr. Mostafa's conversations with the British authorities about setting up training camps in the UK to allow Muslims to fulfill their religious duty to train for jihad to demonstrate that setting up camps to train Muslims did not translate into terrorist training.  He was not permitted to do so.

[57]     The advertisement prepared by Ujaama that was posted in mosques in the UK and the U.S. stated, "You are invited to

and enthusiasm of those present.

Counts Nine and Ten related to a young man who worked in Mr. Mostafa's mosque, Feroz Abassi, who with financial assistance of the Mosque traveled to Afghanistan and received jihad training at various camps, including those run by al Qaeda.[58]

Count Eleven related to money given by Mr. Mostafa to Ujaama to deliver to people in Afghanistan to support an all-girls school, provide medical care for the daughter of a friend, and provide support to wives and widows of the mujahadeen.  See Tr. 2146-2151, 2184.

The most serious of the charges were Counts One and Two, which alleged hostage taking and a conspiracy to take hostages in Yemen. That event led to the death of tourists and many rebel fighters. There was never a dispute that Mr. Mostafa was a supporter of the rebel organization, the Aden-Abyan Islamic Army ("AAIA").  Supporters of Sharia ("SAS"), an organization supported by Mr. Mostafa, provided an outlet for  declarations, including the warning that all infidels must leave the region or seek a promise of protection from the emir of jihad Abu Hassan al-Mihdar.[59]  Mr. Mostafa explained that he did not "issue" the warnings but merely "echoed" them, see, e.g., Tr.3463, further explaining that "I'm not one of his advisors to tell him what to do. I'm just his mouthpiece."  See Tr.2945, GX 250; see also Tr.3251-52, Tr.1390, GX 250.

Mr. Mostafa acknowledged that he purchased a satellite telephone for the leader of the AAIA

---

[57]  come spend the time with us. Survival training. Sunnah horse riding, Arabian horses." It included archery, combat and martial arts, rifle and handgun handling, hunting and fishing, farming, and animal raising, hiking and Sunnah fun and religious classes. It exhorted, "Get away from dunia (worldly affairs), be amongst Muslims." It also quoted a price of 660 British pounds. See Tr.2059-60.

[58]  Saajid Badat, who the Government described as a hardcore member of al Qaeda, testified that he met Abassi in an Afghanistan guesthouse and then saw him again one time when he was digging with a spade in al Qaeda sponsored training camp.  See Tr.1774-75. Badat also testified that most of the men who trained, even at the Al Qaeda sponsored camps went home immediately after training and only a "very small percentage" went to the front lines to fight the Northern Alliance.  See Tr.1710, Tr.1729.  He believed that training was an obligation like praying or charity and did not include fighting. See Tr.1698–99. He also said the fight in Afghanistan was between Afghani versus Afghani. See Tr.1719.

[59]  He is also known as Zayn al-Abidin al-Mihdar.

months before the kidnapping of the tourists, had it delivered to him, purchased minutes for him, and spoke with him, including after the kidnaping of the tourists.

Notably, in October 2000, Mr. Mostafa granted an interview with Mary Quin, one of the tourists. He consented to the recording of that interview, which was admitted into evidence as well as the testimony of Ms. Quin.  Ms. Quin agreed that Mostafa said he believed that the kidnaping was a reaction by Hassan to something and a "spontaneous act." Tr. 2943-44. Mr. Mostafa also indicated that the kidnaping was justified under Islamic law but believed that "politically it was not very good...." Tr. 2854, 2948-49, GX 219.  He further testified that the kidnaping by the AAIA was a mistake because it would "end with more trouble" and that he had no prior knowledge of the plan.  Tr. 3265-66.  Mr. Mostafa further explained that after the kidnaping he sought to take the role as a negotiator to free those arrested by the Yemeni government in exchange for the hostages.  See Tr. 3479.[60]

Ms. Quin wrote a book about her experience. On March 24, 2014, the Government provided in discovery a copy of a portion of her draft of the book, Kidnapped In Yemen: One Woman's Amazing Escape From Captivity, as Government Bates No. 3502-24 (A.402-A.409).  This draft provides important insight as to Mr. Mostafa's motivation and culpability relevant to the instant motion.[61]

The section provided to trial counsel includes the following conversation between Abu Hassan and Mr. Mostafa, also known as Abu Hamza (the quotation marks are Ms. Quin's):

> He [Abu Hassan] turned to Osama Al-Masri who was busy trying to get a signal on the satellite phone. "Osama, call Abu Hamza in London. He can speak for us to the British and let their newspapers know we have captured 13 of their people...."

---

[60]     The defense sought to present evidence that he previously acted as an intermediary for the British government in prior hostage situations as well but were precluded by Judge Forrest.  See Tr. 2829-2841, see also Letter from Jeremy Schneider, dated, May 7, 2014 (Doc. No. 337).

[61]     Apparently, this draft was not satisfactory to the editors as it presented Mr. Mostafa, an individual despised by a significant portion of the British population, in a too favorable light.

"This is Abu al-Hassan. I have big news for you, my friend. The British and American infidels will sit up and listen to the Islamic Army now."

Abu Hamza's first reaction was alarm. "Does it concern my son?"

"It is how we will save him, Abu Hamza. You will know that I, Abu al-Hassan, rescued your son. But you must help us."

"What has happened? Tell me what you have done?"

"We have kidnapped sixteen tourists. Now Salih's government must give in to our demands."

"Why have you done this? You will bring the Security Forces down on your Army before you are ready to act. Who are these foreigners?" Hamza became even more worried.  He had never met Hassan but he knew from his reputation and from past conversations with the man that he was egotistical and capable of precipitous, ill-considered actions…. "You must tell the newspapers and CNN. President Salih will not risk angering the British and Americans by letting these tourists die."

X          X          X

"In the name of Allah, Hassan, you must not harm them."  Hamza knew the consequences for his son and stepson, perhaps his whole organization, would be devastating if the tourists were killed.  He stopped and thought for a moment.  He must appeal to Hassan's interests, keep him calm and assure him of support, to stop him from doing something even more stupid.

"Abu Hassan, you have achieved a great thing.  But the hostages are only valuable to you alive.  You must be sure to keep them alive so you have power to negotiate.  Keep all of them alive, at least until you have freed our brothers."

A.402-A.404.

      To further understand the nature of a criminal defendant's intent, is it helpful to understand why the offense occurred in the first place.  To that end, we have sought assistance from Professor Gregory Johnsen, whose expertise includes an understanding of Yemeni culture and the radical Islamic groups operating in Yemen. Our effort to demonstrate this should not be seen as an attempt to minimize the terrible consequences of the kidnapping, but rather is done to show that there are mitigating factors to be

considered when analyzing whether Mr. Mostafa would be a danger to his community if he was released as a result of this motion.

While the act of kidnapping to seek redress of any kind is a serious offense, as Dr. Johnsen has explained, the act of kidnapping foreigners was viewed differently during that turbulent period in the recently unified Yemen. Kidnapping, usually by tribes, was done "often as way of pressuring Saleh's government to fulfill a neglected promise such as paving a road, building a hospital, or the release of a prisoner who had been taken by the government." A.397.[62]

As per the Yemeni custom, the victim of kidnappers were treated well, so well that in 1997,

> the *Washington Post* ran a story on kidnappings in Yemen, entitled: "Kidnapping in Yemen is Hospitality." The piece focused on the 1993 kidnapping of US Foreign Service officer, Haynes Mahoney. The captors, the piece explains, slaughtered goats in Mahoney's honor, invited him to chew qat, and tried to keep his spirits up with cookies, tea, and cigarettes. "They were as polite as one can be when one is pointing a gun at someone," Mahoney said. "I was treated pretty much like a compulsory guest."

A.397.

Odd as it might sound today, at the time kidnapping became a form of "adventure tourism with some westerners traveling to tribal areas in the hopes of getting kidnapped so that they would have a story to tell back home." A.398, citing, Lancaster, "Kidnapping in Yemen is Hospitality" (available at https://www.washingtonpost.com/wp-srv/inatl/mideast/may/22/kidnap.htm).

> As the late Shaykh Abdullah al-Ahmar, the Speaker of Yemen's Parliament and head of the country's largest tribal confederation, put it at one point during the 1990s: "Kidnapping in Yemen is hospitality. Kidnapping is part of tourism; it's an adventure for the tourist, because the tourist will end up learning about the customs of the tribes, as well as their good hospitality."

A.398-A.399.

> Most estimates suggest that in the 1990s, between 150 – 200 westerners were kidnapped in Yemen. The vast majority – although tragically not all

---

[62] Ms. Quin's descriptions of "normal" kidnaping was the same as described by Dr. Johnsen. See A.408.

of them – were released unharmed. Throughout the 1990s, the operating assumption for most tribes and groups in Yemen was that if you wanted to put pressure on Saleh's government the quickest and most effective way to do so was by kidnapping western tourists. Throughout this period, the Yemeni government typically responded by negotiating not with military force.

A.399.

This is not to say that the victims of Counts 1 and 2 had traveled to Yemen in the hopes of being kidnapped – far from it.  But it does help explain the thinking behind the Yemini kidnappers.  On direct examination Mr. Mostafa explained that he did not have prior knowledge of the kidnapping, nor did he think it was helpful to the group's cause.  However, as explained by Laura Kasinof, an American journalist who lived in Yemen and wrote a book about her time in the country, "If a tribe wanted to bribe the government in some way, to get Uncle Mohammed out of prison, for example, then Western foreigners were good bargaining chips" (A.398).

Al-Mihdhar, seeking to obtain the release of his supporters, learned that a group of tourists would be traveling through Abyan, the area where he was.  On December 28, 1998, he and his followers kidnapped the tourists and their drivers to use them to secure the release of his men.  Id. 6.  As Professor Johnsen explained:

> Given how quickly the kidnapping plot came together as well as the way local Islamists groups such as AAIA functioned at the time it would have been inconsistent for al-Mihdhar to inform anyone outside of Yemen of his plans prior to taking the tourists hostage. Kidnappings in Yemen in the 1990s were a local response to local events and an attempt to put pressure on Saleh's government, and that is exactly what al-Mihdhar was attempting to do.

A.400-A.401.  Thus, as Mr. Mostafa testified, the kidnapping charged in Counts 1 and 2 were most likely a spontaneous act by al-Mihdhar with little planning and no advance consultation with Mr. Mostafa.

Again, *none* of the above is meant to excuse Mr. Mostafa's role purchasing a satellite phone for

al-Mihdhar prior to the kidnapping and speaking with him on that satellite phone after the kidnapping was already underway, but it does place the events in context. This was the rare kidnapping that went wrong and had tragic results, but kidnappings in Yemen at the time were not conducted in the manner that one would ordinarily assume, and to this day Mr. Mostafa insists that he was attempting to negotiate the release of the victims after the crime had begun. Such may have been too little, too late, with respect to the sufficiency of the jury's verdict, but it remains relevant to whether Mr. Mostafa presents a continuing or future danger to others or the community if he were to be released, which we respectfully submit he would not.

## 2.     <u>Restrictions Upon Return to England</u>

Attached to this submission is a report by Bridget Prince on the restrictions that Mr. Mostafa would undoubtedly face upon his return to the United Kingdom. <u>See</u> A410-14, *Report by Bridget Prince, One World Research, re: Restrictions Applying to Sentenced Prisoners on Release in the UK* (referred to herein as "Ms. Prince's report"). As your Honor is aware, as a result of the letter from Gareth Pierce submitted in support of co-defendant Haroon Aswat's request, the restrictions on Mr. Mostafa's liberty and conduct will be severe. <u>See</u> Exhibit A to Haroon Aswat's Motion for Compassionate Release, dated, February 26, 2021, <u>United States v. Mostafa, et al. (Aswat)</u>, Docket No. 04 Cr. 356 (AT) (SDNY) (Doc. No. 575-1). Mr. Mostafa will face the same or more severe restrictions as Mr. Aswat.

As noted in Ms. Prince's report, the primary restrictions imposed by the United Kingdom is called "Notification." These restrictions will remain in place for thirty (30) years, undoubtedly, for the rest of Mr. Mostafa's life. Because of the nature, date, and sentence of the convictions, Mr. Mostafa will clearly fall within the application of Part 4, Section 57, of the Act. <u>See</u> A.411 ¶ 9. This section will provide substantially more supervision and restrictions. These restrictions will include:

12.     The individual subject to notification must notify to the police the following information:

    (i)      Name (and any other names when used when dealt with at court)/date of birth/national insurance number.

    (ii)     Home address on the date of the notification/the address of any other premises in the UK at the time of notification at which the person regularly resides or stays.

    (iii)    Contact details including phone numbers and email addresses/Details of all financial accounts.

    (iv)    Passport details/Travel notification required to register any foreign travel regardless of the time and length and additional details including departure and arrival points and accommodation details.

    (v)     Identifying information of any motor vehicle of which the person is the registered keeper, or which the person has a right to use (whether routinely or on specific occasions or for specific purposes).

13.     Notification of the above must be made to the police each year.  In the event of any changes they must be immediately notified.

14.     <u>Part 4 Monitoring/Management</u>
The individual subject to Part 4 will be monitored by the relevant Terrorist Offender Management Unit (TOMU) (understood in the case of Mr Mustafa to be the Metropolitan Police in London).

    (i)      It is understood that monitoring and management would be likely to include what is described by police as "trip wire coverage". This refers to the flagging up of movements beyond specified boundaries.

    (ii)     TOMU monitoring provides for 24/7 response if triggered by activities of concern being monitored including a triggering of what are described by police as "overt markers".

    (iii)    Each individual is allocated a dedicated TOMU case officer.

    (iv)    Frequency of TOMU risk assessment and review dictated by level of risk.

(v)     Home visits (announced and unannounced). The police may at any time obtain a warrant to search premises in order to assess the risk posed by that individual.[63]

(vi)    Monitoring of compliance and investigation/prosecution of breaches.

(vii)   Interaction and liaison with partner agencies and support agencies to promote "desistance and disengagement" and "identify intervention opportunity".[64]

15.     Breach of any of the Notification provisions can constitute a criminal offence subject to trial, conviction and imprisonment as well as remand in custody pending trial if charged.

A.411-A.412.

There is also the further potential of a separate regime initiated by the Minister for Home Affairs and implemented with the cooperation of the Police under the Terrorism Prevention and Investigation Measures Act of 2011.  This provides for additional restrictions should there be new intelligence not sufficient to provide the basis for a criminal prosecution.  "The standard of proof for the impositions of a TPIM has been reduced from the SSHD being satisfied on the balance of probabilities, to 'reasonable belief'" (A.413-A.414 ¶ 21).

19.     The application of the Act provides powers ordered by the Secretary of State for Home Affairs and carried out by the police (subject to the jurisdiction of the High Court).  The relevant powers provide for extensive impact upon the actions of the individual.  The restrictions provided for include:

---

[63]     See A.412 ¶ 14 n.2 ("There is no requirement, as with other police search powers, for the relevant officer to have reasonable grounds for suspicion in relation to any offence, or for believing there are items of value to a terrorist organisation. It is also notable that, although the power of entry for the stated purposes and search requires a warrant, it is possible for such a warrant to authorise *"entry to and search of the premises on more than one occasion"* – or even to authorise entry on an unlimited number of such occasions.").

[64]     See A.412 ¶ 14 n.3 ("This refers to programs designed to rehabilitate individuals who have been involved in terrorism or terrorism-related activity and reduce the risk they pose to the UK."), citing, https://homeofficemedia.blog.gov.uk/2019/11/05/fact-sheet-desistance-and-disengagement-programme/.

(i)     Wearing of electronic tags. (The GPS electronic tagging alerts a tagging company and in turn local police to an individual's moving out of the demarked boundaries).

(ii)    The imposition of curfews

(iii)   Requirement to report (frequently once or even twice a day) in person to police by telephone.

(iv)    Restrictions upon contact with other persons (those in contact requiring to be specifically cleared).

(v)     Access to electronic devices.

(vi)    Restrictions on visitors to residence, on work, on study.

(vii)   Ability to move outside the boundaries demarked including boundaries within relevant cities or towns.

20.     Just as breaches of Notification provisions constitute a criminal offence, so too do breaches of TPIM conditions.

A.413.

Moreover, under the Counter Terrorism and Sentencing Act of 2021, "compulsory polygraph testing to assess compliance with measures, or assessing whether a variation of a measure is necessary" can be imposed as well as "compulsory drug testing for Class A and B drugs" and "a conviction for a breach of TPIM will now be an offence which attracts a Notification requirement" (A.414 ¶ 21(iv)-(vi)).

Thus, if your Honor grants this motion and Mr. Mostafa returns to London, he will be subject to monitoring that is ***even greater*** than the usual conditions of supervised release to which U.S. courts are accustomed.

### 3.      Mr. Mostafa has the support of his family.

In addition to all the above-stated bases for a reduction in Mr. Mostafa's sentence, we ask that the Court also consider the impact Mr. Mostafa's lengthy and uniquely harsh incarceration has had on his family back home in England.  For certain, the Court can be assured that were Mr. Mostafa to be released

back to the United Kingdom he would have the love and support of his family, and through their support

he will be able to receive the care and daily assistance that he has been sorely lacking while in United

States custody.  Indeed, a review of the letters submitted by his family in support of this application, evince

a family that loves him without bounds and who are desperate for his return.  See A.415-A.422.

One of Mr. Mostafa's sons, Imran Mostafa Kamel, writes:

> I understand that my father's conviction has been determined by the court, and I do not wish to contest that decision.  Instead, I want to share a personal perspective on the impact of his absence on our family and why I believe he deserves consideration for compassionate release.
>
> I was just 11 years old when my father's presence was taken away from my life due to his incarceration.  My youngest sister has never had the opportunity to experience her father's presence at all; she was just a baby when he was imprisoned.
>
> The consequences of his actions have undoubtedly shaped our lives, but it's important to recognize the enduring scars that the absence of a parent can leave on a family.  I, a 30-year-old man, still find myself crying myself to sleep at times, struggling with the profound loss and the emotional turmoil it brings.
>
> I know that my brothers and sisters share these feelings, but we often find it difficult to openly discuss our pain, making it even more challenging to cope.  My father has instilled in us the importance of education as the key to a successful life.  Despite his absence, he ensured we had access to quality education, and it's because of this foundation that I can articulate my thoughts in this letter.
>
> My childhood memories are filled with images of a loving family home and private schooling, all made possible by my father's dedication and commitment.  While I acknowledge that my father has made mistakes, as we all do, I firmly believe that his errors should not condemn our entire family to a lifetime of suffering.  It is not for me to decide his fate, but I implore the court to consider the human aspect of his situation.  My father is at the end of his life, and his time at the ADX supermax prison in Colorado has exacerbated his physical and emotional challenges.  His severe disability is evident, and his deteriorating health cannot be overlooked.

I want the court to understand the deep and unwavering love I hold for my father, regardless of the past. I will forever plead for mercy on his behalf, not as an attempt to alter the past but as a request to grant him the compassion and dignity he deserves in the final chapters of his life.

Letter from Imran Mostafa Kamel, dated, November 6, 2023 (A.415).

Mr. Mostafa's wife, Najat Chaffe, echoes this sentiment and adds to it the impact his incarceration has had on her life, and the lives of their children and grandchildren:

Our family has been deeply distressed by his absence, as he has left an irreplaceable void that no one can fill. The yearning to have him back in our lives has only intensified over time, and his grandchildren, myself, and our children have missed him dearly.

As his devoted wife, I have spent countless years alone, shouldering the immense responsibility of raising our children and providing for their day-to-day needs. The toll it has taken on me, both mentally and physically, has been overwhelming. My heart longs for the support and companionship Mr. Mostafa would offer during my difficult moments. It is now time for him to come back home to his family, where he truly belongs.

While it is true that my husband has made mistakes in the past, I firmly believe that his family should not be condemned to suffer for the remainder of our lives. The punishment he has endured over these two decades has been severe, and the time has come for him to reconcile with his loved ones and embrace the opportunity for rehabilitation and redemption.

I would like to emphasize that Mr. Mostafa's current prison, ADX Florence in Colorado, is an unparalleled maximum-security facility that is not conducive to the needs of an individual with his disability. The extensive duration he has spent in this austere environment has undoubtedly exacerbated his condition, rendering him physically and mentally deteriorated. It is imperative that he receive proper care and support to overcome these challenges, which is why a compassionate release is crucial for his well-being.

In closing, I would like to express the emotional toll this extended separation has had on our family, particularly on my own state of mind. I am in desperate need of his presence, love, and unwavering support. To witness his reunion with our precious grandchildren and to enjoy quality time together as a family would be a dream come true. I firmly believe that his return is not just a personal desire but a necessary step towards healing and rebuilding what we have lost during these unbearable years.

Thank you for taking the time to consider our compassionate release request. We trust in your wisdom and understanding of the profound impact this decision holds for our family. We anxiously await your response and hope that you grant Mr. Mostafa Kamel Mostafa the opportunity to rejoin his loved ones and begin a new chapter in his life.

Letter from Najat Chaffe, dated, November 7, 2023 (A.421-A.422).

Finally, Mr. Mostafa's son, Othman M. Kamel, adds:

It has been over two decades since our father left our home, and the void he left behind remains unfillable. The absence of his presence has been deeply felt by our entire family. His absence has affected not only me but also his grandchildren, who have grown up without the love, guidance, and bond of a grandfather. We miss him terribly, and it is with utmost sincerity and desperation that we implore you to enable our long-overdue reunion.

My father was always a pillar of support in my life, especially during my studies and the challenges I faced. His wisdom, strength, and unconditional love were instrumental in shaping the person I am today. I cannot put into words how much we yearn to have him back by our side, spending quality time with his grandchildren and creating precious memories together.

X     X     X

While it is true that my father has made mistakes, it is unjust that his family should suffer for the remainder of their lives. At his age, his health has severely deteriorated, and the passing years in the ADX Superman prison facility in Colorado have only worsened his condition. My father's current state of health and the location of the prison make it increasingly difficult for us to visit him and provide the care and support he deserves during these difficult times.

In conclusion, I plead with you to consider the compassionate release of my father. We understand that accountability is necessary, but we firmly believe that he has served a significant portion of his sentence and that it is time for him to make amends within the comforting arms of his family. The emotional well-being and happiness of his grandchildren … call for his presence more than ever…. Our family longs to seek the healing that can only come from the reunion of a father and his loved ones.

Letter from Othman M. Kamal, dated, November 7, 2023 (A.417-A.418); see also Letter from Mariam

Mostafa Kamel (A.416); Letter from Marwa Mostafa Kamel (A.419-A.420).

**V.      Granting compassionate release or a reduction in sentence for Mr. Mostafa would *not* be an outlier.**

Finally, we note that granting compassionate release or a reduction in sentence would not be an outlier.  Ample precedent exists for reducing a defendant's sentence from life imprisonment to time-served or the equivalent, including in cases involving charges related to terrorism or even where the defendant himself committed violent crimes including murder.

For example, we are aware of at least the following cases where murder was charged or was a sentencing factor and the defendant initially received a life sentence (or more) but later had his sentence reduced upon a motion brought pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), and, except where indicated, all of these cases resulted in the defendant's immediate release notwithstanding the severity of his charges:

| Case Name & Citation | Original Sentence | After CR Motion (time served) |
|---|---|---|
| United States v. Aaron Harris, 2020 WL 132436 (D.Conn. Jan. 13, 2020) | Life | 239 months |
| United States v. Hector Luis Rios, 2020 WL 7246440 (D.Conn. Dec. 8, 2020) | Life | 26 years |
| United States v. Jerome Suggs, 2021 WL 2661874 (D.Conn. June 28, 2021) | Life | 30 years (reduced, not released) |
| United States v. Kenneth Richardson, Docket No. 99 Cr. 264 (ECF No. 2585) (D.Conn. Oct. 3, 2019) | Life | 19 years |
| United States v. Leonard Jones, Docket No. 99 Cr. 264 (ECF No. 2625) (D.Conn. Dec. 19, 2019) | Life | 215 months |
| United States v. Luis Noel Cruz, 2021 WL 1326851 (D.Conn. April 9, 2021) | Life | 26 years |

65

| | | |
|---|---|---|
| United States v. Luke Jones, 2020 WL 2791862 (D.Conn. May 29, 2020) | Life | 450 months |
| United States v. Lyle Jones, Docket No. 99 Cr. 264 (ECF No. 2592) (D.Conn. Oct. 7, 2019) | Life | 239 months |
| United States v. Quinne Powell, 2019 WL 4889112 (D.Conn. Oct. 3, 2019) | Life | 226 months |
| United States v. Wilfredo Perez, 2021 WL 837425 (D.Conn. March 4, 2021) | Life | 23 years |
| Brown v. United States, 2021 WL 5015752 (D.Md. Oct. 28, 2021) | Life + 30 years | 40 years (reduced, not released) |
| United States v. David Furtado Gray, 2021 WL 1856649 (D.Md. May 10, 2021) | Life | 31 years |
| United States v. James Moore, 2022 WL 2835032 (D.Md. July 19, 2022) | Life + 35 years | 40 years (reduced, not released) |
| United States v. Terry Charles Jenkins, 2021 WL 4691025 (D.S.C. Oct. 7, 2021) | Life | 25 years |
| United States v. John Bass, 514 F.Supp.3d 977 (E.D.Mich. Jan. 22, 2021) | Life | 22 years |
| United States v. Robert Moses Wilkerson, 2021 WL 1062353 (E.D.N.C. March 19, 2021) | Life | 25 years |
| United States v. Tyone Tidwell, 476 F.Supp.3d 66 (E.D.Pa. 2020) | Life | 26 years |
| United States v. Manzoor Qadar, 2021 WL 3087956 (EDNY July 22, 2021) | Life | 21 years |
| United States v. Richard Lugo, 2022 WL 732153 (EDNY March 11, 2022) | Life | 25 years (reduced, not released) |

| United States v. Michael Lloyd Cummings, 2021 WL 4263659 (S.D.Ind. Sept. 20, 2021) | Life | 30 years |
|---|---|---|
| United States v. Alan Quinones, 2021 WL 797835 (SDNY Feb. 27, 2021) | Life | 35 years (reduced, not released) |
| United States v. Andrew Ramsay, 538 F.Supp.3d 407 (S.D.N.Y. May 11, 2021) | Life | 30 years (reduced, not released) |
| United States v. Diego Rodriguez, 492 F.Supp. 3d 306 (SDNY Sept. 30, 2020) | Life | 30 years (reduced, not released) |
| United States v. Gluzman, 2020 WL 4233049 (SDNY July 23, 2020) | Life | 24 years |
| United States v. Juan Ramirez, 2021 WL 4150891 (SDNY Sept. 13, 2021) | Life + 45 years | 23 years |
| United States v. Martin Lewis, 2021 WL 3292180 (SDNY Aug. 2, 2021) | Life | 30 years (reduced, not released) |

Ample examples also exist of cases where the defendant was convicted of terrorism-related charges but nonetheless was granted a reduction in their sentence resulting in, except where noted, their immediate release:

| Case Name | Original Sentence | After CR Motion (time served) |
|---|---|---|
| United States v. Kassim Tajideen, Docket No. 17 Cr. 046 (ECF 264) (D.D.C. May 28, 2020) | 5 years | 3 years |
| United States v. Amina Farah Ali, 2021 WL 1517941 (D.MN April 16, 2021) | 20 years | 11 years |

| | | |
|---|---|---|
| United States v. Ardit Ferizi, 16 Cr. 042 (ECF 89 & 137) (E.D.Va. Aug. 28, 2020 & Apr. 1, 2022) | 20 years | 5 years |
| United States v. Sami Samir Hassoun, 470 F.Supp.3d 804 (N.D.IL July 3, 2020) | 23 years | 10 years |
| Rafael Antonio Garavito-Garcia v. United States, 544 F.Supp.3d 484 (SDNY June 21, 2021) | 300 months | 180 months (reduced, not released) |
| United States v. Abel Abdel Bary, 2020 WL 5946985 (SDNY Oct. 7, 2020) | 300 months | 299 months 1 week[65] |
| United States v. Wesam El-Hanafi, 460 F.Supp.3d 502 (SDNY May 19, 2020) | 15 years | 10 years |
| United States v. Sabirhan Hasanoff, 2020 WL 6285308 (SDNY Oct. 27, 2020) | 18 years | 10 years |

Obviously, each of the above cases presented unique facts, otherwise a motion for reduction in sentence would not have been granted in each instance. The point merely is that granting Mr. Mostafa compassionate release or a reduction in sentence would by no means be an outlier. Indeed, we respectfully submit that the conditions discussed in this case present some of the most unique and extraordinary circumstances presented in any case to date, and in turn we submit without hesitance that the requested relief should be granted.

---

[65]     Similar to Mr. Mostafa, Bary was arrested in his home in London on July 11, 1999, based on a warrant requesting extradition to the United States. After extensive litigation before the courts in the United Kingdom and the European Union, Bary was extradited to the Southern District of New York on October 6, 2012. In calculating Bary's release date, the BOP fully credited Bary for the thirteen years he had served in U.K. custody pending extradition, on top of the additional eight years he served in BOP custody after his extradition and eventual plea and sentencing, a calculation that was adopted by the Court in Judge Kaplan's decision to grant Mr. Bary's application for a reduction in sentence. See Bary, 2020 WL 5946985, at *7-*8. Moreover, much like Mr. Mostafa, Bary served his U.S. pretrial detention at the MCC and his post-trial term of imprisonment at ADX before being released to ICE custody for deportation.

## VI.   <u>Conclusion</u>

Accordingly, Defendant Mostafa Kamel Mostafa, by and through counsel, respectfully requests that this Court reduce his term of imprisonment to "time-served", impose five-year current terms of supervised release on Counts 1 and 2, and direct his immediate transfer to ICE custody for deportation. Alternately, we respectfully request that Mr. Mostafa's sentence be reduced to a term of months and that this Court does so in a manner that credits him for his time-served in U.K. custody after being arrested, pending extradition, in this case.

Dated: New York, New York
            December 15, 2023

Respectfully submitted,

<u>/s/ Sam A. Schmidt</u>
Sam A. Schmidt, Esq.
29 Broadway, Suite 1412
New York, New York 10006
(212) 346-4666

<u>/s/ Michael K. Bachrach</u>
Michael K. Bachrach, Esq.
224 West 30th Street, Suite 302
New York, New York 10001
(212) 929-0592

*Attorneys for Defendant Mostafa Kamel Mostafa*

69