UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X

UNITED STATES OF AMERICA,

       - against -                          04 Cr. 356 (AT)

MUSTAFA KAMEL MUSTAFA,
a/k/a Mostafa Kamel Mostafa,

               Defendant.

-----------------------------------------------------X

**DEFENDANT MOSTAFA KAMEL MOSTAFA'S
MOTION FOR COMPASSIONATE RELEASE AND/OR REDUCTION IN SENTENCE**

**APPENDIX**

**(Vol. 1 of 4)**

SAM A. SCHMIDT, ESQ.          MICHAEL K. BACHRACH, ESQ.
29 Broadway, Suite 1412         224 West 30th Street, Suite 302
New York, New York 10006      New York, New York 10001
(212) 346-4666                (212) 929-0592

*Attorneys for Defendant Mostafa Kamel Mostafa*

## <u>Table of Contents</u>

*Vol. 1 of 4:*

Letter Request to Warden for compassionate Release, dated, January 12, 2023 ................1

<u>United States v. Abu Hamza</u> (City of Westminster (U.K.) Magistrate's Court) (Workman, S.DJ.) (November 15, 2007) ...........................................................................3

Affidavit ADX Warden, dated, October 3, 2007 ...............................................................19

<u>Mustafa Kamel Mustafa (Otherwise Abu Hamza) v. United States,</u> [2008] EWHC 1357
(High Court, Queen's Bench Div.) (June 20, 2008) ..........................................................32

Observations of Foreign and commonwealth Office, dated, November 13, 2008 ............63

Observations of Foreign and commonwealth Office, dated, October 24, 2011 ................90

<u>Case of Babar Ahmad and Others v. United Kingdom,</u>
Appl. Nos. 24027/07, 11949/08, 66911/09, 67354/09
(European Court of Human Rights) (April 10, 2012) ........................................................97

Excerpt, <u>United States v. Julian Assange</u> (City of Westminster (U.K.) Magistrate's Court) (Baraitser, DJ.) (January 4, 2021) .......................................................................179

*Vol. 2 of 4:*

Letter for Sentencing from Dr. Kligler, dated, December 4, 2014 ..................................181

Exhibit from Government Sentencing Submission – Letter from B.O.P.,
dated, January 2, 2015 .....................................................................................................185

Excerpts from Sentencing Transcript, dated, January 9, 2015 ........................................188

Judgment, dated, January 12, 2015 .................................................................................191

Special Administrative Measures, dated, January 7, 2021 ..............................................196

Letter from Lindsay Lewis, Esq. to B.O.P. counsel, dated, March 21, 2013 ..................214

Email Correspondence from Lindsay Lewis, Esq. to B.O.P., dated April 20, 2016 ........219

Letter from Lindsay Lewis, Esq. to B.O.P. counsel, dated April 20, 2016 .....................221

Email Correspondence from Lindsay Lewis, Esq. to B.O.P., dated May 12, 2016 .........225

Email Correspondence from Lindsay Lewis, Esq. to B.O.P., dated August 19, 2016    226

Letter from Lindsay Lewis, Esq. to B.O.P. counsel, dated April 18, 2016 ....................227

Letter from MCC Counsel to Lindsay Lewis, Esq., dated, May 16, 2013 ....................229

Excerpts from Affidavit of Lindsay Lewis, Esq. re: Assange Extradition Request, Dated, July 17, 2020 ........................................................................................................232

Addendum Report by Lindsay Lewis, Esq. re: Assange Extradition Request, Dated, September 29, 2021 ..............................................................................................234

*Complaints, Remedy Requests and Responses (BOP complaints and responses including some civil case pro se writings)*

    Partial List Prepared by Mr. Mostafa ..................................................................250

    Partial List Prepared by BOP. ............................................................................266

**Vol. 3 of 4:**

    Various Complaints, Remedy Requests and Responses ......................................291

    Letter to Magistrate Judge Hegarty, dated January 16, 2020..............................342

*Documents from <u>Mostafa v. Garland, et al.</u>, Docket No. 20 Cv. 694 (D. Colo)*

    Excerpts, Fourth Amended Complaint, dated, July 11, 2022 (Doc. No. 199)    347

    Excerpt, Complaint, dated, January 10, 2020 (Doc. No. 1)................................373

    Excerpts, First Amended Complaint, dated May 5, 2020 (Doc. No. 9)..............375

    Excerpts, Pro se Motion, dated September 24, 2020 (Doc. No. 43-1)................376

    Declaration of D. McMullen, dated, May 26, 2021 (Doc. No. 96-7) .................380

    Mr. Mostafa's Diagram and Comments on Cells from Pro Se Answer to Motion to dismiss, dated, July 16, 2021 (Doc. No. 119).................................................390

    Excerpt, Pro Se submission, dated, December 6, 2021 (Doc. No. 158) ..............394

*Vol. 4 of 4:*

Statement of Dr. Gregory Johnsen Yemen Re: Yemen (2022)..........................................395

Excerpt, Draft Chapter of Book by Mary Quin (Gov't Bates No. 3502-24) ..................402

Report by Bridget Prince, One World Research, *Restrictions to Sentenced Prisoners on Release in the UK* .................................................................................410

Letters in Support from Mr. Mostafa's Family ...............................................................415

Excerpt, Sentencing Transcript, <u>Regina v. Abu Hamza</u>, dated, February 7, 2006..........423

## LAW OFFICE OF SAM A. SCHMIDT
**29 Broadway Suite 1412**
**New York, N.Y.  10006**
**(212) 346-4666**
**Facsimile (212) 346-4668**
**E-mail lawschmidt@aol.com**

Sam A. Schmidt, Esq.
_____

January 12, 2023

Warden Andre Matevousian
ADX Florence
5880 HWY 67 SOUTH
FLORENCE, CO  81226

By U.S. Mail and email to FLX-ExecAssistant-S@bop.gov

Re:     Request for Reduction in Sentence/Compassionate Release

Dear Warden Matevousian

Please accept this request for a reduction in sentence pursuant to 18 U.S.C. § 3582 on behalf of inmate Mostafa Kamel Mostafa Reg. No. 67495-054. Given his disabilities and limitations caused by the S.A.M. and the facility, as counsel, I am filing this request on his behalf.

Mr. Mostafa seeks a reduction in sentence based upon numerous compelling and extraordinary circumstances. He is a sixty-four-year-old double-arm amputee, who is blind in one eye, limited vision in the other eye, and suffers from diabetes, hypertension, sever psoriasis and hyperhidrosis, a serious skin condition. He has also suffered through two debilitating infections of the COVID-19 virus during his incarceration at your facility. His health has continued to deteriorate while held in custody of the Bureau  Mr. Mostafa's cell was not designed for his disability.

In seeking extradition for the United Kingdom, the United States government and the Bureau of Prisons made promises and commitments that he would not be designated to ADX Florence and if he spent some time there, it would be for a very short period of time. The British courts and the European Court Human Rights relied on these promises and commitments in ordering his

1

**A.1**

extradition.

      At the extradition proceedings the United States government agreed that Mr. Mostafa's medical conditions included "type 2" diabetes and raised blood pressure, extensive psoriasis, hyperhydrosis (excessive sweating provoked by a neurological condition) which requires him to shower and change his clothes at least twice daily, blindness in the right eye, with poor vision in the left, and bilateral traumatic amputation of the distal third of both forearms for which prostheses are fitted and that the stumps in both arms are subject to regular outbreaks of infection, which have been increasing in severity. The government promised to provide adequate accommodations but have not.

      Should he be released, he will return to England and reside with his wife and some of his children. Because of the nature of his conviction, he will be monitored by the British security services.

      Please respond to this request as soon as possible and certainly within the required 30 days.

               Sincerely yours,
                   /s/
               Sam A. Schmidt

IN THE CITY OF WESTMINSTER MAGISTRATES' COURT:

UNITED STATES OF AMERICA

-V-

ABU HAMZA

## Introduction

1. The United States of America seeks the extradition of Abu Hamza in respect of conduct which had it occurred within the United Kingdom, would have amounted to the following offences:

1. Between the 23rd December 1998 and 29th December 1998 conspired with others to take hostages in Yemen

2. Between the 23rd December 1998 and 29th December 1998 did aid and abet Abu Hassan to commit the offence of hostage taking in Yemen

3. Between the 1st October 1999 and 30th April 2000 conspired with others to control and manage an association of persons in Bly Oregon organising, training and equipping them for the purpose of fighting jihad in Afghanistan.

4. Between the 1st October 1999 and 30th April 2000 conspired with others to control and manage an association of persons in Bly Oregon who would be organised, trained and equipped in such manner as to arouse reasonable apprehension that they would be employed for the purpose of fighting Jihad.

5. Between the 1st October 1999 and 30th April 2000 conspired with others to have firearms in Bly Oregon with intent to commit indictable offences of unlawful drilling, prohibition of para-military organisations, possession of explosives under suspicious circumstances enlistment in the service of a foreign state.

6. Between the 1st October 1999 and 30th April 2000 conspired with others to use or have possession of property namely a training camp and equipment intending that it would be used in the furtherance of or in connect of acts of terrorism, namely the fighting of Jihad in Afghanistan.

7. Between the 1st October 1999 and 31st December 1999 gave, lent or otherwise made available to another the sum of £4000 knowing or having reasonable cause to suspect that it would be applied for the use of the commission of or the furtherance of, or in the connection with, acts of terrorism namely fighting of Jihad in Afghanistan.

1

**A.3**

8.  Between the 1st June 2000 and 19th December 2001 conspired with others to give, lend or otherwise make available money including travelling expenses for persons to attend Afghanistan and other property knowing or having reasonable cause to suspect that it would be applied for the use in the commission of or furtherance of, or in connection with, acts of terrorism namely attendance and terrorist activities at an Al Qaeda terrorist training camp and elsewhere in Afghanistan involving the use and possession of light weaponry, machine guns, explosives, detonators, mines, anti aircraft weapons and the planning of bombings, hostage taking and suicide bombing .

9.  Between the 1st March 2001 and 30th April 2001 conspired with others to invite CC2 to receive instruction and training in the use of firearms and explosives in Afghanistan.

2. The proceedings are governed by the Extradition Act of 2003 and the United States of America is a Part 2 Territory. It is an accusation case.

3. The Secretary of State issued a certificate under s. 70 (1) of the 2003 Act on 25th May 2004 and the defendant was arrested on 27th May 2004 and brought before me. He was remanded in custody pending the receipt of the formal request from the United States of America and on 23rd July 2004, the extradition hearing commenced. I was satisfied that the required documents had been received and properly served. I was satisfied that the defendant was the person being sought by the United States of America.

4. At that stage it was conceded by the defence that each of the offences were extradition offences. The defence have since reconsidered their position on that issue and I have heard legal argument. In the course of these reasons, I will give my decision on that issue.

5. The hearing was then adjourned until 19th October 2004 to enable the defence to make submissions on a number of issues.

6. On 18th October 2004, the day prior to the extradition hearing, Mr Abu Hamza was arrested and charged with domestic offences. On 19th October I sent those matters to the Central Criminal Court to be dealt with pursuant to s. 51 of Crime and Disorder Act 1998. I was

**A.4**

then required, pursuant to s. 88 of the Extradition Act, to adjourn the extradition hearing until the disposal of charges.

7.  On 7th February 2006, Mr Abu Hamza was convicted of the domestic matters and sentenced to a term of 7 years imprisonment.  His appeal to the Court of Appeal Criminal Division was dismissed and at the end of January 2007 the Appeal Committee of the House of Lords refused to grant leave to appeal.

8.  Directions were then given for the extradition hearing to recommence and a 2 day hearing was arranged at Belmarsh Court on 21st May 2007.  Unfortunately the prison authorities arranged for Mr Abu Hamza to be admitted to hospital 2 days before the hearing for some elective surgery.  The prison doctor certified that Mr Abu Hamza was well enough to attend the hearing and the hearing commenced but further medical evidence was received the following morning which indicated that he was not well enough to attend.  The matter was therefore adjourned until 11th July.

9.  Mr Alun Jones QC, on behalf of the defendant, makes a number of submissions.  The first is that the court should rule that an enquiry was necessary as to whether the proceedings amounted to an abuse of process. For reasons that I gave in an earlier ruling I concluded that the conduct alleged could not amount to an abuse of process of this court and that therefore no enquiry was required.  A challenge was also made to 6 of the 9 charges as not being extradition offences, the passage of time and human rights issues.

**Extradition Offences**

10. Mr Brandon, on behalf of the defendant, submits that a number of the charges do not amount to extradition offences.  He concedes that in respect of charges 1 and 2 which relate to the conspiracy to take hostages in the Yemen, these are extradition offences.  A similar concession is made in respect of charge 9 which alleges a conspiracy to involve others in the instruction and training in the use of firearms and explosives in Afghanistan.

Charges 3 and 4 relate to a conspiracy between 1st October 1999 and 30th April 2000 to control and manage an association of persons in Bly, Oregon for the purpose of organising training and equipping them to use or display physical force in promoting a political objective in Afghanistan.  It is submitted that the English law offence which can

3

**A.5**

be identified in this conduct is s. 2 of the Public Order Act 1936. It is submitted that in the absence of any express provision this offence is not extra-territorial in jurisdiction and as the objective was to fight jihad in Afghanistan, there is no equivalent English offence. Mr Keith, on behalf of the United States government acknowledges that s. 2 of the Public Order Act 1936 is not extra-territorial but that the conduct which needs to be transposed is the conspiracy to control and manage an association of persons in Bly, Oregon and the fact that the political objective was to occur outside the United States does not mean that the offence required an extra-territorial jurisdiction. The offence itself is the controlling and managing of the association and equipping them for the purpose described. I am satisfied that the process of transposition can be carried out without requiring an extra-territorial jurisdiction in the English law.

11. Mr Brandon continues by submitting that it is a necessary element of the offence for there to be an association of person other than those who are involved in the conspiracy. I have reached the conclusion that an association can be of any size and there is no requirement to exclude the co-conspirators from their association. I am satisfied that had the conduct occurred within the United Kingdom, the offence under s. 2 of the Public Order Act 1936 would have been committed.

12. Charge 5 alleges a conspiracy to have with them firearms with intent to commit one or more indictable offences, namely, unlawful drilling, prohibition of quasi military organisations and possession of explosives under suspicious circumstances. A further allegation that there was intent to commit the enlistment to the service of a foreign state has been withdrawn.

13. Mr Brandon has referred me to the Law Commission's report on Repeal Proposals of January 2005 in which the Commission recommend the repeal of this offence under s. 1 of the Unlawful Drilling Act of 1819. I fully accept the Commission's reasoning and recommendation. Had the conduct complained of occurred after March 2001, the conduct could probably have been better described by one of the offences under the Terrorism Act 2000. However, as the conduct occurred in the year 2000, that was not a course which could be adopted in this case. Nevertheless, the conduct alleged meets the elements of the offence under s. 1 of the Unlawful Drilling Act 1819 and that offence is still on the

**A.6**

statute book and can, in my view, be relied upon to establish that this conduct amounts to an extradition offence.

14. Similarly I am satisfied that the conduct had it occurred within the United Kingdom could have been indicted under Section 2 of the Public Order Act 1936 and under Section 4 of the Explosive Substances Act 1883. I am therefore satisfied that charge 5 is an extraditable offence.

15. Charge 6 alleges a conspiracy to possess property intending that it should be used for the commission of acts of terrorism and charge 7 relates to making money available having reasonable cause to suspect that it be used for the commission of acts of terrorism. It is submitted on behalf of the defendant that in 1999 when the conduct is alleged to have occurred, Terrorist Act committed abroad were not triable in English courts. It is further argued that the setting up of a training camp would not amount to terrorism within the meaning contained in the Prevention of Terrorism Act 1989 as the action did not involve the use of violence for political ends. In respect of the conspiracy to fund terrorism, it is also submitted that the only acts of terrorism contemplated in the conduct would have occurred outside the United Kingdom, probably in Afghanistan and that therefore at the time of the alleged offence it would not have been triable in an English court.

16. Applying the transposition test I am satisfied that if a Jihad camp were set up in England it would by its very nature amount to an act of terrorism within the jurisdiction of the English courts. I am also satisfied that the nature of the camps would be such that training could lead to the commission of offences of hostage taking, kidnap and murder which could be prosecuted before the English courts by virtue of extra territorial extradition.

Similarly I am satisfied in respect of charge 8 that the transposition of the conduct so that there was an act of funding within England to facilitate the creation of a camp connected with the furtherance of acts of terrorism, would amount to conduct which had it occurred in England would have constituted an offence under the Prevention of Terrorism (temporary provisions) Act 1989.

**A.7**

5

17. It being conceded that English charges 1, 2 and 9 are extradition offences, I am satisfied that all 9 charges are extradition offences.

**Passage of Time**

18. It is submitted on behalf of the defendant that his extradition to the United States of America is barred by virtue of Section 73(1)(c) and Section 82 of the Extradition Act 2003. Section 82 provides that:

> A persons extradition to a category 2 territory is barred by reason of the passage of time if (and only if) it appears that it would be unjust or oppressive to extradite him by reason of the passage of time since he is alleged to have committed the extradition offence.

19. In considering this submission I am conscious that the burden lies upon the defendant to show, on the balance of probabilities, that it would be unjust or oppressive. In considering whether it is unjust or oppressive I am applying Lord Diplock's test in <u>Kakis v The Government of the Republic of Cyprus</u> .

> "unjust I regard as directed primarily to the risk of prejudice to the accused in the conduct of the trial itself, oppressive as directed to the hardship to the accused resulting from changes in his circumstances that have occurred during the period to be taken into consideration; but there is room for overlapping and between them they would cover all cases where to return would not be fair"

20. In considering whether the delay has been culpable, I have followed the guidance in The Government of Croatia v Spanovic in which it is suggested this court should first examine "whether or not the defendants complaint of culpable delay is made out before considering whether as a result it would be unjust or oppressive to extradite". I have noted Lord Justice Hughes observation that "although culpable delay maybe relevant, the principal focus, when it comes to considering the passage of time, is not a judgement on the performance of the requesting state's investigation, but on the effect that time passing has had".

**A.8**

6

21. I deal first with the Yemen charges in which it is said that the defendant conspired with others to take hostages in the Yeman between the 23rd December 1998 and 29th December 1998. In outline, five members of the "supporters of Sharia" were arrested in Aden in respect of allegations of terrorism. It is believed that as a direct response to those arrests hostages were taken in the Yemen on the 28th December 1998. The following day Yemeni forces intervened in an attempt to secure the release of the hostages. A number were successfully released but 4 hostages were killed and 2 others seriously wounded. The Yemeni authorities immediately instituted an investigation and within days were joined investigators from the FBI and from Scotland Yard. This defendant made a number of television and radio broadcasts admitting contacts with the kidnappers and being associated with the purchase of a satellite telephone said to have been in the possession of the Yemen kidnappers. In the course of the Scotland Yard investigation the defendant was arrested, interviewed and then released, the United Kingdom authorities clearly believing there was insufficient evidence to prosecute the defendant at that stage.

22. Meanwhile in the Yemen the kidnappers arrested in the Yemen were placed on trial which concluded in May of 1999. The principal offender, Abu Al Hassan, was sentenced to death and executed on 17th October 1999. Other defendants received lengthy terms of imprisonment.

23. In October 2000 the defendant recorded an interview with a Miss Mary Quinn who was one of the former hostages. In January 2003 the FBI obtained a copy of this recorded interview and reviewed the evidence against Mr Abu Hamza. That evidence was then

7

**A.9**

placed before a grand jury in the United States and an indictment issued on the 19th April 2004 coupled with a warrant for his arrest.

24. On the 21st May 2004 a request was made for Mr Abu Hamza's extradition and he was arrested in the United Kingdom on the 27th May 2004. The extradition hearing began on the 23rd July 2004 but on the 26th August Mr Abu Hamza was arrested upon suspicion of committing certain domestic offences. Leave to petition the House of Lords on those domestic charges was dismissed on the 30th January 2007 which then enabled these proceedings to continue.

25. It is now almost 10 years since the date of the offences that are alleged to have occurred in the Yemen. Some 2 years and 3 months are attributable to the time taken in concluding the domestic proceedings in the United Kingdom.

26. I first consider whether the delay between the date of the alleged offence in December 1998 and the United States indictment in 2004 is a delay for which the requesting state is culpable. It is submitted by Mr Jones that the United Kingdom authorities found there was insufficient evidence on which to prefer any charges and the combined resources of investigators from the Yemen, the FBI and United Kingdom were unable to establish sufficient evidence to warrant charges against the defendant. Certainly it seems to be the view of the United States prosecutor at the time that there was insufficient evidence.

27. Mr Jones's submission continues on the basis that there is no further evidence which would warrant a prosecutor conducting a review and changing the decision. Had there

8

**A.10**

been no further evidence it would still, in my view, be open to a reviewing prosecutor to change the decision, provided it was done in good faith and did not render any subsequent trial unjust. However, in this case it is the United States Authority's contention that further evidence has come to light in the form of an interview between the defendant and Mary Quinn, one of the Yemen hostages. That interview was conducted in October 2000 and details are recorded in Mary Quinn's book published in 2005. The FBI however, obtained a copy of the recorded interview in January 2003 and I am satisfied that it was that evidence which prompted a reconsideration of the case and the application for a grand jury indictment. That indictment was obtained within 15 months. Mr Jones submits that the evidence contained in that interview adds nothing to the evidence that was available in 1999. In so far as it is proper for me to inquire into the nature of the evidence, I do not share that view. The admissions alleged to have been made by the defendant are clearly matters which the prosecutor is entitled to consider and may provide the necessary evidencel.

28. In relation to the alleged offences in Afghanistan and Bly Oregon, there have been no detailed submissions as to culpability for any delay but I have nevertheless looked at the sequence of events. I am satisfied that the allegation largely rests upon the evidence of Mr Ujaama whose evidence did not become available to the United States Authorities until April 2003. There has been no obvious delay in prosecuting these charges.

29. In respect of all the allegations I am therefore satisfied that there has been no culpable delay on behalf of the requesting state.

**A.11**

30. I now turn to the effect that any delay has had, to see whether it would now be unjust or oppressive to extradite the defendant.

31. In relation to the Yemen allegations, Mr Jones submits that much of the evidence that would have been relevant to any trial has been destroyed or is no longer available or is testimony which witnesses are no longer willing to give. Although I have not been told the precise details of the defence, I accept that a number of witnesses, who can be described as co-conspirators are likely to refuse to give evidence for the defendant for fear of extradition or prosecution. That fact seems to me to stem from the nature of this allegation and any injustice that may arise does not arise by reason of the passage of time. It is said that the defendant's alleged conduct was through the man named Abu Hassan. I do not wish to speculate on what evidence he could have given but I think it is more likely that his evidence would have been more beneficial to the prosecution than to the defence. Be that has it may, he is now dead having been executed in October 1999. Whilst his evidence may well have been relevant it would not have been available to the court even if the case had proceeded without any delay. It is submitted that the whereabouts of a number of the hostages are unknown and had the case proceeded without delay they would have been available to give evidence. I do not consider that their absence would, in itself, render any trial unjust.

32. Whilst telephone billing records and financial records are assumed to be available there appears to be some doubt as to there completeness. The significance of any missing records has not been established. Exhibits from the hostage takers trial may not have been preserved or maybe difficult to locate. I have no reason to think that the absence of this real evidence should have an adverse effect upon the justice of any trial.

**A.12**

33. I am therefore satisfied that it would not be unjust or oppressive to extradite the defendant solely by reason of the passage of time.

### The Defendant's Convention Rights and Section 87 of The Extradition Act 2003

34. Under Section 87 of the Act I am required to decide whether the defendant's extradition would be compatible with the Convention Rights within the meaning of the Human Rights Act 1998. Mr Jones on behalf of the defendant submits that to extradite the defendant would be an unjustified and disproportionate interference with his Article 8 Rights on the grounds that his family life will be interfered with. Mr Jones couples this submission with a submission on forum which he maintains is relevant to the determination of the proportionality of the extradition request. Almost all extraditions for serious offences separates the defendant from his family and as Lord Justice Laws stated in the case of Bermingham, the issue is one of proportionality:- "is the interference with family life proportionate to the legitimate aim of the proposed extradition? There is a strong public interest in honouring Extradition Treaties made with other states" and where extradition is resisted on Article 8 grounds "a wholly exceptional case would have to be shown to justify a finding that the extradition would on the particular facts be disproportionate to its legitimate aim".

35. Mr Jones submits that this is "a wholly exceptional case". The defendant has a large family in the United Kingdom and if extradited the defendant was likely to remain in custody in the United States. It is submitted, and it seems highly likely to me, that the defendant's family would not be permitted to enter the United States and even if they

11

**A.13**

were able to do so they would find the distances and expense of travelling to be too great to permit contact between the defendant and his family.

36. In coupling the Article 8 Rights with the issue of forum the defence urge me to say that the defendant's Article 8 Rights could be preserved by prosecuting him for these offences in the United Kingdom. Because the offences would be capable of being prosecuted here it is submitted that it would be disproportionate for the defendant's Article 8 Rights to be forfeited by causing him to be extradited on offences that are triable here.

37. I except the defence submission that the offences in relation to the hostage taking are capable of being tried here and the United States has no greater claim to try these issues. However, I am satisfied that there has been ample opportunity for the prosecuting authorities in this country to consider whether or not to prosecute and they have chosen not to do so. The defendant was (at the time) a British National, the satellite telephone alleged to have been bought by him was purchased in London using United Kingdom credit cards and all the conduct alleged against the defendant has said to have occurred within the United Kingdom. However, that does not in anyway create a bar to another country exercising its jurisdiction to prosecute. I am satisfied that in relation to the offences in Bly Oregon these offences are triable only in the United States of America. I consider it appropriate for all charges to be dealt with together and I therefore conclude that the decision by the United States of America to prosecute for these matters cannot be criticised or form part of a bar to extradition.

38. The severe curtailment of the defendant's Article 8 Rights has to be considered in proportion to the nature of the allegation being made. The gravity and seriousness of

**A.14**

these allegations is such that the public interest in honouring the extradition treaty outweighs the inevitable interference with the defendant's family life.

Article 3

39. The defendant is a man aged 48 who is in poor health having suffered a number of traumatic injuries and medical complaints which include diabetes and raised blood pressure, the loss of sight in his right eye and poor vision in the left and the amputation of the forearms of both his arms.

40. Mr Bruce Malloy, an experienced United States Attorney, gave evidence before me that the defendant, if extradited, was likely to be incarcerated in the Federal Supermax Prison in Colorado and be subject to Special Administrative Measures.

41. I have been provided with a number of reports and descriptions of the regime in Supermax prisons, many of which are of undoubted authority. The report of the Commission on Safety and Abuse in American's Prisons, prepared by a former Chief Judge of the United States Court of Appeals describes prisoners in Supermax prisons as being "locked down for 23 hours a day in small cells between 48 and 80 sq ft with no natural light, no controls over the electric light in their cells and no view outside their cells. They have no contact with other prisoners – even verbal – and no meaningful contact with staff. They maybe able to spend up to an hour every other day alone in a concrete exercise pen. Access to books and writing material is limited; radio and television is banned; calls to and visits with family are very infrequent when permitted at all".

13

**A.15**

42 It is submitted on behalf of the defendant that if convicted he is likely to remain in such conditions for the rest of his natural life which his own physical illness and disabilities would exacerbate.

43. Whilst I accept the general nature of the regime as described by the Commission I am also assisted by the evidence of a Mr R Wiley who is the warden of the Supermax Prison in Florence Colorado. He gives a very similar description of the conditions except that all cells have some natural light and the cell light itself maybe turned on and off by the inmate. Individual cells have black and white television which can also receive radio stations. Inmates receive a minimum of five hours out of cell exercise per week in secure single recreation areas. They receive one monthly social telephone call and may receive visits. Communication between inmates is limited to "yelling or using the air ventilation as a voice conduit". Mr Hugo Keith on behalf of the government submits that the United States is a mature and sophisticated democracy that respects the rule of law and it will be unusual, to say the least, if one of its lawful and carefully prescribed methods of incarceration were to be condemned by another country as giving rise to an automatic violation of Article 3. I note and fully accept his concern but, in my view, if such a regime were to be applied for a lengthy indefinite period it could properly amount to inhuman and degrading treatment which would violate Article 3.

44. However, in considering the evidence of Mr Bruce Malloy I have to compare it with the evidence provided by Warden Wiley. Whilst I have no doubt that Mr Malloy holds the honest belief that the defendant would be incarcerated in a supermax prison I believe that the evidence of Warden Wiley to be more accurate. He being more closely associated with the penal institution concerned and plays an important part in implementing the

**A.16**

14

policy in relation to that establishment. On the basis of his evidence I am satisfied that the defendant would not be detained in these conditions indefinitely, that his undoubted ill health and physical disabilities would be considered and, at worst, he would only be accommodated in these conditions for a relatively short period of time. Whilst I find these conditions offensive to my sense of propriety in dealing with prisoners, I cannot conclude that, in the short term, the incarceration in a supermax prison would be incompatible with his Article 3 Rights.

45. It is submitted that the defendant, if convicted, would be subject to special administrative measures. I am satisfied that those measures impose substantial limitations on defendant's rights particularly in relation to visits and communications. However I am satisfied that the procedures in the United States are such that these measures would not be imposed except as a matter of necessity. I am satisfied that the measures are open to administrative remedy and to review by the courts. In view of this defendant's disability I am far from satisfied that special administrative measures would be applied. Even if they were so applied following the ruling in Aswat v The USA I cannot be satisfied that there is a real risk of a violation of Article 3.

46. Finally it has been submitted to me that the defendant faces the risk of re- extradition or deportation to a country where he would be subjected to torture or inhuman treatment. It appears that the defendant's British nationality has been removed and although originally from Egypt he is effectively stateless. I am satisfied that there is no real risk of re-extradition and I am also satisfied that there are judicial safeguards in the United States which would protect these rights should it ever become necessary.

**A.17**

47. I am therefore satisfied that the matters for which the United States of America seeks the defendant's extradition are extradition offences, that they are not barred by virtue of the passage of time and that extradition would be compatible with the defendant's Convention Rights.

48. The Defendant is currently serving a sentence of imprisonment in the United Kingdom but subject to any representations from counsel I propose to send the matter to the Secretary of State for his decision on whether the defendant should be extradited to America.

Tim Workman
Senior District Judge
City of Westminster
15th November 2007

16

**A.18**

IN THE MAGISTRATE COURT
AT WESTMINSTER

THE UNITED STATES OF AMERICA,

v.

ABU HAMZA.

---

### DECLARATION OF R. WILEY

---

1.    I, R. Wiley, hereby declare that I am the Warden at the United States
Department of Justice, Federal Bureau of Prisons ("Bureau") facility known as the United
States Penitentiary, Administrative Maximum ("ADX"), located in Florence, Colorado. I
have held this position since May 2005. I have been employed by the Bureau, in positions of
increasing responsibility, since May 1984.

2.    It is the policy of the Bureau (and the ADX) to treat all inmates humanely and
with decency, consistent with our obligation to ensure the safety of others at the institution
(staff and inmates). Bureau staff shall not discriminate against inmates on the basis of race,
religion, national origin, sex, disability, or political belief. This includes the making of
administrative decisions and providing access to work, housing and programs.

3.    The ADX is a high security, facility housing maximum custody sentenced
inmates in single occupancy cells. Maximum custody is the highest custody level that can be
assigned to an inmate. This is the only facility of its type in the Bureau, although there are
many other United State Penitentiaries. This 490-bed facility opened in 1994. The missions
of the ADX are to: (1) assist the agency in maintaining the safety of both staff and inmates,
while eliminating the need to increase the security of other penitentiaries; and (2) confine

1

**A.19**

P47

inmates under close controls while providing them opportunities to demonstrate progressively responsible behavior; participate in programs in a safe, secure environment; and establish readiness for transfer to a less secure institution. The ADX does not have the mission of housing inmates who are un-sentenced and pending trial.

4.    Accordingly, if Abu Hamza were extradicted to the United States, he would not be incarcerated at the ADX pending trial. A federal criminal defendant is only eligible for incarceration at the ADX following a conviction and sentencing.

5.    I am aware that Abu Hamza has some medical concerns. Specifically, I am aware that he has type 2 diabetes, raised blood pressure, psoriasis, loss of sight in one eye and a bilateral amputation of both forearms that necessitates assistance with the activities of daily living. I am advised by the Chief of Health Programs for the Bureau that an individual presenting with these types of medical concerns would likely be incarcerated in a Bureau medical facility, at least initially, following his conviction and sentencing. After a full medical evaluation, a determination would be made regarding the most appropriate placement for him, considering the level of medical care and security controls needed. If it is determined that Abu Hamza cannot manage his activities of daily living, it is highly unlikely that he would be placed at the ADX but, rather, at a medical center. I am aware of at least one other high profile convicted international terrorist who, due to various medical concerns, is presently housed at a Bureau medical facility.

6.    The ADX houses less than one-third of one percent of the Bureau's overall inmate population: 95 percent of the inmate population was transferred to the ADX from other facilities, while only 5 percent are direct court commitments. The Bureau ensures, through careful case reviews, that the ADX is used for only those offenders who need the

2

213

**A.20**

28

controls available here.

7.      The decision to place an inmate at the ADX is a classification decision – which is actually a behavioral prediction – made utilizing the Bureau's classification system. The Bureau's classification system provides basic objective criteria and individual factors for assessing the security needs of each individual inmate. The Program Statement which provides the basic objective criteria for designating inmates to the ADX is 5100.08, Inmate Security Designation and Custody Classification. This Program Statement is available for review on the Internet at www.bop.gov.

8.      The authority to designate an inmate to a particular institution is vested solely in the Federal Bureau of Prisons. *See* 18 U.S.C. § 3621.

9.      The inmates housed at the ADX meet one or both of two basic criteria: (1) the inmate's conduct in other correctional institutions created a risk to the institutional security and good order, posed a risk to the safety of staff, inmates or others, or to public safety; and/or (2) as a result of the inmate's status either before or after incarceration, the inmate could not be safely housed in the general population of a regular correctional facility.

10.     The Bureau's classification system does not allow for an inmate to be housed at the ADX solely based on the nature of the crime he committed before incarceration. Nor does the Bureau have any specific policy in regard to where al Qaeda inmates serve their time. Only those offenders who clearly need the security controls available at the ADX are housed there. As mentioned, the designation of an inmate to the ADX is a classification decision premised on recommendations that a particular inmate needs additional controls to ensure the safe and secure operation of correctional facilities and to promote public safety.

11.     This close scrutiny of inmates for designation to the ADX is reflected in the

3

214

**A.21**

designation of inmates who have convictions for terrorism activities and/or ties to international terrorism. I am aware that 195 persons are currently in the custody of the Bureau who have convictions for terrorism activities and/or ties to international terrorism. It was determined that only 38 need the additional security controls of the ADX. The remaining 157 are housed throughout the Bureau at various other facilities, including, medical centers and medium and high security facilities.

12. A newly committed/sentenced inmate is afforded multi-level reviews prior to his placement at the ADX. Specifically, staff at the Designation and Sentence Computation Center prepares a designation packet. The designation packet is then sent to the Federal Bureau of Prisons' North Central Regional Office. Once the referral packet arrives at the North Central Region, the packet is reviewed by staff and forwarded to the Regional Director. If the North Central Regional Director concludes that ADX placement is inappropriate, the process terminates. If the North Central Regional Director approves the designated, the newly committed inmate is designated and transferred to the ADX.

13. An inmate's incarceration at the ADX does not impact his sentence duration.

14. Generally, the status of inmates are reviewed in three ways: Classification, Program Review, and a Progress Report.

15. Classification and Program Review refers to the procedure whereby an inmate's case is formally reviewed by the Unit Team. These meetings are generally referred to as "team" and the inmate is present. Team meetings are intended to give staff and inmates the opportunity to discuss issues in an open format. This is the inmate's opportunity for individual attention and he or she should be encouraged to ask questions and discuss concerns.

4

215

**A.22**

16.    Classification is the initial team meeting whereby a careful review of the case and inmate's history are discussed and relevant programs are recommended. The purpose of the meeting is to clearly define for the inmate: (1) sentence information, including financial obligations; (2) educational programs; (3) security/custody levels; (4) release plans; and (5) work assignments. These programs reflect the needs of the inmate and are stated in measurable terms.

17.    Generally, initial classification occurs within four weeks of an inmate's arrival at his designated institution.

18.    Subsequent team meetings are referred to as Program Reviews. These meetings are held at least once every six months (every three months for inmate's with less than one year remaining to serve) and are conducted to monitor and evaluate the inmate's progress in all program areas. Program participation is discussed in relation to the schedule developed at initial classification. New and/or revised goals are developed as necessary.

19.    A progress report is the principal document used by the Unit Team to evaluate the behavior and activities of inmates. The progress report is a detailed comprehensive account of an inmate's case history, prepared by the Case Manager at prescribed intervals during the inmate's confinement. Generally, the Case Manager composes the progress report with input from other unit staff, work detail supervisors, and education instructors.

20.    The progress report reflects the inmate's past status, assess his current status, and offers an indication of anticipated accomplishments. It is to reflect an evaluation of the inmate's past status, an assessment of his or her current status, and potential for future performances. This could include the inmate's continued participation in a program, and what they plan to do at the completion of the program, or if they plan to use what they have learned

5

216

**A.23**

upon their release. Information is also provided on the inmate's relationship with others (both staff and inmates), particularly with respect to attitude, punctuality, etc.

21.    A progress report is required, at a minimum, once every three years. At the ADX, the inmates are provided with a copy of the most current progress report. Upon request, an inmate may read and receive a copy of any progress report retained in the inmate's central file.

22.    Upon arrival at the ADX, the inmate has the opportunity to raise any concerns he has about his designation/transfer/incarceration at the ADX, during his initial classification.

23.    The inmate may also challenge his transfer through the Bureau's Administrative Remedy Program, which is set forth in Program Statement 1330.13, Administrative Remedy Program.

24.    The procedure requires that an inmate first address his complaint to the Warden. If dissatisfied with that response, the inmate may appeal his complaint to the Regional Director. If dissatisfied with the Regional Director's response, the inmate may appeal to the Director, National Inmate Appeals, in the Office of the General Counsel in Washington D.C. Generally, an inmate has not exhausted his remedies until he has sought review at all three levels.

25.    Under this procedure, inmate complaints must be made within specific time frames. Ordinarily, a complaint must be made within 20 days of the time the incident complained of occurs. Failure to raise a complaint in a timely manner can result in lack of review. Procedures also exist to allow an inmate to bypass the initial level of review at the institution if there is some indication that the complaint is of a sensitive nature. Such

6

217

**A.24**

complaints may be filed directly with the Regional Director.

26.     Inmates incarcerated at the ADX are able to seek review of any issue relating to

of his confinement before the United States District Courts.

27.     The ADX has nine housing units, which allows the Bureau to employ a phased

housing unit/privilege system.  (None of these units are reserved just for Islamic inmates.)

This stratified system of housing inmates is used to provide inmates with incentives to adhere

to the standards of conduct associated with a maximum security custody program.  As inmates

at the ADX demonstrate periods of clear conduct and positive institution adjustment, they may

progress from the General Population Units, through Intermediate and Transitional Units, to

finally, the Pre-Transfer Unit located at the United States Penitentiary, High Security,

Florence, Colorado, with increasing degrees of personal freedom and privileges at each stage.

The types of privileges afforded to the inmates are determined by their housing unit

assignments in this layered program.  It will take an inmate a minimum of 36 months to work

his way through the layered system of housing.  The minimum stay in a General Population

Units is twelve months, the Intermediate Program six months, Transitional Program six

months, and the Pre-Transfer Unit twelve months.  It is the goal of the ADX to transfer

inmates to less secure institutions when the inmate demonstrates that a transfer is warranted

and he no longer needs the controls of the ADX.

28.     The security needs of the inmates housed at the ADX require very restrictive

procedures for movement of the inmates, interaction with staff, other inmates, recreation,

visitation, and programming.  However, the central operating philosophy of this institution is

to allow inmates as much unrestrained movement and program access within the institution as

possible, consistent with staff and inmate safety.

7

218

**A.25**

33

P53

29.    All inmates at the ADX are single celled. Cells are generally side-by-side and allow communication between inmates by yelling, or using the air ventilation as a voice conduit. Each cell has a light, which the inmate may turn on and off as needed.

30.    A current, basic description of several of the housing units from most to least restrictive is as follows:

a.    The Control Unit (B-Unit) houses the most dangerous, violent, disruptive and assaultive inmates in the Bureau's custody. Each cell in the Control Unit is approximately 87 square feet, which does not include the sallyport area of the cell, which is 17 square feet. Each cell has a solid outer door and an inner grill. Each cell solid outer door as a window, which looks out on to the range. Each cell also has a window that looks outside, providing the inmate with natural lighting. Admission to the Control Unit is governed by 28 C.F.R. § 541.40, *et seq.*, and Program Statement 5212.07, Control Unit Programs. The inmates housed in the Control Unit receive a minimum of 7 hours of out of cell exercise per week. The inmates recreate individually in secure single recreation areas. The inmates consume their meals in their cells. The inmates receive one monthly social telephone call and may receive up to five social visits per month. Shower stalls are located within the cells.

b.    The Special Security Unit (H-Unit) currently only houses those inmates who have Special Administrative Measures imposed on them, pursuant to 28 C.F.R. §§ 501.2 and 501.3, or restrictions imposed by a court, pursuant to 18 U.S.C. § 3582(d). The placement of an inmate in this unit at the ADX is a classification decision. Each cell in the Special Security Unit has approximately 75.5 square feet of living space and do not have a sallyport or a shower. Each cell has a solid outer door. Each cell solid outer door as a window, which looks out on to the range. Each cell also has a window that looks outside, providing the inmate with natural lighting. The inmates housed in the Control Unit receive a minimum of 5 hours of out of cell exercise per week. The inmates recreate individually in secure single recreation areas. The inmates consume their meals in their cells. The inmates receive one monthly social telephone call and may receive social visits.

c.    The Special Housing Unit (Z-Unit) is a short-term housing unit for both inmates in Disciplinary Segregation, who have been found guilty of prohibited acts while at the ADX, and those in Administrative Detention, who have pending internal investigations, transfer or have other temporary administrative needs. Admission to the Special

8

219

**A.26**

Hamza s2 echr annex_053

34

Housing Unit is governed by 28 C.F.R. § 541.2, et seq., and Program Statement 5270.07, Inmate Discipline and Special Housing Units. The placement of an inmate into the Special Housing Unit is a classification decision. Each cell in the Special Housing Unit is 87 square feet, which does not include the sallyport area of the cell, which is 17 square feet. Each cell has a solid outer door and an inner grill. Each cell solid outer door as a window, which looks out on to the range. Each cell also has a window that looks outside, providing the inmate with natural lighting. These inmates receive a minimum of 5 hours of out of cell exercise per week. The inmates recreate individually in secure single recreation areas. The inmates consume their meals in their cells. The inmates receive a minimum of one monthly social telephone call and may receive up to five social visits per month. Shower stalls are located within the cells.

d.     Each of the four General Population Units (D, E, F, G-Units) houses those inmates who have demonstrated an inability to function in a less restrictive environment without being a threat to others or the secure and orderly operation of the institution. The placement of an inmate in one of these units at the ADX is a classification decision premised on recommendations that a particular inmate needs additional controls to ensure the safe and secure operation of correctional facilities and to promote public safety. Each cell in the High Security Unit is 87 square feet, which does not include the sallyport area of the cell), which is 17 square feet. Each cell has a solid outer door and an inner grill. Each cell solid outer door as a window, which looks out on to the range. Each cell also has a window that looks outside, providing the inmate with natural lighting. These inmates receive a minimum of 11 hours of out of cell exercise per week. The inmates recreate individually in secure single recreation areas. The inmates consume their meals in their cells. The inmates receive one monthly social telephone call and may receive up to five social visits. Shower stalls are located within the cells.

e.     The Intermediate and Transitional Units (J, K-Unit) prepare inmates for transitioning from Phase I of the General Population Unit program to an open, general population facility. The advancement of an inmate to the next phase of the Step-Down Program is a classification decision. Each cell in J and K-Units has approximately 75.5 square feet of living space and do not have a sallyport or a shower. Each cell has a solid outer door. Each solid outer door as a window, which looks out on to the range. Each cell also has a window that looks outside, providing the inmate with natural lighting. These inmates receive a minimum of 15 or 20 hours of out of cell exercise per week, depending on which phase of the Step-Down Program they are in. The inmates recreate in groups. The inmates in the intermediate phase of the program consume their

9

**A.27**

meals in their cells. The inmates in the transitional phase eat their meals out on the range with other inmates. The inmates in the pre-transfer phase eat their meals in the Inmate Dining Room at the ADX. The inmates receive anywhere from 3 - 4 social telephone calls per month, depending on which phase they are in the program. Shower stalls are not located within the cells. Inmates in the pre-transfer phase of the program may leave the unit, under a staff escort, to purchase items from Commissary.

31. All inmates are provided with access to both indoor recreation and outdoor recreation. Inmates who choose to go to outside recreation have access to sunlight and fresh air five days a week.

32. Inmates in B, D, E, F, and G units have individual black and white televisions in each cell, which provide 24-hour select broadcast channels (60 Channels), channels for closed circuit institutional programming (Recreation, Education, Religious Services, and Psychology), radio stations, and digital music channels.

33. Inmates in H-Unit also have individual black and white televisions in each cell, which provide fewer than 24-hour select broadcast channels. They are also provided with similar channels for closed circuit institutional programming and digital music channels.

34. All inmates at the ADX have contact with other persons on a daily basis. The Warden, Associate Wardens, Captain, and Department Heads perform weekly rounds so that they can visit with each inmate. Correctional officers perform regular rounds throughout all three shifts on a daily basis. A member of an inmate's unit team visits him every day, Monday through Friday, except on holidays. Inmates receive regular visits from medical staff, education staff, religious services staff, and psychology staff when they perform their rounds, and upon request if needed. Inmates also have access to medical and mental health visits upon request.

35. All inmates have access to educational opportunities. To meet the diverse

10

221

**A.28**

36

P56

educational needs of the inmate population, the Education Department provides adult basic and secondary education; English as a Second Language; high school equivalency (GED); and post-secondary, release preparation, adult continuing education and parenting courses. All courses are via a closed circuit television system, with a monitor in each cell, except post-secondary education. They are open to all inmates who wish to participate. On a regular basis, teachers provide one-on-one assistance to inmates.

36. In addition, the Education Department provides the inmate population with access to law and leisure library services. Each housing unit is provided a basic law and leisure library for informational and recreational purposes, respectively. The main law library is housed in the Education Department and is accessible to all inmates. Library technicians make daily rounds to all housing units to deliver leisure and law materials. Official testing is completed monthly for those inmates who have met the testing eligibility requirements and are recommended by the teachers. Testing is completed on an individual basis.

37. Recreational activities that reduce inmate idleness and provide a positive use of leisure time, are also available to the inmate population. These include weekly leisure games via closed circuit television system, weekend brain teasers, arts and crafts, wellness programs, a weekly movie program and special holiday activities.

The institution provides religious services for all faiths and community volunteers augment ADX Florence's chaplaincy program. However, all religious activities are broadcast to the inmate population via closed circuit televisions.

38. The inmates are afforded medical and dental care services. The Health Services Department at FCC Florence consists of a 51- position cadre of medical professionals and ancillary staff. Health Services staff provides a broad spectrum of medical

11

222

**A.29**

P57

and dental care, consistent with outpatient community health care standards.  Inmates with major medical concerns may be treated in a local hospital, or are transferred to one of the Bureau's Medical Centers.

39.    A substance abuse program is available to all inmates.  The substance abuse program coordinated by Psychology Services consists of drug awareness and education programs provided via closed circuit televisions.  Follow-up programming is available for those with sufficient motivation to undertake individualized treatment plans and long-term follow-ups with their unit counselors.

40.    Psychology services are available to all inmates through the Psychology Department.  The Psychology Department provides a full range of services, including evaluation, psychotherapy, and other treatment programs, such as smoking cessation, stress and anger management, and alternatives to criminal lifestyles program, within the context of the ADX structure.

41.    All inmates may receive non-contact legal visits.  All inmates may send and receive general and special correspondence.

42.    The Bureau provides inmates requesting a religious diet reasonable and equitable opportunity to observe their religious dietary practice within the constraints of budget limitations and the security and orderly running of the institution and the Bureau through a religious diet menu.

12

223

**A.30**

38

P58

Pursuant to the provisions of 28 U.S.C. 1746, I declare under penalty of perjury

that the foregoing is true and correct to the best of information, knowledge, and belief.

Executed on this 3rd day of October, 2007, at Florence, Colorado.

R. Wiley
Warden
United States Penitentiary, Administrative Maximum

13

224

**A.31**

39

Neutral Citation Number: [2008] EWHC 1357 (Admin)

Case No: CO/1748/2008

Royal Courts of Justice

Strand, London, WC2A 2LL

20/06/2008

B e f o r e :

THE PRESIDENT OF THE QUEEN'S BENCH DIVISION

MR JUSTICE SULLIVAN

_____

Between:

Musta\*\* Kamel Musta\*\* (Otherwise Abu Hamza) Appellant - and – The Government of the

United States of America

Secretary of State for the Home Department

Respondents

_____

Alun Jones QC and Ben Brandon (instructed by Arani & Co) for the Appellant

Hugo Keith and Clair Dobbin (instructed by The Crown Prosecution Service) for the first

Respondent

James Eadie QC (instructed by the Treasury Solicitor) for the second Respondent

Hearing dates: 12th-15th May 2008

_____

HTML VERSION OF JUDGMENT

_____

President of the Queen's Bench Division :

This is the judgment of the Court

1. The extradition of Musta\*\* Kamel Musta\*\* (otherwise known as Abu Hamza) is sought by the Government of the United States of America (USA). These are connected appeals first, against the order of District Judge Workman at the City of Westminster Magistrates Court on 15th November 2007 sending the case to the Secretary of State for the Home Department under section 87(3) of the Extradition Act 2003 (the Act) for her decision whether the appellant is to be extradited, and second, against her decision under section 93(4) of the Act ordering his

**A.32**

版权所有：全球法规网
Copyright© http://policy.mofcom.gov.cn

extradition.

2. We shall have to address the timetable in detail, but for present purposes it is sufficient to notice that the indictment was dated 19th April 2004. The appellant was arrested on 27 May 2004. The request for extradition was submitted by the USA on 24 May 2004. The appellant was remanded in custody. The proceedings are governed by the Extradition Act, and for these purposes, the USA is a Part 2 territory. The extradition proceedings were interrupted when the appellant was charged with offences contrary to United Kingdom law. In due course he was prosecuted to conviction, and sentenced to imprisonment. The extradition proceedings resumed in May 2007, and were subsequently adjourned because of the appellant's medical condition. When he was fit, the proceedings resumed, and were concluded on 15 November 2007.

3. The appellant is accused of conduct which, had it occurred within the United Kingdom, would have amounted to the following offences:

1. Between 23rd December 1998 and 29th December 1998, conspired with others to take hostages in Yemen. 2. Between the same dates, aided and abetted counselled and procured Abu Hassan and others to commit the offence of hostage-taking in Yemen. 3. Between 1st October 1999 and 30th April 2000, conspired with others to control and manage an association of persons in Bly, Oregon, who would be organised and trained, or organised and equipped for the purpose of enabling them to be employed for the use or display of physical force in promoting a political object, namely to make hijrah to and to fight jihad in, Afghanistan. 4. Between the same dates, conspired with others to control and manage an association of persons in Bly, Oregon, who would be organised and trained, or organised and equipped in such a manner as to arouse reasonable apprehension that they were organised and either trained or equipped for the purpose of enabling them to be employed for the use or display of physical force in promoting a political object, namely to make hijrah to, and to fight jihad in Afghanistan. 5. Between the same dates, conspired with others to have with them firearms in Bly, Oregon with intent to commit one or more of the following indictable offences: unlawful drilling; prohibition of quasi-military; possession of explosives under suspicious circumstances; enlistment in the service of a foreign state. 6. Between the same dates, conspired with others to use or have possession of property, namely a training camp and equipment, intending that it shall be applied or used for the commission of, or in furtherance of or in connection with, acts of terrorism, namely the fighting of jihad in Afghanistan 7. Between 1st October 1999 and 31st

**A.33**

版权所有：全球法规网
Copyright© http://policy.mofcom.gov.cn

December 1999, gave, lent or otherwise made available to another money, namely 4000, knowing or having reasonable cause to suspect that it would be applied or used for the commission of, or in furtherance of or in connection with, acts of terrorism, namely the fighting of jihad in Afghanistan. 8. Between 1st June 2000 and 19th December 2001, conspired with others to give, lend, or otherwise make available money including travel expenses for persons to attend Afghanistan, and other property including a letter of introduction to a high ranking member of the Taliban, knowing or having reasonable cause to suspect that it would be applied or used for the commission of, or in furtherance of or in connection with, acts of terrorism, namely attendance and terrorist activities at an al Qaeda terrorist training camp and elsewhere in Afghanistan involving the use and possession of light weaponry, machine, explosives, detonators, mines, anti-aircraft weapons and the planning of bombings, hostage taking and suicide bombing. 9. Between 1st March and 30th April 2001, conspired with others to invite CC-2 to receive instruction and training in the use of firearms and explosives in Afghanistan.

4. In summary the indictment is divided into groups of charges which relate to three areas of alleged criminal activity. Charges 1 and 2 are related to hostage taking in the Yemen in December 1998. This crime culminated in the deaths of several hostages. Charges 3-5 address arrangements for an alleged terrorist training camp at Bly, Oregon in the USA between October 1999 and early 2000, which culminated in charges 6-9, violent jihad in Afghanistan between June 2000 and December 2001.

5. Since the appellant's arrest two of his alleged co-conspirators, originally unnamed, have been named and indicted. They are Oussama Kassir and Haroon Aswat. Aswat's extradition was ordered by the second respondent on 1st March 2006. His appeal against that order was dismissed in the High Court on 30th November 2006. ([2006] EWHC 2927 (Admin)) His case is now under consideration before the European Court of Human Rights. Kassir was extradited from the Czech Republic to the USA.

6. As we shall see, it was a recurring feature of the submissions by Mr Alun Jones QC on behalf of the appellant that the three groups of charges were properly to be regarded as manifestations of a world-wide terrorist conspiracy. It is indeed possible to conclude that in the broadest non-legal sense such a conspiracy may exist, and if so, that there may be many hundreds, if not thousands, of supporters involved to a greater or lesser extent in it. However that is remote from the specifics of the three distinct groups of offences in which the appellant

**A.34**

版权所有：全球法规网
Copyright© http://policy.mofcom.gov.cn

is alleged to have been involved, and for which he provides a common link. On any view, and indeed reinforced by Mr Jones' contention that the groups of alleged offences are themselves to be regarded as manifestations of an overall conspiracy, we have no doubt that the interests of justice require that the three groups of offences should be tried in the same jurisdiction. There is an undoubted link between the Yemen crimes and this country, but save in the broad sense that terrorist activity abroad may be prosecuted in this jurisdiction there is none between this country and the Bly Oregon offences or the Afghanistan offences. On the other hand there is a direct link between the United States and the Yemen offences and the United States and the Afghanistan offences, and the Bly Oregon offences are exclusively related to the United States. On any view, there is ample justification for a trial of all three groups of offences in the United States.

7. We must also highlight at the outset the focus by Mr Jones on the appellant's very poor health. The combined effect of his disabilities is undoubtedly very serious. He is 48 years old. His medical complaints include "type 2" diabetes and raised blood pressure, for both of which he is prescribed appropriate medication, extensive psoriasis, hyperhydrosis (excessive sweating provoked by a neurological condition) which requires him to shower and change his clothes at least twice daily, blindness in the right eye, with poor vision in the left, and bilateral traumatic amputation of the distal third of both forearms for which prostheses are fitted. The stumps in both arms are subject to regular outbreaks of infection, which have been increasing in severity. As we shall see the appellant's health is deployed by Mr Jones to reinforce a number of his criticisms of the decisions currently under appeal, and his submission that these alleged offences should be tried in this country.

8. The order made by Judge Workman is criticised on three grounds, each of which, if properly considered, should have resulted in the failure of the extradition proceedings.

a) It would be an abuse of process to extradite the appellant to face trial for the alleged offences in the United States of America. The request for extradition is "tainted" because, contrary to Article 3 of the European Convention of Human Rights, it is founded in whole or in part on evidence obtained directly or indirectly by torture or ill treatment. This is the "torture" ground. It is linked to an alleged failure by the judge to correct and overrule the refusal by the second respondent to disclose relevant material which it is said would bear on this issue: b) Extradition to the United States would be incompatible with the rights provided for the appellant under

版权所有：全球法规网
Copyright© http://policy.mofcom.gov.cn

articles 3, 6 and 8 of the European Convention. There is a real risk that if extradited the appellant would be subjected to torture or ill treatment contrary to article 3, and that there would be a disproportionate interference with his rights under article 8. Linked with this submission is the suggestion that it would be inappropriate for courts in this country to act or rely on diplomatic assurances tendered by the first respondent. This is the "ECHR" ground. c) By reason of the passage of time since the alleged offences were committed, it would be unjust and oppressive for the appellant's extradition to be ordered. This is the "delay" ground

The decision of the Secretary of State is criticised on what, effectively, are the same grounds.

9. The papers prepared in support of the appeal are voluminous. During the course of the hearing our attention was directed to numerous passages from a vast array of documents and reports. Something of the bulk of the papers can be discerned from the fact that at the conclusion of the hearing, at our request, a core bundle of papers was prepared. We are grateful to counsel for their considerable efforts in producing it. However, taken with bundle A which was said to be "essential", the material core evidence extended to very nearly 800 pages, some closely typed. We shall endeavour to summarise the contentions said by the appellant to derive from a consideration of the material, without reciting it. We should also record that our attention was drawn to numerous authorities, but save where absolutely necessary, we do not propose to refer to or list them. In our view the essential principles are clear.

Chronology

10. On 23rd December 1998 six members of the "Supporters of Sharia" were arrested in Aden in respect of planned bombings of Western targets. Explosives, weapons, documents and tapes were found. A few days later, on 28 December 1998, sixteen Western tourists were kidnapped in the Yemen. The leader of the kidnapping gang was Abu Al Hassan. The victims included several citizens of the United Kingdom, as well as two from the United States. Yemeni forces intervened on 29th December. The hostages were used as human shields. Four of them were killed. Three of the four dead were British nationals, the other was Australian. Two of the hostages were seriously injured, one a citizen of the United States, Mary Quinn.

11. While these calamitous events were in progress, on 29th December 1998, in this country, the appellant ordered 500 of additional airtime for satellite telephone for use by Abu Al Hassan. Shortly afterwards, the appellant attempted to obtain a refund.

12. Two days later officers from the Metropolitan Police anti-terrorist branch flew to the

版权所有：全球法规网
Copyright© http://policy.mofcom.gov.cn

Yemen, and at much the same time, an investigation was put into progress by the United States authorities.

13. On 11th January 1999 the appellant was interviewed on British television. He admitted that he had been contacted by the kidnappers, but denied that their leader was a member of the Supporters of Sharia. He acknowledged that one of the suspects was possibly his stepson, but stated that he was unaware of any connection between the kidnappers and those planning to bomb Western targets. A week later he gave another interview in which he admitted that the Supporters of Sharia had issued a communiqu on 30th December 1998 but he repeated that he himself only became involved after he had been contacted by Abu Al Hassan. A number of subsequent media interviews followed. However, in these interviews, the appellant distanced himself from any criminal involvement in the Yemeni offences. He was acting as an information channel at the time, seeking to find an honourable solution to the crisis.

14. In the meantime Mary Quinn was interviewed and "de-briefed" by detectives from Scotland Yard and agents from the Federal Bureau of Investigations. Approximately a month later she was again interviewed by an officer from the Metropolitan Police anti-terrorist branch and an FBI officer. These interviews were recorded. However they did not provide any direct evidence implicating the appellant. They are referred to in the first Metropolitan Police OIC report, dated 1 March 1999, and another undated Metropolitan Police report, which appears to be a second report, prepared later in 1999.

15. On 15 March 1999 the appellant was arrested for suspected involvement in the Yemen hostage taking, and his house was searched. He was interviewed between 15th and 18th March. These were effectively "no comment" interviews. Property taken from his home was returned to the appellant in December 1999.

16. On 5th May 1999, the trial of the hostage takers in the Yemen concluded. Mr Jones suggested that those who were tried in the Yemen were or would have been victims of torture or cruel and inhuman treatment. Abu Al Hassan and two others were convicted and sentenced to death by firing squad. A fourth defendant was sentenced to 20 years imprisonment. The other defendants were acquitted. Abu Al Hassan's execution took place on 17th October 1999.

17. Pausing in the narrative, Mr Jones submitted that, looked at overall, by this date ample evidence had gradually became available to justify the appellant's prosecution in this country for involvement in the Yemeni offences. He pressed us with the grounds advanced for opposing the appellant's appeal against the decision of the Home Secretary made very much

**A.37**

版权所有：全球法规网
Copyright© http://policy.mofcom.gov.cn

later, in 2003, depriving him of his "British citizenship". In them it was alleged that the appellant had made a number of observations in the media which were, or were regarded as admissions that he was in contact with the kidnappers during the kidnapping and supported it; that the Supporters of Sharia received a telephone call from Abu Al Hassan on 28th December 1998, and that their subsequent press release, which was signed by the appellant, contained a justification for their actions and further commented that if Abu Al Hassan was executed, matters would escalate and that there would be killings without kidnappings.

18. In considering these submissions we cannot avoid noting that Ms Arani, the appellant's solicitor who acted for him throughout this period of arrest and interview stated in terms that notwithstanding the interviews which lasted for three days, together with production and explanation orders, at that time "they appeared no closer to having any sort of case against him". Referring to both the appellant and another man, now deceased, who was arrested at the same time for the same offence, she continued that the "explanation" orders which were sought were "nothing more than a last desperate attempt to compel them to talk in the hope that they will implicate themselves and others, including those who were being held in Yemen without charge". Without accepting the accuracy of that assertion, the observations by the appellant's solicitor about events in early 1999 tend to undermine Mr Jones' submission that a prosecution for the Yemeni offences should have been mounted here.

19. According to the undated report from the Metropolitan Police in 1999 the kidnapping offences and the planned bombing offences were linked. It was however decided in the United Kingdom that neither the appellant nor any other suspect should be prosecuted for criminal involvement in the Yemeni hostage taking offences. The report expressed itself in unequivocal terms, that links between the appellant and the hostage takers were established, but it continued "evidentially the links have proved inconclusive, and rely heavily on information gathered from Yemeni sources which would not ordinarily be admissible during a British trialthere does nor appear to be evidence to prove that Abu Hamzaconspired with the kidnappers to bring about the kidnap or deaths of the tour groups hostages although suspicions will always remain". No doubt there were reasonable grounds for suspicion about the nature of the appellant's contacts with the Yemen in December 1999. In this jurisdiction however that would not have been sufficient to found a prosecution, let alone a prosecution with a realistic prospect of success.

**A.38**

版权所有：全球法规网
Copyright© http://policy.mofcom.gov.cn

20. The Bly, Oregon conspiracy began in October 1999. Its objective was to train for violent jihad in Afghanistan. In very brief summary, a military style army camp was established in Bly Oregon. Training was given in the use of weaponry and firearms and combat techniques. Thereafter those trained were to be deployed in Afghanistan. One of those involved in this conspiracy was known as CC-1, James Ujaama, a citizen of the USA. Those who attended the camp included Aswat and Kassir. Later, Ujaama arranged for CC-2, Feroz Abassi, to be taken to Afghanistan and introduced to CC-3 Al Libi, an alleged "front line" commander in Afghanistan. For the moment no further narrative of the details of the conspiracy, or the appellant's alleged involvement in it is necessary.

21. On 22nd October 2000 a recorded interview took place between the appellant and Mary Quinn. In the course of the interview the appellant made a number of significant self-incriminating observations. However, his more public interviews continued to assert that his involvement with the Yemeni offences was not criminal. Thus, in December 2002, in a Newsnight programme, he asserted that his contact with the Yemen at the time of the hostage taking was to see whether any honourable way to achieve the release of the hostages could be found.

22. It was not until February 2003 that the FBI became aware of the appellant's tape recorded interview with Mary Quinn. Her account of her experiences in the Yemen in December 1999 was published later, in 2005, "Kidnapped in Yemen". Mr Jones suggested that it is "difficult to understand" how this recorded interview escaped the attention of the FBI until January 2003. However that is the evidence and we can see no reason to disbelieve it. Then, significantly, in March 2003, James Ujaama agreed to be interviewed in relation both to the Bly Oregon and Afghanistan offences. A significant body of evidence lends weight to his allegations that the appellant was involved in the Bly Oregon and Afghanistan conspiracies. Shortly afterwards, on 14th April 2003, in the USA, Ujaama pleaded guilty to his participation in these offences and entered into a written co-operation agreement. The first witness testified in the investigation by the grand jury in June 2003, and further witnesses testified in December 2003 and April 2004.

23. On 19th April 2004, the appellant was indicted in the United States. An arrest warrant was issued. The request for his extradition followed on 21st May, and he was arrested on 27th May.

24. The first extradition hearing in this country began on 23rd July 2004. During the course of the hearing Ujaama's identity was disclosed. The hearing was adjourned to 19th October 2004.

版权所有：全球法规网 Copyright© http://policy.mofcom.gov.cn

However, on 26th August 2004, the appellant was arrested on suspicion of committing offences in the United Kingdom, and on 18th October he was charged. This led to the postponement of the extradition proceedings, and preparation for the appellant's trial in this jurisdiction.

25. On 7th February 2006 the appellant was convicted and sentenced to 7 years' imprisonment. On 28th November 2006 his appeal against conviction was dismissed by the Court of Appeal Criminal Division. Contentions on the appellant's behalf at his trial that an abuse of process arising from the delay which occurred between 1999 and 2004 had occurred, reinforced by a claim that the appellant had been given an implied assurance that no action would be taken against him, were rejected. (see [2006] EWCA Crim 2918 at paras 55-57) Leave to petition the House of Lords was subsequently refused. Nearly three years after they were adjourned, the extradition proceedings began again. The case was sent to the Secretary of State on 15th November 2007, and she ordered the extradition of the appellant on 7th February 2008.

26. Mr Jones drew attention to a letter from the Attorney General of the United States dated 8th January 2008 to the Secretary of State, complaining about the delayed extradition process. He observed that if extradition was further delayed until the end of the sentence currently being served by the appellant in autumn 2008 "in the worst case, it might mean we would eventually have to abandon our extradition request". The letter stated the obvious. In any proceedings the longer delay the greater the difficulties which arise in establishing the facts. However, the letter represented an endeavour by the authorities in the USA to avoid delay which had the potential to weaken the strength of the prosecution case. After all it is now five years since James Ujaama entered into his written co-operation agreement, and his importance to the prosecution case is obvious. We are, of course, conscious of the problems created for a defendant by delay, but we cannot interpret this letter as an expression of concern that the appellant would be unlikely to receive a fair trial in the USA on that basis.

Delay

We shall begin by dealing with the third criticism of Judge Workman's decision.

27. The principles are well understood. The passage of time may constitute a barrier to what would otherwise be an appropriate order for extradition provided it would result either in a judicial process in the requesting country which, by reference to the language of s82 of the Extradition Act 2003 could properly be stigmatised as "unjust", or if the impact on the individual whose extradition is sought would, in the light of the changed circumstances since

**A.40**

版权所有：全球法规网
Copyright© http://policy.mofcom.gov.cn

the date of the offence, be "oppressive". Both concepts amply cover any unfairness in the proposed proceedings arising from delay.

28. It was submitted to Judge Workman that it would be unjust to extradite the appellant because the passage of time would cause irretrievable prejudice to the preparation for and conduct of any trial in the United States. It was nearly ten years since events alleged in the Yemen case, nine since the events alleged in Bly Oregon, and eight since the Afghanistan terrorist offences occurred. Judge Workman accepted that in relation to the Yemen allegations, material which the appellant might seek to deploy at his trial would not be available to him, but that, he held, was not caused by the passage of time, but arose because of the "nature of the allegation". He further considered that there was no obvious delay in relation to the Bly Oregon and Afghanistan charges and noted that there had been "no detailed submissions as to culpability for any delay".

29. The submission that the passage of time had caused prejudice was repeated to us by Mr Jones. In summary, witnesses would no longer be available to the prosecution and the defence. The case was stale. The delay was attributable to delays in the United States and the choice of extradition proceedings rather than a trial in the United Kingdom. The judge failed to give sufficient weight to the consequences of the delay to the dimming of witness recollection, and the loss and destruction of documentary material. It was wrong to attribute these problems to the nature of the proceedings faced by the appellant.

30. As we have already recorded Mr Jones suggested that a great deal of material said to implicate the appellant in the Yemeni crime was obtained by and through British intelligence, and that indeed by mid-1999 the investigation was more or less complete. He was at pains to highlight that the strength of the evidence amply justified the appellant's prosecution at a much earlier date, and given the death of the three British citizens, the interest of this country in such a prosecution was obvious. Therefore, he argued, the United Kingdom is the proper forum for trial of the offences covered by the charges the appellant now faces. The appellant was living here at all material times, and although the offences were indeed "extradition offences" for the purposes of the 2003 Act, the criminal conduct alleged against him would be triable and should be tried in this country.

31. However that may be, as we have also recorded, it was decided by the Metropolitan Police that there was insufficient evidence to justify the prosecution of the appellant in this country

A.41

for any offences connected with the Yemen outrage. Notwithstanding what we shall choose to regard as a mere forensic flourish deployed by Mr Jones in his written submissions, where he referred to a "genuinely independent criminal justice system", and appeared to imply any failure to prosecute for the Yemen offences in this country would indicate that the criminal justice system here is not truly independent, we cannot find the slightest evidence to suggest that the decision that the appellant should not be prosecuted in this country was reached otherwise than on an objective analysis of the available evidence. We reject the innuendo that it was tainted by some improper collusive agreement with the authorities in the United States to leave the responsibility for bringing criminal charges against the appellant to them. There is not the slightest evidence to justify it.

32. In our judgment the prosecution of the appellant for alleged involvement in the Yemen offences was not properly viable until the FBI became aware of the contents of the interview between Mary Quinn and the appellant. These interviews wholly undermined his assertion of innocent involvement in those offences, and provided sufficient evidence to justify a prosecution by adding weight to what were previously reasonable but unconfirmed and unprovable suspicions of his involvement in them. Shortly afterwards, in March 2003, Ujaama provided credible evidence linking the appellant with the Bly Oregon and Afghanistan conspiracies. Until it became available, the appellant was not linked with either the Bly Oregon or the Afghanistan offences and there was no basis whatever on which his extradition for this offences could be sought, nor indeed for that matter, for him to be prosecuted for his involvement in them. Both Mary Quinn and James Ujaama live in the United States. Although no doubt arrangements could be made to invite Mary Quinn to give evidence in the United Kingdom if the appellant were prosecuted here, (although query, whether there could be any lawful basis for commanding her attendance) the same can hardly be said of James Ujaama. His agreement is with the authorities in the United States. In any event, the United States has a clear and obvious interest in this prosecution.

33. The issue arising in relation to the Yemen charges is utterly simple: either the appellant's admitted contacts with Abu Al Hassan and his gang were innocent, indeed honourable, or they were criminal. The prosecution must establish that they were criminal. We fail to see how any of the hostages or any of the Yemeni forces who stormed the compound in which they were detained, or indeed any evidence from the trials of the Yemen Seven or the hostage takers can

版权所有：全球法规网
Copyright© http://policy.mofcom.gov.cn

throw any light whatever on the nature of the appellant's involvement. The suggestion that he might have called Abu Al Hassan himself as a defence witness at any trial if he had not been executed is totally unreal. The cross-examination of him by the prosecution would have been devastating in its impact on the appellant's defence. In any event there was not nor could there ever have been the slightest prospect of a trial of the appellant beginning before Abu Al Hassan's execution. Another suggestion is that the British members of the Yemen Seven would be in a position to give evidence of the torture and human rights abuses to which they were subjected in the Yemen. They would be irrelevant to any issue at the appellant's trial. Similarly, the assertion that the circumstances in which some of the hostages were shot remained "controversial to this day" fails any possible relevance test.

34. The difficulties facing the submission is further revealed in the context of the Bly Oregon and Afghanistan allegations. In relation to these allegations the single question is whether the appellant was involved in the criminal activities alleged against him. It is said that the passage of time "must surely have deprived him of any meaningful ability to call witnesses from the Finsbury Park mosque to speak about Ujaama's and Abassi's decisions in 2000, their association with the appellant, and whether the appellant encouraged them to act as alleged in the indictment". This is vague in the extreme. No potential witness to any of these matters who might have been but no longer is available has been identified. Moreover as we know in the context of the Yemen allegation, the appellant was perfectly capable of asserting an innocent involvement or interest in 1999 and 2000, which was subsequently undermined by new evidence. It is, however, most unlikely that the appellant would have made exculpatory remarks in relation to the other offences: to have said anything at all would have drawn attention to them. In any event, the proceedings in relation to Bly Oregon and Afghanistan were started as soon as realistically practicable after the appellant's involvement became apparent, and it was appropriate for the allegation to be made.

35. The reasons for the delay thereafter are obvious from the narrative. What is more, since 2004, the appellant can have been under no illusions about his position. The extradition proceedings against him were postponed while he was being prosecuted for a separate but serious offence in this country. No one suggested that that prosecution was or should be treated as a replacement for the extradition proceedings, or that they were somehow being discontinued, or treated as discontinued. In short, the delay in these proceedings since 2004 is consequent on the legitimate purpose of bringing the appellant's additional criminal activity in

**A.43**

版权所有：全球法规网
Copyright© http://policy.mofcom.gov.cn

this country to justice here.

36. Like Judge Workman, notwithstanding the passing of the years, we are quite unpersuaded that the complaint based on delay is sustained. In this context it would not be "unjust" nor "oppressive" for the appellant to be extradited to the USA to face the charges for which he is currently indicted.

Torture

37. We must emphasise at the outset that there is no suggestion that the appellant himself has been the victim of torture, and none of the evidence proposed to be advanced against him in the USA (including his admissions to Mary Quinn) derives, either directly or indirectly from unacceptable ill treatment of which he was the victim.

38. Mr Jones' submission on this issue therefore developed at some distance from the appellant himself, and indeed from the Yemen offences. His focus was the Bly Oregon and Afghanistan offences. James Ujaama is a crucial witness for the prosecution in relation to them. He has made a plea bargain with the prosecuting authorities in the United States. Under its terms he will give evidence against the appellant at his trial or forfeit the advantages accruing to him under the agreement. That constitutes a pressure on him to give evidence, but it does not remotely come within the realms of ill-treatment or torture.

39. The critical link between the Bly Oregon and Afghanistan offences involves a British citizen called Feroz Abbasi. There is no other significant British connection with either the Bly Oregon or Afghanistan offences. The history of Abbasi's arrest in Afghanistan and his subsequent transfer to the United States is fully set out in the papers. The suggestion is that he was subjected to torture not only on his arrest in Afghanistan, but also when he was taken and detained in Guantanamo Bay. However that may be, the USA has made clear, in terms which constitute an undertaking, that any references to evidence and information provided by Abbasi were excluded from the request for extradition and they are not and will not be relied on in proceedings against the appellant in the USA. The information of which Abbasi was the source is identified in the papers and, without making any concessions to the assertion that Abbasi was the victim of torture, any reliance on Abbasi's evidence is expressly retracted. Accordingly, while there are reasonable grounds to suspect that Abassi may have been tortured, it is unnecessary to carry out further investigations in order to ascertain whether he was. His evidence is no longer relied for the purpose of these proceedings and would constitute

**A.44**

版权所有：全球法规网
Copyright© http://policy.mofcom.gov.cn

inadmissible hearsay in the USA because, unsurprisingly as an alleged co-conspirator, he would not be willing to return to the USA to give evidence.

40. There is a further limb to the "torture" contention. Ibn Al-Shaykh Al-Libi as an individual in charge of training camps in Afghanistan in 2001. He was arrested in late 2001 or early 2002 in Afghanistan, and subsequently transferred to the United States and detained in Guantanamo Bay. It is suggested that he was the subject of illegal "rendition" or "abduction" by the authorities in the United States to Libya. A number of sources are said to show that he was tortured both in Afghanistan, and Guantanamo Bay, and following his rendition. He is also said to have been detained and tortured in Egypt and Jordan. He is now said to have "disappeared". Again, whatever the truth about these assertions, Al-Libi's involvement, if any, would, like Abassi, be as a co-defendant, one of the appellant's co-conspirators. He is not a witness, no evidence from him will be deployed at the appellant's trial, and none has been used in support of the extradition proceedings.

41. Drawing the threads together, we can summarise the position very shortly. Mr Jones suggested that evidence obtained by torture should be rejected. Such conduct outrages civilised values, and to admit such evidence would constitute an endorsement if not an encouragement to its use. On the issue of principle we agree, but the stark reality is that when the possible use of direct "torture" is addressed, it emerges that none of the victims of alleged torture provide evidence against the appellant. None of those allegedly ill-treated by the authorities anywhere in the world provide or will provide evidence against him either in relation to the extradition request or to any trial which may take place in the United States.

"The fruits of the poisoned tree"

42. Faced with these realities, Mr Jones advanced his challenge to the extradition proceedings on the basis that there are substantial grounds for believing that both the extradition request and the evidence at any subsequent trial in the USA are founded, if not in whole, at least in part on evidence obtained indirectly by torture, frequently described as the fruits of the poisoned tree.

43. Mr Jones focussed our attention on the evidence of Mr Butsch, a special agent employed by the FBI, the co-lead investigator of the allegations against the appellant, an expert witness in the USA in relation to the identities and activities of Al Qaeda leaders, operatives and associates, and Al Qaeda training camps in Afghanistan prior to September 2001. In his affidavit he speaks of "confessions" given by at least one of those convicted of bombing an

**A.45**

版权所有：全球法规网
Copyright© http://policy.mofcom.gov.cn

embassy of the USA, and makes further references to the hostage taking conspiracies in the Yemen. Mr Jones contended that much of what Mr Butsch learned, and much of his expertise, which would be deployed in evidence in the appellant's trial in the USA, is based, at least in part, on information coming into his possession as a result of torture, and therefore that part of his evidence represents the "fruits of the poisoned tree". We shall not repeat the assertions made by Mr Jones in relation to torture, and in particular the allegations that Abassi and Al Libi were tortured. However he asserted that Mr Butsch had taken part in interrogations in Pakistan which must have involved torture. When that assertion is examined, however, it appears that Abassi himself, when recording in his diary the way in which he was treated in Kandahar when FBI agents were interviewing him, said that it was "not so bad". Another man, Begg, provides evidence which does not include any assertion that Mr Butsch tortured him, or was present at or party to any occasion when he was tortured or ill-treated.

44. It is clear that general matters relating to Al Qaeda, its views and objectives, is publicly available. The circumstances in which Ujaama became a witness for the prosecution are clear. The single glimmer of a possibility that any direct evidence against the appellant might be tainted by indirect torture arose in the context of Ujaama's evidence. In summary, Mr Jones suggested that his evidence against the appellant was or might have been founded on material which became available after Abassi was captured in 2002. From this it was said that there are reasonable grounds to believe that the evidence which Ujaama would give represents the indirect fruits of Abassi's ill-treatment. However, Ujaama himself was not tortured, and there is nothing to suggest that any of his evidence against the appellant proceeded either from what Abassi told him, or from what those who interrogated him in the USA (always with his defence lawyer present) told him that Abassi had said. In short, there is nothing to suggest that Ujaama's allegations in relation to Bly Oregon and Afghanistan derive from anything said by Abassi under torture.

45. Mr Jones then focussed attention on the affidavit of Mr Bruce, an Assistant United States Attorney and co-lead prosecutor in the appellant's case. His information depended on four years of personal involvement in the investigation, prosecution and extradition of the appellant, and he says that in the course of discussions he spoke to "domestic and foreign law enforcement officers, prosecutions and intelligence offences". He also studied a vast body of material gathered in the course of the investigation as well as "extensive additional evidencefrom all over the world". According to Mr Jones' argument, it is an inevitable

**A.46**

版权所有：全球法规网
Copyright© http://policy.mofcom.gov.cn

consequence of the process of information collection and gathering by Mr Bruce that he, like Mr Butsch, must have been supplied with information which was originally produced, or included information originally produced by torture or ill-treatment.

46. From this, Mr Jones went on to argue that there was ample material to justify the requirement for further information to be disclosed to him by the USA which would enable him to penetrate to the heart of the torture issue, but whether that order should be made or not, there was in any event clear evidence that torture was used on some of the individuals involved and identified in these proceedings, and in view of the clear inference that the application for the appellant's extradition included such material, the inevitable conclusion is that the extradition proceedings should fail. The appellant will be tried in the USA on the basis of the fruits of torture, not least because in the USA, evidence obtained by torture is admissible. The fact that torture was involved in the process goes merely to its weight.

47. In our judgment the reasons why this submission is flawed can be grouped under three separate headings, as follows:

i) The submission fails to recognise that, unlike evidence obtained directly by torture, "the fruits of the poisoned tree" are, in principle, admissible under domestic law, and that in this respect there is no fundamental difference between the approach to such evidence either in this country or in the USA.

ii) The allegation that the evidence against the appellant is "tainted by torture" is made in the most general terms, is unsupported by evidence, and also fails to distinguish between evidence which is the indirect fruits of torture and that which is indirectly obtained as a result of ill-treatment falling short of torture.

iii) The underlying contention that the approach in the USA to evidence tainted by torture is "deficient", because evidence that a witness has been tortured would go to weight rather than admissibility (a) does not address the fact that the case against the appellant does not rely on evidence from any witness who is said to have been tortured, or from torture of the appellant himself; (b) draws a legal distinction between admissibility and weight which is, on the facts of the present case, a distinction without any practical difference; and (c) is, notwithstanding the evidence of Ms Stemler, an attorney employed by the United States Department of Justice accepting the evidence of Mr Maloy, an attorney in the United States instructed on behalf of the appellant, in conflict with authorities in the USA and with the understanding of both the

**A.47**

版权所有：全球法规网
Copyright© http://policy.mofcom.gov.cn

House of Lords and the European Court of Human Rights about the approach of courts in the USA to such evidence. (see A and other v Secretary of State for the Home Department [2006] 2 AC 221 at paragraph 17 and Jalloh v Germany (Application no. 54810/00, (2007) 44 EHRR 32 ) at paragraph 105.

48. Whether there is a material difference between the approach to evidence obtained directly by torture in this country and the USA, there is no material difference between the approaches of the two legal systems to evidence obtained indirectly by torture. The "fruits of the poisoned tree" are not inadmissible in a criminal trial in this country. Accordingly, even if the prospect that such evidence would be deployed at the appellant's trial in the USA were satisfactorily established, it could not be said to be an abuse of process for the appellant to be extradited to another jurisdiction where, like our own, such evidence would, in principle, be admissible. The appellant relied on the latter half of one sentence in the opinion of Lord Hoffman in A (2) where he said that evidence obtained as a result of torture "may be so compelling and so independent that it does not carry enough of the smell of the torture chamber to require its exclusion". However none of the material relied on by the USA carries anything of the smell of the torture chamber sufficient to require its exclusion in a trial in this country. The evidence of Mr Butsch will be deployed against the appellant at his trial in the USA. However, as we have indicated, most of the background matters to which he refers can be found in publicly available material. To the extent that his expertise is derived in part from discussions with security and intelligence officials in other countries, his position is no different from that of any other witness who has expertise in relation to the activities of Al Qaeda. The fact that the original source of some of the information about these activities, much of which is now publicly available, may have resulted from torture or ill-treatment of unknown or even identifiable individuals in distant countries where the rule of law may not be given the proper respect demanded of it here does not mean that background evidence about Al Qaeda and its activities given by a witness who professes expertise in the subject carries with it "the smell of the torture chamber".

49. On analysis the submission that the expert evidence likely to be given by Mr Butsch at trial has been "tainted by torture" is wholly unparticularised. Moreover the assertions made on the appellant's behalf do not attempt to distinguish between evidence that may have been obtained by torture and evidence obtained by ill-treatment falling short of torture. While the latter may

版权所有：全球法规网
Copyright© http://policy.mofcom.gov.cn

be excluded in a criminal trial in the United Kingdom under section 78 of the Police and Criminal Evidence Act 1984, there is no absolute bar to its admissibility. Article 15 of the United Nations Convention against Torture requires that any statement "established" to have been made as a result of torture shall not be "invoked", while article 16 demonstrates that within the Convention itself a clear distinction is drawn between torture and forms of ill-treatment not amounting to torture. Where Article 16 applies the exclusion rule again is not absolute. The position is not materially different in the context of the European Convention of Human Rights. The "general question" whether the use of evidence obtained by ill-treatment in breach of Article 3 falling short of torture "automatically renders a trial unfair" for the purposes of Article 6, was left open in Jalloh (paragraph 107). An allegation that evidence is "tainted by violations of Article 3" goes to its weight, not to its admissibility (per Neuberger LJ in A (2) [2005] 1 WLR 414, paragraph 263). Our attention was drawn to Othman (Jordan) v Secretary of State for the Home Department [2008] EWCA Civ 290, but in that case the court was concerned with evidence obtained directly by torture and was considering whether there was a real risk that statements extracted under torture would be used. The principles in A (2) and Jalloh were applied.

50. Mr Jones also drew our attention to the decision of the ECtHR in Harutyunyan v Armenia (application number 36549/03, BAILII: [2007] ECHR 541 ) a judgment dated 28th June 2007, in which the court was concerned with a confession and witness statements obtained in violation of Article 3. Jalloh was referred to and the court concluded, at paragraph 63, that: "Incriminating evidence whether in the form of a confession or real evidence obtained as a result of acts of violent or brutality or other forms of treatment which can be characterised as torture should never be relied on as proof of the victim's guilt, irrespective of its probative value".

Although the court did not have to decide whether the treatment inflicted on the appellant and two witnesses amounted to torture within Article 3, it clearly had regard to the findings of the domestic court as to the severity of the ill-treatment which had "the attributes of torture" when reaching its conclusion that there had been a violation of the right to a fair hearing under Article 6. This decision does not assist the appellant in the present case. There is no suggestion here that evidence obtained by violence or brutality will be used as proof of the guilt of the victim of such violence or brutality.

51. In accordance with the present arrangements, the USA is not required to produce the

版权所有：全球法规网
Copyright© http://policy.mofcom.gov.cn

evidence on which it will rely at the appellant's trial. However the allegations against him have been set out in some detail in narrative form in statements from Mr Butsch and Mr Bruce. The appellant was therefore provided with an opportunity to particularise those aspects of the evidence against him where he could contend that there is a real risk that the evidence may have been obtained indirectly by torture. It is significant that nothing specific has been identified. Generalised allegations that some, unspecified, parts of a case against an appellant might be indirectly tainted by torture do not provide a sufficient basis for allowing an appeal on abuse of process grounds (see R (Government of USA) v Bow Streets Magistrates Court [2007] 1 WLR 1157 at para 84). In the present case, even if, on the appellant's case, it were possible to conclude that some of those named in the papers had been subjected to torture, nothing obtained from them is relied on in the course of these proceedings, and where Mr Butsch and Mr Bruce are analysing material from all sorts of disparate sources in order to properly carry out their duties, their evidence as a whole is not tainted by the possibility that in part they may be informed by the fruits of torture, at any rate to the extent that further disclosure is required or that their evidence should be disregarded.

52. We must next address the contention that by contrast with the jurisdiction in this country under section 78 of the 1984 Act to exclude evidence obtained directly or indirectly by torture or ill-treatment in breach of Article 3, the powers of the courts in the United States are "deficient" because the evidence that a witness has been tortured goes not to admissibility but to weight. Mr Maloy provided evidence in support relying on Portelli 469 F. 2d 1239(2nd Circ 1972). In this case, after torture by the police, a witness, Melville, provided a damaging witness statement against Portelli, and when the trial took place 8 months later, repeated the same story in open court. The court distinguished between a confession which had been coerced from a defendant which would be excluded as a matter of law and the testimony of a witness forced to make a pre-trial statement who had subsequently asserted that his testimony at trial was true. In the latter case the evidence was admissible, and it was for the jury to consider whether it was true. We doubt the relevance of this decision to the present appeal, and we can indeed imagine circumstances in which after due inquiry of the witness a judge in this country would admit such evidence and invite the jury to decide what weight, if any, should be attached to it. However it is not suggested that at any trial in the USA evidence may be given against this appellant by any witness who has, under torture, previously made a damaging statement

版权所有：全球法规网
Copyright© http://policy.mofcom.gov.cn

against him. In relation to Ujaama the appellant merely contends that he has been improperly coerced into giving evidence against him. This is an issue which can be explored in cross-examination, and will in due course go to the weight to be attributed to Ujaama's evidence. In any event, we note that two years after the decision in Portelli, the first circuit of the US Court of Appeal decided in La France 499 F 2d 29 that the court was under a duty to exclude evidence if, after conducting its own inquiry, it found evidence to have been unconstitutionally coerced. Mr Maloy does not refer to this decision. Indeed our perception of the lack of any material difference between the approaches adopted in this country and in the USA towards "torture tainted" evidence is reinforced by the most recent decisions in the House of Lords and the European Court of Human Rights. This is consistent with the longstanding opinion of the United States Supreme Court in Rochin v California [1952] 342 US 165 upholding the due process clause in the constitution of the USA where the proceedings "offend those cannons of decency and fairness which express the notions of justice of English-speaking peoples even towards those charged with the most heinous offences". In A (No 2) Lord Bingham referred to this decision and clearly regarded the law in the USA as to the inadmissibility of involuntary confessions as being in harmony with the position under English common law. In Jalloh the ECtHR, having considered the case law in the USA, found support for its decision by adopting the approach of the Supreme Court, saying that "any other conclusion would only serve to legitimate indirectly the sort of morally reprehensible conduct which the authors of Article 3 of the Convention sought to prescribe or, that it was so well put in the US Supreme Court's judgment in the Rochin case "to afford brutality the cloak of law" (paragraph 105). Given these authorities, at the very highest level in the USA, the United Kingdom and the European Court of Human Rights, we are unpersuaded that there would in practice be any significant difference between the approaches of the two legal systems towards evidence that it allegedly tainted by torture.

53. For these reasons, which, not withstanding their length, represent but a brief summary of the material deployed before us in the papers and oral argument, this criticism of Judge Workman's decision also fails.

European Convention of Human Rights

Trial in the United Kingdom

54. The 2003 Act provides the criteria by which the decision whether to extradite or not is

A.51

governed. Subject to specific safeguards, if the conditions are satisfied, extradition should follow. We must now address the ground of appeal based on the appellant's ECHR rights and whether, whatever the apparent justification for extradition, it should nevertheless be refused. Irrespective of his submissions in relation to torture and "tainted" evidence the foundation for Mr Jones' submission is that the appellant could and should stand trial in the United Kingdom for his alleged involvement in these offences. We have already identified our clear view that these offences should be tried in the same jurisdiction and that the most obvious forum for their trial would be the USA. Nevertheless Mr Jones relies on a number of advantages which would accrue to the appellant if he were tried here, where there would be jurisdiction for his trial to take place, and these include the preservation of his ECHR rights.

55. Perhaps the first and most obvious advantage was one which, for understandable forensic reasons, Mr Jones did not advance. The "delay" in any such prosecution, and the circumstances in which it occurred, would provide the foundation for an argument that any future trial in the United Kingdom would constitute an abuse of process on well recognised principles. Before the appellant's trial in this country, and after his conviction, it was urged unsuccessfully on his behalf that he would not receive or had not received a fair trial on, among other grounds, the nature and quality of the pre-trial publicity. Following his conviction and unsuccessful appeal the publicity argument in any subsequent trial of the three groups of offences would be deployed with renewed force. It would be coupled with submissions based on the delayed process and the unfairness of proceeding with offences of such seriousness, not only when it was decided nearly a decade ago that the appellant should not be prosecuted, but also on the basis that if he was to be tried at all, he should have faced criminal proceedings once, and should not, after conviction, have to endure resuscitated charges. In short, the abuse of process argument in relation to a trial of the matters engaged in the extradition proceedings would be deployed with yet greater force if the appellant were to be tried here. The argument would be reinforced to the absence of any direct or indirect United Kingdom connection with the Bly Oregon offences and the subsequent offences in Afghanistan.

56. If this abuse of process argument were successful, the trial of the appellant in this country in this jurisdiction would be stayed. The authorities in the United States would then re-seek his extradition. It would then be argued that the extradition should not be permitted on precisely the same grounds which are now advanced, fortified, of course, by the argument that it had been sought to try the appellant in the United Kingdom, and that the proceedings had been

版权所有：全球法规网
Copyright© http://policy.mofcom.gov.cn

stayed. There would, on any view, be a substantial delay, and a trial which ought to take place might never do so. It is sometimes overlooked that that, too, constitutes an abuse of process.

57. These observations do not imply any criticism of Mr Jones. The simple reality is that any counsel briefed to defend the appellant on these charges would, at the very least, be entitled to make these submissions, and would be failing in the performance of his professional duty to his client if he elected not to do so.

58. Mr Jones identified the advantages available to the appellant in a trial conducted here. The police and security officials who were involved in the investigation of the Yemen offences in 1999 and 2000 would be readily available to give evidence. We simply do not understand how any of these witnesses could assist with the appellant's case. If they were to give any evidence at all they would almost certainly be providing evidence in support of the prosecution. The defence, as indicated on his behalf, is a simple one. He was acting as an innocent channel of communication. If the ideas of others involved in the process were pernicious, and dangerous, he was ignorant of them. It therefore follows that the British hostages, now back in this country, could not add anything to assist him. They were simply the victims of whatever part in the process he may have played. They cannot contribute to the question whether his involvement was criminal or not. Examining the corresponding disadvantages identified by Mr Jones, we accept that Abbasi would be unlikely to visit the United States to give evidence in support of the defence. If however it were contemplated that he might be called to give evidence to support the appellant, a very careful forensic decision would have to be made when one result of doing so would be likely to be that the confession which implicates the appellant in the Afghanistan group of charges would be placed before the jury. We are making no decision on the point, but, on any view, the prospect of calling Abbasi to give whatever evidence he could in support of the appellant would be fraught with difficulty and potentially catastrophic consequences to the defendant.

59. We shall not address each of the individual potential advantages identified by Mr Jones. They are equally nebulous. Set against them, a further consideration merits attention. A trial here would almost certainly lack the live evidence of James Ujaama, and probably, but less certainly, the live evidence of Mary Quinn. The evidence of these two crucial witnesses would, at most, be available to be used before the jury in the form of written witness statements, to be read. Any such proposal would be strongly opposed on behalf of the appellant. The exercise of

**A.53**

版权所有：全球法规网
Copyright© http://policy.mofcom.gov.cn

judicial discretion in these circumstances would require very fine judgment, and it would certainly not be impossible that the judge would refuse to allow such critical and crucial incriminating evidence to be read.

Assurances

60. The argument is redolent with implied, if not express criticism of the United States of America, and its judicial processes. In effect we are invited to the conclusion that the diplomatic assurances given by the USA cannot be relied on, or more tactfully, cannot be wholly relied on. We have read Diplomatic Notes which make it clear that (a) that the United States will not seek nor carry out the death penalty against the appellant; (b) that the appellant will be prosecuted before a Federal Court in accordance "with the full panoply of rights and protections that would otherwise be provided to a defendant facing similar charges". He would not be prosecuted before a military commission, nor "criminally prosecuted at any tribunal or court other than a Federal Court", and he will not be treated as "an enemy combatant"; and if the prosecution is discontinued, or he is acquitted, or when he has completed any sentence following conviction, if the appellant requests it, he will be returned to the United Kingdom.

61. It is of course possible to identify occasions when justifiable criticism can be directed at some of the activities for which the USA is responsible both within and outside the country. It seems to us, however, critical to acknowledge that it would be splendid, but wholly unrealistic, to be able to say with absolute assurance that nothing ever goes wrong in this or indeed any other country. Utopia, after all, represents the fantasy society of an idealist. Occasional errors and lapses from the highest standards consequent on human fallibility should not undermine the assumption that a civilised country, respecting the rule of law, will abide by undertakings and assurances given on its behalf and that the rule of law will be applied to its criminal processes. The United States of America is a major democracy, one of the repositories of the common law. Whatever criticisms may be made of it, and even allowing for human fallibility, in all the many years of mutual extradition agreements between the United States and the United Kingdom, no example has been drawn to our attention where either the executive or the judiciary of the United States failed to honour any assurances or undertakings given in the course of extradition proceedings. That is a remarkable record, and the consequences of breaches of assurances accepted in good faith would be hugely damaging for the standing of the United States, and as the USA authorities plainly recognise, the knock on consequences for

版权所有：全球法规网
Copyright© http://policy.mofcom.gov.cn

subsequent applications by the United States for extradition would be disastrous. Putting all this in context, references to human rights abuse in Guantanamo Bay and touchdowns in Diego Garcia, previously denied, coming to light, because the United States authorities gave this information to the United Kingdom government are irrelevant.

62. Mr Jones referred us to an Amnesty International Report dated 10th March 2008 entitled "United States of America: to be taken on trust". This deals with assurances given by the United States in the context of extradition and the "war on terror". No one needs reminding of Amnesty International's reputation, but in this report a great deal of comment is erected on the basis of very little evidence. The report addresses the position of Babar Ahmad and Haroon Aswat, one of the appellant's co-conspirators in the Bly, Oregon charges. The report concludes that there is no "guarantee" that they will remain within the United States criminal justice system, and Amnesty International declares that it is not "in a position to assess the likelihood that they will be designated as "enemy combatant" if extradited to the United States." The organisation considers that while the USA's global "war paradigm remains in place, this remains a possible outcome, despite the diplomatic assurance provided by the US embassy in London". All this said, the report itself acknowledges that it has "no evidence to suggest that the assurances have not been given in good faith or to suggest that the US authorities are planning to remove either Babar Ahmed or Haroon Aswat from the criminal justice system after extradition, and it does not intend to call into question the independence of the federal prosecutors involved in this case". In short, Amnesty International is suggesting that there should be a guarantee that the assurances given by the United States government will be complied with. In our judgment, however, that is not the appropriate test, which, seeking to encapsulate it briefly, is whether there are substantial grounds for believing that there is a real risk of treatment which would contravene the appellant's Article 3 rights (see Saadi v Italy (Application no. 37201/06, BAILII: [2008] ECHR 179 ) a judgment of the Grand Chamber of the ECtHR dated 28th February 2008, para 125) We do not seek to add to the views expressed by the Divisional Court in Aswat v USA [2006] EWHC 2927 (Admin), or indeed the rejection, as manifestly ill-founded, by the European Court of Human Rights in Al Moayad v Germany (Application no. 3586/03, para 68) of the contention that the diplomatic assurances of the United States in the context of the "war on terror" can and should no longer be relied on. In our judgment, if we need to look for a guarantee that the USA will honour its diplomatic assurances, the history of unswerving compliance with them provides a sure guide. We are

**A.55**

版权所有：全球法规网
Copyright© http://policy.mofcom.gov.cn

satisfied that these diplomatic assurances will be honoured

Ill-treatment: Article 3

63. A separate submission arising under Article 3 is directed at the consequences of the extradition proceedings if in due course the appellant were convicted. It is submitted that the appellant would be sentenced to multiple terms of life imprisonment with the overwhelming likelihood that he would be required to serve his sentence in the Federal Bureau of Prisons' (FOB's) "Supermax" prison "ADX" in Florence Colorado. He would there be subject to Special Administrative Measures (SAMS). In the appellant's circumstances, in particular his medical condition, the treatment to which he would be subjected at ADX Colorado would contravene the rights protected by Article 3.

64. We agree that if convicted the appellant would be sentenced to very lengthy terms of imprisonment, and that in all likelihood, a whole life tariff would be imposed. Of itself this would not constitute a breach of Article 3.

65. There is a considerable body of unchallenged evidence about the conditions in Supermax prisons generally. There are differences between "Supermax" prisons operated by different states, and indeed between the state run Supermax prisons and the ADX. It is unnecessary to rehearse this evidence. Our concern is not the generality of conditions faced by prisoners in "Supermax" prisons, but with the circumstances which would be likely to apply to the appellant. The direct evidence is given by Mr Wiley, the warden of ADX in Florence Colorado. There is no dispute about the appellant's medical condition, summarised earlier in the judgment. Mr Wiley states that he has been advised by the chief of health programmes for the FOB that if, after a full medical evaluation "it is determined that (the appellant) cannot manage his activities of daily living, it is highly unlikely that he would be placed at the ADX but, rather, at a medical centre". This statement is said by Mr Jones to be "self serving". He argues that it conflicts with much of the other published material from authoritative sources. He drew our attention to material which dealt with conditions in "Supermax" prisons, and to the details of information about the likely conditions which would apply if the appellant were detained at ADX Colorado. He sought permission to rely on a report dated March 2008 from Professor Andrew Coyle, professor of prison studies at the school of law, at King's College London. For the reasons given in a witness statement by Ms Arani, we were satisfied that it would not have been possible for this report to be obtained in time for the proceedings before Judge Workman.

**A.56**

版权所有：全球法规网
Copyright© http://policy.mofcom.gov.cn

We therefore admitted it.

66. On analysis it does not carry these issues further forward. Professor Coyle was not able to visit ADX Colorado. He therefore restricted his evidence to commenting on the available written material, including Mr Wiley's evidence. Basing himself on his view that "the balance of available evidence suggests that (the appellant) might expect to stay in the ADX Florence for many years", he concludes that it is likely that there would a violation of Article 3 in terms of the appellant's conditions of detention. Among the annexes to his report is a lengthy letter dated 2nd March 2007 from Human Rights Watch to the director of the FOB. That letter makes numerous criticisms of the ADX regime in measured but forceful terms. It expresses concern "about the effects of long term isolation and limited exercise on the mental health" of ADX inmates, but it does not criticise the regime's treatment of the inmates' physical health problems, and if there were any such evidence in relation to their physical as opposed to their potential mental problems, it seems likely that Human Rights Watch would have addressed the problem.

67. A common thread which runs through all the reports is the potential adverse effect on the mental health of inmates of long term social isolation. As it happens, unless the ADX Florence regime ignores the appellant's medical condition, and his need for nursing assistance, the fact that his disabilities are so grave will mean that he will, of necessity, be less likely to suffer the social isolation that is the greatest concern of all those who criticise the Supermax system. It is noteworthy that, not withstanding the many criticisms, Professor Coyle says of the staff at ADX Florence that they are "professional in the way they carry out their duties". There is no reason to believe that there is a real risk that the appellant's many medical needs would be left untreated by the FOB. Professor Coyle does not engage with the evidence of Mr Wiley, nor does he seek to explain why Mr Wiley's account of the advice that he has received from the FOB's chief of health programme is or might be wrong. We can see no basis for rejecting Mr Wiley's evidence about the arrangements likely to be put in place for the appellant if he is convicted in the USA.

68. Judge Workman examined Mr Wiley's evidence about the circumstances which would apply to an inmate of ADX Florence. He concluded that if such a regime "were to be applied for a lengthy indefinite period it could properly amount to inhuman and degrading treatment which would violate Article 3" (emphasis supplied). Having examined the conflicting material

版权所有：全球法规网
Copyright© http://policy.mofcom.gov.cn

he believed that Mr Wiley's evidence would be "more accurate, he being more closely associated with the penal institution concerned", and someone who played "an important part in implementing the policy in that establishment". On this basis the judge was satisfied that the defendant "would not be detained in these conditions indefinitely, that his undoubted ill health and physical disabilities would be considered and, at worst, he would only be accommodated in these conditions for a relatively short period of time. Whilst I found these conditions offensive to my sense of propriety in dealing with prisoners, I cannot conclude that, in the short term, the incarceration in the Supermax prison would be incompatible with his Article 3 rights". Mr Jones adopted the conclusion that detention in conditions in a Supermax prison would be incompatible with the appellant's Article 3 rights, but suggested that the judge's finding that the appellant's undoubted ill health and physical disabilities would be considered, and his observations about the likely length of time that he would be accommodated in the standard conditions at ADX Florence were unfounded. In the context of the appellant's medical condition, we agree with Judge Workman and his conclusion is not undermined by the fresh evidence from Professor Coyle.

69. We must add two footnotes. First, the constitution of the United States of America guarantees not only "due process", but it also prohibits "cruel and unusual punishment". As part of the judicial process prisoners, including those incarcerated in Supermax prisons, are entitled to challenge the conditions in which they are confined, and these challenges have, on occasions, met with success. Second, although Mr Wiley's evidence does not constitute the kind of assurance provided by a Diplomatic Note, we shall proceed on the basis that, if the issue of confinement in ADX Florence arose for consideration, a full and objective medical evaluation of the appellant's condition, and the effect of his disabilities on ordinary daily living and his limited ability to cope with conditions at ADX Florence would indeed be carried out. This would take place as soon as practicable after the issue arises for consideration, so that the long delay which appears to have applied to another high profile convicted international terrorist, who is now kept at an FOB medical centre because of his ailments would be avoided.

70. We should add that, subject to detailed argument which may be advanced in another case, like Judge Workman, we too are troubled about what we have read about the conditions in some of the Supermax prisons in the United States. Naturally, the most dangerous criminals should expect to be incarcerated in the most secure conditions, but even allowing for a necessarily wide margin of appreciation between the views of different civilised countries

**A.58**

版权所有：全球法规网
Copyright© http://policy.mofcom.gov.cn/

about the conditions in which prisoners should be detained, confinement for years and years in what effectively amounts to isolation may well be held to be, if not torture, then ill treatment which contravenes Article 3. This problem may fall to be addressed in a different case.

Family life Article 8

71. This leads to the further consideration, whether an extradition order would constitute a disproportionate interference with the appellant's family life. Effectively it is submitted that in the unlikely event that the appellant's family would be permitted to enter the United States in order to visit him, the physical and financial obstacles to travelling to a remote high security prison in the Midwest would be virtually insurmountable. Accordingly, if extradited, the appellant faces no real prospect of continuing contact with his family, except for occasional telephone calls and correspondence, for the rest of his life. The appellant has a large family, and it is plain that the consequences of extradition, and subsequent conviction, would gravely interfere with his family life. When addressing the question whether any interference with the appellant's Article 8 rights would be disproportionate great weight should be accorded to the strong public interest in honouring extradition arrangements. The facts would have to be "striking and unusual" to lead to the conclusion that extradition was a disproportionate interference with an extraditee's Article 8 rights: Jaso (and others) v Central Criminal Court No. 2 Madrid [2007] 2983 (Admin), para 57. The offences alleged against the appellant are very serious indeed, the more so if that they were all part of the same "global conspiracy to commit international terrorism". The public, indeed the international interest, in bringing conspiracies of this kind to justice in the most appropriate forum transcends national interests, a view shared by the members of the United Nations which have become parties to the Convention against Terrorism.

72. Mr Jones submitted that extradition to the United States would indeed constitute such disproportionate interference because, in reality, the appellant would be deprived of the family visits which he currently enjoys, and would continue to enjoy if he were tried and convicted of these offences in this country. The problem with this submission is that whether convicted in the United Kingdom or the United States, the sentences imposed on the appellant would certainly be very lengthy indeed, and could be the deprivation for the rest of his life of anything resembling a normal family life. A reasonably informed assessment of the likely length of time the appellant would be ordered to serve in this country would be a whole life sentence and a

**A.59**

版权所有：全球法规网
Copyright© http://policy.mofcom.gov.cn

minimum term of not less than 40 years imprisonment. If he was serving the sentence in the United Kingdom, the appellant would be imprisoned in high security conditions. Those have applied to him in HMP Belmarsh for the last 4 years. Visits of family members to him in Belmarsh are permitted. If imprisoned in the United States he would be deprived of such visits as he presently enjoys. This deprivation must be set against the statutory purpose underlying the 2003 Act. It was intended to clarify, and codify, the rules for extradition so that criminality might be better combated in a "global world". The Act must be applied, and our extradition commitments honoured. Inevitably, the more serious the offence, the longer the likely sentence, and the greater the interference with the extraditee's Article 8 rights, but the common approach to terrorism throughout the civilised world would be derailed if an extradition process which might culminate in amply justified sentences of huge length, to be served in prisons abroad, could, save in the most exceptional circumstances, constitute a breach of the defendant's Article 8 rights: otherwise the entire purpose of international co-operation on this issue would be undermined.

Conclusion

73. A number of further matters of detail were raised by Mr Jones, and indeed after the conclusion of the oral argument, we received further observations by the appellant himself through his solicitors. They do not impinge on our clear conclusion that the order made by Judge Workman was properly made, and that the subsequent decision of the second respondent was unassailable. Both appeals are accordingly dismissed.

Procedural guidance

74. We have referred to the voluminous amount of material prepared in support of the appeal. Before the hearing began we were provided by the appellant's representatives with twelve files containing nearly 5,000 pages of documents, together with three volumes containing 39 authorities. These were duplicated, to a considerable extent, by two volumes from the first respondent containing 29 authorities. Further documents and authorities were produced during the course of the hearing. The claimant's skeleton argument did not include a reading list. No core bundle was provided. As mentioned earlier, we were provided, after the hearing had concluded, with a core bundle of documents and a core bundle of authorities.

75. On an appeal to the High Court under section 103 of the 2003 Act an appellant is entitled to challenge "the relevant decision" on both fact and law. The factual and legal issues raised on

**A.60**

版权所有：全球法规网
Copyright© http://policy.mofcom.gov.cn

such appeals are often of some complexity. It is our impression that court time is wasted because no Practice Directions have been issued as to the conduct of such appeals. These appeals must be dealt with expeditiously; hence the need for clear procedural guidance.

76. In applications for judicial review paragraph 15 of the Practice Direction supplementing CPR Part 54 sets out a timetable for the filing and service of skeleton arguments, and a list of what they must contain:

(1) a time estimate for the complete hearing, including delivery of judgment; (2) a list of issues; (3) a list of the legal points to be taken (together with any relevant authorities with page references to the passages relied on); (4) a chronology of events (with page references to the bundle of documents (see paragraph 16.1); (5) a list of essential documents for the advance reading of the court (with page references to the passages relied on) (if different from that filed with the claim form) and a time estimate for reading; and (6) a list of persons referred to. Paragraph 16 of the Practice Direction requires the claimant to file a paginated and indexed bundle of relevant documents, including those required by the defendant and other parties.

77. Until further guidance is issued, these Practice Directions should be adopted for the purposes of appeals under section 103. If the bundle exceeds 500 pages the parties should agree a core bundle in accordance with paragraph 15 of the Practice Direction which supplements CPR Part 52. The parties should also agree a joint bundle of authorities. Since the principles are well established more than one joint bundle of authorities will seldom be justified. There is one very obvious procedural difference between an appeal under section 103 and an application for judicial review. In the case of the latter, the claimant is required to set out not merely a detailed statement of his grounds for bringing the claim, but also a statement of the facts relied upon: 54 PD.5.6. Unlike other statutory appeals to the Administrative Court, where the tribunal or other decision taker at first instance will have set out the facts in some considerable detail, the judgments of the District Judges designated to hear extradition cases under the 2003 Act are, for reasons which are wholly understandable, models of brevity. The background facts are often summarised in a nutshell. If an appellant considers that the District Judge's summary of the factual background is incomplete, or inaccurate, in any material respect, then the appellant's skeleton argument should set out the facts on which the claimant relies, with appropriate cross references to the paginated bundles of documents. The respondents will then be able to indicate their agreement, or disagreement with the claimant's statement of facts in their skeleton arguments. The same process will apply in reverse if the

**A.61**

版权所有：全球法规网
Copyright© http://policy.mofcom.gov.cn

respondent is dissatisfied with the District Judge's summary.



**A.62**

IN THE EUROPEAN COURT
OF HUMAN RIGHTS

Application No. 36742/08

MUSTAFA KAMAL MUSTAFA (ABU HAMZA)

v

UNITED KINGDOM

---

OBSERVATIONS OF THE GOVERNMENT OF THE
UNITED KINGDOM ON ADMISSIBILITY AND MERITS

---

Foreign and Commonwealth Office
LONDON SW1A 2AH

13 November 2008

## INTRODUCTION

1.  The case arises out of the proposed extradition of the applicant from the United Kingdom to the United States of America to face terrorism charges.

2.  By letter dated 18 September 2008, the Fourth Section of the Court gave notice of the application to the Government and invited written observations on the admissibility and merits of the case; and notified the Government that the application of Rule 39 be continued pending the Court's consideration of the case.

3.  The letter dated 18 September 2008 enclosed a Statement of Facts prepared by the Secretariat and a list of six particular questions on which the Government were asked to comment under the general question whether there would be a violation of Articles 3, 5 or 6 of the Convention if the applicant were to be extradited to the United States.

4.  These Observations are divided into the following parts: Part I deals with the facts and domestic law and practice; Part II addresses the Diplomatic Assurances given in this case, the effect of which is common to a number of the Court's questions; Part III then addresses in turn each of the Court's six questions; and Part IV sets out the conclusions the Court is invited to reach.

1

Hamza ECHR s2 art34_001

**A.64**

41

### PART I: THE FACTS AND DOMESTIC LAW AND PRACTICE

5.   The relevant facts are set out in the judgment of the Divisional Court (Sir Igor Judge P, then President of the Queen's Bench Division and now the Lord Chief Justice, and Sullivan J) dated 20 June 2008 (the Judgment), especially at paragraphs 1-28.

6.   The relevant provisions of the Extradition Act 2003 (the 2003 Act) are summarised in the Statement of Facts. They are set out more fully at paragraphs 5-11 of the Divisional Court's judgment in *Ahmad and Aswat v Government of USA* (the Ahmad Judgment). A copy of the Ahmad Judgment is available to the Court in *Ahmad and Aswat v the United Kingdom*, Application No 24027/07.

7.   As appears from those provisions, by reason of section 87(1) and the broad rights of appeal conferred under the 2003 Act both the first instance court and the Divisional Court on appeal were required to consider and decide whether the applicant's extradition, "would be in compliance with his Convention rights within the meaning of the Human Rights Act 1998...". If not, the domestic courts were obliged by the 2003 Act to order the applicant's discharge. Accordingly, the domestic courts were required to, and did, examine all the Convention issues that the applicant chose to raise. They concluded, having considered all the evidence with conspicuous care, that the extradition of the applicant would not violate his Convention rights.

8.   The Government relies upon the detailed reasoning given by the Divisional Court in the Judgment. For completeness, the Government annex to these Observations at **Annex 1** the written Skeleton Arguments prepared for the hearing before the Divisional Court by the United States Government and by the Secretary of State.

2

PART II:   THE DIPLOMATIC ASSURANCES

The Diplomatic Assurances

9.   Three Diplomatic Assurances have been provided by the United States in relation to the applicant. They were annexed to the Skeleton Argument of the Secretary of State in the Divisional Court (Annex I). Each was considered by the Divisional Court. They are clear and important:

9.1.   In Diplomatic Note No 57, the US Government expressly assured the UK Government that:

"...the United States will neither seek the death penalty against, nor will the death penalty be carried out against ... [the applicant], upon his extradition to the United States."

9.2.   In Diplomatic Note No 017, the US Government expressly assured the UK Government that:

"...upon extradition to the United States ... [the applicant] will be prosecuted before a Federal Court in accordance with the full panoply of rights and protections that would otherwise be provided to a defendant facing similar charges. Pursuant to his extradition, ... [the applicant] will not be prosecuted before a military commission, as enabled by the Military Commissions Act of 2006; nor will he be criminally prosecuted in any tribunal or court other than a United States Federal Court; nor will he be treated as an enemy combatant."

9.3.   In Diplomatic Note No 005, the US Government expressly assured the UK Government that:

"... if ... [the applicant] is acquitted or has completed any sentence imposed or if the prosecution against him is discontinued, not pursued or ceases for whatever reason, United States authorities will return ... [the applicant] to the United Kingdom, if he so requests."

10.   Before the domestic courts, and before the Court, the applicant has sought to challenge these assurances. His case is that they cannot be relied on. That case was

3

**A.66**

considered with care and rejected by the Divisional Court (just as a materially identical case had been considered and rejected by the Divisional Court in the *Ahmad and Aswat* cases). Their reasoning is at paragraphs 60-62.

10.1. They noted that the United States was, "a major democracy, one of the repositories of the common law" (paragraph 61 of the Judgment).

10.2. They noted that, "in all the many years of mutual extradition arrangements between the United States and the United Kingdom, no example has been drawn to our attention where either the executive or the judiciary of the United States failed to honour any assurances or undertakings given in the course of extradition proceedings" (paragraph 61 of the Judgment). The reason that no such case had been drawn to their attention is because there has been no such case.

10.3. They noted that the consequences of breaches of assurances accepted in good faith would be hugely damaging both for the standing of the United States and, as the United States clearly recognized, would have "disastrous" consequences for subsequent applications by them for extradition from the United Kingdom.

These first three points echo the findings of the Divisional Court in *Ahmad and Aswat*: see the Ahmad Judgment at paragraphs 74-76.

10.4. They considered with particular care the Amnesty International Report dated 10 March 2008 on which the applicant had placed reliance (see paragraph 62 of the Judgment). They noted in relation to it that:

10.4.1. "in this report a great deal of comment is erected on the basis of very little evidence";

10.4.2. Amnesty themselves acknowledged in the report that there was "no evidence to suggest" that the assurances in the cases there considered (Ahmad and Aswat) had not been given in good faith, or that the United States were planning (in breach of the

4

assurances) to remove the two from the criminal justice system after extradition; and,

10.4.3.   Amnesty were advocating a "guarantee" of compliance with the assurances which was not the Convention test (substantial grounds for believing that there is a real risk).

10.5. They accepted and endorsed the reasoning in the Ahmad Judgment. In doing so, they (like the Divisional Court in *Ahmad and Aswat*) took fully into account the Court's judgment in *Al-Moayad v Germany*, Application No. 3586/03, esp. at paragraph 68 (considered further below).

11.   They concluded:

"In our judgment, if we need to look for a guarantee that the USA will honour its diplomatic assurances, the history of unswerving compliance with them provides a sure guide. **We are satisfied that these diplomatic assurances will be honoured.**" (emphasis added)

12.   The true underpinning of the argument that the assurances could not be relied on was commented on by the Divisional Court at paragraph 60 of the Judgment. They noted that, "the argument is redolent with implied, if not express criticism of the United States of America, and its judicial processes. In effect, we are invited to the conclusion that the diplomatic assurances given by the USA cannot be relied on, or more tactfully, cannot be wholly relied on." In milder language, they were making the same point as had been made by Laws LJ in the Ahmad Judgment in which he described the applicants' case on this aspect as being, "a very serious allegation of bad faith. It amounts to an accusation that the [Diplomatic] Notes are nothing but a smokescreen to conceal the United States' true intentions" (Ahmad Judgment, paragraph 65). Laws LJ had commented that it was little wonder that Leading Counsel for the applicants had not pursued the suggestion explicitly. He concluded that there was "not a sliver of justification, in any of the evidence…, for so grave a charge" (Ahmad Judgment, paragraph 65).

5

**A.68**

13.  These conclusions by separate Divisional Courts are, it is submitted, entirely consistent with the Court's jurisprudence and in particular *Al Moayad v Germany*. The facts of *Al Moayad v Germany* are very close to those of the present application (and those in *Ahmad and Aswat*). In particular, it involved an extradition from a Contracting State to the United States on the basis of a diplomatic assurance that Military Order No. 1 would not be applied to the person extradited.

14.  It sets out the applicable Article 3 principles in such a case, including the principle that for Article 3 responsibility of the returning state to be engaged, "substantial grounds [must be] shown for believing that the person in question would, if extradited, face a real risk of being subjected to treatment contrary to Article 3 in the receiving country" (paragraph 62). The Court's reasoning in concluding that there were no such substantial grounds was in summary as follows:

14.1. The reports of ill-treatment of terrorist suspects concerned persons detained outside the United States at places such as Guantanamo Bay and Bagram.

14.2. The German authorities and courts had been satisfied by the diplomatic assurance given to them by the United States Embassy on behalf of the United States that Mr Al-Moayad would not be detained in those places (paragraph 66).

14.3. The critical issue was accordingly, "how far the said assurance can be considered effectively to have averted this danger" (paragraph 67).

14.4. The Court noted that the diplomatic assurance was binding under international law (paragraph 69).

14.5. The German authorities and courts had stated in the extradition proceedings and conditions for allowing extradition that they understood that the assurance comprised an undertaking not to detain Mr Al-Moayad in a facility outside the United States (paragraph 67). The Court found this to be sufficient. As is noted below, the diplomatic assurance relied upon in Mr Al-Moayad's case was in terms that were considerably less comprehensive than those given in

6

the cases of these applicants. It was simply an assurance that Mr Al-Moayad would not be prosecuted by a military tribunal pursuant to Military Order No. 1 or by any other extraordinary court.

14.6. The Court also attached importance to the fact that it had not been Germany's experience that assurances given to them by the United States in the course of extradition proceedings were not respected in practice (paragraph 68).

14.7. The Court also attached importance to the fact that Mr Al-Moayad's personal circumstances had been carefully considered by the German Courts (paragraph 68).

14.8. In the circumstances, the Court concluded that the assurance was such as to avert the risk of the applicant being subjected to Article 3 ill-treatment following his extradition.

15. In relation to Article 6, similar issues arose. The Court set out the applicable principles in such an extradition case at paragraph 100. Its reasoning on the Article 6 complaint was as follows:

15.1. Mr Al-Moayad was within the category of terrorist suspects to whom Military Order No. 1 applied.

15.2. However, the diplomatic assurance given by the United States could be relied on to avert the risk of a flagrant denial of justice (paragraphs 102-103).

15.3. In addition, the US-German extradition treaty provided further protection against any such risk (paragraph 203).

15.4. Importance was attached in this context also to the long standing experience of extraditions to the United States and to the thorough examination of the case by the German authorities and courts (paragraph 104).

15.5. The Court noted that, as it had confirmed in other cases (eg *Soering* and *Einhorn v France*, Decision on Admissibility dated 16 October 2001), proceedings before the ordinary United States criminal courts respect the rule of law (paragraph 105).

7

16. *Al-Moayad v Germany* is itself consistent on the approach to assurances and undertakings given by the United States with the reasoning of the Court in *Einhorn v France*.

17. *Einhorn v France* also involved an extradition to the United States, in that case from France. Two aspects of the case are relevant in this context.

    17.1. There was a complaint under Article 3. As appears from the penultimate and final sub-paragraphs of paragraph 26, the United States had given a diplomatic assurance that, if Mr Einhorn was extradited, the death penalty would not be sought, imposed or executed. The Court noted that, "consequently...the assurances obtained by the Government are such as to remove the danger of the applicant being sentenced to death...".

    17.2. There were a variety of complaints under Article 6 including in particular that Mr Einhorn risked being unable to reopen on the merits the decision to convict him *in absentia*. Two diplomatic notes from the United States and an affidavit from the District Attorney had stated that he would be able to be retried by virtue of a Pennsylvanian statute. That was sufficient to remove any substantial risk of a flagrant denial of justice. The Court stated:

> "The Government's good faith cannot be called in question in this case, seeing that what is in issue is compliance with international law by the United States of America, which cannot be said not to be a State based on the rule of law." (final sub-paragraph of paragraph 33).

18. In these circumstances, the Government make the following submissions in relation to the Diplomatic Assurances given in this case:

    18.1. The reasoning of the Court in *Al-Moayad v Germany* is directly applicable. Indeed, this application is *a fortiori* given the more comprehensive nature of the Diplomatic Assurances in this case.

8

18.2. The Court has accepted in a number of past cases, of which *Al-Moayad v Germany* is the most recent example, that Contracting States can rely on assurances formally given by the United States as to what will and will not occur, and what powers will and will not be exercised, following extradition.

18.3. There is every reason for concluding that the comprehensive assurances given in the Diplomatic Assurances in this case will be honoured. Put another way, there is, as the domestic courts found and for all the reasons they gave, no substantial risk that they will not be honoured. In particular it is to be noted that in the 150 years of extradition arrangements between the United Kingdom and the United States there has not been a single example of a failure to honour such undertakings.

18.4. Further, as in *Al-Moayad v Germany*, the Court can rely on the fact that the particular circumstances of the case and the Diplomatic Notes themselves were the subject of detailed and careful consideration in the domestic courts.

9

PART III:    THE COURT'S QUESTIONS

QUESTION 1

*(1) What is the likely length of sentence which would be imposed on the applicant if he were found guilty of any or all of the charges against him?*
*(2) If the applicant's likely sentence is a life sentence without any possibility of early release on parole, would such a sentence violate Article 3 (see Kafkaris v Cyprus [GC], no.21906/04, 12 February 2008; Nivette v France (dec.), no.44190/98, ECHR 2001-VII and Einhorn v France (dec.), no.71555/01, ECHR 2001 XI)?*

19.    With respect to the first part of Question 1, the Divisional Court found that if convicted the applicant would be sentenced, "to very lengthy terms of imprisonment and that in all likelihood a whole life tariff would be imposed" (paragraph 64 of the Judgment). Annexed to these Observations as **Annex 2** is a recent letter from US Department of Justice to the Home Office setting out in detail the range of sentences available in relation to each of the counts on the indictment against the applicant in the United States criminal proceedings, and the issues that would arise in relation to such sentences.

20.    With respect to the second part of Question 1, the applicant did not assert before the domestic courts and does not assert before this Court that any life sentence imposed on the applicant would be irreducible, and by virtue of this feature alone raise an issue under Article 3.

21.    Further, as the Court is aware from the evidence before it in the *Ahmad and Aswat* cases (see letter of US Department of Justice, dated 19 November 2007, pp2-3) and as is confirmed by the United States Department of Justice letter at Annex 2, under United States federal law any sentence of life imprisonment can subsequently be reduced by virtue of each of the following four mechanisms:

21.1. The sentencing court may, upon a motion of the Director of the Bureau of Prisons, reduce the term of imprisonment upon a finding that 'extraordinary and compelling reasons warrant such a reduction' (18 U.S.C. §

10



3582(c)(1)(A)(i)).    By regulation, the Bureau of Prisons exercises its discretion where such reasons 'could not reasonably have been foreseen by the court at the time of sentencing' (28 C.F.R. §§ 571.60-571.64). Such cases generally involve inmates with terminal illnesses.

21.2. If the inmate provides substantial assistance in the investigation or prosecution of a third party (Fed. R. Crim. P. 35(b); 18 U.S.C. § 3582(c)(1)(B).

21.3. If the inmate has been sentenced to life imprisonment on the basis of a sentencing guideline range that is subsequently lowered by the United States Sentencing Commission (see 18 U.S.C. § 3582(c)(2)).

21.4. The defendant may request commutation of his sentence by the President of the United States (U.S. Const., art. II, § 2; 28 C.F.R. §§ 1.1-1.11; §§ 571.40-571.41).

22.   Accordingly, any life sentence imposed on the applicant would be both *de jure* and *de facto* reducible.

23.   As such, the likely sentence which would be imposed on the applicant if convicted would not raise an issue under Article 3 (see *Kafkaris v Cyprus* [GC], no.21906/04, 12 February 2008 at paragraph 98; see also the Government's *Further Observations* in the *Ahmad and Aswat* cases at paragraphs 26-32).

11

QUESTION 2

*(1) Is there a real risk that following any conviction the applicant would be detained in "supermax" detention facility?*
*(2) If so, how long is such detention likely to last?*
*(3) Would such detention be in violation of Article 3, having regard (a) to the applicant's medical condition and disabilities and/or (b) the likely length of any sentence?*

*Parts (1) and (2)*

24.  The first part of Question 2 correctly implies that the applicant will not be detained in a "supermax" detention facility before any conviction. The evidence before the domestic courts established that "supermax" detention facilities are not available in relation to those who have not been convicted.

25.  Further, the evidence before the domestic courts was that the issue as to whether the applicant would ever be detained in such a facility would be determined having regard, in particular, to the applicant's medical condition. There was no dispute about that medical condition, which is summarised at paragraph 7 of the Judgment.

26.  Mr Wiley, the warden of the "supermax" detention facility, ADX in Florence Colarado provided sworn evidence to the domestic courts. His affidavit is at **Annex 3**. His evidence was that if, after full medical evaluation, "it is determined that the [applicant] cannot manage his activities of daily living, it is highly unlikely that he would be placed at the ADX but, rather, at a medical centre" (quote from the evidence of Mr Wiley set out at paragraph 65 of the Judgment).

27.  The Divisional Court accepted that evidence:

     "...if the issue of confinement in ADX Florence arose for consideration, a full and objective medical evaluation of the [applicant's] condition, and the effect of his disabilities on ordinary daily living and his limited ability to cope with conditions at ADX Florence would indeed be carried out. This would take place as soon as

12

practicable after the issue arises for consideration...." (paragraph 69 of the Judgment)

28. Both Judge Workman and the Divisional Court evidently had considerable doubts about whether, given his medical condition, there was any risk whatever of any detention of the applicant in a "supermax" detention facility. However, both considered the issue on the basis that there might be a short period of detention in such a facility. Again, a clear conclusion was reached. Judge Workman concluded that the applicant's "undoubted ill health and physical disabilities would be considered and, at worst, he would only be accommodated in these conditions for a relatively short period of time." The Divisional Court agreed with that conclusion (see paragraph 68 of the Judgment, especially the final sentence).

29. In the circumstances, it is submitted that the likelihood is that the applicant will not be detained in a "supermax" detention facility at all in the event of a conviction. However, it is at least possible that that might occur. If it were to do so, it is clear on the evidence considered and accepted by the domestic courts that any such detention would be for a relatively short period given the extent and nature of the applicant's ill health and physical disabilities.

*Part (3)*

30. The applicant's case under Article 3 proceeded before the domestic courts and proceeds before the Court on the basis of the **combination** of the alleged length of detention in a "supermax" detention facility, the applicant's medical condition, and the alleged effects of what he described as "long term social isolation" in such a facility. It is evident therefore that the Article 3 case cannot survive the clear findings of fact made by the domestic courts: namely that, even if he were detained for some period in such a facility, the applicant would only be so detained for a relatively short period of time pending medical evaluation, and would then be transferred to a medical centre. It is not and could not sensibly be suggested that the mere fact of a short period of detention of this kind would violate Article 3.

13

31. The Divisional Court also noted that, even in relation to this short period, he would be unlikely to suffer social isolation:

> "...the fact that his disabilities are so grave will mean that he will, of necessity, be less likely to suffer the social isolation that is the greatest concern of all those who criticise the Supermax system." (paragraph 67 of the Judgment).

32. It is to be emphasised, although the issue does not arise in this case, that it is not accepted that detention in a "supermax" detention facility even for a long period would amount to a breach of Article 3.   The Court, in such a case, would need to consider with care the matters raised in some detail at paragraphs 6.10-6.20 of the Skeleton Argument of the United States (at Annex 1), and the Government's detailed observations in the *Ahmad and Aswat* case (see *Further Observations*, Part 3, paragraphs 33-97).

33. In particular, the Court would need to consider and take into account the fact referred to at paragraph 69 of the Judgment – namely, that the United States' Constitution expressly prohibits "cruel and unusual punishment" and guarantees "due process" enabling prisoners, including those detained in "supermax" detention facility, to challenge their conditions of detention.   As the Divisional Court noted such challenges "have, on occasions, met with success" (paragraph 69 of the Judgment).

34. In these circumstances, it is submitted that the clear answer to Part (3) of Question 2 is "no", even assuming some detention in a "supermax" detention facility.

14

QUESTION 3

*When taken with the Government's letter of 31 July 2008, are the terms of diplomatic note 005 of 8 February 2008 sufficient to remove any risk that the applicant would be subjected to rendition or extraordinary rendition at the conclusion of the criminal proceedings currently pending against him in breach of Article 3 of the Convention? In this regard, what relevance, if any, is to be attached to the fact that the applicant is stateless?*

35.  Diplomatic Assurance No. 005 was dated 8 February 2008 and was in the clearest terms, providing in relevant part:

> "The Government of the United States assures the Government of the United Kingdom that if [the applicant] is acquitted or has completed any sentence imposed or if the prosecution against him is discontinued, not pursued or ceases for whatever reason, the United States authorities will return [the applicant] to the United Kingdom, if he so requests."

36.  This Diplomatic Assurance provides a complete answer to this part of the claim and is sufficient to remove any risk that the applicant would be subjected to rendition or extraordinary rendition.  The Government do not repeat but rely upon the submissions made in Part II concerning the force and effect of such diplomatic assurances from the United States.

37.  If further comfort were necessary, it is also to be noted that:

37.1. there is no evidence that any person extradited to the United States, from the United Kingdom or anywhere else, has been subsequently subjected to rendition, extraordinary or otherwise; and,

37.2. Article 12 of the 1972 US-UK Treaty, which underpins this extradition request, includes express protection of the applicant's specialty rights.

38.  The letter of 31 July 2008 does not in some way resurrect the alleged risk of rendition.  The United States are committed to permitting the applicant to return to the United Kingdom in the circumstances referred to in Diplomatic Assurance No.

15

005. If return is made, the United Kingdom would then deal with the applicant in the United Kingdom. He would not be returned against his will to the United States of America.



39. It is important to note in this respect that the applicant is not stateless.



40. The applicant is currently a British citizen. The Government considers that he enjoys Egyptian citizenship too. Proceedings began in 2003 to deprive the applicant of his British citizenship. He has appealed against the deprivation and his appeal is before the Special Immigration Appeals Commission. The applicant will remain a British citizen until such time as his appeal is determined. If he were to win his appeal, he would remain British (and Egyptian). If he were to lose, he would be rendered solely Egyptian. In law, he cannot be deprived of his British citizenship if that would mean that he became stateless.

16

7

## QUESTION 4

*Is there a real risk that evidence obtained directly or indirectly by torture, ill- treatment or threat of ill-treatment would be used in criminal proceedings against the applicant? If so, would it be a flagrant denial of justice and a violation of Article 6 § 1 of the Convention (Jalloh v Germany [GC], no.54810/00, §§ 103-108, ECHR 2006-...; Harutyunyan v Armenia, no.36549/03, § 63, ECHR 2007-...)?*

41. The allegations that evidence obtained directly or indirectly by torture might be used in the criminal proceedings against the applicant in the United States was dealt with extensively in the Judgment at paragraphs 37-53. It is submitted that the Divisional Court was right to reject this part of the case for the reasons they gave.

42. The Divisional Court made clear at the outset that there was no suggestion that the applicant had been the victim of torture or that any evidence against him derived either directly or indirectly from unacceptable ill-treatment of which he was a victim: paragraph 37 of the Judgment. They re-emphasised this point when considering *Harutyunyan v Armenia*, Application No. 36549/03, that:

   "There is no suggestion here that evidence obtained by violence or brutality will be used as proof of the guilt of the victim of such violence or brutality" (paragraph 50 of the Judgment)

*James Ujaama*

43. The Divisional Court then dealt with the position in relation to James Ujaama. They noted that he had made a plea bargain with the United States' authorities. They concluded that the plea bargain constituted pressure on him to give evidence, "but it does not remotely come within the realms of ill-treatment or torture" (paragraph 38 of the Judgment).

44. That conclusion was entirely consistent with the conclusion of the Divisional Court in *Ahmad and Aswat* which considered the position of Mr Ujaama at some considerable length: paragraphs 38-43 of the Ahmad Judgment. As the Divisional

17

**A.80**

8

Court in *Ahmad and Aswat* noted the evidence was and is powerfully against any suggestion of ill-treatment in relation to Mr Ujaama:

44.1. Mr Ujaama was represented in the United States by two experienced attorneys, including Mr Mahler.

44.2. Mr Ujaama accepted in paragraph 2 of the plea agreement that he was pleading guilty because he was in fact guilty. He expressly acknowledged in paragraph 17 of the plea agreement that he had entered into that agreement freely and voluntarily and that no threats or promises had been made to induce him to enter the plea of guilty.

44.3. District Judge Rothstein, at the hearing on 14 April 2003, noted that the purpose of that hearing was to, "make sure that, if indeed today you [Mr Ujaama] enter a guilty plea, you're doing so freely and voluntarily and that you understand the consequences of what you're doing" (see pages 2-3 of the Transcript). She then specifically inquired of Mr Ujaama whether any threats to him or to his family had been made by anyone representing the US Government. Mr Ujaama confirmed that they had not (see pages 30-31 of the Transcript). District Judge Rothstein then made findings to that effect (see page 31 of the Transcript).

44.4. As Mr Bruce's First Supplemental Affidavit indicates

44.4.1. this part of the case appears solely to be based on Mr Loflin III's statement that Mr Mahler had told him that the US Government had threatened Mr Ujaama (see Bruce, paragraph 7);

44.4.2. Mr Mahler denies that Mr Loflin III's statement is accurate (Bruce, paragraph 9);

44.4.3. Mr Mahler positively denies that his client, Mr Ujaama, was threatened with indefinite detention as an enemy combatant if he did not co-operate (Bruce, paragraph 9).

44.5. Mr Mahler's own Affidavit was clear

"I do not recall telling Mr Loflin that the United States threatened Mr Ujaama with indefinite detention as an enemy combatant if he refused to co-operate,

18

nor do I think it is possible I would have said such a thing because it is simply not true. No such threat was made...." (paragraph 6)

"Mr Loflin never provided me with a copy of his affidavit or with any opportunity to correct his statement. I can state unequivocally and categorically, however, that he is mistaken. Not only did I not make such a statement to him, it is not true. Mr Ujaama was never threatened that he would be held indefinitely as an enemy combatant. The subject of enemy combatant status clearly came up during plea negotiations and a provision was included in the Plea Agreement precluding such treatment, but neither my co-counsel nor I perceived a credible threat that Mr Ujaama would be held by the United States as an enemy combatant." (paragraph 10)

*Others allegedly providing direct evidence*

45.  The Divisional Court then considered and dealt with the other suggestions made by the applicant that torture evidence might be used against him. Their conclusion on the facts was clear:

"...none of the victims of alleged torture provide evidence against [the applicant]. None of those allegedly ill-treated by the authorities anywhere in the world provide or will provide evidence against him either in relation to the extradition request or to any trial which may take place in the United States." (paragraph 41 of the Judgment)

*Evidence allegedly obtained indirectly as a result of torture*

46.  The applicant sought to suggest a variety of ways in which evidence that might be relied on against him might be obtained indirectly as a result of torture. Each was rejected for the reasons given by the Divisional Court at paragraphs 42-53.

47.  The Divisional Court's principal factual conclusions were that:

47.1. it could not be established by the applicant that any evidence obtained indirectly by torture would be deployed at his trial (paragraph 48 of the Judgment);

19

**A.82**

47.2. most of the background matters relied on by Mr Butsch, relating to the activities of Al Qaida generally, were in any event to be found in publicly available materials – that evidence could on no view be said to carry with it the "smell of the torture chamber" (paragraph 48 of the Judgment);

47.3. the submission by the applicant that such evidence was tainted by torture was in any event "wholly unparticularised" (paragraph 69 of the Judgment); and,

47.4. the case against the applicant, "does not rely on evidence from any witness who is said to have been tortured" (paragraph 47(iii) of the Judgment).

48.  Accordingly, it is submitted that the findings of fact by the Divisional Court indicate that there is no real risk of the kind indicated in the first part of the Court's question.

*Legal principles*

49.  Despite these factual findings, the Divisional Court went on to examine the relevant legal principles at paragraphs 48-52 of the Judgment. They examined the relevant United States authorities on the admissibility of, and weight to be attributed to, evidence that might be tainted by torture whether directly or indirectly. They compared that with the United Kingdom jurisprudence and the applicable jurisprudence of this Court (including *Jalloh v Germany*, Application No. 54810/00 and *Harutyunyan*). The Court is invited to read this analysis. The Divisional Court concluded:

"...we are unpersuaded that there would in practice be any significant difference between the approaches of the two legal systems towards evidence that is allegedly tainted by torture." (paragraph 52 of the Judgment)

*Jalloh v Germany* and *Harutyunyan*

50.  *Jalloh v Germany* establishes that evidence obtained by **torture**, "should never be relied on as proof of the victim's guilt, irrespective of its probative value"

20

(paragraph 105). That is also the rule laid down in Article 15 of the Torture Convention.

51. *Jalloh v Germany* left open the question whether the use of evidence obtained by an act qualified as inhuman and degrading treatment automatically renders a trial unfair: paragraph 107. The Court concluded that on the facts – having particular regard to the decisiveness of the evidence and the relatively light seriousness of the offence – that the use of evidence obtained in the way the evidence had been obtained in that case (by the forcible admission of emetics) rendered his trial unfair.

52. If the issue arose in this application (which it does not in the light of the factual findings of the Divisional Court dealt with above), it would be submitted that evidence obtained by treatment that is contrary to Article 3, but does not amount to torture, should not be the subject of an automatic rule rendering any trial in violation of Article 6 irrespective of the facts.

53. Still less should it be subject to any automatic rule that the possibility of admission of evidence obtained in that way by a foreign court is sufficient to establish the risk of a **flagrant** denial of justice. That is all the more so in the case of an extradition to the United States of America. The United States' courts operate under the rule of law and subject to the panoply of fair trial guarantees provided for in US law, including the Constitution. It is specifically to be noted in this respect that the Court's decision in *Jalloh* extensively cited from, and relied on, the judgment of the US Supreme Court in *Rochin v California*.

54. It is emphasised that this is a submission that does not need to be dealt with in this case. However, given the potential wider significance of the issue, the Government would wish to make expanded submissions on it, in the event that the Court were to conclude that these points might need to be decided in this case. At this stage, it is submitted in summary as follows:

21

54.1. The Torture Convention itself draws a clear distinction in this respect. Article 16(1) which applies to cruel, inhuman and degrading treatment or punishment (but not torture) does not apply the exclusionary rule of evidence in Article 15. In those circumstances, it is difficult to see how a system of foreign law which does not apply the exclusionary rule to lesser forms of ill-treatment could be characterised as thereby permitting flagrant denials of justice.

54.2. Treatment falling within Article 3 has to reach a minimum level of severity; and is, of course, a fundamental guarantee from which no derogation is permitted. However, even recognising that, Article 3 covers a wide range of treatment on a scale of severity.

54.3. It does not follow that rules governing the admission of evidence should be the same for evidence obtained in violation of Article 3 without regard to where on the scale of severity the treatment falls.

54.4. The better approach in principle would be to restrict the automatic exclusionary rule to torture; and for other cases to turn on their particular facts. A non-fact sensitive rule, automatically applied, should be avoided unless no other principle will suffice. The Court has frequently recognised the need to determine Article 6 issues on the basis of the particular facts in issue. That approach recognises that in all save the most exceptional circumstances the facts are likely to have a critical bearing on considering whether a process, viewed as a whole, was fair.

54.5. That approach would in no sense diminish the strength of Article 3. If evidence was obtained in breach of Article 3, but short of torture, that would plainly be a factor of considerable relevance to an assessment of whether a trial was unfair, or whether there existed a risk of a flagrant denial of justice. A court could decide, no doubt in the light of cross-examination, what, if any, weight should be placed on the evidence in question.

55. For all these reasons it is submitted that there is no real risk of a flagrant denial of justice in the event of the extradition of the applicant.

22

**A.85**

QUESTION 5

*Is there a real risk that the applicant would be subjected to "special administrative measures" before trial? If so, would such measures further breach Article 3?*

56.　The issue whether the applicant would or might be subject to special administrative measures (SAMs) was raised by the applicant before the Divisional Court but was not pursued on his behalf in the oral argument.   That argument focussed on supermax detention post conviction.   However, it is accepted, as it was in *Ahmad and Aswat*, that there is a real risk that the applicant might be subject to SAMs.

57.　It is submitted that, even if that were to occur, those measures would not violate Article 3.    It is further submitted that that is for the reasons analysed by the Divisional Court in *Ahmad and Aswat*: see paragraph 93 of the Ahmad Judgment. In that case, the Divisional Court concluded that applying the relevant Convention principles, "the evidence ... does not begin to establish a concrete case under Article 3" (at paragraph 93).   As set out in the Government's Observations in *Ahmad and Aswat* at paragraph 48,  it is submitted that this conclusion was the correct one on the evidence and entirely reasonable in the circumstances.

58.　It is also submitted that, to the extent that the Article 3 case rests in part of issues under Article 6, the Divisional Court in *Ahmad and Aswat* were also correct in their rejection of an Article 6 complaint based on SAMs: see paragraphs 95-6 of the Ahmad Judgment, and paragraph 49 of the Government's Observations in *Ahmad and Aswat*.

23

QUESTION 6

*Are the terms of the diplomatic notes no. 57 of 20 July 2004 and no.017 of 9 May 2007 sufficient to remove any risk that the applicant would be designated as an "enemy combatant" pursuant to Military Order No.1 at the conclusion of the criminal proceedings currently pending against him? If not, would such a designation give rise to a real risk of a violation of Articles 3, 5 and 6 of the Convention? In this regard, what, if any, significance is to be attached to the use of the different terms "upon extradition" and "pursuant to his extradition" in the diplomatic notes? Finally in this regard, what significance, if any, is to be attached to the fact that the applicant is stateless?*

59.   The issues on this aspect of the case turn (as they did before the Divisional Court) on the meaning and effect of Diplomatic Assurances provided by the United States in each case.   The terms of the Diplomatic Assurances are set out above at paragraph 9.

60.   The Divisional Court held in clear terms that there was no real risk that the United States would not honour the assurances given.   It is submitted that that was plainly a justified and a correct finding.

61.   No point on the wording of the Diplomatic Assurances was taken before the Divisional Court.

62.   It is submitted that the applicant was correct not to do so.   There is no significance to be attached to the use of "upon" in one paragraph and "pursuant to" in the next paragraph.   The effect of both is in substance the same, namely that after his extradition certain things will and will not occur.   That is how the Government has understood them.   It is also plainly the way that the United States understood them.   In the circumstances, there is no risk created by any lack of clarity in the language used in the Diplomatic Assurances.

63.   In any event, the United States are now well aware that the English courts and the Government are proceeding on the basis that the Diplomatic Notes have the meaning they were found by the English courts (in the Ahmad Judgment) to have –

24

**A.87**

ie a meaning that precluded a series of things including designation and treatment as an enemy combatant after criminal proceedings have ended. Indeed, this was the meaning positively asserted, and accepted, by the United States before the English courts in *Ahmad and Aswat*, this point not having been pursued in the present case before the Divisional Court. This feature renders any semantic arguments about the wording irrelevant because the meaning as understood by the United Kingdom is clear, and has been confirmed in the Divisional Court proceedings and in the Judgment. That such an understanding is relevant to assessment of risk of treatment contrary to the Convention in cases such as this is confirmed by the Court's reasoning in *Al-Moayad v Germany* (at paragraph 67, summarised above).

64.  As noted above, it is not correct to state that the applicant is stateless. He currently has British (and also Egyptian) citizenship.

65.  In any event, the applicant's citizenship has no impact on the issues at stake. His return to the United Kingdom at the conclusion of the criminal process in the United States has been addressed above.

25

## PART III    CONCLUSION

66. For all these reasons, it is submitted that this case is without merit. It has been carefully and exhaustively examined by the domestic courts. There is no basis for concluding that the extradition of the applicant to the United States would violate his Convention rights. The application should therefore be declared inadmissible as manifestly ill-founded.    Alternatively, the Court is invited to find on the merits that the extradition of the applicant would *not* violate his Convention rights.

13 November 2008

**Derek Walton**
(Agent of the Government
of the United Kingdom)

26

**A.89**

17



**Foreign &
Commonwealth
Office**

Room K.G.106a
Legal Advisers
King Charles Street
London SW1A 2AH

24 October 2011

Tel: 020 7008 3785
Fax: 020 7008 4069
Email: Derek.Walton@fco.gov.uk
www.fco.gov.uk

Mr T.L. Early
Section Registrar
European Court of Human Rights
Council of Europe
F-67075 Strasbourg CEDEX
France.

<u>By E-transmission</u>

Dear Sir

**<u>Application Nos. 24027/07, 11949/08 and 36742/08</u>**
**<u>BABAR AHMAD & OTHERS v UNITED KINGDOM</u>**
**<u>Application Nos. 66911/09 and 67354/09</u>**
**<u>BARY and AL FAWWAZ v UNITED KINGDOM</u>**

I write further to my letter of 6 October 2011 and the letter in response from the Court, dated 7 October 2011.

As the Court is aware, the UK Government has sought to obtain information from the United States authorities in response to a series of questions posed by the Judge Rapporteur concerning the operation of the Step Down and Special Security Unit Programs at ADX Florence, Colorado, USA. By those questions, the Judge Rapporteur indicated that the Court sought 'meaningful assistance' as to:

    i.     how long an inmate is likely to spend at ADX [Florence] before being admitted to the Step Down or Special Security Unit Program;

    ii.    how long an inmate is likely to spend in each phase of the respective programs; and

    iii.   how long an inmate is likely to spend in either program before transfer out of ADX.

In order to answer these questions, the US authorities (the Federal Bureau of Prisons) have, at the request of the United Kingdom Government, conducted a detailed statistical analysis of a random sample of thirty inmates selected from the General Population and/or each phase of the Step Down Program: see letter, dated 24 October 2011, attached. Having done so, and

**A.90**

with the caveats and restrictions set out in the attached letter from the US DoJ, the answers to the Judge Rapporteur's questions are, <u>with respect to the Step Down Program,</u> as follows:

   i.     How long an inmate is likely to spend at ADX [Florence] before being admitted to the Step Down or Special Security Unit Program?
Answer: **3 years.**

   ii.    How long is an inmate likely to spend in each phase of the respective programs?

Answer:
**Intermediate phase: 9 months**
**Transitional phase: 11 months**
**Pre-Transfer phase: 9 months**

   iii.   How long an inmate is likely to spend in either program before transfer out of ADX?
Answer: **3 years in the General Population followed by 2 years 5 months 'progressing' through the Step Down Program.**

Insofar as the Special Security Unit is concerned, the US DoJ has explained that the US authorities are unable to provide similar information on account of *inter alia* security concerns and on-going litigation in the US: see letter attached. Accordingly, insofar as those procedures are concerned, the UK Government relies on its earlier observations: see most recently *Observations*, dated 27 September 2011, Parts 2 & 3.

Yours faithfully

**Derek Walton**
(Agent for the Government of
the United Kingdom)

**A.91**



**U.S. Department of Justice**

Criminal Division

*Washington, D.C. 20530*

October 24, 2011

Mr. Julian Gibbs
Home Office
5th Floor, Fry Building
2 Marsham Street
London, England SW1P 4DF

      Re:   Extradition of Babar Ahmad, Haroon Aswat, Syed Talha Ahsan, and
             Mustafa Kamel Mustafa (Abu Hamza)

             **Applications no.: 24027/07 Ahmad and Aswat v. the United Kingdom**
             **11949/08 Ahsan v. the United Kingdom**
             **36742/08 Mustafa (abu Hamza) v. the United Kingdom (No. 2)**

Dear Mr. Gibbs:

      This is in response to your letter posed by the Judge Rapporteur at the European Court of Human Rights (ECtHR) (see letters to the UK Government dated 9 September 2011, 29 September 2011, and 6 October 2011) and further to my last letter addressing these issues, dated 26 September 2011.

      The following responsive information was provided by officials at the Federal Bureau of Prisons (BOP). According to BOP officials, the information that the ECtHR is seeking is not maintained by the BOP in the ordinary course of business. The BOP receives requests for this information in criminal and civil litigation. In each instance, the BOP objects to the request, arguing, among other things, (1) the BOP does not maintain the information in the form requested, in the ordinary course of the agency's business; (2) the compilation, assimilation, and synthesization of voluminous records to provide the information in the form sought would cause the agency to expend substantial time and resources, incurring undue expense; (3) the information sought is confidential and privileged (5 U.S.C. § 552(b)(7)(E)); and (4) such information bears on the function and security of the United States' most secure penal institution. The courts routinely sustain the objection finding (1) the request to be oppressive and requiring excessive amounts of research and compilation of data at great expense that has no direct bearing on the matters at issue; and (2) the disclosure of the information would compromise the integrity of the Step-Down Program, the Special Administrative Measures (SAMs) program, and the Special Security Unit Program, in detriment to the Department of

Justice's various law enforcement missions. *See, e.g.,* Rezaq v. Nalley, No. 07-cv-02483-LTB-KLM (D. Colo.); Saleh, et al. v. Federal Bureau of Prisons, Nos. 05-cv-02467-PAB-KLM, 06-cv-01747-PAB-KLM, 07-cv-00021-PAB-KLM (D. Colo.); Ayyad, et al. v. Holder, Nos. 05-cv-2342-WYD-MJW, 05-cv-02653-WYD-MJW (D. Colo.); USA v. Basciano, No. 05-cr-060 (E.D.N.Y.); USA v. Breeden, 3:03-cr-00013-SGW (W.D. Va.); USA v. Sahakian, et al., No. 1:03-cr-00180-009 (S.D. Ill.); USA v. Nyaminani, No. cr-02-256 (D.C. Cir.); USA v. Lee, No. 97-cr-243 (E.D. Ark.); USA v. Johnson, No. 96-cr-379 (N.D. Ill.).

Nevertheless, in an effort to cooperate with the ECtHR and without waiving the above-stated objections, BOP officials again reviewed the request to determine what responsive information could be gathered and provided without being oppressive and unduly burdensome and compromising the integrity of the Step-Down Program, the SAMs program, and the Special Security Unit program. They determined, without waiving the objection stated above, that BOP staff could randomly select thirty (30) inmates who are currently in the General Population and/or three phases of the Step-Down Program (Program) and conduct an extensive manual review of computerized records for each of the thirty inmates to provide information responsive to the request. This would result in a review of close to 10% of the inmates currently housed in the General Population and Program units.

With regard to information regarding inmates housed in the Special Security Unit, however, BOP officials determined that, for the objections mentioned above, they will not be able to provide any additional information. Moreover, there is still open and active civil litigation on many of the issues surrounding the management of those inmates with SAMs at the ADX. A request for such information was made in those matters. BOP officials objected to the request for the reasons stated above, and the objection was sustained.

Accordingly, BOP staff proceeded with the random selection and extensive review of 30 inmates housed in the General Population and Program units at the ADX. Of those 30 inmates randomly selected, 10 are currently in the General Population; seven are currently in the Intermediate phase; six are currently in the Transitional phase; and seven are currently in the Pre-Transfer phase. The results of the review are as follows:

2

**A.93**

| Inmate | General Population | Intermediate | Transitional | Pre-Transfer | PRIOR SAM(Y/N) |
|---|---|---|---|---|---|
| 1 | 7 years, 10 months* | 1 month* | | | N |
| 2 | 8 months | | | | N |
| 3 | 5 years, 10 months | | | | N |
| 4 | 1 year, 6 months | | | | N |
| 5 | 5 years, 11 months | | | | N |
| 6 | 7 months | | | | N |
| 7 | 3 years, 6 months | | | | N |
| 8 | 3 years, 5 months | | | | N |
| 9 | 3 years, 2 months | | | | N |
| 10 | 4 years, 7 months | | | | Y |
| 11 | 5 years | 6 months | | | N |
| 12 | 2.5 years | 1 month | | | N |
| 13 | 2 years | 1 month | | | N |
| 14 | 3 years, 2 months* | 1 year,   2 months* | | | N |
| 15 | 2 years, 8 months* | 2 years, 10 months* | 5 months* | | N |
| 16 | 3.5 years | 1 month | | | N |
| 17 | 3 years | 1 month | | | N |
| 18 | 4 years* | 1 year* | 1 year, 1 month* | | N |
| 19 | 4 years* | 1 year* | 1 year* | | N |
| 20 | 3 years, 2 months* | 1 year* | 11 months* | | N |
| 21 | 1 year, 7 months | 6 months | 6 months | | N |
| 22 | 4 years | 6 months | 6 months | | N |
| 23 | 2.5 years | 7 months | 4 months | | N |
| 24 | 3 years | 2 years | 8 months | 1 year | N |
| 25 | 4 years, 4 months* | 1 year* | 1 year, 4 months* | 8 months | N |
| 26 | 1 year, 4 months | 6 months | 7 months | 1 year | N |
| 27 | 1 year, 6 months | 6 months | 7 months | 1 year | Y |
| 28 | 2 years* | 1 year* | 1 year* | 5 months | N |
| 29 | 3 years | 6 months | 7 months | 1 year | N |
| 30 | | | 3 years | 6 months | N |

3

Based on the above random sample, the average time an inmate is in a General Population Unit before being placed into the Intermediate phase of the Program is three years; the average time an inmate is in the Intermediate phase of the Program before being placed into the Transitional phase is nine months,; and the average time an inmate is in the Transitional phase before being placed into the Pre-Transfer phase is 11 months. Six of the seven inmates currently in the Pre-Transfer phase are awaiting redesignation and transfer to another institution. Based on the above random sample, the average time an inmate must wait in the Pre-Transfer phase to be approved for transfer and to begin to await redesignation is nine months. Accordingly, based on the random sample, the average time it takes an inmate to advance through the General Population and each of the phases of the Program before being approved for transfer is five years, five months.

There are a number of variables which impact the averages from the random sample:

a.   Seven of the 30 inmates randomly selected failed the Program and were returned to the General Population to start the Program over. Those seven inmates are identified above with a "*" by the amount of time they spent in General Population and/or a particular phase of the Program. The amount of time indicated for these inmates reflects the total amount of time they spent in the General Population and/or applicable Program phases. In addition, each of the seven inmates spent time in the Special Housing Unit following his removal from the Program and prior to his return to the General Population. The time in Special Housing Unit was included in the total for his time in the General Population. Each of these raised the overall average of time spent in the General Population and applicable Program phases of this random sample. Six of these seven inmates have begun their second time through the phases of the Program. Two of those six inmates are in the Pre-Transfer phase of the Program. Two of those six inmates are in Transitional phase of the Program. The remaining two of those six inmates are currently in the Intermediate Phase of the Program.

b.   Six of the 30 inmates randomly selected were away from the ADX on writs and temporary transfers to BOP medical facilities ranging from one to two years. The time on writ and temporary transfer was not subtracted from the total time spent in the General Population and, if applicable, the Program phases. This raised the overall average time spent in the General Population and applicable Program phases of this random sample.

c.   Other issues also impacted the amount of time spent by the inmates randomly selected in the General Population and, if applicable, the Program phases. These issues include, but are not limited to: disciplinary reports received by the inmate while at the ADX; poor interactions with staff at the ADX; poor interactions with other inmates at the ADX; refusal to follow programming recommendations of his Unit Team; poor overall institutional adjustment including, but not limited to, personal hygiene and cell sanitation; the reason(s) the inmate was designated to the ADX; the inmate's criminal history; the

4

**A.95**

inmate's involvement with criminal organizations, if any, and the potential safety and security threat(s) implicated by such involvement; the inmate's overall adjustment during his history of confinement; the institution's safety and security needs, including the safety and security of staff; the safety and security needs of the inmate; the safety and security needs of other inmates; the safety and security needs of the public.

d.    Two of the 30 inmates randomly selected did have SAMs and were housed in the Special Security Unit when they first arrived at the ADX.  One of those two inmates is currently in the Pre-Transfer phase of the Program.  This inmate was housed in the Special Security Unit for six months.  He was removed from the Special Security Unit when his SAM was vacated by the Attorney General.  He was then placed into a General Population Unit at the ADX.  He is awaiting redesignation and transfer to another institution.  The other inmate who initially had SAM when he arrived at the ADX and who is currently housed in the General Population at the ADX, was housed in the Special Security Unit for 13 months.  He too was removed from the Special Security Unit when his SAM was vacated by the Attorney General.

If you have any further questions on these cases, please do not hesitate to contact us.

Sincerely,

Mary Ellen Warlow
Director

By:    _Blake_

Lystra G. Blake
Associate Director



**EUROPEAN COURT OF HUMAN RIGHTS**

**COUR EUROPÉENNE DES DROITS DE L'HOMME**

FOURTH SECTION

**CASE OF BABAR AHMAD AND OTHERS
v. THE UNITED KINGDOM**

*(Applications nos. 24027/07, 11949/08, 36742/08, 66911/09 and 67354/09)*

JUDGMENT

STRASBOURG

10 April 2012

<u>**FINAL**</u>

*24/09/2012*

*This judgment has become final under Article 44 § 2 of the Convention. It may be subject to editorial revision.*



**A.97**

**In the case of Babar Ahmad and Others v. the United Kingdom,**

The European Court of Human Rights (Fourth Section), sitting as a Chamber composed of:

LechGarlicki, *President,*
David ThórBjörgvinsson,
NicolasBratza,
PäiviHirvelä,
GeorgeNicolaou,
LediBianku,
NebojšaVučinić, *judges,*

and Lawrence Early,*SectionRegistrar,*

Having deliberated in private on 20 March 2012,

Delivers the following judgment, which was adopted on that date:


## PROCEDURE

1. The case originated in five applications (nos. 24027/07, 11949/08 36742/08, 66911/09 and 67354/09) against the United Kingdom of Great Britain and Northern Ireland lodged with the Court under Article 34 of the Convention for the Protection of Human Rights and Fundamental Freedoms ("the Convention").

2. The first application was lodged on 10 June 2007 by two British nationals, Mr Babar Ahmad ("the first applicant") and Mr Haroon Rashid Aswat ("the second applicant"). They were both born in 1974.

The second application was lodged on 5 March 2008 by Mr Syed Tahla Ahsan ("the third applicant"), who is also a British national. He was born in 1979.

The third application was lodged on 1 August 2008 by Mr Mustafa Kamal Mustafa, known more commonly as Abu Hamza ("the fourth applicant"). He is a British national, who was born in 1958.

The fourth application was lodged on 21 December 2009 by Mr Adel Abdul Bary ("the fifth applicant"). He is an Egyptian national who was born in 1960.

The fifth application was lodged on 22 December 2009 by Mr Khaled Al-Fawwaz ("the sixth applicant"). He is a Saudi Arabian national who was born in 1962.

3. The first, second, third and fifth applicants were represented by Ms G. Peirce, a lawyer practising in London with Birnberg Peirce & Partners, assisted by Mr B. Cooper, counsel. The fourth applicant was represented by Ms M. Arani, a lawyer practising in Middlesex, assisted by Mr A. Jones QC and Mr B. Brandon, counsel. The sixth applicant was represented by Mr A. Raja, a lawyer practising in London with Quist

Solicitors, assisted by Mr J. Jones, counsel. The Government were represented by their Agent, Mr D. Walton of the Foreign and Commonwealth Office.

4. The applicants, who are the subject of extradition requests made by the United States of America, alleged in particular that, if extradited and convicted in the United States, they would be at real risk of ill-treatment either as a result of conditions of detention at ADX Florence (which would be made worse by the imposition of "special administrative measures") or by the length of their possible sentences.

5. On 6 July 2010 the Court delivered its admissibility decision in respect of the first four applicants.

It declared admissible the first, second and third applicants' complaints concerning detention at ADX Florence and the imposition of special administrative measures post-trial. It declared the fourth applicant's complaint in respect of ADX Florence inadmissible, finding that, as a result of his medical conditions (see paragraph 37 below), there was no real risk of his spending anything more than a short period of time at ADX Florence.

The Court also declared admissible all four applicants' complaints concerning the length of their possible sentences. It declared inadmissible the remainder of the applicants' complaints.

Finally, the Court decided to continue to indicate to the Government under Rule 39 of the Rules of Court that it was desirable in the interests of the proper conduct of the proceedings that the applicants should not be extradited until further notice.

6. On 3 September 2010, the President of the Chamber decided, under Rule 54 § 2 (b) of the Rules of Court, that notice of the fifth and sixth applicants' cases should be given to the Government of the United Kingdom. It was further decided that the Rule 39 indications made in respect of these applicants should also remain in place until further notice.

7. Further to the Court's admissibility decision of 6 July 2010 and the President's decision of 3 September 2010, all six applicants and the Government filed observations (Rules 54 § 2 (b) and 59 § 1).In addition, third-party comments were received from the non-governmental organisationsthe American Civil Liberties Union, the National Litigation Project at Yale Law School, Interights and Reprieve,which had been given leave by the President of the Chamber to intervene in the written procedure (Article 36 § 2 of the Convention and Rule 44 § 2). The parties replied to those comments (Rule 44 § 5).

**A.99**

# THE FACTS

## I.  THE CIRCUMSTANCES OF THE CASES

### A.  The United States indictments

8.  The applicants have been indicted on various charges of terrorism in the United States of America. They are the subject of three separate sets of criminal proceedings in the United States federal courts. The first set concerns the first applicant, Mr Ahmad, and the third applicant, Mr Ahsan. The second set of proceedings concerns the second applicant, Mr Aswat, and the fourth applicant, Abu Hamza. The third set of proceedings concerns the fifth applicant, Mr Bary, and the sixth applicant, Mr Al Fawwaz.

9.  The details of each indictment are set out below. On the basis of each indictment, the United States Government requested each applicant's extradition from the United Kingdom. Each applicant then contested his proposed extradition in separate proceedings in the English courts.

### 1.  The indictment concerning the first and third applicants

10.  The indictment against the first applicant was returned by a Federal Grand Jury sitting in Connecticut on 6 October 2004. It alleges the commission of four felonies between 1997 and August 2004: conspiracy to provide material support to terrorists; providing material support to terrorists; conspiracy to kill, kidnap, maim or injure persons or damage property in a foreign country; and money laundering. On 28 June 2006, a similar indictment was returned against the third applicant, save that the charge of money laundering was not included. For both indictments, the material support is alleged to have been provided through a series of websites, one of whose servers was based in Connecticut. The charge of conspiracy to kill, kidnap, maim or injure persons or damage property in a foreign country is based on two allegations: first, that the websites exhorted Muslims to travel to Chechnya and Afghanistan to defend those places; and second, that classified US Navy plans relating to a US naval battle group operating in the Straits of Hormuz in the Persian Gulf had been sent to the website. The plans are alleged to have discussed the battle group's vulnerability to terrorist attack.

### 2.  The indictment concerning the second and fourth applicants

11.  The indictment against the fourth applicant was returned on 19 April 2004 by a Federal Grand Jury sitting in the Southern District of New York. It charges him with eleven different counts of criminal conduct. These cover three sets of facts.

4        BABAR AHMAD AND OTHERSv. THE UNITED KINGDOMJUDGMENT

12.  The first group of charges relates to the taking of sixteen hostages in Yemen in December 1998, four of whom died during a rescue mission conducted by Yemeni forces. The indictment charges the fourth applicant with conspiracy to take hostages and hostage taking and relates principally to his contact with the leader of the hostage takers, Abu Al-Hassan, before and during the events in question.

13.  The second group of charges relates to the conduct of violent *jihad* in Afghanistan in 2001. The indictment alleges that the fourth applicant provided material and financial assistance to his followers and arranged for them to meet Taliban commanders in Afghanistan. In this respect, four counts of the indictment charge him with providing and concealing material support and resources to terrorists and a foreign terrorist organisation and conspiracy thereto. A further count charges him with conspiracy to supply goods and services to the Taliban.

14.  The third group of charges relates to a conspiracy to establish a *jihad* training camp in Bly,Oregon between June 2000 and December 2001. Two counts charge the fourth applicant with providing and concealing material support and resources to terrorists and providing material support and resources to a foreign terrorist organisation (Al Qaeda); a further two counts charge him with conspiracy to the main two counts.

15.  On 12 September 2005, a superseding indictment was returned which named and indicted the second applicant as the fourth applicant's alleged co-conspirator in respect of the Bly,Oregon charges (thus charging the second applicant with the same four counts as those faced by the fourth applicant in respect of the Bly,Oregon conspiracy). On 6 February 2006 a second superseding indictment was returned, which indicted a third man, Oussama Abdullah Kassir, as a co-conspirator in respect of the Bly,Oregon charges.

16.  Mr Kassir was extradited to the United States from the CzechRepublic in September 2007. On 12 May 2009, Mr Kassir was convicted on five counts relating to the Bly,Oregon*jihad* camp conspiracy. He was also convicted of a further six counts relating to the operation of terrorist websites. On 15 September 2009, after submissions from Mr Kassir and his defence counsel, the trial judge sentenced Mr Kassir to the maximum permissible sentence on each count. As a life sentence was the maximum permissible sentence on two of the counts, Mr Kassir had effectively been sentenced to a term of life imprisonment.

### 3.  *The indictment concerning the fifth and sixth applicants*

17.  In 1999 a Federal Grand Jury sitting in the Southern District of New York returned an indictment against Osama bin Laden and twenty other individuals, including the applicants,*inter alia* alleging various degrees of involvement in or support for the bombing of the United States embassies in Nairobi and Dar es Salaam in 1998.

18. The fifth applicant is charged with four counts: conspiracy to kill United States nationals, conspiracy to murder, conspiracy to destroy buildings and property, and conspiracy to attack national defence utilities.

19. The sixth applicant is charged with two hundred and eighty-five counts of criminal conduct, including over two hundred and sixty-nine counts of murder.

## B. The applicants' extradition proceedings in the United Kingdom

### 1. Extradition proceedings against the first applicant

20. The first applicant was arrested in London on 5 August 2004. On 23 March 2005, the United States Embassy in London issued Diplomatic Note No. 25. Where relevant, the note provides:

> "Pursuant to Article IV of the Extradition Treaty Between the Government of the United States and the Government of the United Kingdom of Great Britain and Northern Ireland, the Government of the United States hereby assures the Government of the United Kingdom that the United States will neither seek the death penalty against, nor will the death penalty be carried out, against Babar Ahmad upon his extradition to the United States.

> The Government of the United States further assures the Government of the United Kingdom that upon extradition to the United States, Babar Ahmad will be prosecuted before a Federal Court in accordance with the full panoply of rights and protections that would otherwise be provided to a defendant facing similar charges.

> Pursuant to his extradition, Babar Ahmad will not be prosecuted before a military commission, as specified in the President's Military Order of November 13, 2001; nor will he be criminally prosecuted in any tribunal or court other than a United States Federal Court; nor will he be treated or designated as an enemy combatant..."

21. Similar Diplomatic Notes were provided in respect of the other applicants in the course of their respective extradition proceedings.

22. At the extradition hearing before the Senior District Judge, the first applicant argued, *inter alia*, that, notwithstanding the Diplomatic Note, the risk of the death penalty being imposed remained since he could be tried on a superseding indictment. He further argued that he remained at risk of being designated as an "enemy combatant" pursuant to United States Military Order No. 1 and that he remained at risk of extraordinary rendition to a third country. He also argued that there was a substantial risk that he would be subjected to special administrative measures whilst in detention in a federal prison, which could involve, among other measures, solitary confinement in violation of Article 3 and restrictions on communication with lawyers in violation of Article 6of the Convention.

23. In a decision given on 17 May 2005, the Senior District Judge ruled that the extradition could proceed and that, *inter alia*, the first applicant's extradition would not be incompatible with his rights under the Convention. The Senior District Judge found that, on the basis of the Diplomatic Note,

there was no risk that the death penalty would be imposed, that the applicant would be designated as an enemy combatant, or subjected to extraordinary rendition. The Senior District Judge found the application of special administrative measures to be the greatest ground for concern but concluded that, having regard to the safeguards accompanying such measures, there would be no breach of the applicant's Convention rights.

24.  The Senior District Judge concluded as follows:

> "This is a difficult and troubling case. The [first applicant] is a British subject who is alleged to have committed offences which, if the evidence were available, could have been prosecuted in this country. Nevertheless the Government of the United States are entitled to seek his extradition under the terms of the Treaty and I am satisfied that none of the statutory bars [to extradition] apply."

Accordingly, he sent the case to the Secretary of State for his decision as to whether the first applicant should be extradited.

25.  On 15 November 2005, the Secretary of State (Mr Charles Clarke) ordered the first applicant's extradition. The first applicant appealed to the High Court (see paragraphs 29*et seq.* below).

### 2.  *Extradition proceedings against the second applicant*

26.  On 7 August 2005 the second applicant was arrested in the United Kingdom, also on the basis of an arrest warrant issued under section 73 of the Extradition Act 2003, following a request for his provisional arrest by the United States.

27.  The Senior District Judge gave his decision in the second applicant's case on 5 January 2006. He concluded that none of the bars to extradition applied, and sent the case to the Secretary of State for his decision as to whether the second applicant should be extradited.

28.  On 1 March 2006, the Secretary of State ordered his extradition. The second applicant appealed to the High Court.

### 3.  *The first and second applicants' appeals to the High Court*

29.  The first and second applicants' appeals were heard together. In its judgment of 30 November 2006, the High Court rejected their appeals. The High Court found that, according to the case-law of this Court, solitary confinement did not in itself constitute inhuman or degrading treatment. Applying that approach,the evidence before it – which included an affidavit from a United States Department of Justice official outlining the operation of special administrative measures – did not "begin to establish a concrete case under Article 3".

30.  The first and second applicants applied for permission to appeal to the House of Lords. This was refused by the House of Lords on 6 June 2007.

### 4. Extradition proceedings against the third applicant

31. The United States formally requested the extradition of the third applicant on 15 September 2006. The extradition hearing started on 20 November 2006 on which date the Senior District Judge determined that the third applicant was accused of offences for which he could be extradited. The case was then adjourned for evidence and argument,*inter alia* as to whether the third applicant's extradition would be compatible with his Convention rights. The hearing resumed on 19 March 2007. By now bound by the High Court's judgment in respect of the first and second applicants, the Senior District Judge found that the third applicant's extradition would be compatible with the Convention. He accordingly sent the case to the Secretary of State for his decision as to whether the third applicant should be extradited.

32. On 14 June 2007, the Secretary of State (Dr John Reid) ordered that the extradition could proceed. The third applicant appealed against this decision to the High Court and also sought judicial review of the alleged failure of the Director of Public Prosecutions for England and Wales ("the DPP") to consider whether he should instead be tried in the United Kingdom. He relied on guidance agreed between the Attorney General of the United States and his United Kingdom counterparts for handling criminal cases with concurrent jurisdiction between the United Kingdom and the United States (see paragraph 63 below).

33. On 10 April 2008 the High Court dismissed the third applicant's human rights appeal, relying on its ruling in respect of the first and second applicants. In the same judgment, it also dismissed his application for judicial review, finding that the guidance had no application to the third applicant's case. The guidance only applied to cases where there had been an investigation of the case in the United Kingdom and the DPP had been seized of the case as prosecutor.

34. On 14 May 2008 the High Court refused to certify a point of law of general public importance which ought to be considered by the House of Lords and also refused leave to appeal to the House of Lords.

### 5. Extradition proceedings against the fourth applicant

35. The United States requested the fourth applicant's extradition on 21 May 2004. He was arrested in London on 5 August 2004.

36. The extradition proceedings were adjourned when he was convicted of offences in the United Kingdom and sentenced to seven years' imprisonment (see *Mustafa (Abu Hamza) v. the United Kingdom (no. 1)* (dec.), no. 31411/07, 18 January 2011). The extradition proceedings resumed when the criminal appeals process was concluded.

### a. The District Court proceedings

37.  When the case came before the Senior District Judge for his decision as to whether the extradition could proceed, the fourth applicant argued,*inter alia*, that his extradition would give rise to a real risk of a violation of Article 3 of the Convention since he would be likely to be detained in a "supermax" detention facility such as the United States Penitentiary, Administrative Maximum, Florence, Colorado ("ADX Florence"). In this connection, he also relied on his poor health, specifically his type-two diabetes, his high blood pressure, the loss of sight in his right eye and poor vision in his left, the amputation of both his forearms (which frequently led to infections through abrasions), psoriasis on much of his body, hyperhydrosis (excessive sweating). A violation of Article 3, he claimed, would also result from the imposition of special administrative measures.

38.  The Senior District Judge, in his ruling of 15 November 2007, rejected all these submissions. In respect of detention at ADX Florence the Senior District Judge found that the fourth applicant's poor health and disabilities would be considered and, at worst, he would only be detained there for a relatively short period of time. The Senior District Judge was also not satisfied that special administrative measures would be applied to the fourth applicant but even if they were, he was bound by the ruling of the High Court in respect of the first and second applicants. Having concluded that none of the bars to extradition applied, the Senior District Judge sent the case to the Secretary of State (Ms Jacqui Smith) for her decision as to whether the fourth applicant should be extradited. She ordered his extradition on 7 February 2008. The fourth applicant appealed to the High Court against the Secretary of State's decision and against the decision of the Senior District Judge.

### b. The High Court proceedings

39.  Before the High Court, the fourth applicant again relied on his submission that conditions of detention at ADX Florence would not comply with Article 3. He also argued that the length of the possible sentence he faced in the United States would be contrary to Article 3 of the Convention.

40.  The High Court gave its judgment on 20 June 2008, dismissing the fourth applicant's appeal. In relation to Article 3, the High Court found that, if convicted, the fourth applicant would be sentenced to very lengthy terms of imprisonment and that, in all likelihood, a life sentence would be imposed. It found that this, of itself, would not constitute a breach of Article 3. On the question of the compatibility of detention at ADX Florence with Article 3, the High Court relied in particular on the understanding of the prison warden, Mr Robert Wiley, to the effect that if, after a full medical evaluation, it was determined that the fourth applicant could not manage his activities of daily living, it would be highly unlikely that he would be placed

at ADX Florence rather than at a medical centre. Accordingly, there was no risk of a violation of Article 3 on this ground. However, the High Court added:

> "[T]he constitution of the United States of America guarantees not only 'due process', but it also prohibits 'cruel and unusual punishment'. As part of the judicial process prisoners, including those incarcerated in Supermax prisons, are entitled to challenge the conditions in which they are confined, and these challenges have, on occasions, met with success.
>
> ...
>
> We should add that, subject to detailed argument which may be advanced in another case,like Judge Workman [the Senior District Judge], we too are troubled about what we have read about the conditions in some of the Supermax prisons in the United States. Naturally, the most dangerous criminals should expect to be incarcerated in the most secure conditions, but even allowing for a necessarily wide margin of appreciation between the views of different civilised countries about the conditions in which prisoners should be detained, confinement for years and years in what effectively amounts to isolation may well be held to be, if not torture, then ill treatment which contravenes Article 3. This problem may fall to be addressed in a different case."

41.  The fourth applicant then applied to the High Court for a certificate of points of law of general public importance and for leave to appeal to the House of Lords. On 23 July 2008, the High Court refused both applications.

### 6. *Extradition proceedings against the fifth and sixth applicants*

42.  The United States Government requested the fifth and sixth applicants' extradition from the United Kingdom in July 1999 and September 1998 respectively.

#### a.  The initial extradition proceedings

43.  At his committal hearing before the District Court, the sixth applicant contended that extradition was only permitted within the terms of the 1972 USA-UK Extradition Treaty for offences committed within the jurisdiction of the requesting State, and not when that State exercised jurisdiction over extra-territorial offences. He further argued that there was "insufficient evidence" to prove a *prima facie* case, which was a requirement for extradition under the Treaty. As part of that submission, he sought to have excluded two anonymous witness statements, which had been provided by two informants, "CS/1" and "CS/2", and which the United States Government relied upon as part of their case against him. It was later revealed that CS/1 was a Mr Al-Fadl who had given evidence against the certain of the applicants' co-defendants during their trial in the United States.

44.  In his ruling of 8 September 1999, the District Judge rejected these submissions. He considered that the proper construction of the Treaty did not prevent the exercise of jurisdiction over extra-territorial offences. The

District Judge was also satisfied that there were real grounds for fear if the identities of CS/1 and CS/2 were revealed. Thus, their anonymous witness statements could be admitted as evidence of a *prima facie* case. He further found that there was a case for the sixth applicant to answer.

45. The sixth applicant appealed to the High Court by way of an application for a writ of *habeas corpus*. The application was dismissed on 30 November 2000. The High Court held that it was necessary to show that the crime in respect of which extradition was sought was alleged to have been committed within the actual territory of the United States. The High Court was, however, satisfied that three overt acts alleged by the United States of America could be relied on to found territorial jurisdiction in the United States, namely (a) the setting up and operating of a secure telephone line in the United States by the sixth applicant through an organisation called MCI; (b) the purchase by the sixth applicant of a satellite phone system in the United States and (c) the issuing, in pursuance of the conspiracy of fatwas and jihads, allegedly prepared with the concurrence of the sixth applicant in the United States and elsewhere. The High Court also found that the District Judge had not erred in admitting the evidence of CS/1 or in finding that there was a *prima facie* case against the sixth applicant. It did not consider it necessary reach any conclusions in respect of CS/2, judging CS/1's evidence to be "far the most significant".

46. While the sixth applicant's appeal was pending before the High Court, a committal hearing before the District Court was held in respect of the fifth applicant. The District Judge gave his ruling on 25 April 2000 in which he reaffirmed the rulings he had made in respect of the sixth applicant and found that there was also a *prima facie* case against the fifth applicant.

47. The fifth applicant also appealed to the High Court and, on 2 May 2001, a differently constituted court dismissed his appeal. Again the High Court found that the District Judge had not erred in admitting the anonymous evidence of CS/1; that there was sufficient evidence against the fifth applicant for the extradition to proceed, and that the United States had jurisdiction to try him.

48. Both applicants appealed to the House of Lords. Their appeals were dismissed on 17 December 2001. The House of Lords found unanimously that the High Court had erred in its finding in respect of jurisdiction: it was sufficient that the offence for which extradition was sought was triable within the United States and an equivalent offence would be triable in the United Kingdom. Accordingly, the applicants were liable to extradition to the United States if a *prima facie* case of conspiracy to murder was established. This was the case for each applicant.

**b. The Secretary of State's decision, the United States' assurances, and the fifth and sixth applicants' appeal to the High Court**

49. Between November 2001 and December 2005 there then followed voluminous representations by the fifth and sixth applicants to the Secretary of State as to why they should not be extradited to the United States.

50. In the course of these exchanges, on 19 April 2002 the President of the United States designated the sixth applicant as a "specially designated global terrorist", which had the effect of placing him on a list of persons maintained by the United States Department of the Treasury and available on its website. This was done pursuant to Executive Order 13224 which enables the American assets of any person so designated to be blocked.

51. Subsequently, on 13 April 2004, the United States Embassy in London issued Diplomatic Note No. 018, which gave assurances that the United States Government would neither seek nor carry out the death penalty against the fifth and sixth applicants. It also gave assurances that they would be tried before a federal court and that they would not be prosecuted by a military commission or designated as enemy combatants. On 18 January 2008, the United States Embassy issued Diplomatic Note No. 002, which assured the United Kingdom Government that, if either applicant were acquitted or completed any sentence imposed or if the prosecution against them were discontinued, the United States authorities would return the men to the United Kingdom, if they so requested.

52. The Secretary of State (Ms Jacqui Smith) rejected the fifth and sixth applicants' representations on 12 March 2008. She found that assurances given by the United States in the Diplomatic Note of 13 April 2004 could be relied upon and thus that the fifth and sixth applicants were not at risk of the death penalty, indefinite detention or trial by a military commission.

53. The fifth and sixth applicants also contended that they would not receive a fair trial in the United States owing to the unavailability of defence witnesses and evidence, adverse publicity, the possible imposition of special administrative measures before trial, and the sixth applicant's designation as a global terrorist. The Secretary of State found none of these claims amounted to a "flagrant denial of justice" such as would act as a bar to extradition.

54. The Secretary of State accepted that there was a real possibility that they would be sentenced to life imprisonment if convicted but, relying on the House of Lords' judgment in *R (Wellington) v. Secretary of State for the Home Department* (see paragraphs 64–72 below), found that this would not amount to a breach of Article 3 of the Convention.

55. The Secretary of State also considered that the conditions of the fifth and sixth applicants' detention in the United States would not violate Article 3 whether they were subjected to "special administrative measures" before trial or detained at ADX Florence after trial. In the fifth applicant's case, this conclusion was not affected by the fact that he suffered from a recurrent

depressive disorder. There was also no risk that either applicant would be tortured, that evidence obtained by torture would be adduced at trial, or that they would be at real risk of torture as a result of extraordinary rendition or *refoulement* to a third State.

56. The fifth and sixth applicants sought judicial review of the Secretary of State's decision in the High Court. Before the High Court the applicants submitted that, if convicted, they would be detained at ADX Florence in violation of Article 3 of the Convention. In rejecting that contention, Lord Justice Scott Baker, delivering the judgment of the court on 7 August 2009, found that the decisions of the United States federal courts in *Ajaj*, *Sattar* and *Wilkinson v. Austin* (see paragraphs 109 and 110 below) demonstrated that there was effective judicial oversight of "supermax" prisons such as ADX. The fifth and sixth applicants would also have the possibility of entering ADX's "step down program" (see paragraphs 84–88 below). He concluded:

> (1) It is reasonably likely that the claimants will be subjected to [special administrative measures] and will be held in ADX Florence following trial.

> (2) Neither [special administrative measures] (see *Ahmad and Aswat*) or life without parole (see *Wellington*) cross the article 3 threshold in the present case. Although near to the borderline the prison conditions at ADX Florence, although very harsh do not amount to inhuman or degrading treatment either on their own or in combination with [special administrative measures] and in the context of a whole life sentence.

> (3) Whether the high article 3 threshold for inhuman or degrading treatment is crossed depends on the facts of the particular case. There is no common standard for what does or does not amount to inhuman or degrading treatment throughout the many different countries in the world. The importance of maintaining extradition in a case where the fugitive would not otherwise be tried is an important factor in identifying the threshold in the present case.

> Had the claimants persuaded me that there was no prospect that they would ever enter the step down procedure whatever the circumstances then in my view the article 3 threshold would be crossed. But that is not the case. The evidence satisfies me that the authorities will faithfully apply the criteria [for entry to the program] and that the stringency of the conditions it imposes will continue to be linked to the risk the prisoner presents. Further, there is access to the US courts in the event that the [Federal Bureau of Prisons] acts unlawfully."

57. In respect of the fifth applicant's submission that his recurrent depressive illness would deteriorate if extradited, the High Court considered that, to the extent that this affected his fitness to stand trial, this was a matter for the United States' authorities and, if he were convicted, the fifth applicant's mental health would be an important factor in deciding whether he should be sent to ADX Florence.

58. The High Court also rejected the fifth and sixth applicants' submissions that they were at real risk of violations of Articles 3, 6 and 14 of the Convention by virtue of the imposition of special administrative

measures, relying on its previous judgment in respect of the first and second applicants (see paragraph 29 above). Having regard to the Diplomatic Note of 18 January 2008, the High Court found that there was no real risk of *refoulement* to Egypt or Saudi Arabia by the United States. The High Court was also satisfied that the United States would honour the assurances it had given in the Diplomatic Note of 13 April 2004. The mere fact that the sixth applicant had been designated as a global terrorist by the President of the United States did not mean he was at risk of a flagrant denial of justice within the meaning of Article 6: the designation added little to what was already known about him; it would be made clear to the jury at any trial what had to be proved as regards the indictment.

59. The High Court also rejected the applicants' submission that they should be tried in the United Kingdom, finding that this was neither viable nor appropriate and that any connection with the United Kingdom was "tenuous indeed".

60. Although the High Court refused leave to appeal to the United Kingdom Supreme Court, it certified two questions of general public importance. The first question was whether prison conditions at ADX Florence were compatible with Article 3; the second question was whether the relativist approach to Article 3 adopted by the majority of the House of Lords in *Wellington*should apply where the issue under Article 3 was one of the compatibility of prison conditions with Article 3.

61. On 16 December 2009, the Supreme Court refused permission to appeal.

## II. RELEVANT DOMESTIC AND INTERNATIONAL LAW ON ARTICLE 3 AND EXTRADTITION

### A. Extradition arrangements between the United Kingdom and the United States

62. At the material time, the applicable bilateral treaty on extradition was the 1972 UK – USA Extradition Treaty (now superseded by a 2003 treaty).Article IV of the 1972 treaty provided that extradition could be refused unless the requesting Party gave assurances satisfactory to the requested Party that the death penalty would not be carried out.

63. Guidance for handling criminal cases with concurrent jurisdiction between the United Kingdom and the United States of America was signed on 18 January 2007 by the Attorney General of the United States of America, Her Majesty's Attorney General and also, for its application to Scotland, by the Lord Advocate. It sets out a series of measures that prosecutors in each State should take to exchange information and consult each other in such cases and to determine issues which arise from concurrent jurisdiction. A case with concurrent jurisdiction is defined as one

which has the potential to be prosecuted in both the United Kingdom and the United States.

### B. Relevant United Kingdom law on Article 3 and extradition: *R (Wellington) v. Secretary of State for the Home Department* [2008] UKHL 72

64. The United States requested the extradition of Ralston Wellington from the United Kingdom to stand trial in Missouri on two counts of murder in the first degree. In his appeal against extradition, Mr Wellington argued that his surrender would violate Article 3 of the Convention, on the basis that there was a real risk that he would be subjected to inhuman and degrading treatment in the form of a sentence of life imprisonment without parole.

65. In giving judgment in the High Court ([2007] EWHC 1109(Admin)), Lord Justice Laws found that there were "powerful arguments of penal philosophy" which suggested that risk of a whole-life sentence without parole intrinsically violated Article 3 of the Convention.He observed:

> "The abolition of the death penalty has been lauded, and justified, in many ways; but it must have been founded at least on the premise that the life of every person, however depraved, has an inalienable value. The destruction of a life may be accepted in some special circumstances, such as self-defence or just war; but retributive punishment is never enough to justify it.Yet a prisoner's incarceration without hope of release is in many respects in like case to a sentence of death.He can never atone for his offence.However he may use his incarceration as time for amendment of life, his punishment is only exhausted by his last breath.Like the death sentence the whole-life tariff is *lex talionis*.But its notional or actual symmetry with the crime for which it is visited on the prisoner (the only virtue of the *lex talionis*) is a poor guarantee of proportionate punishment, for the whole-life tariff is arbitrary: it may be measured in days or decades according to how long the prisoner has to live.It is therefore liable to be disproportionate – the very vice which is condemned on Article 3 grounds – unless, of course, the death penalty's logic applies: the crime is so heinous it can never be atoned for.But in that case the supposed inalienable value of the prisoner's life is reduced, merely, to his survival: to nothing more than his drawing breath and being kept, no doubt, confined in decent circumstances.That is to pay lip-service to the value of life; not to vouchsafe it."

However, and "not without misgivings", he considered that the relevant authorities, including those of this Court, suggested an irreducible life sentence would not always raise an Article 3 issue.

66. Wellington's appeal from that judgment was heard by the House of Lords and dismissed on 10 December 2008. Central to the appeal was paragraph 89 of this Court's judgment in*Soering v. the United Kingdom*, 7 July 1989, § 89, Series A no. 161, where the Court stated that considerations in favour of extradition:

> ".. must also be included among the factors to be taken into account in the interpretation and application of the notions of inhuman and degrading treatment or punishment in extradition cases."

67. A majority of their Lordships,Lord Hoffmann, Baroness Hale and Lord Carswell, found that, on the basis of this paragraph, in the extradition context, a distinction had to be drawn between torture and lesser forms of ill-treatment. When there was a real risk of torture, the prohibition on extradition was absolute and left no room for a balancing exercise. However, insofar as Article 3 applied to inhuman and degrading treatment and not to torture,itwas applicable only in arelativist form to extradition cases.

68. Lord Hoffmann, giving the lead speech, considered the Court's judgment in the case of*Chahal v. the United Kingdom*, 15 November 1996, § 81,*Reports of Judgments and Decisions* 1996-V,in which the Court stated that:

> "It should not be inferred from the Court's remarks [at paragraph 89 of *Soering*] that there is any room for balancing the risk of ill-treatment against the reasons for expulsion in determining whether a State's responsibility under Article 3 (art. 3) is engaged."

Lord Hoffmann stated:

> "In the context of *Chahal*, I read this remark as affirming that there can be no room for a balancing of risk against reasons for expulsion when it comes to subjecting someone to the risk of torture. I do not however think that the Court was intending to depart from the relativist approach to what counted as inhuman and degrading treatment which was laid down in *Soering* and which is paralleled in the cases on other articles of the Convention in a foreign context. If such a radical departure from precedent had been intended, I am sure that the Court would have said so."

For Lord Hoffmann, paragraph 89 of *Soering* made clear that:

> "...the desirability of extradition is a factor to be taken into account in deciding whether the punishment likely to be imposed in the receiving state attains the 'minimum level of severity' which would make it inhuman and degrading. Punishment which counts as inhuman and degrading in the domestic context will not necessarily be so regarded when the extradition factor has been taken into account."

He went on to state:

> "A relativist approach to the scope of article 3 seems to me essential if extradition is to continue to function. For example, the Court of Session has decided in *Napier v Scottish Ministers* (2005) SC 229 that in Scotland the practice of 'slopping out' (requiring a prisoner to use a chamber pot in his cell and empty it in the morning) may cause an infringement of article 3. Whether, even in a domestic context, this attains the necessary level of severity is a point on which I would wish to reserve my opinion. If, however, it were applied in the context of extradition, it would prevent anyone being extradited to many countries, poorer than Scotland, where people who are not in prison often have to make do without flush lavatories."

69. A minority of their Lordships,Lord Scott and Lord Brown,disagreed with these conclusions. They considered that the extradition context was

irrelevant to the determination of whether a whole life sentence amounted to inhuman and degrading treatment. They found no basis in the text of Article 3 for such a distinction. Lord Brown also considered that the Court, in *Chahal* and again in*Saadi v. Italy* [GC], no. 37201/06,ECHR 2008-..., had departed from the previous, relativist approach to inhuman and degrading treatment that it had taken in *Soering*. He stated:

> "There is, I conclude, no room in the Strasbourg jurisprudence for a concept such as the risk of a flagrant violation of article 3's absolute prohibition against inhuman or degrading treatment or punishment (akin to that of the risk of a 'flagrant denial of justice'). By the same token that no one can be expelled if he would then face the risk of torture, so too no one can be expelled if he would then face the risk of treatment or punishment which is properly to be characterised as inhuman or degrading. That, of course, is not to say that, assuming for example 'slopping out' is degrading treatment in Scotland, so too it must necessarily be regarded in all countries (see para 27 of Lord Hoffmann's opinion)... the Strasbourg Court has repeatedly said that the Convention does not 'purport to be a means of requiring the contracting states to impose Convention standards on other states' (*Soering*, para 86) and article 3 does not bar removal to non-Convention states (whether by way of extradition or simply for the purposes of immigration control) merely because they choose to impose higher levels or harsher measures of criminal punishment.

> Nor is it to say that a risk of article 3 ill-treatment, the necessary pre-condition of an article 3 bar upon extradition, will readily be established. On the contrary, as the Grand Chamber reaffirmed in *Saadi* at para 142:

> '[T]he Court has frequently indicated that it applies rigorous criteria and exercises close scrutiny when assessing the existence of a real risk of ill-treatment . . . in the event of a person being removed from the territory of the respondent State by extradition, expulsion or any other measure pursuing that aim. Although assessment of that risk is to some degree speculative, the Court has always been very cautious, examining carefully the material placed before it in the light of the requisite standard of proof . . . before . . . finding that the enforcement of removal from the territory would be contrary to article 3 of the Convention. As a result, since adopting the *Chahal* judgment it has only rarely reached such a conclusion.'"

Therefore, for Lord Brown,if a mandatory life sentence violated Article 3 in a domestic case, the risk of such a sentence would preclude extradition to another country.

70.  However,despite these different views,none of the Law Lords found that the sentence likely to be imposed on Mr Wellington would be irreducible; having regard to the commutation powers of the Governor of Missouri, it would be just as reducible as the sentence at issue in *Kafkaris v. Cyprus* [GC], no. 21906/04,ECHR 2008-.... All five Law Lords also noted that, in *Kafkaris*, the Court had only said that the imposition of an irreducible life sentence may raise an issue under Article 3. They found that the imposition of a whole life sentence would not constitute inhuman and degrading treatment in violation of Article 3 *per se*, unless it were grossly or clearly disproportionate. Lord Brown in particular noted:

> "Having puzzled long over this question, I have finally concluded that the majority of the Grand Chamber [in *Kafkaris*] would not regard even an irreducible life

> sentence—by which, as explained, I understand the majority to mean a mandatory life sentence to be served in full without there ever being proper consideration of the individual circumstances of the defendant's case—as violating article 3 unless and until the time comes when further imprisonment would no longer be justified on any ground—whether for reasons of punishment, deterrence or public protection. It is for that reason that the majority say only that article 3 may be engaged."

Lord Brown added that this test had not been met in Wellington's case, particularly when the facts of the murders for which he was accused, if committed in the United Kingdom, could have justified a whole life order.However, Lord Brown considered that, in a more compelling case, such as the mercy killing of a terminally ill relative, this Court "might well judge the risk of ill-treatment to be sufficiently real, clear and imminent to conclude that extradition must indeed be barred on article 3 grounds".

71.  Finally, Lord Hoffmann, Lord Scott, Baroness Hale and Lord Brown all doubted Lord Justice Laws' view that life imprisonment without parole was *lex talionis*. Lord Hoffman, Baroness Hale and Lord Brown did not accept his premise that the abolition of the death penalty had been founded on the idea that the life of every person had an inalienable value; there were other, more pragmatic reasons for abolition such as its irreversibility and lack of deterrent effect. Lord Scott rejected the view that an irreducible life sentence was inhuman and degrading because it denied a prisoner the possibility of atonement; once it was accepted that a whole life sentence could be a just punishment, atonement was achieved by the prisoner serving his sentence.

72.  Wellington's application to this Court was struck out on 5 October 2010, the applicant having indicated his wish to withdraw it (*Wellington v. the United Kingdom* (dec.), no. 60682/08).

## C. Relevant Canadian case-law

73.  Section 1 of the Canadian Charter of Rights provides that the Charter guarantees the rights and freedoms set out in it "subject only to such reasonable limits prescribed by law as can be demonstrably justified in a free and democratic society." Section 7 provides:

> "Everyone has the right to life, liberty and security of the person and the right not to be deprived thereof except in accordance with the principles of fundamental justice."

Section 12 provides:

> "Everyone has the right not to be subjected to any cruel and unusual treatment or punishment."

74.  In *United States v. Burns* [2001] S.C.R. 283, Burns and another (the respondents) were to be extradited from Canada to the State of Washington to stand trial for murders allegedly committed when they were both eighteen. Before making the extradition order the Canadian Minister of

Justice had not sought assurances that the death penalty would not be imposed.The Supreme Court of Canada found that the remoteness between the extradition and the potential imposition of capital punishment meant the case was not appropriately considered under section 12 but under section 7. However, the values underlying section 12 could form part of the balancing process engaged under section 7. The extradition of the respondents would, if implemented, deprive them of their rights of liberty and security of person as guaranteed by section 7. The issue was whether such a deprivation was in accordance with the principles of fundamental justice. While extradition could only be refused if it "shocked the conscience" an extradition that violated the principles of fundamental justice would always do so. The court balanced the factors that favoured extradition against those that favoured seeking assurances that the death penalty would not be sought.The latter included the fact that a degree of leniency for youth was an accepted value in the administration of justice, even for young offenders over the age of eighteen.The court concluded that the objectives sought to be advanced by extradition without assurances would be as well served by extradition with assurances. The court held therefore that assurances were constitutionally required by section 7 in all but exceptional cases.

75.  In *United States of America v. Ferras; United States of America v. Latty*, [2006] 2 SCR 77, the appellants were to be extradited to the United States to face charges of fraud (the *Ferras* case) or trafficking of cocaine (the *Latty* case). The appellants in the *Latty* case had argued that, if extradited and convicted they could receive sentences of ten years to life without parole and this would "shock the conscience". In dismissing the appeals, the Supreme Court affirmed the balancing approach laid down in *Burns* to determining whether potential sentences in a requesting state would "shock the conscience".The harsher sentences the appellants might receive if convicted in the United States were among the factors militating against their surrender but they had offered no evidence or case-law to back up their assertions that the possible sentences would shock the conscience of Canadians. The factors favouring extradition far outweighed those that did not.

### D.  Relevant international law on *non-refoulement*

#### 1.  The International Covenant on Civil and Political Rights

76.  Article 7 of the ICCPR where relevant provides that "no one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment." The Human Rights Committee's most recent general comment on Article 7 (No. 20, of 10 March 1992) states the Committee's view that: "States parties must not expose individuals to the danger of torture or cruel, inhuman or degrading treatment or punishment upon return

to another country by way of their extradition, expulsion or *refoulement*." (see also *Chitat Ng v. Canada*,CCPR/C/49/D/469/1991,7 January 1994; *A.J.R. v. Australia*, CCPR/C/60/D/692/1996, 11 August 1997).

### 2.  The United Nations Convention Against Torture

77.  Article 3 § 1 of the 1984 United Nations Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("UNCAT") provides:

> "No State Party shall expel, return ("*refouler*") or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture."

78.  Article 16 § 2 provides:

> "The provisions of this Convention are without prejudice to the provisions of any other international instrument or national law which prohibits cruel, inhuman or degrading treatment or punishment or which relates to extradition or expulsion."

### 3.  The Council of Europe Guidelines on Human Rights and the fight against terrorism

79.  The above guidelines (adopted by the Committee of Ministers on 11 July 2002) contain the following provisions on *refoulement* and extradition:

> "**XII.  Asylum, return ('*refoulement*') and expulsion**
>
> ...
>
> 2.  It is the duty of a State that has received a request for asylum to ensure that the possible return ("*refoulement*") of the applicant to his/her country of origin or to another country will not expose him/her to the death penalty, to torture or to inhuman or degrading treatment or punishment. The same applies to expulsion.
>
> **XIII.  Extradition**
>
> 1.  Extradition is an essential procedure for effective international co-operation in the fight against terrorism.
>
> ...
>
> 3.  Extradition may not be granted when there is serious reason to believe that:
>
> (i)  the person whose extradition has been requested will be subjected to torture or to inhuman or degrading treatment or punishment..."

### 4.  The European Union Charter

80.  Article 19 § 2 of the Charter of Fundamental Rights of the European Union provides:

> "No one may be removed, expelled or extradited to a State where there is a serious risk that he or she would be subjected to the death penalty, torture or other inhuman or degrading treatment or punishment."

III. RELEVANT DOMESTIC AND INTERNATIONAL LAW AND
    PRACTICE ON DETENTION AT ADX FLORENCE

## A.  Evidence of conditions of detention at ADX Florence

81.  ADX Florence, a so-called "supermax" prison, is one of a number of detention facilities at the Federal Correctional Complex,Florence,Colorado. The parties have provided a great deal of evidence in respect of conditions of detention at ADX and general facilities at FCC Florence.The applicants have also submitted general evidence on "supermax" prisons and their effects on prisoners. The evidence submitted may be summarised as follows.

### 1.  Evidence submitted by the Government

82.  The Government submitted a series of declarations, which had been prepared specifically for the present proceedings by officials at FCC/ADX Florence. Thereafter, in reply to a series of questions put by the Court in respect of the number of inmates entering ADX's "step down program", two further letters were provided by the United States Department of Justice (see paragraphs 93–97 below).

#### a.  The declarations

83.  Mr Louis J. Milusnic, the associate warden of ADX, outlined the regime which was in place at the special security unit (H Unit) for inmates who were subjected to special administrative measures. All cells were single occupancy, had natural light and measured 75.5 square feet (approximately 7 square metres). Showers were not in-cell but on a shared range.

84.  Inmates in H Unit were part of the special security unit program, which had three phases that inmates could work through.

In phase one, the "baseline" phase, inmates had two non-legal telephone calls per month, five social visits, access to a commissary list and art and hobby craft items, and escorted shower time three times a week. They had ten hours per week of out-of-cell recreation time (increased from five hours per week in September 2009). As of November 2010, twelve inmates were in phase one.

In phase two, conditions were the same save that three non-legal telephone calls per month were permitted, the commissary list was expanded and inmates were permitted to go to the shower unescorted, five times per week. Eleven inmates were in phase two.

In phase three, group recreation was permitted five days a week (for a minimum of one and a half hours per day, in groups of four) and the number of non-legal telephone calls increased to four. Inmates ate one meal together and engaged in recreational activities together for one and a half hours per

day. Access to showers was unrestricted and the commissary list was further expanded. Four inmates, who had all been convicted of terrorist activity, had progressed to phase three.

Advancement through the phases was authorised by a Program Screening Committee, whose six-monthly reviews the inmate attended. The Committee's task was to determine whether an inmate could function with additional privileges without posing a security or safety risk. Advancement was subject to various factors including good conduct, participation in programmes recommended by the Unit, positive behaviour and respectful conduct and positive overall institutional adjustment.

85. Recreation alternated daily between outside and inside recreation. Outdoor recreation took place in adjacent individual recreation areas, which allow an inmate full visual access to the recreation yard and other inmates. Conversations could be carried on in a normal tone of voice and most inmates spent the majority of their recreation time talking to other inmates. Each individual outdoor area measured 12 feet by 20 feet (approximately 3.66 metres by 6 metres) and contained pull-up bars and footballs.Individual indoor areas measured 14 feet by 10 feet. Recreation had only been cancelled once in thirteen months for security reasons.

86. There was no limit on inmates' correspondence with family members and special administrative measures could be modified to allow correspondence beyond the immediate family. There were also no limits on correspondence with legal representatives and access to a law library for up to two hours at a time. Inmates received a free, daily copy of *USA Today*. They had access to fifty television channels and seven FM radio channels. They could speak to inmates in adjacent cells using the air ventilation as a voice conduit. They had regular contact with prison staff – a member of the Unit Team visited every inmate every day – and there were visits from medical, education, religious service and psychology staff, including two Arabic speakers. Inmates could request to speak with an officer at any time.

87. Mr Milusnic also outlined the criteria and procedures for placement at ADX Florence.An inmate either had to: (i) create a security risk at other correctional facilities; or (ii) as a result of his or her status, be unable to be safely housed in the general population of another institution. Referral to ADX was initiated by the staff at the inmate's current institution. If the warden of that institution, the relevant regional director and the Bureau's designation centre all concurred, a hearing took place. The inmate was given written notice at least twenty-four hours prior to the hearing. After the hearing, a report with a recommendation was prepared and given to the inmate. The final decision was taken on the basis of the report by an Assistant Director of the Federal Bureau of Prisons, with the possibility of appeal to the chief of the designation centre and thereafter the Office of the General Counsel.

88. Ms Patricia Rangel is the Unit Manager for the General Population Units at ADX.She provided two declarations.

Her first declaration outlined the Federal Bureau of Prisons procedures for review of the status of inmates. There was an initial classification upon arrival at a new Bureau institution, which took place at a meeting attended by the inmate and which defined,*inter alia*, the work and educational programmes the inmate would follow, his or her release plans, and security/custody levels. Thereafter, there were six-monthly program reviews (including progress review reports, which were signed by the inmate and the Unit Manager) and more detailed, three-yearly progress reports, which were also made available to the inmate.

In her declaration Ms Rangel also outlined the different levels of security in ADX units and the step down program. The units followed a "stratified" system of housing from General Population Units to the Intermediate, Transitional and Pre-Transfer Units. It would take an inmate a minimum of thirty-six months to work through the system: the minimum stay in each unit was twelve months in a General Population Unit, six months in Intermediate, six in Transitional and twelve in Pre-Transfer. Specific conditions in each unit were as follows.

General Population Unit cells were 87 square feet (8 square metres) plus a sallyport (exit area) of 17 square feet. Showers were within the cells. There was a window with natural lighting and inmates could control the lighting in their cell via a dimmer switch. Lights on the range were switched off at night, but, as in all federal prisons, were briefly turned on for three cell counts during the night. Meals were delivered in-cell. Inmates received two fifteen minute telephone calls and up to five social visits per month. It was possible and permissible for inmates to talk to each other in their cells via the ventilation system or during their out-of-cell recreation.

Inmates had ten hours out-of-cell exercise each week in single-cell recreation areas, some of which were grouped together on large recreation yards. Ms Rangel gave the sizes of the two types of outdoor individualised recreation areas as 240 square feet and 315 square feet (22 and 29 square metres). The size of the indoor areas was 389 square feet (36 square metres). Recreation privileges could be restricted for violations of rules and regulations. Restrictions on outdoor recreation were in three-month increments (three months for a first offence, six for a second offence and so on).

Intermediate Unit cells were 75.5 square feet and did not have a sallyport or shower. There was a window with natural lighting; cell doors faced out onto a range. Inmates were assigned to a group of eight inmates with whom they recreated. Meals were provided to inmates one group at a time, meaning each group was allowed out of their cells to collect their meals in the range. Inmates received three fifteen-minute telephone calls and up to

five social visits per month. Showers stalls were on the range, where inmates could shower any time they were out on the range.

Transitional Units had similar conditions to Intermediate Units save that inmates were assigned to groups of sixteen inmates. They received twenty-one hours of out-of-cell recreation per week in their assigned group on the range or in a large recreation yard. Meals were consumed in groups on the range. Inmates were unrestrained when out of their cells. They received an extra fifteen-minute telephone call per month and could leave the unit unrestrained but escorted to purchase items from the commissary.

The Pre-Transfer Unit was located at another penitentiary at FCC Florence. As in the Intermediate and Transitional Units, inmates ate their meals and recreated within their assigned group. They received twenty-four and a half hours' out-of-cell recreation time per week, and five visits and three hundred minutes of telephone calls per month.

In the General Population, Intermediate and Transitional Units, access to television, radio and books, contact with prison staff and rules on correspondence were as outlined by Mr Milusnic.

The rules governing the step down program were set out in an "institution supplement", which had been updated in September 2009. An inmate's placement in and advancement through the step down program were reviewed every six months, subject to the minimum periods in each unit, set out above, and other criteria such as participation in defined programmes, positive behaviour and overall institutional adjustment.According to the updated supplement, mitigation of the original reason for placement at ADX Florence was no longer a factor which was considered, but the Step Down Screening Committee, which made decisions on advancement, could have regard to the initial reasons for placement at ADX and other safety and security factors. The final decision was one for the Warden. Any negative decision had to be reasoned (unless providing reasons would pose a threat to individual safety or institutional security) and was subject to appeal through the Bureau's administrative remedy programme. Since the implementation of the updated supplement, there had been a 56% increase in movement of inmates from the four General Population Units to the Intermediate Unit and a 135% increase in movement from the Intermediate to the Transitional Unit. Inmates had also completed the programme and been transferred out of ADX Florence. This included Arab-Muslim inmates.

89.  Mr Christopher B. Synsvoll is the Department of Justice Supervising Attorney at FCC Florence. His declaration outlined the application of special administrative measures. These measures were rare: of 210,307 Federal Bureau of Prison inmates, forty-one were subjected to them; twenty-seven of the forty-one were in H Unit at ADX Florence. Special administrative measures could be challenged through the Bureau's administrative remedy programme, which led to a review of the need for the

measures and which involved consultation with other agencies such as the FBI. This process had, on occasion, led to the modification of certain special administrative measures such as allowing greater communication for inmates with the outside world.

90.  The psychologist assigned to ADX Florence, Dr Paul Zohn, outlined the psychological and psychiatric care available at the prison. The preference was to treat inmates with mental health problems *in situ* rather than in hospitals where this was possible. Care was provided by one psychiatrist and two psychologists who made regular rounds through the housing units at ADX. Various treatment programs were available and inmates who needed psychotropic medication were seen regularly by a psychiatrist. Contrary to assertions previously made by the applicants, video-conferencing was not ordinarily used to assess an inmate's mental health. The main mental health disorders such as bipolar affective disorder, depression, post-traumatic stress disorder and schizophrenia would not preclude a designation to ADX and could be managed successfullythere. Conditions of confinement were largely determined by security needs and would be modified based on mental illness only if the inmate's mental status warranted such a change. However, if necessary, inmates could be referred to one of the Bureau's Psychiatric Referral Centers for acute psychiatric care. Inmates who would be considered "seriously mentally ill" would not be housed at ADX but at a ReferralCenter. All new inmates at ADX received an initial psychological evaluation and, if necessary, follow-up assessment and treatment planning.Thereafter, the psychological department monitored any treatment needs such as medication or modification to an inmate's housing, work or program assignment.

91.  The prison chaplain at ADX, Michael S. Merrill, stated that an imam was available to inmates four days a month and would speak to inmates at their cell door. The chaplain had also significantly expanded the Islamic section of the religious library at the prison, which included 158 Arabic language books. There were also 320 videos and DVDs on Islam. The Religious Services Department provided Islamic-faith programming through its closed-circuit television channel, including four to five days of Sunni Muslim programming on Friday and recitations of the Qur'an on Friday and Saturday evenings. Inmates had access to a halal diet; special arrangements were made for meals during Ramadan. Although there could be no formal congregational prayer for any faith group, Muslim inmates could perform the Azan (call to prayer) and the Salat (five daily prayers) in their cells; they could also have access to prayer rugs, prayer oil, prayer beads and religious headgear in their cells.

92.  Ms Roxana Mack, the Assistant Supervisor of Education at ADX, stated that H unit inmates had access to approximately 900 books with no limit on the number of books an inmate could borrow. They had access to a

law library for two hours at a time, including access to electronic databases. There were also educational courses.

### b. The Department of Justice's letters

93. In the course of proceedings before the Court, the respondent Government were asked to provide information as to:

 (i) how long inmates in the Special Security Unit program had spent at ADX and how long they had been in each phase of the program;

 (ii) how many inmates were in each phase of the step down program;

 (iii) how long each inmate had spent at ADX and how long they had been in each phase of the program; and

 (iv) how many inmates had completed the program, how long they had spent at ADX and how long they had been in each phase of the program

94. The questions were forwarded to the United States authorities. By letter dated 26 September 2011, the Department of Justice stated that there were 252 inmates in ADX's General Population Unit. The Special Security Unit program could house up to 32 inmates. There were 17 inmates in phase I, nine in phase II and six in phase III. For the step down program, 32 inmates were in J Unit, 32 in K Unit and 25 in D/B Unit. The Department of Justice stated that the Bureau of Prisons obligations under United States law prevented disclosure of information as to the length of time inmates had spent at each stage of the two programs.

95. By letters dated 29 September and 7 October 2011, the Section Registrar clarified that the questions put by the Court were not intended to obtain information on specific inmates but rather to provide meaningful assistance as to: the length of time an inmate was likely to spend at ADX before being admitted to either program; how long he was likely to spend in each phase of either program; and how long he was likely to spend in either program before transfer out of ADX.

96. On 24 October 2011 the Agent of the Government of the United Kingdom replied, forwarding a letter of the same date from the Department of Justice, which set out the results of a statistical analysis conducted by the Bureau of Prisons. The analysis was based on a random sample of thirty inmates selected from the General Population at ADX and/or each phase of the step down program.On the basis of that sample, an inmate was likely to spend three years at ADX before being admitted to the Step Down or Special Security Unit programs. The likely times in each phase were: nine months in intermediate, eleven months in transition and nine months in pre-transfer. Thus, an inmate was likely to spend three years in General Population followed by two years and five months progressing through either program.

97. The Department of Justice's letter of 26 September 2011 also stressed that, while generally inmates who were subject to special administrative measures were housed in the Special Security Unit, it was

possible for such inmates to be housed at other prisons.Furthermore, if special administrative measure were vacated for an inmate at ADX, he could be transferred from ADX to other prison. This had occurred for seven of the thirteen inmates whose special administrative measures had been vacated.

### 2. Evidence submitted by the applicants

98.  The applicants submitted general evidence as to the effect of solitary confinement on prisoners and specific evidence as to the prison regime at ADX Florence.

99.  The applicants also provided a report by a psychiatrist, Dr Terry Kupers, which had been prepared specifically for the present proceedings. He considered that a supermax prison regime did not amount to sensory deprivation but there was an almost total lack of meaningful human communication. This tended to induce a range of psychological symptoms ranging from panic to psychosis and emotional breakdown. All studies into the effects of supermax detention had found such symptoms after sixty days' detention. Once such symptoms presented, it was not sufficient to return someone to normal prison conditions in order to remedy them. If supermax detention were imposed for an indeterminate period it also led to chronic despair. Approximately half of suicides in United States prisons involved the 6-8% of prisoners held in such conditions. The effects of supermax conditions were worse for someone with pre-existing mental health problems. There was also evidence of solitary confinement leading to a range of physical illnesses. Dr Kuper's conclusions were supported by a number of journal articles by psychologists and criminologists, which the applicants provided.[1]

100.  The specific evidence on ADX Florence included a series of statements by Professor Laura Rovner, Director of the Civil Rights Clinic at the University of Denver, which had acted for a number of prisoners at ADX Florence. Professor Rovner's statements were based on her experience of ADX, the evidence of her clients, and various affidavits which had been prepared for litigation in the federal courts regarding ADX Florence. Her latest statement, of 27 May 2011, responded to the six declarations submitted by the Government. Her statement, and the other evidence provided by the applicants, may be summarised as follows.

---

1. These included: P Scharff Smith, "Solitary Confinement – History, Practice, and Human Rights Standards" 181 *Prison Service Journal* 3-11; S. Shalev, "Inside a Supermax"; 181 *Prison Service Journal* 21-25; F. Cohen, "Isolation in Penal Settings: The Isolation-Restraint Paradigm" 22 *Journal of Law and Policy* 295; C. Haney, "A Culture of Harm: Taming the Dynamics of Cruelty in Supermax Prisons" 35:8 *Criminal Justice and Behaviour* 956; C. Haney, "Mental Health Issues in Long-Term Solitary and 'Supermax' Confinement" (2003) 49:1 *Crime and Delinquency* 124; S. Grassian, "Psychiatric Effects of Solitary Confinement" (2006) 22 *Journal of Law and Policy* 353.

101. Professor Rovner recalled that one of the former wardens of ADX had publicly described the prison as "a clean version of hell". Professor Rovner stated that, despite the evidence set out in the six declarations, conditions at ADX Florence had not changed significantly in the last two years. Solitary confinement for long periods continued. One lawyer, Mr Mark H. Donatelli, had conducted a survey which had found that at least forty-three inmates of ADX Florence had spent eight years or more in "lock-down" conditions there and at previous prisons.

Contact with staff could be as little as one minute per day. Some prisoners were placed on "single recreation status", meaning no one else was permitted to be in adjoining recreation cells at the same time.Recreation privileges could be terminated for minor infractions: one prisoner was denied outdoor exercise for sixty days for trying to feed crumbs to birds. When he challenged this sanction through the grievance process, it was increased to ninety days. Upon further appeal he was told that the decision was not punitive but a managerial strategy to impress upon him the importance of adhering to institutional procedures. Indoor recreations were little more than cages with a single pull-up bar for exercise. There was nothing to do in outdoor recreation cages save to pace up and down. There was limited visibility – all that could be seen was the sky through chain linking. Recreation was frequently cancelled owing to staff shortages.

The evidence also showed that, despite the consensus in the medical profession that prisoners with mental illnesses should not be held in solitary confinement, ADX continued to house seriously mentally ill prisoners, including those with severe schizophrenia and bipolar disorder. Several inmates were too sick to communicate properly with their representatives; a report had been received of one prisoner who was too ill to write, but was living a cell that he had covered in six inches of rubbish and faeces. Several prisoners had stated in witness statements prepared for litigation in the United States courts, that there were mentally ill prisoners at ADX Florence who, because of their conditions, screamed all night, making sleep difficult for others. General medical facilities were also inadequate: there were only two doctors for 3,200 inmates at FCC Florence, and only basic healthcare needs were met. There were also reports from Human Rights Watch which indicated that force feeding of hunger strikers took place in an unnecessarily punitive and painful way.

Religious services were extremely limited – one Muslim inmate had only seen an imam three times – and one inmate in a general population unit had received an incident report for intoning the Azan. Books and educational activities were also limited.

For inmates, particularly those subjected to special administrative measures, telephone calls, and social visits were highly restricted and subject to monitoring. Contact with other inmates was generally prohibited and, when they were not, communication between cells could only be

carried out by yelling, which was prohibited. Visits were limited to one adult visitor at a time, with no physical contact, and required fourteen days' written notice. Evidence in cases brought by inmates who had been subjected to special administrative measures indicated that letters could be limited to three sheets of paper per week and certain family members could be refused clearance to write to or speak with an inmate. Special administrative measures could also mean that an inmate was prohibited from watching news channels on television, from receiving recent newspapers or any Arabic publications whatsoever; one inmate received his newspaper with whole sections removed. International telephone calls were expensive and liable to disruption.

Despite the adoption of objective criteria for placement at ADX, it remained the case that all those subjected to special administrative measures or convicted of terrorism offences were liable for placement, regardless of their security risk or their disciplinary record in other institutions. The placement hearing was window dressing: one hearing officer had carried out one hundred hearings and never found an inmate to be unsuitable for placement. There was evidence of hearings taking place *post facto*, in some cases many years after the transfer to ADX had been carried out. Inmates also received only twenty-four hours' notice of a hearing and did not have the right to legal representation. There was evidence that hearing officers did not read all of the evidence submitted and based their decisions on unreliable evidence. Inmates did not see all the evidence against them. Professor Rovner also provided declarations by Arab Muslim clients, in which they stated that they had never been told the reasons for their placement at ADX and had been sent there after 9 September 2011, despite years of good conduct in other, much less restrictive prisons, both in the United States and elsewhere.

Although there had been an increase in the number of admissions to the step down program, the fact remained that many inmates were spending significant periods of time in solitary confinement prior to admission, despite having met the criteria for admission for years. Four clients of the Clinic had only been admitted to the program after periods of between seven and thirteen years in solitary confinement and only then after commencing litigation against the Bureau of Prisons. Another two clients had never been admitted, despite their clean disciplinary records and despite periods of eight to nine years at ADX. Even after the changes to procedures governing entry to the program, an inmate's original crime continued to serve as the basis for placement at ADX; thus it was possible for an inmate to be unable to sufficiently mitigate the original reason for placement and so gain admission to the program. Moreover, if an inmate had never been told the reasons for his placement, he could not know what he had to do to gain admission to the program. The program required three years to complete and a prisoner needed one year of clear conduct in general population before

being eligible for step down. Even eligibility for the program did not mean that a prisoner would be allowed into it.

Conditions in the first phase of the step down program did not differ significantly from general population units. According to one inmate, Mr Rezaq, lockdowns occurred frequently in J Unit, which meant inmates were confined to their cells, and could last days or even weeks. Inmates could also be removed from the program at any time without explanation or due process, even for the most minor infractions. Some had been removed from the program without receiving an incident report or were removed after receiving a report for an incident for which they were soon found not guilty.Yet, following such removals, they were either denied re-admission to the program or forced to spend years going through it again. The Bureau itself had estimated that only 5% of inmates progressed though the program in the minimum three years. Even successful completion of the step down program might only result in a transfer to a "communications management unit", such as those housed at USP Terre Haute or USP Marion, where conditions remained restrictive.

According to Professor Rovner, it was difficult to dispute the evidence provided by the Government on special administrative measures (owing to restrictions contained in the measures themselves) but, on the basis of public information, she was able to state that the effect of the measures could amount to solitary confinement, even if an inmate was not detained at ADX. The indefinite prolongation of special administrative measures meant that certain Arab-Muslim inmates had spent between five and thirteen years in solitary confinement both before and after trial. Challenging such measures was impossible for inmates without access to legal representation.Legal aid was not available and, even if *pro bono* legal representation was obtained, the Department of Justice could still refuse to give the lawyers the necessary clearance; this had happened to her Clinic.

102. The applicants also relied on two letters from Human Rights Watch. The first, dated 2 May 2007 to the Director of the Federal Bureau of Prisons, followed a tour the organisation had been given of ADX Florence. The letter expressed concerns that a number of prisoners convicted of terrorism offences had been sent to the prison based on the nature of their crimes and, despite good conduct since their arrival, had remained in general population units and thus outside the step-down programme for up to nine years. The letter made suggestions for improvement in respect of recreation, mail, telephone use, the library. It also noted that progress was to be made on better meeting prisoners' religious needs, such as the provision of a full-time imam and commended the educational programmes available through the prison's television system. In the letter Human Rights Watch expressed serious concerns as to prisoners' inability to do any meaningful exercise in the indoor and outdoor recreation areas, owing to the size of these areas and the lack of any proper equipment. The letter urged the prison

authorities to investigate reports of retaliation against prisoners who were on hunger strike in the form of transfer to harsher cells. The letter also said that Human Rights Watch was extremely concerned about the effects of long-term isolation and highly limited exercise on the mental health of prisoners and criticised reports of rushed consultations between prisoners and psychologists, as well as the fact that evaluations were carried out via closed circuit television.

103.  The applicants obtained a second letter from Human Rights Watch, dated 21 August 2008, which stated that Human Rights Watch considered conditions at ADX violated the United States' treaty obligations under the International Covenant on Civil and Political Rights and the United Nations Convention against Torture. It was unremarkable that "minor adjustments" had been made to the regime but it remained in essence one of "long-term and indefinite incarceration in conditions of extreme social isolation and sensory deprivation".

### B.  The Eighth Amendment and conditions of detention

104.  The Eighth Amendment to the Constitution provides,*inter alia*, that cruel and unusual punishments shall not be inflicted.

105.  The Eighth Amendment requires prison officials to provide humane conditions of confinement, to ensure inmates receive adequate food, clothing shelter and medical care, and to take reasonable measures to guarantee their safety (*Farmer v. Brennan* 511 US 825 (1994). Only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation (*Wilson v. Seiter* 501 U.S. 294, 304 (1991); *Rhodes v. Chapman* 452 U.S. 337, 347 (1981)). A serious deprivation is necessary, because routine discomfort is part of the penalty inmates pay for their crimes (*Hudson v. McMillan* 503 US 1 (1992); *Sandin v. Conner* 515 US 472 (1995)).Thus, in order to establish that a deprivation violates the Eighth Amendment, a prisoner must satisfy: (i) an objective test by demonstrating a sufficiently serious deprivation; and (ii) a subjective test by showing that the conditions of confinement involve the deliberate imposition of pain or deliberate indifference to it (*Wilson*, cited above).

106.  In *Hutto v. Finney* 437 US 678 (1978), the Supreme Court upheld a lower court order limiting periods of punitive isolated confinement to thirty days, in circumstances where the lower court had found that conditions in the prison in question amounted to cruel and unusual punishment. The court recognised that confinement in an isolation cell was a form of punishment which was subject to scrutiny under Eighth Amendment standards but rejected the submission that indeterminate sentences to punitive isolation always constituted cruel and unusual punishment.

107.  Lower federal courts have found that whether an extended term of solitary confinement violates the Eighth Amendment will depend on the particular facts of each situation, including the circumstances, nature and duration of the confinement (*DeSpain v. Uphoff* 264 F.3d 965 (10th Cir. 2001)). Although they have recognised that prolonged conditions of solitary confinement may cause significant psychological damage (*Davenport v. DeRobertis* 844 F.2d 1310, 1313 (7th Cir. 1988)), the lower courts have, for the most part, rejected Eighth Amendment claims arising either from conditions of solitary confinement or from periods of confinement to cells for twenty-two or twenty-three hours per day (see,*inter alia*,*Five Percenters* 174 F.3d 471 (4th Cir. 1999); *In re Long Term Admin. Segregation* 174 F.3d 464 (4th Cir. 1999); *Anderson v. County of Kern* 45 F.3d 1310 (9th Cir. 1995); *Peterkin v. Jeffes* 855 F.2d. 1021 (3d cir. 1988); *Smith v. Romer* 107 F.3d 21 (10th Cir. 1997)).However, in *Ruiz v. Johnson* 37 F. Supp 2d 855 (1999), the highest level of administrative segregation in the Texan prison system was found to reach levels of psychological deprivation that violated the Eighth Amendment. There, the court found there had been deliberate indifference to a systemic pattern of extreme social isolation and reduced environmental stimulation. The objective test was found to have been met in respect of three prisoners who had been in solitary confinement for between twenty-nine and thirty-five years: *Wilkerson v. Stalder* 639 F. Supp. 2d 654 M.D.La.,2007.

108.  Lower courts outside the Tenth Circuit (which has jurisdiction over ADX Florence) have ruled that solitary confinement of prisoners with pre-existing serious mental illness can be sufficiently harmful to violate the objective test laid down in *Wilson*, cited above: see *Jones 'El v. Berge* 164 F. Supp. 2d 1096 (2001) (concerning Wisconsin's "supermax" prison) and *Madrid v. Gomez* 889 F. Supp 1146 (1995) (concerning detention at Pelican Bay State Prison, California). However, the subjective test laid down in *Wilson* may not be satisfied unless a plaintiff can show that prison officials attributed any deterioration in his mental state to the conditions of his confinement. Negligence in this respect does not suffice; deliberate indifference is required (*Scarver v. Litscher* 434 F. 3d 972 (7th Cir. 2006)).

## C.  Due process of law

109.  The Fifth Amendment protects against deprivation of life, liberty or property without due process of law. In the context of prison discipline, due process rights are triggered by an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life (*Sandin v. Conner*, cited above). This will include transfer to a "supermax" security prison (*Wilkinsonv. Austin* 545 US 209 (2005)). In *Wilkinson*, the court upheld a system which gave notice of the reasons for placement in the supermax prison, an opportunity to reply and multiple levels of review. Periodic

review of administrative segregation is also required to ensure that it is not used as a pretext for indefinite confinement (*Hewitt v. Helms* 459 US 460 (1983)).

*Sandin* has been interpreted by the Tenth Circuit as requiring prisoners to show that their conditions of confinement deviate substantially from the baseline accepted treatment of prisoners (*Estate of DiMarco v. Wyoming Department of Corrections* 473 F. 3d 1334 (10th Cir. 2007)). This test was found not to be satisfied by fourteen months' solitary confinement in *DiMarco* because the prisoner in question had been provided with the ordinary essentials of prison life.

### D.  Litigation challenging conditions of detention at ADX Florence

110.  In *Sattar v. Gonzales* 2009 WL 606115 (D.Colo.2009) the United States District Court for the District of Colorado dismissed a challenge to conditions of detention at ADX Florence and to the imposition of special administrative measures. The plaintiff had limited contact with his family and attorneys and so the court found that the "severe limitations of ADX confinement"did not amount to the necessary deprivation required by the objective test.

A constitutional challenge to the imposition of special administrative measures at ADX was also dismissed by the District Court in *Al-Owhali v. Holder*1011 WL 288523 (D. Colo. 2011); the case is now the subject of an appeal.

In *Georgacarakos v. Wiley*, 2010 WL 1291833 (D.Colo. 2010) the District Court found that detention at ADX for five years did not amount to atypical and significant hardship, given the availability of social visits and phone calls, the opportunity to converse with other inmates in the recreation areas, and the possibility of transfer out of ADX via the step down program. *Georgacarakos* was recently followed in *Matthews v. Wiley* 744 F. Supp. 2d 1159 (D. Colo. 2010).

In *Magluta v. United States Federal Bureau of Prisons*, 29 May 2009, the District Court held that the plaintiff's allegation that detention at ADX had led to a significant deterioration of his mental condition failed to satisfy the objective test in *Wilson* cited above. The plaintiff had not shown that conditions at ADX, even if lonely or uncomfortable, failed to provide basic human necessities; ADX was a prisonand confinement was"intendedto punish inmates, not coddle them".

111.  In *Hill v. Pugh* 75 Fed. Appx. 715 (10th Cir. (2003)) United States Court of Appeals for the Tenth Circuit rejected an Eighth Amendment claim that ADX conditions were cruel and unusual. The plaintiff was isolated in his cell twenty-three hours a day for five days a week and twenty-four hours the remaining two days. However, his minimal physical requirements of food, shelter, clothing and warmth had been met and so the conditions

showed neither an "unquestioned and serious deprivation of basic human needs" nor "intolerable or shocking conditions". Similar conclusions were reached in *Jordan v. the Federal Bureau of Prisons* 191 Fed. Appx 639 (10th Cir. 2006),*Ajaj v. United States* 293 Fed.Appx. 575 (10th Cir. 2008).

112. In *Rezaq, et al. v. Nalley, et al*,the plaintiffs brought Eighth Amendment claims concerning their placements at ADX at various dates between 1997 and 2003. The District Court granted the Bureau of Prisons' motions for summary judgment: 2010 WL 5157317 (D. Colo. 2010); 2010 WL 5464294 (D. Colo. 2010). The court, following the recommendations of the Magistrate Judge, found that the plaintiff's terrorist backgrounds and convictions provided a legitimate penological interest for transferring them to ADX, particularly when only thirty-five of the two hundred and six inmates in federal prisons with international terrorism convictions had been assigned to ADX. The plaintiffs' conditions of confinement there were not so extreme as to be atypical and significant. The conditions were also different from thosein *Wilkinsonv. Austin*(see paragraph 109 above) in that ADX offered more opportunities for outdoor exercise, interaction with other inmates and educational programmes. There was also insufficient evidence of significant mental harm: there was no evidence that one of the plaintiff's depression could be attributed to ADX; the remainder of the plaintiffs' emotional problems were typically experienced by prisoners. Finally, owing to the availability of periodical reviews and the step down program, confinement at ADX was not indeterminate. The plaintiffs have appealed to the Court of Appeals for the Tenth Circuit, though they have all been transferred out of ADX.

113. In *Silverstein v. Federal Bureau of Prisons* 704 F Supp. 2d 1077 (2010), before the District Court the plaintiff alleges that he has been held in solitary confinement at ADX Florence and other institutions since 1983. The Bureau of Prisons has sought summary judgment in its favour in respect of the plaintiff's claims. A decision is awaited; a six-day jury trial was set to begin on 23 January 2012.

### E.  Relevant international materials on solitary confinement

#### 1.  Council of Europe

114.  The Council of Europe Guidelines on human rights and the fight against terrorism contain the following provision:

"**XI.  Detention**

1. A person deprived of his/her liberty for terrorist activities must in all circumstances be treated with due respect for human dignity.

2. The imperatives of the fight against terrorism may nevertheless require that a person deprived of his/her liberty for terrorist activities be submitted to more severe restrictions than those applied to other prisoners, in particular with regard to:

(i) the regulations concerning communications and surveillance of correspondence, including that between counsel and his/her client;

(ii) placing persons deprived of their liberty for terrorist activities in specially secured quarters;

(iii) the separation of such persons within a prison or among different prisons, on condition that the measure taken is proportionate to the aim to be achieved."

115. The European Prison Rules (contained in Recommendation Rec(2006)2 of the Committee of Ministers of the Council of Europe to Member States) where relevant, provide as follows:

### Security

"51.1  The security measures applied to individual prisoners shall be the minimum necessary to achieve their secure custody.

51.2  The security which is provided by physical barriers and other technical means shall be complemented by the dynamic security provided by an alert staff who know the prisoners who are under their control.

51.3  As soon as possible after admission, prisoners shall be assessed to determine:

*a.* the risk that they would present to the community if they were to escape;

*b.* the risk that they will try to escape either on their own or with external assistance.

51.4  Each prisoner shall then be held in security conditions appropriate to these levels of risk.

51.5  The level of security necessary shall be reviewed at regular intervals throughout a person's imprisonment."

### Safety

52.1  As soon as possible after admission, prisoners shall be assessed to determine whether they pose a safety risk to other prisoners, prison staff or other persons working in or visiting prison or whether they are likely to harm themselves.

52.2  Procedures shall be in place to ensure the safety of prisoners, prison staff and all visitors and to reduce to a minimum the risk of violence and other events that might threaten safety.

52.3  Every possible effort shall be made to allow all prisoners to take a full part in daily activities in safety.

52.4  It shall be possible for prisoners to contact staff at all times, including during the night.

52.5  National health and safety laws shall be observed in prisons.

### Special high security or safety measures

53.1  Special high security or safety measures shall only be applied in exceptional circumstances.

53.2  There shall be clear procedures to be followed when such measures are to be applied to any prisoner.

53.3  The nature of any such measures, their duration and the grounds on which they may be applied shall be determined by national law.

53.4  The application of the measures in each case shall be approved by the competent authority for a specified period of time.

53.5  Any decision to extend the approved period of time shall be subject to a new approval by the competent authority.

53.6  Such measures shall be applied to individuals and not to groups of prisoners.

53.7  Any prisoner subjected to such measures shall have a right of complaint in the terms set out in Rule 70.

**Requests and complaints**

70.1  Prisoners, individually or as a group, shall have ample opportunity to make requests or complaints to the director of the prison or to any other competent authority.

70.3  If a request is denied or a complaint is rejected, reasons shall be provided to the prisoner and the prisoner shall have the right to appeal to an independent authority."

116.  The 21st General Report of the European Committee for the Prevention of Torture, 10 November 2011, addressed solitary confinement, which it defined as whenever a prisoner is ordered to be held separately from other prisoners or was held together with one or two other prisoners. The Committee observed:

"[Solitary confinement] can have an extremely damaging effect on the mental, somatic and social health of those concerned. This damaging effect can be immediate and increases the longer the measure lasts and the more indeterminate it is. The most significant indicator of the damage which solitary confinement can inflict is the considerably higher rate of suicide among prisoners subjected to it than that among the general prison population."

The report therefore urged States to minimise the use of solitary confinement. It should be proportionate and, the longer it was used, the stronger the reasons for it had to be. It should be lawful and subject to accountability, with the fullest possible reasons given and records kept. It should be necessary and non-discriminatory.It should never be imposed as part of a sentence and, if imposed as a disciplinary sanction, the maximum period should be fourteen days. In that period, a prisoner should have at least one hour's outdoor exercise per day and other appropriate mental stimulation.

The report also stated that the Committee's recommended procedural safeguards should be rigorously followed where administrative solitary confinement was used for preventative purposes, including periodical and external reviews which considered, among other things, whether some of the restrictions imposed were strictly necessary. In such situations, prisoners should have an individual regime plan which attempted to maximise contact

with others. Resources should also be made available to attempt to reintegrate the prisoner into the main prison community.

For material conditions in solitary confinement, the Committee stated that the cells used should meet the same minimum standards as those applicable to other prisoner accommodation.These included a cell of no less than six square metres, proper cell furnishings, adequate natural and artificial light, heating and ventilation, and sufficiently large exercise areas to allow genuine exertion.

The Committee also stated that medical personnel should never participate in decisions on solitary confinement and should report to the prison director whenever a prisoner's health was put seriously at risk by solitary confinement.

### 2. The Inter-American system

117. The Inter-American Commission on Human Rights has found that isolation could in itself constitute inhuman treatment, and a more serious violation could result for someone with a mental disability (*Victor Rosario Congo v. Ecuador*, case 11.427, 13 April 1999).

In *Montero Aranguren et al (DetentionCenter of Catia) v. Venezuela*, judgment of 5 July 2006, the Inter-American Court of Human Rights stated:

> "...solitary confinement cells must be used as disciplinary measures or for the protection of persons only during the time necessary and in strict compliance with the criteria of reasonability, necessity and legality. Such places must fulfil the minimum standards for proper accommodation, sufficient space and adequate ventilation, and they can only be used if a physician certifies that the prisoner is fit to sustain it. (footnotes omitted)"

### 3. The United Nations

118. Isolation for twenty-three hours a day in a two by two metres cell with ten minutes of sunlight per day was found by the United Nations Human Rights Committee to violate Article 7 of the ICCPR in *Polay Campos v. Peru*,CCPR/C/61/D/577/1994,6 November 1997.

119. In its recommendations to State parties, the United Nations Committee against Torture has recommended that:

- solitary confinement be strictly and specifically regulated by law and applied only in severe circumstances, with a view to its abolition (Conclusions and Recommendations in respect of Luxembourg, CAT/C/CR/28/2, at paragraph 6(b));

- there should be adequate review mechanisms relating to the determination and duration of solitary confinement (Conclusions and Recommendations in respect of Denmark,CAT/C/CR/28/1 at paragraph 7(d));

- solitary confinement for long periods of time may constitute inhuman treatment (Conclusions and Recommendations in respect of Switzerland,A/49/44, paragraph 133).

120. The United Nations Special Rapporteur for Torture has found that isolation for twenty-two to twenty-four hours per day may amount to ill-treatment and, in certain instances, torture (Interim Report of 28 July 2008,A/63/175, at paragraphs 77-85). The report included a copy of the Istanbul statement on the use and effects of solitary confinement, which was adopted at the International Psychological Trauma Symposium in December 2007. The statement included the following on the effects of solitary confinement:

> "It has been convincingly documented on numerous occasions that solitary confinement may cause serious psychological and sometimes physiological ill effects. Research suggests that between one third and as many as 90 per cent of prisoners experience adverse symptoms in solitary confinement. A long list of symptoms ranging from insomnia and confusion to hallucinations and psychosis has been documented. Negative health effects can occur after only a few days in solitary confinement, and the health risks rise with each additional day spent in such conditions.
>
> Individuals may react to solitary confinement differently. Still, a significant number of individuals will experience serious health problems regardless of the specific conditions, regardless of time and place, and regardless of pre-existing personal factors. The central harmful feature of solitary confinement is that it reduces meaningful social contact to a level of social and psychological stimulus that many will experience as insufficient to sustain health and well being."

121. In his Interim Report of 5 August 2011,A/66/268, the current Special Rapporteur for Torture found that where the physical conditions and the prison regime of solitary confinement caused severe mental and physical pain or suffering, when used as a punishment, during pre-trial detention, indefinitely prolonged, on juveniles or persons with mental disabilities, it could amount to cruel, inhuman or degrading treatment or punishment and even torture. The report highlighted a number of general principles to help to guide States to re-evaluate and minimise its use and, in certain cases, abolish the practice of solitary confinement. He stated that the practice should be used only in very exceptional circumstances, as a last resort, for as short a time as possible. He further emphasised the need for minimum procedural safeguards, internal and external, to ensure that all persons deprived of their liberty were treated with humanity and respect for the inherent dignity of the human person.

IV. RELEVANT DOMESTIC AND INTERNATIONAL LAW AND PRACTICE ON LIFE SENTENCES

### A. The applicants' possible sentences, the federal sentencing system and presidential pardons

#### 1. Evidence from the United States Department of Justice

122. In a letter dated 26 November 2010 the United States Department of Justice set out the maximum sentences each of the six applicants would face if convicted.

123. The first applicant faces four counts of criminal conduct. The first count, conspiracy to provide material support to terrorists, carries a maximum sentence of fifteen years in prison. The second count, providing material support to terrorists, carries the same maximum sentence. The third count,conspiracy to kill, kidnap, maim or injure persons or damage property in a foreign country, carries a maximum sentence of life in prison. The sentence for the final count, money laundering, is a maximum of twenty years. None of the counts contained a mandatory minimum sentence. The trial judge would have the discretion to impose a sentence of no imprisonment up to the maximum penalties, to run consecutively or concurrently.

124. For the second applicant, the Department of Justice stated that the maximum penalty he faced was not fifty years' imprisonment, as previously stated, but thirty-five years' imprisonment. This was because the maximum penalties for his offences were lower at the time of the alleged commission of the offences than the current sentences. The correct maximum penalties on each of the four counts he faced were: five years' imprisonment for the count of conspiracy to provide material support and resources to terrorists; ten years for providing material support and resources to terrorists; ten years for conspiring to provide material support and resources to a designated foreign terrorist organisation; and ten years for providing material support and resources to a designated foreign terrorist organisation. None of the counts carried a mandatory minimum sentence and, as for the first applicant, the trial judge would have the discretion to impose a sentence of no imprisonment up to the maximum penalties, to run consecutively or concurrently.

125. For the third applicant, as he is charged with the same offences as the first applicant (save for the money laundering charge), the possible sentences would be the same.

126. For the fourth applicant, for the Yemen hostage-taking counts, the maximum sentences are life imprisonment. For the Bly,Oregon counts, the maximum sentences were the same as those for the second applicant. For the Afghanistan counts, the maximum sentences are fifteen years'

imprisonment on each count. None of the counts carried a mandatory minimum sentence and the trial judge's discretion in sentencing would be the same as for the first three applicants.

127.  For the fifth applicant, the maximum sentences are:
conspiracy to kill United States nationals – life imprisonment;
conspiracy to murder – life imprisonment;
conspiracy to destroy buildings and property – life imprisonment; and
conspiracy to attack national defence utilities – ten years' imprisonment. The third count,conspiracy to destroy buildings and property, has a mandatory minimum sentence of twenty years' imprisonment. Therefore, if convicted on all four counts, the trial judge's sentencing discretion would range from twenty years' imprisonment to life.

128.  For the sixth applicant, each of the two hundred and sixty-nine counts of murder with which he is charged carries a mandatory minimum sentence of life imprisonment. The remaining counts carry maximum penalties of between ten years and life imprisonment.

129.  The Department of Justice's letter also set out the applicable law on federal sentencing. In addition to the need to have regard to the purposes of sentencing (set out in section 3553(a) of Title 18 of the United States Code), a trial judge had to consider the non-binding sentencing guidelines of the United States Sentencing Commission, a judicial body. These required the trial judge to have regard *inter alia* to any mitigating or aggravating factors, the defendant's criminal history, any credit for a guilty plea, and the effect of any assistance given to the United States' authorities.

130.  The letter further confirmed that, as set out at paragraph 72 of the Court's admissibility decision, there were four ways a sentence of life imprisonment could be reduced.

First, it could be reduced by the sentencing court upon the motion of the Director of the Bureau of Prisons upon a finding that "extraordinary and compelling reasons warrant such a reduction". This generally involved inmates with terminal illnesses.

Second, if a defendant provided substantial assistance in the investigation of a third party, the Government could move within one year of sentencing for a reduction in the sentence.

Third, if the defendant had been sentenced on the basis of sentencing guidelines which were subsequently lowered by the Sentencing Commission (the judicial body responsible for promulgating the guidelines) then the sentencing court could reduce the term of imprisonment.

Fourth, the defendant could request commutation by the President. While commutation was exercised sparingly, such relief had, on occasion, been granted for serious offences involving national security. For example, in 1999 President Clinton commuted the sentences of thirteen members of the FALN, a violent Puerto Rican nationalist organisation responsible for

bombings in the 1970s and 1980s, who had been convicted of conspiracy to commit armed robbery, bomb-making, sedition and other offences.

131.  Other reductions were available to those sentenced to less than life imprisonment. Fifty-four days' credit was available each year for exemplary compliance with institutional disciplinary regulations; this allowed for release after 85% of the sentence had been served. Additionally, any defendant had a statutory right of appeal against sentence to a federal court of appeals and, though rare, to the United States Supreme Court. He could also seek review of the sentencing by the trial judge within one year of the sentence being passed.

132.  The Department of Justice's letter of 22 September 2011 stated that sentences were normally to run concurrently unless the law provided for consecutive sentences or the trial judge positively ordered that any sentences which were imposed were to run consecutively. In the applicants' indictments, the only counts which carried mandatory concurrent sentences were three of the counts faced by the sixth applicant (one count of using and carrying an explosive, and two counts of using and carrying a dangerous device during the bombing of the US Embassies in Nairobi and Dar es Salaam).

The letter also underlined the Department of Justice's view that the federal sentencing guidelines gave the trial judge a broad discretion in sentencing.

### 2.  Evidence submitted by the applicants

133.  The applicants submitted a declaration from Ms Denise Barrett, the National Sentencing Resource Counsel for Federal Public and Community Defenders. She stated that a trial judge's discretion in sentencing was not as broad as the Department of Justice had suggested. It remained subject to increases as well as reductions on appeal. The sentencing guidelines allowed for significant increases in sentences if the offences involved terrorism, such that the recommended guideline sentence was the same as the statutory maximum sentence, irrespective of the absence of any prior criminal record. Owing to the possibility of consecutive sentences being imposed, she therefore assessed the possible sentences as:

> the first applicant, life plus fifty years;
> the second applicant, thirty-five years;
> the third applicant, life plus thirty years;
> the fourth applicant, two life sentences plus ninety-five years;
> the fifth applicant, three consecutive life sentences plus ten years;
> the sixth applicant, numerous consecutive life sentences.

For the mechanisms for sentence reduction, Ms Barrett noted the following. Compassionate release for the terminally ill or disabled was not automatic and was assessed with reference to additional factors such as the nature of the crime committed and the length of time served. Reduction for

substantial assistance to the authorities depended on the initiative of the Government, not the court. Subsequent lowering of the relevant sentencing guidelines could only reduce a sentence if the Sentencing Guidelines Commission made the change retroactive and might not reduce the overall sentence if the person concerned was convicted of other offences and given consecutive sentences. For presidential commutation, the FALN pardons had only been for those who had been convicted of non-violent crimes and had been offered on the condition that the individuals concerned renounce violence.The pardons had nonetheless been very controversial.

## B. Eighth Amendment case-law on "grossly disproportionate" sentences

134.  The Eighth Amendment has been interpreted by the Supreme Court of the United States as prohibiting extreme sentences that are grossly disproportionate to the crime (*Graham v. Florida* 130 S. Ct. 2011, 2021 (2010)). There are two categories of cases addressing proportionality of sentences.

The first category is a case-by-case approach, where the court considers all the circumstances of the case to determine whether the sentence is excessive. This begins with a "threshold comparison" of the gravity of the offence and the harshness of the penalty. If this leads to an inference of gross disproportionality, the court compares the sentence in question with sentences for the same crime in the same jurisdiction and other jurisdictions. If that analysis confirms the initial inference of gross disproportionality, a violation of the Eighth Amendment is established.

In the second category of cases, the Supreme Court has invoked proportionality to adopt "categorical rules" prohibiting a particular punishment from being applied to certain crimes or certain classes of offenders.

135.  Under the first category, the Supreme Court has struck down as grossly disproportionate a sentence of life imprisonment without parole imposed on a defendant with previous convictions for passing a worthless cheque (*Solem v. Helm* 463 US 277 (1983)). It has upheld the following sentences: life with the possibility of parole for obtaining money by false pretences (*Rummel v. Estelle* 445 US 263 (1980)); life imprisonment without parole for possessing a large quantity of cocaine (*Harmelin v. Michigan* 501 US 957 (1991)); twenty-five years to life for theft under a "three strikes" recidivist sentencing law (*Ewing v. California* 538 US 11 (2003)); forty years' imprisonment for distributing marijuana (*Hutto v. Davis* 454 US 370 (1982)).

136.  Examples of cases considered under the second category include *Coker v. Georgia* 433 US 584 (1977) (prohibiting capital punishment for rape) and *Roper v. Simmons* 543 US 551 (2005) (prohibiting capital

punishment for juveniles under eighteen). In *Graham*, cited above, the court held that the Eighth Amendment also prohibited the imposition of life imprisonment without parole on a juvenile offender who did not commit homicide. The court found that life imprisonment without parole was an especially harsh punishment for a juvenile and that the remote possibility of pardon or other executive clemency did not mitigate the harshness of the sentence.Although a State was not required to guarantee eventual freedom to a juvenile offender convicted of a non-homicide crime, it had to provide some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation. The court also held that a sentence lacking in legitimate penological justification (such as retribution, deterrence, incapacitation and rehabilitation) was, by its nature, disproportionate.Such purposes could justify life without parole in other contexts, but not life without parole for juvenile non-homicide offenders.

### C. Relevant international and comparative law on life sentences and "grossly disproportionate" sentences

137.  The relevant texts of the Council of Europe, the European Union and other international legal texts on the imposition and review of sentences of life imprisonment, including the obligations of Council of Europe member States when extraditing individuals to States where they may face such sentences, are set out in*Kafkaris*, cited above, at §§ 68-76. Additional materials before the Court in the present cases (and those materials in *Kafkaris* that are expressly relied on by the parties) may be summarised as follows.

#### 1. Life sentences in the Contracting States

138. In his comparative study entitled "Outlawing Irreducible Life Sentences: Europe on the Brink?",23: 1 *FederalSentencing Reporter* Vol 23, No 1 (October 2010), Professor Van Zyl Smit concluded that the majority of European countries do not have irreducible life sentences, and some, including Portugal, Norway and Spain, do not have life sentences at all.In Austria,Belgium,CzechRepublic,Estonia,Germany,Lithuania,Luxembourg,Poland,Romania,Russia,Slovakia,Slovenia,Switzerland and Turkey,prisoners sentenced to life imprisonment have fixed periods after which release is considered.In France three such prisoners have no minimum period but it appears they can be considered for release after 30 years. InSwitzerland there are provisions for indeterminate sentences for dangerous offenders where release can only follow new scientific evidence that the prisoner was not dangerous, although the provisions have not been used.The study concludes that only the Netherlands and England and Waleshave irreducible life sentences.

### 2. Council of Europe texts

139. The European Committee for the Prevention of Torture and Inhuman or Degrading Treatment or Punishment ("CPT") prepared a report on "Actual/Real Life Sentences" dated 27 June 2007 (CPT (2007) 55). The report reviewed various Council of Europe texts on life sentences, including recommendations (2003) 22 and 23, and stated in terms that: (a) the principle of making conditional release available is relevant to all prisoners, "even to life prisoners"; and (b) that all Council of Europe member States had provision for compassionate release but that this "special form of release" was distinct from conditional release.

It noted the view that discretionary release from imprisonment, as with its imposition, was a matter for the courts and not the executive, a view which had led to proposed changes in the procedures for reviewing life imprisonment in Denmark,Finland and Sweden. The report also quoted with approval the CPT's report on its 2007 visit to Hungary in which it stated:

> "[A]s regards "actual lifers", the CPT has serious reservations about the very concept according to which such prisoners, once they are sentenced, are considered once and for all as a permanent threat to the community and are deprived of any hope to be granted conditional release".

The report's conclusion included recommendations that: no category of prisoners should be "stamped" as likely to spend their natural life in prison; no denial of release should ever be final; and not even recalled prisoners should be deprived of hope of release.

### 3. The International Criminal Court

140. Article 77 of the Rome Statute of the International Criminal Court allows for the imposition of a term of life imprisonment when justified by the extreme gravity of the crime and the individual circumstances of the convicted person. Such a sentence must be reviewed after twenty-five years to determine whether it should be reduced (Article 110).

### 4. The European Union

141. Article 5(2) of Council Framework Decision of 13 June 2002 on the European arrest warrant provides:

> "if the offence on the basis of which the European arrest warrant has been issued is punishable by custodial life sentence or life-time detention order, the execution of the said arrest warrant may be subject to the condition that the issuing Member State has provisions in its legal system for a review of the penalty or measure imposed, on request or at the latest after 20 years, or for the application of measures of clemency to which the person is entitled to apply for under the law or practice of the issuing Member State, aiming at a non-execution of such penalty or measure..."

**A.140**

44        BABAR AHMAD AND OTHERSv. THE UNITED KINGDOMJUDGMENT

### 5. *The United Kingdom*

142. *R. v. Lichniak* and *R. v. Pyrah* [2003] 1 AC 903, the House of
Lords considered the compatibility of a mandatory life sentence as imposed
in England and Wales with Articles 3 and 5 of the Convention. It found that,
in its operation, a mandatory life sentence was not incompatible with either
Article.

Such a sentence was partly punitive, partly preventative. The punitive
element was represented by the tariff term, imposed as punishment for the
serious crime which the convicted murderer had committed. The
preventative element was represented by the power to continue to detain
the convicted murderer in prison unless and until the Parole Board, an
independent body, considered it safe to release him, and also by the power
to recall to prison a convicted murderer who had been released if it was
judged necessary to recall him for the protection of the public (Lord
Bingham of Cornhill at § 8 of the judgment).

The House of Lords therefore held firstly, that the appellant's complaints
were not of sufficient gravity to engage Article 3 of the Convention and
secondly, that the life sentence was not arbitrary or otherwise contrary to
Article 5 § 1 of the Convention. Lord Bingham added:

> "If the House had concluded that on imposition of a mandatory life sentence for
> murder the convicted murderer forfeited his liberty to the state for the rest of his days,
> to remain in custody until (if ever) the Home Secretary concluded that the public
> interest would be better served by his release than by his continued detention, I would
> have little doubt that such a sentence would be found to violate articles 3 and 5 of the
> European Convention on Human Rights ... as being arbitrary and disproportionate."

143. In *R. v. Secretary of State for the Home Department, ex parte
Hindley* [2001] 1 AC 410, HL and *R. v. Anderson* [2003] 1 AC 837, HL, the
House of Lords found that, under the tariff system then in operation, there
was "no reason, in principle, why a crime or crimes, if sufficiently heinous
should not be regarded as deserving lifelong incarceration for purposes of
pure punishment" (per Lord Steyn at pp. 416H). Lord Steyn also observed:
"there is nothing logically inconsistent with the concept of a tariff by saying
that there are cases were the crimes are so wicked that even if the prisoner is
detained until he or she dies it will not exhaust the requirements of
retribution and deterrence" (p. 417H).

144. Under the present statutory framework in England and
Wales,Chapter 7 of the Criminal Justice Act 2003, a trial judge can impose
a whole life term or order on a defendant convicted of murder. Such a
defendant is not eligible for parole and can only be released by the Secretary
of State. In *R v. Bieber* [2009] 1 WLR 223 the Court of Appeal considered
that such whole life terms were compatible with Article 3 of the
Convention.

It found that a whole life order did not contravene Article 3 of the
Convention because of the possibility of compassionate release by the

Secretary of State. It also found that the imposition of an irreducible life sentence would not itself constitute a violation of Article 3 but rather that a potential violation would only occur once the offender had been detained beyond the period that could be justified on the ground of punishment and deterrence.The court stated:

"45. While under English law the offence of murder attracts a mandatory life sentence, this is not normally an irreducible sentence. The judge specifies the minimum term to be served by way of punishment and deterrence before the offender's release on licence can be considered. Where a whole life term is specified this is because the judge considers that the offence is so serious that, for purposes of punishment and deterrence, the offender must remain in prison for the rest of his days. For the reasons that we have given, we do not consider that the Strasbourg court has ruled that an irreducible life sentence, deliberately imposed by a judge in such circumstances, will result in detention that violates article 3. Nor do we consider that it will do so.

46.  It may be that the approach of the Strasbourg court will change. There seems to be a tide in Europe that is setting against the imposition of very lengthy terms of imprisonment that are irreducible. Thus it may become necessary to consider whether whole life terms imposed in this jurisdiction are, in fact, irreducible.

...

Under the regime that predated the 2003 Act it was the practice of the Secretary of State to review the position of prisoners serving a whole life tariff after they had served 25 years with a view to reducing the tariff in exceptional circumstances, such as where the prisoner had made exceptional progress whilst in custody. No suggestion was then made that the imposition of a whole life tariff infringed article 3.

...

Under the current regime the Secretary of State has a limited power to release a life prisoner under section 30 of the Crime (Sentences) Act 1997.

...

At present it is the practice of the Secretary of State to use this power sparingly, in circumstances where, for instance, a prisoner is suffering from a terminal illness or is bedridden or similarly incapacitated. If, however, the position is reached where the continued imprisonment of a prisoner is held to amount to inhuman or degrading treatment, we can see no reason why, having particular regard to the requirement to comply with the Convention, the Secretary of State should not use his statutory power to release the prisoner.

49.  For these reasons, applying the approach of the Strasbourg court in *Kafkaris v Cyprus* 12 February 2008, we do not consider that a whole life term should be considered as a sentence that is irreducible. Any article 3 challenge where a whole life term has been imposed should therefore be made, not at the time of the imposition of the sentence, but at the stage when the prisoner contends that, having regard to all the material circumstances, including the time that he has served and the progress made in prison, any further detention will constitute degrading or inhuman treatment."

ffffff

### 6. Germany

145. Article 1 of the Basic Law of the Federal Republic of Germany provides that human dignity shall be inviolable. Article 2(2) provides:

> "Every person shall have the right to life and physical integrity. Freedom of the person shall be inviolable. These rights may be interfered with only pursuant to a law."

The compatibility of a mandatory sentence of life imprisonment for murder with these provisions was considered by the Federal Constitutional Court in the *Life Imprisonment* case of 21 June 1977, 45 BVerfGE 187 (an English translation of extracts of the judgment, with commentary, can be found in D.P. Kommers, *The Constitutional Jurisprudence of the Federal Republic of Germany* (2nd ed.), Duke University Press, Durham and London, 1997 at pp. 306-313).

The court found that the State could not turn the offender into an object of crime prevention to the detriment of his constitutionally protected right to social worth. Respect for human dignity and the rule of law meant the humane enforcement of life imprisonment was possible only when the prisoner was given "a concrete and realistically attainable chance" to regain his freedom at some later point in time.

The court underlined that prisons also had a duty to strive towards the re-socialisation of prisoners, to preserve their ability to cope with life and to counteract the negative effects of incarceration and the destructive changes in personality that accompanied imprisonment. It recognised, however, that, for a criminal who remained a threat to society, the goal of rehabilitation might never be fulfilled; in that case, it was the particular personal circumstances of the criminal which might rule out successful rehabilitation rather than the sentence of life imprisonment itself. The court also found that, subject to these conclusions, life imprisonment for murder was not a senseless or disproportionate punishment.

146. In the later *War Criminal* case 72 BVerfGE 105 (1986), where the petitioner was eighty-six years of age and had served twenty years of a life sentence imposed for sending fifty people to the gas chambers, the court considered that the gravity of a person's crime could weigh upon whether he or she could be required to serve his or her life sentence. However, a judicial balancing of these factors should not place too heavy an emphasis on the gravity of the crime as opposed to the personality, state of mind, and age of the person. In that case, any subsequent review of the petitioner's request for release would be required to weigh more heavily than before the petitioner's personality, age and prison record.

147. In its decision of 16 January 2010, BVerfG, 2 BvR 2299/09, the Federal Constitutional Court considered an extradition case where the offender faced "aggravated life imprisonment until death" (*erschwerte lebenslängliche Freiheitsstrafe bis zum Tod*) in Turkey. The German

government had sought assurances that he would be considered for release and had received the reply that the President of Turkey had the power to remit sentences on grounds of chronic illness, disability, or old age. The court refused to allow extradition, finding that this power of release offered only a vague hope of release and was thus insufficient. Notwithstanding the need to respect foreign legal orders, if someone had no practical prospect of release such a sentence would be cruel and degrading (*grausam und erniedrigend*) and would infringe the requirements of human dignity provided for in Article 1.

### 7. Canada

148. The Supreme Court of Canada has found that a grossly disproportionate sentence will amount to cruel and unusual treatment or punishment (see,*inter alia*,*R v. Smith (Edward Dewey)*[1987] 1 SCR 1045). In *R v. Luxton*[1990] 2 S.C.R. 711, the court considered that, for first degree murder, a mandatory minimum sentence of life imprisonment without eligibility for parole for twenty-five years was not grossly disproportionate. Similarly, in *R v. Latimer* 2001 1 SCR 3, for second degree murder, a mandatory minimum sentence of life imprisonment without eligibility for parole for ten years was not grossly disproportionate. The court observed that gross disproportionality would only be found on "rare and unique occasions" and that the test for determining this issue was "very properly stringent and demanding".

### 8  South Africa

149. In *Dodo v. the State*(CCT 1/01) [2001] ZACC 16, the South African Constitutional Court considered whether a statutory provision which required a life sentence for certain offences including murder, was compatible with the constitutional principle of the separation of powers, the accused's constitutional right to a public trial and the constitutional prohibition on cruel, inhuman or degrading treatment or punishment. The court found none of these constitutionals provisions was infringed, since the statute allowed a court to pass a lesser sentence if there were substantial and compelling circumstances. The court did, however, observe that the concept of proportionality went to the heart of the inquiry as to whether punishment was cruel, inhuman or degrading.

150. In *Niemand v. The State* (CCT 28/00)[2001] ZACC 11, the court found an indeterminate sentence imposed pursuant to a declaration that the defendant was a "habitual criminal" to be grossly disproportionate because it could amount to life imprisonment for a non-violent offender. The court "read in" a maximum sentence of fifteen years to the relevant statute.

### 9. Other jurisdictions

151. In *Reyes v. the Queen* [2002] UKPC 11 the Judicial Committee of the Privy Council considered that a mandatory death penalty for murder by shooting was incompatible with section 7 of the Constitution of Belize, which prohibits torture and ill-treatment in identical terms to Article 3 of the Convention. Lord Bingham observed that to deny the offender the opportunity, before sentence is passed, to seek to persuade the court that in all the circumstances to condemn him to death would be disproportionate and inappropriate was to treat him as no human being should be treated. The relevant law was not saved by the powers of pardon and commutation vested by the Constitution in the Governor-General, assisted by an Advisory Council; in Lord Bingham's words "a non-judicial body cannot not decide what is the appropriate measure of punishment to be visited on a defendant for the crime he has committed".

152. In *deBoucherville v. the State of Mauritius* [2008] UKPC 70 the appellant had been sentenced to death. With the abolition of the death penalty in Mauritius, his sentence was commuted to a mandatory life sentence. The Privy Council considered the Court's judgment in *Kafkaris*, cited above, and found that the safeguards available in Cyprus to prevent Kafkaris from being without hope of release were not available in Mauritius. The Mauritian Supreme Court had interpreted such a sentence as condemning de Boucherville to penal servitude for the rest of his life and the provisions of the relevant legislation on parole and remission did not apply. This meant the sentence was manifestly disproportionate and arbitrary and so contrary to section 10 of the Mauritian Constitution (provisions to secure protection of law, including the right to a fair trial).It had also been argued by the appellant that the mandatory nature of the sentence violated section 7 of the Constitution (the prohibition of torture, inhuman or degrading punishment or other such treatment). In light of its conclusion on section 10, the Committee considered it unnecessary to decide that question or to consider the relevance of the possibility of release under section 75 (the presidential prerogative of mercy). It did, however, find that the safeguards available in Cyprus (in the form of the Attorney-General's powers to recommend release and the President's powers to commute sentences or decree release) were not available in Mauritius. It also acknowledged the appellant's argument that, as with the mandatory sentence of death it had considered in *Reyes*, a mandatory sentence of life imprisonment did not allow for consideration of the facts of the case. The Privy Council also considered any differences between mandatory sentences of death and life imprisonment could be exaggerated and, to this end, quoted with approval the dicta of Lord Justice Laws in *Wellington* and Lord Bingham in *Lichniak* (at paragraphs 65 and 142 above).

153. In *State v. Philibert* [2007] SCJ 274, the Supreme Court of Mauritius held that a mandatory sentence of 45 years' imprisonment for

murder amounted to inhuman or degrading treatment in violation of section 7 on the grounds that it was disproportionate.

154.  In *State v. Tcoeib* [1997] 1 LRC 90 the Namibian Supreme Court considered the imposition of a discretionary life sentence to be compatible with section 8 of the country's constitution (subsection (c) of which is identical to Article 3 of the Convention).Chief Justice Mahomed, for the unanimous court, found the relevant statutory release scheme to be sufficient but observed that if release depended on the "capricious exercise" of the discretion of the prison or executive authorities, the hope of release would be "too faint and much too unpredictable" for the prisoner to retain the dignity required by section 8. It was also observed that life imprisonment could amount to cruel, inhuman or degrading treatment if it was grossly disproportionate to the severity of the offence.The High Court of Namibia found mandatory minimum sentences for robbery and possession of firearms to be grossly disproportionate in *State v. Vries* 1997 4 LRC 1 and *State v Likuwa* [2000] 1 LRC 600.

155.  In *Lau Cheong v. Hong Kong Special Administrative Region* [2002] HKCFA 18, the Hong Kong Court of Final Appeal rejected a challenge to the mandatory life sentence for murder. It found that the possibility of regular review of the sentence by an independent board meant it was neither arbitrary nor grossly disproportionate and thus it did not amount to cruel, inhuman or degrading punishment.

156.  Section 9 of the New Zealand Bill of Rights Act 1990 also protects against disproportionately severe treatment or punishment.


# THE LAW


## I.  JOINDER OF THE APPLICATIONS

157.  Given their similar factual and legal background, the Court decides that the applications of the first, third, fourth, fifth and sixth applicants should be joined pursuant to Rule 42 § 1 of the Rules of Court.

Having regard, however, to the nature of the facts and the substantive issues raised by the second applicant, particularly in relation to his complaint concerning detention at ADX Florence, the Court considers that it is not appropriate to join his application but to treat it separately.


## II.  ARTICLE 3 AND THE EXTRADITION

158.  The applicants made two complaints in relation to their proposed extradition. First, they complained that, if convicted in the United States, they would be detained at ADX Florence and, furthermore, would be

subjected to special administrative measures (SAMS). They submitted that conditions of detention at ADX Florence (whether alone or in conjunction with SAMS) would violate Article 3 of the Convention. Second, the applicants complained that, if convicted, they would face sentences of life imprisonment without parole and/or extremely long sentences of determinate length in violation of Article 3 of the Convention.

159.  Article 3 provides:

> "No one shall be subjected to torture or to inhuman or degrading treatment or punishment."

160.  The Government contested each of these arguments.

161.  However, before turning to the merits of each of these complaints, it is necessary for the Court to consider the submissions of the parties as to the relevance, if any, of the extradition context to complaints made under Article 3 of the Convention, as well as the parties' submissions as to the appropriate forum for the applicants' prosecution. Those submissions may be summarised as follows.

## A.  The Government

162.  The Government relied on the reasoning of the House of Lords in *Wellington* and the Canadian Supreme Court in *Burns* and *Ferras* (see paragraphs 66–72,74 and 75 above). On the basis of those cases, the Government submitted that, in the extradition context, a distinction had to be drawn between torture and other forms of ill-treatment. A real risk of torture in the receiving State should be an absolute bar on extradition.However, for all other forms of ill-treatment, it was legitimate to consider the policy objectives pursued by extradition in determining whether the ill-treatment reached the minimum level of severity required by Article 3. This was the appropriate means of resolving the tension that existed between the Court's judgments in *Soering*, on the one hand, and *Chahal* and *Saadi*, on the other. Article 3 could not be interpreted as meaning that any form of ill-treatment in a non-Contracting State would be sufficient to prevent extradition. Such an absolutist approach to Article 3 would mean, for instance, that practices such as head shaving or shackling could act as a bar to extradition because the Court had found these forms of ill-treatment to be in breach of Article 3 (see *Yankov v. Bulgaria*, no. 39084/97, §§ 114-121, ECHR 2003-XII (extracts); and *Henaf v. France*, no. 65436/01, §§ 45-89, ECHR 2003-XI).

163.  The Government did not accept the applicants' submission that the possibility of prosecution in the United Kingdom was relevant in determining whether their extradition was compatible with Article 3. This submission appeared to be based on the Court's judgment in *Soering*, where the Court had found that the possibility of trial in the Federal Republic of

Germany was "a circumstance of relevance" in its overall assessment under Article 3 (paragraph 110 of the judgment). However, the facts of *Soering* were wholly exceptional. Both the United States and the Federal Republic of Germany had jurisdiction and the FederalRepublic itself had submitted that extradition to the United States would breach the applicant's Convention rights. In any event, there were no domestic proceedings under way in the United Kingdom for any of the applicants and they could not be prosecuted in the United Kingdom for the full range and gravamen of the conduct alleged against them. The prosecutions were more properly brought in the United States. In any event, the possibility of prosecution in the United Kingdom could only be relevant if the Court were to follow the relativist approach of the House of Lords in *Wellington*, which the applicants had urged the Court not to do.

### B.  The applicants

164.  The applicants rejected the submission that Article 3 allowed for a balancing exercise of any kind. The Court had specifically rejected that submission in *Saadi*, cited above. Even if, in extradition cases, a relativist approach could be taken in respect of ill-treatment which fell short of torture, this was irrelevant to their case because, in their submission, years of solitary confinement at ADX amounted to torture or, at the very least, was at the upper end of the scale of ill-treatment (see further below). Furthermore, none of the policy reasons for taking a relativist approach to ill-treatment arising from life sentences could apply to ill-treatment arising from prison conditions. Detention at ADX was not mandated by United States law and the United States could give an undertaking not to detain the applicants there.Thus, the alternative to detention at ADX was not that they would be fugitives from United States justice, but rather that they would be detained in American prisons which were Article 3 compliant.

165.  The United Kingdom was the appropriate forum for prosecution of each applicant and it had jurisdiction to try them. For the first and third applicants, the link with the United States was that one of the servers for the website they had run had been based in Connecticut for eighteen months. The case against them was based on material seized in searches of premises in the United Kingdom, which the police had immediately handed to the United States' authorities. The fourth applicant had been the subject of a Metropolitan Police investigation but had never been charged. All the evidence against him came from materials seized during that investigation. The criminal conduct of the fifth and sixth applicants was alleged to have taken place in their London offices. All witnesses were in the United Kingdom and, as with the other applicants, all relevant evidence had been obtained there. The applicants submitted that the fact that the United Kingdom could prosecute them compatibly with Article 3 was a general

consideration in assessing the proportionality of their extradition and its consequences.

## C. The Court's assessment

166. The Court begins by noting the parties' submissions as to the appropriate forum for prosecution. It observes, however,that the Government do not intend to prosecute the applicants for any of the offences for which their extradition is sought (cf. *Soering*, § 16, cited above, where the Federal Republic of Germany had, by its extradition request to the United Kingdom, indicated its intention to prosecute the applicant and, in addition, its extradition request had contained proof that German courts had jurisdiction to try the applicant). Consequently, the Court considers that the question of the appropriate forum for prosecution, and whether this is relevant to the Court's assessment under Article 3, does not therefore arise for examination in the present case.

167. The Court further notes that the House of Lords in *Wellington* has identified a tension between *Soering* and *Chahal*, both cited above, which calls for clarification of the proper approach to Article 3 in extradition cases. It also observes that the conclusions of the majority of the House of Lords in that case depended on three distinctions which, in their judgment, were to be found in this Court's case-law. The first was between extradition cases and other cases of removal from the territory of a ContractingState; the second was between torture and other forms of ill-treatment proscribed by Article 3; and the third was between the assessment of the minimum level of severity required in the domestic context and the same assessment in the extra-territorial context. It is appropriate to consider each distinction in turn.

168. For the first distinction, the Court considers that the question whether there is a real risk of treatment contrary to Article 3 in another State cannot depend on the legal basis for removal to that State. The Court's own case-law has shown that, in practice, there may be little difference between extradition and other removals. For example, extradition requests may be withdrawn and the ContractingState may nonetheless decide to proceed with removal from its territory (see *Muminov v. Russia*, no. 42502/06,§ 14, 11 December 2008). Equally, a State may decide to remove someone who faces criminal proceedings (or has already been convicted) in another State in the absence of an extradition request (see, for example,*Saadi v. Italy*, cited above,and *Bader and Kanbor v. Sweden*, no. 13284/04, ECHR 2005-XI). Finally, there may be cases where someone has fled a State because he or she fears the implementation of a particular sentence that has already been passed upon him or her and is to be returned to that State, not under any extradition arrangement, but as a failed asylum seeker (see *D. and Others v. Turkey*, no. 24245/03, 22 June 2006). The Court considers that it

would not be appropriate for one test to be applied to each of these three cases but a different test to be applied to a case in which an extradition request is made and complied with.

169. For the second distinction, between torture and other forms of ill-treatment, it is true that some support for this distinction and, in turn, the approach taken by the majority of the House of Lords in *Wellington*, can be found in the *Soering* judgment. The Court must therefore examine whether that approach has been borne out in its subsequent case-law.

170. It is correct that the Court has always distinguished between torture on the one hand and inhuman or degrading punishment on the other (see, for instance,*Ireland v. the United Kingdom*, 18 January 1978, § 167, Series A no. 25; *Selmouni v. France* [GC], no. 25803/94,§§ 95-106,ECHR 1999-V). However, the Court considers that this distinction is more easily drawn in the domestic context where, in examining complaints made under Article 3, the Court is called upon to evaluate or characterise acts which have already taken place. Where, as in the extra-territorial context, a prospective assessment is required, it is not always possible to determine whether the ill-treatment which may ensue in the receiving State will be sufficiently severe as to qualify as torture. Moreover, the distinction between torture and other forms of ill-treatment can be more easily drawn in cases where the risk of the ill-treatment stems from factors which do not engage either directly or indirectly the responsibility of the public authorities of the receiving State (see, for example,*D. v. the United Kingdom*, 2 May 1997,*Reports of Judgments and Decisions* 1997-III, where the Court found that the proposed removal of a terminally ill man to St Kitts would be inhuman treatment and thus in violation of Article 3).

171. For this reason, whenever the Court has found that a proposed removal would be in violation of Article 3 because of a real risk of ill-treatment which would be intentionally inflicted in the receiving State, it has normally refrained from considering whether the ill-treatment in question should be characterised as torture or inhuman or degrading treatment or punishment. For example, in *Chahal* the Court did not distinguish between the various forms of ill-treatment proscribed by Article 3: at paragraph 79 of its judgment the Court stated that the "Convention prohibits in absolute terms torture or inhuman or degrading treatment or punishment". In paragraph 80 the Court went on to state that:

> "The prohibition provided by Article 3 against ill-treatment is equally absolute in expulsion cases. Thus, whenever substantial grounds have been shown for believing that an individual would face a real risk of being subjected to treatment contrary to Article 3 if removed to another State, the responsibility of the ContractingState to safeguard him or her against such treatment is engaged in the event of expulsion ..."

Similar passages can be found, for example, in *Mamatkulov and Askarov v. Turkey* [GC], nos. 46827/99 and 46951/99, § 67, ECHR 2005-I and *Saadi v. Italy* [GC], no. 37201/06, § 125,ECHR 2008-... where, in reaffirming this

test, no distinction was made between torture and other forms of ill-treatment.

172.  The Court now turns to whether a distinction can be drawn between the assessment of the minimum level of severity required in the domestic context and the same assessment in the extra-territorial context. The Court recalls its statement in *Chahal*, cited above, § 81 that it was not to be inferred from paragraph 89 of *Soering* that there was any room for balancing the risk of ill-treatment against the reasons for expulsion in determining whether a State's responsibility under Article 3 was engaged. It also recalls that this statement was reaffirmed in *Saadi v. Italy*, cited above, § 138,where the Court rejected the argument advanced by the United Kingdom Government that the risk of ill-treatment if a person is returned should be balanced against the danger he or she posed. In *Saadi* the Court also found that the concepts of risk and dangerousness did not lend themselves to a balancing test because they were "notions that [could] only be assessed independently of each other" (ibid. § 139). The Court finds that the same approach must be taken to the assessment of whether the minimum level of severity has been met for the purposes of Article 3: this too can only be assessed independently of the reasons for removal or extradition.

173.  The Court considers that its case-law since *Soering* confirms this approach. Even in extradition cases, such as where there has been an Article 3 complaint concerning the risk of life imprisonment without parole, the Court has focused on whether that risk was a real one, or whether it was alleviated by diplomatic and prosecutorial assurances given by the requesting State (see *Olaechea Cahuas v. Spain*, no. 24668/03, §§ 43 and 44,10 August 2006; *Youb Saoudi v. Spain* (dec.), no. 22871/06, 18 September 2006; *Salem v. Portugal* (dec.), no. 26844/04, 9 May 2006; and*Nivette v. France* (dec.), no. 44190/98, ECHR 2001-VII). In those cases, the Court did not seek to determine whether the Article 3 threshold has been met with reference to the factors set out in paragraph 89 of the *Soering* judgment. By the same token, in cases where such assurances have not been given or have been found to be inadequate, the Court has not had recourse to the extradition context to determine whether there would be a violation of Article 3 if the surrender were to take place (see, for example,*Soldatenko v. Ukraine*, no. 2440/07,§§ 66-75, 23 October 2008). Indeed in the twenty-two years since the *Soering* judgment, in an Article 3 case the Court has never undertaken an examination of the proportionality of a proposed extradition or other form of removal from a ContractingState. To this extent, the Court must be taken to have departed from the approach contemplated by paragraphs 89 and 110 of the *Soering* judgment.

174. Finally, the Court considers that, in interpreting Article 3, limited assistance can be derived from the approach taken by the Canadian Supreme Court in *Burns* and *Ferras*(see paragraphs 74 and 75 above). As the applicants have observed, those cases were about the provision of the

Canadian Charter on fundamental justice and not the Charter's prohibition on cruel or unusual treatment or punishment. Furthermore, the Charter system expressly provides for a balancing test in respect of both of those rights, which mirrors that found in Articles 8-11 of the Convention but not Article 3 (see paragraph 73 above).

175. Instead, the Court considers that greater interpretative assistance can be derived from the approach the Human Rights Committee has taken to the prohibition on torture and ill-treatment contained in Article 7 of the ICCPR. The Committee's General Comment No. 20 (see paragraph 76 above) makes clear that Article 7 prevents *refoulement* both when there is a real risk of torture and when there is a real risk of other forms of ill-treatment. Further, recent confirmation for the approach taken by the Court and by the Human Rights Committee can be found in Article 19 of the Charter on Fundamental Rights of the European Union, which provides that no one may be removed, expelled or extradited to a State where there is a serious risk that he or she would be subjected to the death penalty, torture or other inhuman or degrading treatment or punishment (see paragraph 80 above). The wording of Article 19 makes clear that it applies without consideration of the extradition context and without distinction between torture and other forms of ill-treatment. In this respect, Article 19 of the Charter is fully consistent with the interpretation of Article 3 which the Court has set out above. It is also consistent with the Council of Europe Guidelines on human rights and the fight against terrorism, quoted at paragraph 79 above. Finally, the Court's interpretation of Article 3, the Human Rights Committee's interpretation of Article 7 of the ICCPR, andthe text of Article 19 of the Charter are in accordance with Articles 3 and 16 § 2 of the United Nations Convention Against Torture, particularly when the latter Article provides that the provisions of the Convention are "without prejudice to the provisions of any other international instrument or national law which prohibits cruel, inhuman or degrading treatment or punishment or which relates to extradition or expulsion" (see paragraph 78 above).

176. The Court therefore concludes that the *Chahal* ruling (as reaffirmed in *Saadi*) should be regarded as applying equally to extradition and other types of removal from the territory of a Contracting State and should apply without distinction between the various forms of ill-treatment which are proscribed by Article 3.

177. However, in reaching this conclusion, the Court would underline that it agrees with Lord Brown's observation in *Wellington* that the absolute nature of Article 3 does not mean that any form of ill-treatment will act as a bar to removal from a ContractingState. As Lord Brown observed, this Court has repeatedly stated that the Convention does not purport to be a means of requiring the Contracting States to impose Convention standards on other States (see, as a recent authority,*Al-Skeini and Others v. the United Kingdom*[GC],no. 55721/07, § 141, 7 July 2011). This being so,treatment

which might violate Article 3 because of an act or omission of a Contracting State might not attain the minimum level of severity which is required for there to be a violation of Article 3 in an expulsion or extradition case. For example, a Contracting State's negligence in providing appropriate medical care within its jurisdiction has, on occasion, led the Court to find a violation of Article 3 but such violations have not been so readily established in the extra-territorial context (compare the denial of prompt and appropriate medical treatment for HIV/AIDS in *Aleksanyan v. Russia*, no. 46468/06, §§ 145–158, 22 December 2008 with *N.v. the United Kingdom* [GC], no. 26565/05, 27 May 2008).

178. Equally, in the context of ill-treatment of prisoners, the following factors, among others, have been decisive in the Court's conclusion that there has been a violation of Article 3:

- the presence of premeditation (*Ireland v. the United Kingdom*,cited above, § 167);

- that the measure may have been calculated to break the applicant's resistance or will (ibid, § 167; *Ilaşcu and Others v. Moldova and Russia*[GC], no. 48787/99, § 446, ECHR 2004-VII);

- an intention to debase or humiliate an applicant, or, if there was no such intention, the fact that the measure was implemented in a manner which nonetheless caused feelings of fear, anguish or inferiority (*Jalloh v. Germany* [GC], no. 54810/00, § 82,ECHR 2006-IX; *Peers v. Greece*, no. 28524/95, § 75, ECHR 2001-III);

- the absence of any specific justification for the measure imposed (*Van der Ven v. the Netherlands*,no. 50901/99, §§ 61-62, ECHR 2003-II; *Iwańczuk v. Poland*, no. 25196/94, § 58, 15 November 2001);

- the arbitrary punitive nature of the measure (see *Yankov*, cited above, § 117);

- the length of time for which the measure was imposed(*Ireland v. the United Kingdom*, cited above, § 92); and

- the fact that there has been a degree of distress or hardship of an intensity exceeding the unavoidable level of suffering inherent in detention (*Mathew v. the Netherlands*,no. 24919/03, §§ 197-205, ECHR 2005-IX).

The Court would observe that all of these elements depend closely upon the facts of the case and so will not be readily established prospectively in an extradition or expulsion context.

179. Finally, the Court reiterates that, as was observed by Lord Brown, it has been very cautious in finding that removal from the territory of a ContractingStatewould be contrary to Article 3 of the Convention. It has only rarely reached such a conclusion since adopting the *Chahal* judgment (see *Saadi*, cited above § 142). The Court would further add that, save for cases involving the death penalty, it has even more rarely found that there would be a violation of Article 3 if an applicant were to be removed to a

State which had a long history of respect of democracy, human rights and the rule of law.

## III. ALLEGED VIOLATION OF ARTICLE 3 OF THE CONVENTION ARISING FROM CONDITIONS AT ADXFLORENCE

### A.  The admissibility of the fifth and sixth applicants' complaints

180.  The Court recalls that, in its admissibility decision of 6 July 2010, it declared admissible the first, second and third applicant's complaints concerning detention at ADX Florence and the imposition of special administrative measures post-trial. It declared inadmissible the fourth applicant's similar complaint, on the grounds that his medical condition meant he was unlikely to spend any more than a short period of time at ADX Florence (see paragraphs 144 and 145 of the decision).

181. The Court finds the fifth and sixth applicant's complaints in relation to ADX Florence and the imposition of special administrative measures post-trial to be indistinguishable from those made by the first and third applicants. Therefore, the fifth and sixth applicant's complaints are not manifestly ill-founded within the meaning of Article 35 § 3(a) of the Convention. The Court notes that they are not inadmissible on any other grounds. They must therefore be declared admissible.

### B.  Merits

#### 1.  The parties' submissions

##### a.  The Government

182. The Government recalled that the applicants were suspected of terrorism and the Council of Europe Guidelines on human rights and the fight against terrorism had recognised that such persons could be subjected to more severe restrictions than those applied to other prisoners (see paragraph 114 above). The Court had also recognised that prohibitions on contact and communication for security reasons did not of themselves amount to inhuman treatment or punishment. The Government accepted that such restrictions could not amount to complete sensory isolation and could not be imposed indefinitely. However, in assessing the nature of solitary confinement, factors to be taken into account included the physical conditions of confinement and the possibility of visits.

183.  On this basis, and in the light of the evidence provided by the ADX officials and the Department of Justice (see paragraphs 82–96 above), the applicants' complaints were unsustainable. The physical conditions of detention at ADX were compatible with Article 3 as interpreted by the

Court. Even in the highest security units at ADX, there were opportunities for communication with other inmates, recreation, education, religious expression and engagment with the outside world. The mental and social needs of inmates were appropriately catered for and inmates could not be described as being detained in conditions that amounted to sensory isolation, still less indefinite solitary confinement, whether total or relative. The evidence, particularly the Department of Justice's replies to the Rapporteur's questions, showed that there were practical and effective opportunities to enter the step down and special security unit programs, which could ultimately lead to transfer to another prison.Moreover, initial placement at ADX was determined by reference to stated, objective criteria, with full procedural protections through the Federal Bureau of Prisons' Administrative Remedy Program.

184.  The Bureau of Prisons had shown itself willing and able to respond to requests for change in conditions, not least the relaxation of conditions in H Unit to allow phase three inmates to eat together, the expansion of Arabic language books in the library, and the discontinuation of strip searches before inmates could leave their cells. All of these factors meant conditions at ADX Florence were distinguishable from *G.B. v. Bulgaria*,no. 42346/98, 11 March 2004 and *Peers v. Greece*, no. 28524/95,ECHR 2001-III and, in fact, were much less severe than in *Ramirez Sanchez v. France* [GC], no. 59450/00,ECHR 2006-IX, where the Court had found no violation of Article 3.

185.  Finally, inmates had recourse to the courts to challenge their conditions of detention (see the summary of relevant Eighth Amendment jurisprudence set out at paragraph 105–110 above). A detailed examination of the federal courts' consideration of the challenges brought by ADX inmates, showed that the allegations made in respect of ADX were unfounded, and that the United States' courts applied a legal analysis which was in reality no different from that applied by this Court. Moreover, these decisions showed that the United States were both able and willing to protect the interests of ADX inmates, assess their claims and uphold them where appropriate. The Government also stated that, within the materials provided by the applicants, the Court could only properly place reliance on the decisions of the United States courts, rather than the untested statements of inmates at ADX or reports based upon them. Among these decisions, the Government placed particular emphasis on the conclusions reached by the Magistrate Judge in *Rezaq* (summarised at paragraph 112 above).They also continued to rely on the accuracy, fairness and good faith of the declarations which had been provided to the Court by the Federal Bureau of Prisons officials.

**A.155**

**b.  The applicants**

*i.  The first, third, fifth and sixth applicants*

186.  The above applicants invited the Court to proceed on the basis that, if convicted, they would be detained at ADX Florence and subjected to special administrative measures. They also adopted the submissions of the third party interveners that the Eighth Amendment did not offer equivalent protection to Article 3 (see paragraph 197 below).

187.  The applicants invited the Court to consider that, throughout their detention in the United Kingdom, they had never been considered physically dangerous and were being held in much less stringent conditions than those at ADX. For instance, the first applicant was being held in a unit were he was never shackled, spent nine hours outside his cell every day and participated in common activities with other prisoners, which included educational classes, cooking for themselves and tending a vegetable garden.He also had weekly "open" visits with his family (sitting in a large hall without intervening glass screens). Even if he were to be convicted in the United Kingdom and classified as a High Risk Category A prisoner (which he was not) his conditions of detention would be less restricted and he would enjoy access to even more educational, religious, sport and recreational facilities than at present. Many of these activities would involve association with large groups of prisoners.

188.  In respect of the procedures for placement at ADX, the applicants relied on the evidence they had submitted which showed that the criteria for placement at ADX Florence was subjective, the transfer hearing was mere window dressing, and inmates had great difficulty in challenging the imposition of special administrative measures. Even on Mr Synsvoll's evidence (see paragraph 89 above) the Bureau of Prisons was at the mercy of the wishes of other Department of Justice agencies such as the FBI, meaning that the measures could not be challenged through its Administrative Remedy Program. In the applicants' submission, these faults in the Bureau's procedures meant that the ADX regime did not comply with the procedural requirements for solitary confinement which the Court had laid down in *Onoufriou v. Cyprus*, no. 24407/04, § 70, 7 January 2010.

189.  The applicants further submitted that,having regard to the Court's case-law and the international materials summarised at paragraphs 114– 121 above,the conditions of detention at ADX amounted to solitary confinement of an indefinite duration and did not comply with the substantive requirements of Article 3.

190. All ADX Florence prisoners who were subjected to special administrative measures were detained at H Unit. It was a place of almost complete social isolation. Communication between inmates and with the outside world was severely curtailed and at the total discretion of the authorities. Contact with prison staff was minimal, as was telephone contact

with the outside world. Educational activities and library access were limited and confined to in-cell activity. Recreation alone in an empty cage was not recreation in any meaningful sense and recreation periods were frequently cancelled.

191.  The very fact of being subjected to special administrative measures meant H Unit inmates were not eligible for the step down program. The program itself was highly capricious. Admission was at the discretion of staff and inmates could be returned to their original unit at any stage for a disciplinary violation or other undefined reason without explanation or due process.This might include something as minor as a disrespectful attitude to staff. As Professor Rovner had observed, despite the increase in the number of inmates admitted to the step down program, it remained a minority of inmates who progressed through it; significant numbers of inmates spent extremely long periods of time at ADX and, in the case of terrorist inmates, they could spent up to thirteen years in solitary confinement before being admitted to the program. Other inmates with good conduct records had spent years but had never been admitted to the program.

192.  The applicants also submitted that the scientific evidence on the detrimental effect of solitary confinement on mental health was unequivocal (see paragraph 99 above) and not disputed by the Government, yet the solitary confinement regime in place at ADX failed entirely to recognise the serious harm it caused to its inmates' mental health. The regime failed to provide mental healthcare which was appropriate to the very serious needs of the patient-inmates. Even on Dr Zohn's evidence, those with serious mental health problems such as schizophrenia were detained at ADX Florence.

193.  In this connection, the first, third and fifth applicants provided the following information on their mental health.

The first applicant had been diagnosed with post-traumatic stress disorder, which had worsened in the prison unit where he was detained.

The third applicant had been diagnosed with Asperger syndrome, recurrent depressive disorder (with his current episode assessed as "mild" as opposed to previous, severe depressive episodes), and obsessive compulsive disorder in conjunction with other anxiety symptoms. The latter had worsened in detention, though his depressive symptoms had improved. Before his Asperger syndrome had been diagnosed in June 2009, a psychiatrist had predicted a high risk of serious depression leading to suicide if the third applicant were to be extradited and placed in solitary confinement for a long period. The third applicant also submitted a statement prepared by an American criminologist, detailing the heightened difficulties experienced by those with Asperger syndrome in federal prisons and the absence of proper facilities within the Bureau of Prisons to treat the condition.

The fifth applicant had a recurrent depressive disorder and had suffered several mental breakdowns while in detention in the United Kingdom. His most recent psychiatrist's report assessed his current episode as moderate to severe. The recommended treatment was medication with psychological treatment and support, including productive activity, opportunities for interaction with others and exercise.

### ii.  The fourth applicant

194.  The fourth applicant asked the Court to reconsider its decision to declare his complaint under this heading inadmissible, which it had done on the grounds that, as a result of his medical conditions (see paragraph 37 above), there was no real risk of his spending anything more than a short period of time at ADX Florence. The fourth applicant submitted a letter from Professor Andrew Coyle of the International Centre for Prison Studies, who had given evidence in the fourth applicant's domestic proceedings. The letter, dated 1 February 2011, noted that the fourth applicant continued to be detained in the United Kingdom in a non-medical facility, subject to a comprehensive health and social care plan and regular daily support. Professor Coyle stated that, because the United Kingdom prison authorities saw no need to transfer the fourth applicant to a medical setting, the United States prison authorities might have regard to this fact and conclude that he could be held at ADX Florence rather than a Bureau of Prison's medical facility. The fourth applicant also submitted evidence that one Arab Muslim who had been convicted of terrorism offences, Omar Abdel Rahman, had been detained at ADX Florence, despite severe heart problems, blindness and diabetes. When his condition worsened, Abdel Rahman was transferred to the United StatesMedicalCenter for Federal Prisoners at Springfield,Missouri and thereafter to a Federal Medical Centre at Butner,North Carolina. He continued to rely on the fact that his disabilities would exacerbate any ill-treatment inherent in detention at ADX Florence.

195.  The fourth applicant submitted that, even if he were not detained at ADX Florence, if he were subjected to special administrative measures, detention at a Bureau of Prisons medical facility could be at least as restrictive as detention at ADX and could involve the same degree of solitary confinement as at ADX. Thus, even if there were no risk of detention at ADX, there was still a real risk of ill-treatment contrary to Article 3 at another facility.

196.  The fourth applicant also submitted that the Eighth Amendment did not offer equivalent protection to Article 3. The Supreme Court of the United States had only recently (and by narrow majorities) decided that it was unconstitutional to impose the death penalty or life imprisonment on minors (*Roper* and *Graham*, cited above) and it was clear that, in respect of interrogation techniques used at Guantánamo Bay, the United States did not

adopt the same definitions of torture and other forms of ill-treatment as this Court.

#### c.  The third party interveners

197.  The third party interveners (see paragraph 7 above) submitted that there was a substantial gap between the protection offered by Article 3 of the Convention and the protection offered by the Eighth Amendment. Article 3 did not require an applicant to show deliberate imposition of pain or deliberate indifference to it (*Alver v. Estonia*, no. 64812/01, § 55, 8 November 2005; *Peers v. Greece*, no. 28524/95, §§74-75, ECHR 2001-III), whereas this was a specific requirement in order to show a violation of the Eighth Amendment (the subjective test set out in *Wilson*: see paragraph 105 above). Article 3 also provided much greater protection against mental suffering and psychological harm arising from conditions of detention (*Mathew v. the Netherlands*, no. 24919/03, §§ 197-205, ECHR 2005-IX and *Hummatov v. Azerbaijan*, nos. 9852/03 and 13413/04, § 121, 29 November 2007); the United States courts did not even consider a significant deterioration of a detainee's mental condition to be sufficient for an Eighth Amendment violation unless there was also a deprivation of basic physical needs such as food, shelter, clothing or warmth (see *Hill* and *Magluta*, cited at paragraph 110 above).

198.  Limited protection was provided by the due process clause of the Fifth Amendment (see paragraph 109 above). Indeed, the Tenth Circuit's construction of that clause provided no additional protection to the Eighth Amendment. The *Wilkinson* case (see also paragraph 109 above) only required the barest administrative review of the decision to place an inmate in a supermax prison and the procedures could be informal and non-adversarial without any requirement for a judge or neutral arbiter. Prison officials could continue to rely on the initial reasons for placement, including the crime for which the inmate was in prison. The wide discretion afforded to officials, the deference afforded by the courts, and the vague criteria for placement at ADX (and for entry to the step down program) meant there was no meaningful review at all.

199.  There were also significant procedural obstacles to prisoners seeking to vindicate their constitutional rights through the federal courts. The Prison Litigation Reform Act 1996 barred prisoners from bringing court claims if all administrative remedies had not been exhausted, a rule which had been enforced strictly by the courts to prevent otherwise compelling cases from proceeding. The Act prevented prisoners from receiving compensation for mental and emotional injuries unless they also showed physical injury, even in respect of official conduct which was deliberately and maliciously intended to harm. The Act further allowed prison officials to seek to terminate a court order in favour of a prisoner after the order had been in force for two years.

### 2. The Court's assessment

#### a. General principles

##### i. Article 3 and detention

200. As the Court has frequently stated, Article 3 of the Convention enshrines one of the most fundamental values of democratic society. It prohibits in absolute terms torture or inhuman or degrading treatment or punishment, irrespective of the circumstances and the victim's behaviour (see, among other authorities,*Labita v. Italy* [GC], no 26772/95, § 119, ECHR 2000-IV; *A.B. v. Russia*, no. 1439/06, § 99, 14 October 2010).

201. In order to fall under Article 3, ill-treatment must attain a minimum level of severity. The assessment of this minimum level is relative; it depends on all the circumstances of the case, such as the duration of the treatment, its physical and mental effects and, in some cases, the state of health of the victim (see *Ireland v. the United Kingdom*, 18 January 1978, § 162, Series A no. 25, and *Gäfgen v. Germany* [GC],no. 22978/05, § 88, ECHR 2010-...). Although the question whether the purpose of the treatment was to humiliate or debase the victim is a factor to be taken into account, the absence of any such purpose cannot conclusively rule out a finding of violation of Article 3 (see *Peers*, cited above, § 74).

202. For a violation of Article 3 to arise from an applicant's conditions of detention, the suffering and humiliation involved must go beyond that inevitable element of suffering or humiliation connected with a given form of legitimate treatment or punishment (see *Enea v. Italy* [GC], no. 74912/01, § 56, ECHR 2009-...). Measures depriving a person of his liberty may often involve an element of suffering or humiliation. However, the State must ensure that a person is detained under conditions which are compatible with respect for his human dignity, that the manner and method of the execution of the measure do not subject him to distress or hardship exceeding the unavoidable level of suffering inherent in detention and that, given the practical demands of imprisonment, his health and well-being are adequately secured (see *Kudła v. Poland* [GC], no. 30210/96,§§ 92-94158, ECHR-XI, and *Cenbauer v. Croatia*, no. 73786/01, § 44, ECHR 2006-III; *A.B. v. Russia*, cited above, § 100).

203. When assessing conditions of detention, account has to be taken of the cumulative effects of these conditions, as well as of specific allegations made by the applicant (see *Dougoz v. Greece*, no. 40907/98, § 46, ECHR 2001-II). The length of the period during which a person is detained in the particular conditions also has to be considered (see, among other authorities,*Ciorap v. Moldova*, no. 12066/02, § 64, 19 June 2007; *Alver v. Estonia*, no. 64812/01, 8 November 2005; *Ostrovar v. Moldova*, no. 35207/03, § 79, 13 September 2005).

204.  In addition to these general principles, the following principles are relevant to the present case.

### ii.  Solitary confinement

205.  The circumstances in which the solitary confinement of prisoners will violate Article 3 are now well-established in the Court's case-law.

206.  Complete sensory isolation, coupled with total social isolation, can destroy the personality and constitutes a form of inhuman treatment which cannot be justified by the requirements of security or any other reason (*Van der Ven v. the Netherlands*,no. 50901/99, § 51, ECHR 2003-II).

207.  Other forms of solitary confinement which fall short of complete sensory isolation may also violate Article 3. Solitary confinement is one of the most serious measures which can be imposed within a prison (*A.B. v. Russia*, cited above, § 104) and, as the Committee for the Prevention of Torture has stated, all forms of solitary confinement without appropriate mental and physical stimulation are likely, in the long term, to have damaging effects, resulting in deterioration of mental faculties and social abilities (see *Iorgov v. Bulgaria*, no. 40653/98, § 83, 11 March 2004) Indeed, as the Committee's most recent report makes clear, the damaging effect of solitary confinement can be immediate and increases the longer the measure lasts and the more indeterminate it is (see the Committee's 21st General Report, summarised at paragraph 116above).

208.  At the same time, however, the Court has found that the prohibition of contact with other prisoners for security, disciplinary or protective reasons does not in itself amount to inhuman treatment or punishment (see*Messina v. Italy (no. 2)* (dec.), no. 25498/94, ECHR 1999-V, quoted with approval by the Grand Chamber in *Ramirez Sanchez v. France*, cited above,§ 12; *Öcalan v. Turkey* [GC], no. 46221/99, § 191, ECHR 2005-IV). In many States Parties to the Convention more stringent security measures, which are intended to prevent the risk of escape, attack or disturbance of the prison community, exist for dangerous prisoners (see,*Ramirez Sanchez v. France* [GC], no. 59450/00, § 138, ECHR 2006-IX; and, as recent examples,*Alboreo v. France*, no. 51019/08, § 110, 20 October 2011 [not yet final] and *Madonia v. Italy* (dec.), no. 1273/06, 22 September 2009).

209.  Thus, whilst prolonged removal from association with others is undesirable, whether such a measure falls within the ambit of Article 3 of the Convention depends on the particular conditions, the stringency of the measure, its duration, the objective pursued and its effects on the person concerned (see *Rohde v. Denmark*, no. 69332/01, § 93, 21 July 2005).

210.  In applying these criteria, the Court has never laid down precise rules governing the operation of solitary confinement. For example, it has never specified a period of time, beyond which solitary confinement will attain the minimum level of severity required for Article 3 (see *Madonia*, cited above). The Court has, however, emphasised that solitary

confinement, even in cases entailing relative isolation, cannot be imposed on a prisoner indefinitely (see *Ramirez Sanchez*, cited above, §§ 136 and 145, where the applicant was held in solitary confinement for eight years and two months).

211.  Equally, although it is not for the Court to specify which security measures may be applied to prisoners, it has been particularly attentive to restrictions which apply to prisoners who are not dangerous or disorderly (see, for example,*A.B. v. Russia*, cited above, § 105 and *Csüllög v. Hungary*, no. 30042/08, § 36, 7 June 2011); to restrictions which cannot be reasonably related to the purported objective of isolation (see *Csüllög*, cited above, § 34,); and to restrictions which remain in place after the applicant has been assessed as no longer posing a security risk (see, for example,*Khider v. France*, no. 39364/05, §§ 118 and 119,9 July 2009).

212.  Finally,in order to avoid any risk of arbitrariness resulting from a decision to place a prisoner in solitary confinement, the decision must be accompanied by procedural safeguards guaranteeing the prisoner's welfare and the proportionality of the measure. First, solitary confinement measures should be ordered only exceptionally and after every precaution has been taken, as specified in paragraph 53.1 of the European Prison Rules. Second, the decision imposing solitary confinement must be based on genuine grounds both *ab initio* as well as when its duration is extended. Third, the authorities' decisions should make it possible to establish that they have carried out an assessment of the situation that takes into account the prisoner's circumstances, situation and behaviour and must provide substantive reasons in their support. The statement of reasons should be increasingly detailed and compelling as time goes by. Fourth, a system of regular monitoring of the prisoner's physical and mental condition should also be put in place in order to ensure that the solitary confinement measures remain appropriate in the circumstances (*Onoufriou*, cited above, § 70). Lastly, it is essential that a prisoner should be able to have an independent judicial authority review the merits of and reasons for a prolonged measure of solitary confinement (*Ramirez Sanchez v. France*, cited above, § 145 above; *A.B. v. Russia*, cited above, § 111).

### iii.  Recreation and outdoor exercise in prison

213.  Of the elements relevant for the assessment of the conditions of detention, special attention must be paid to the availability and duration of outdoor exercise and the conditions in which prisoners may take it. The Court has frequently observed that a short duration of outdoor exercise limited to one hour a day was a factor that further exacerbated the situation of the applicant, who was confined to his cell for the rest of the time without any kind of freedom of movement (see *Yevgeniy Alekseyenko v. Russia*, no. 41833/04, § 88, 27 January 2011; *Gladkiy v. Russia*, no. 3242/03, § 69,21

December 2010, § 69,*Skachkov v. Russia*, no. 25432/05, § 54, 7 October 2010).

214. The physical characteristics of outdoor exercise facilities also featured prominently in the Court's analysis. In *Moiseyevv. Russia*, the exercise yards in a Moscow prison were just two square metres larger than the cells and hardly afforded any real possibility for exercise. The yards were surrounded by three-metre-high walls with an opening to the sky protected with metal bars and a thick net. The Court considered that the restricted space coupled with the lack of openings undermined the facilities available for recreation and recuperation (see *Moiseyev v. Russia*, no. 62936/00, § 125, 9 October 2008). The Court examined the characteristics of outdoor exercise in *Mandić and Jović v. Slovenia*, nos. 5774/10 and 5985/10, 20 October 2011. The Court found that the applicants' situation (in overcrowded conditions) was further exacerbated by the fact that they were confined to their cell day and night, save for two hours of daily outdoor exercise, and an additional two hours per week in the recreation room. As there was no roof over the outdoor yard, it was hard to see how the prisoners could use the yard in bad weather conditions in any meaningful way. It was true that the applicants were allowed to watch TV, listen to radio and read books in the cell. The Court found, however,that this could not make up for the lack of possibility to exercise or spend time outside the overcrowded cell (see paragraph 78 of the judgment).

### iv   Detention and mental health

215. The Court has held on many occasions that the detention of a person who is ill may raise issues under Article 3 of the Convention and that the lack of appropriate medical care may amount to treatment contrary to that provision (see *Sławomir Musiałv. Poland*, no. 28300/06, § 87,20 January 2009with further references therein). In particular, the assessment of whether the particular conditions of detention are incompatible with the standards of Article 3 has, in the case of mentally ill persons, to take into consideration their vulnerability and their inability, in some cases, to complain coherently or at all about how they are being affected by any particular treatment.The feeling of inferiority and powerlessness which is typical of persons who suffer from a mental disorder calls for increased vigilance in reviewing whether the Convention has (or will be) complied with. There are three particular elements to be considered in relation to the compatibility of an applicant's health with his stay in detention: (a) the medical condition of the prisoner, (b) the adequacy of the medical assistance and care provided in detention, and (c) the advisability of maintaining the detention measure in view of the state of health of an applicant (ibid. and *Dybeku v. Albania*, no. 41153/06, § 41, 18 December 2007).

**b. Application of the general principles to the facts of the case**

*i. The case of the fourth applicant*

216.  The Court turns first to the case of the fourth applicant, who asks the Court to reconsider its decision to declare his complaint in respect of ADX inadmissible. The Court will only re-examine complaints which have been declared inadmissible in exceptional circumstances where a clear mistake has been made either in the establishment of facts that are relevant to the admissibility requirements or in the Court's assessment (*Ölmez and Ölmez v. Turkey* (dec.), no. 39464/98, 5 July 2005).

217.  Those circumstances do not obtain in the fourth applicant's case. Indeed, as the letter from Professor Coyle recognises, the fourth applicant is not detained in a medical facility but is subject to a comprehensive health and social care plan and regular daily support. On the basis of the information provided by the parties as to the regime at ADX, the Court does not consider that it would be possible for such a plan, or such regular support, to be provided at ADX. It may well be that, as the fourth applicant submits, Omar Abdel Rahman was detained at ADX Florence, despite severe heart problems, blindness and diabetes. However, the fourth applicant's disabilities are much more severe, not least the fact that both his forearms have been amputated. This fact alone would appear to make detention at ADX impossible. The Court therefore refuses the fourth applicant's request.

*ii. The cases of the first, third, fifth and sixth applicants.*

218.  For the above applicants, the Government have accepted that, although detention at ADX would not be inevitable if they were extradited and convicted in the United States, there is a real risk of detention there. The Court will proceed on this basis.

219.  In considering whether detention at ADX would violate Article 3, the Court observes that it does not appear to be in dispute that physical conditions at ADX Florence – that is, the size of cells, the availability of lighting and appropriate sanitary facilities and so on – meet the requirements of Article 3. Instead, the complaints made by the applicants are principally directed first, at the alleged lack of procedural safeguards before placement at ADX and second, at ADX's restrictive conditions and lack of human contact.

220.  For the first, the Court finds no basis for the applicants' submission that placement at ADX would take place without any procedural safeguards.The evidence submitted by the United States' authorities shows that not all inmates who are convicted of international terrorism offences are housed at ADX. Therefore, while it may well be the case that, as Professor Rovner states, inmates convicted of terrorism offences were sent to ADX soon after 11 September 2001 (despite years of good conduct in other, less

secure federal prisons), the applicants have not shown that they would be detained at ADX merely as a result of conviction for terrorism offences. Instead, it is clear from the declarations submitted by the Government, particularly that of Mr Milusnic, that the Federal Bureau of Prisons applies accessible and rational criteria when deciding whether to transfer an inmate to ADX. Placement is accompanied by a high degree of involvement of senior officials within the Bureau who are external to the inmate's current institution. Their involvement and the requirement that a hearing be held before transfer provide an appropriate measure of procedural protection. There is no evidence to suggest that such a hearing is merely window dressing. Even if the transfer process were unsatisfactory, there would be recourse to both the Bureau's administrative remedy programme and the federal courts, by bringing a claim under the due process clause of the Fourteenth Amendment, to cure any defects in the process. Despite the third party interveners' submission that recourse to the courts is difficult, the fact that Fourteenth Amendment cases have been brought by inmates at ADX shows that such difficulties can be overcome.

221. For the second complaint, ADX's restrictive conditions, it is true that the present applicants are not physically dangerous and that, as the Court has observed at paragraph 211 above, it must be particularly attentive to any decision to place prisoners who are not dangerous or disorderly in solitary confinement. However, as the applicants' current detention in high security facilities in the United Kingdom demonstrates, the United States' authorities would be justified in considering the applicants, if they are convicted, as posing a significant security risk and justifying strict limitations on their ability to communicate with the outside world. There is nothing to indicate that the United States' authorities would not continually review their assessment of the security risk which they considered the applicants to pose. As Ms Rangel has indicated, the Federal Bureau of Prisons has well-established procedures for reviewing an inmate's security classification and carrying out reviews of that classification in six-monthly program reviews and three-yearly progress reports.Moreover, as the Department of Justice's most recent letters show, the United States' authorities have proved themselves willing to revise and to lift the special administrative measures which have been imposed on terrorist inmates thus enabling their transfer out of ADX to other, less restrictive institutions (see paragraph 97 above).

222. The Court also observes that it is not contested by the Government that conditions at ADX Florence are highly restrictive, particularly in the General Population Unit and in phase one of the Special Security Unit.

It is clear from the evidence submitted by both parties that the purpose of the regime in those units is to prevent all physical contact between an inmate and others, and to minimise social interaction between inmates and staff. This does not mean, however, that inmates are kept in complete

sensory isolation or total social isolation. Although inmates are confined to their cells for the vast majority of the time, a great deal of in-cell stimulation is provided through television and radio channels, frequent newspapers, books, hobby and craft items and educational programming. The range of activities and services provided goes beyond what is provided in many prisons in Europe. Where there are limitations on the services provided, for example restrictions on group prayer, these are necessary and inevitable consequences of imprisonment (see,*mutatis mutandis*,*Dickson v. the United Kingdom*[GC], no. 44362/04, § 68, ECHR 2007-V). The restrictions are, for the most part, reasonably related to the purported objectives of the ADX regime (cf. *Csüllog*, cited above, concerning unnecessary restrictions, such as a prohibition on tea-bags and books).

The Court also observes that the services provided by ADX are supplemented by regular telephone calls and social visits and by the ability of inmates, even those under special administrative measures, to correspond with their families. The extent of those opportunities would be of considerable assistance to the applicants who would, by their extradition, be separated from their families in the United Kingdom.

The Court finds that there are adequate opportunities for interaction between inmates. While inmates are in their cells talking to other inmates is possible, admittedly only through the ventilation system. During recreation periods inmates can communicate without impediment. Indeed, as Mr Milusnic indicates, most inmates spend their recreation periods talking (see his declaration at paragraph 85 above).

In addition, although it is of some concern that outdoor recreation can be withdrawn for periods of three months for seemingly minor disciplinary infractions, the Court places greater emphasis on the fact that, according to Mr Milusnic, inmates' recreation has only been cancelled once for security reasons and that the periods of recreation have been increased from five to ten hours per week.

All of these factors mean that the isolation experienced by ADX inmates is partial and relative (see *Ramirez Sanchez*, cited above, § 135).

223. The Court would also note that, as it emphasised in *Ramirez Sanchez*, cited above, § 145,solitary confinement, even in cases entailing relative isolation, cannot be imposed indefinitely. If an applicant were at real risk of being detained indefinitely at ADX, then it would be possible for conditions to reach the minimum level of severity required for a violation of Article 3. Indeed, this may well be the case for those inmates who have spent significant periods of time at ADX. However, the figures provided by the United States' authorities, although disputed by the applicants, show that there is a real possibility for the applicants to gain entry to the step down or special security unit programs. First, the Department of Justice's letter of 26 September 2011 shows that while there were 252 inmates in ADX's General Population Unit, 89 inmates were in the step down

program. The figures provided in that letter for the special security unit program, when compared with the November 2010 figures given by Mr Milusnic, demonstrated that inmates are progressing through that program too. Second, Ms Rangel's declarations show that inmates with convictions for international terrorism have entered the step down program and, in some cases, have completed it and been transferred to other institutions.Ms Rangel's declaration is confirmed by the *Rezaq et al v. Nalley et al* judgment of the District Court where the petitioners, all convicted international terrorists, had brought proceedings to obtain entry to the step down program but, by the time the matter came to judgment, had completed the program and been transferred elsewhere (see paragraph 112 above).

224. Finally, to the extent that the first, third and fifth applicants rely on the fact that they have been diagnosed with various mental health problems, the Court notes that those mental health conditions have not prevented their being detained in high-security prisons in the United Kingdom. On the basis of Dr Zohn's declaration, it would not appear that the psychiatric services which are available at ADX would be unable to treat such conditions. The Court accordingly finds that there would not be a violation of Article 3 in respect of these applicants in respect of their possible detention at ADX.

## IV. ALLEGED VIOLATION OF ARTICLE 3 ARISING FROM THE APPLICANTS' POSSIBLE SENTENCES

### A. The admissibility of the fifth and sixth applicants' complaints

225. The first, third and fourth applicants' complaints under this head were declared admissible by the Court in its decision of 6 July 2010. The fifth and sixth applicants' complaints are indistinguishable from those made by the first, third and fourth applicants; those complaints are not, therefore,manifestly ill-founded within the meaning of Article 35 § 3(a) of the Convention. The Court notes that they are not inadmissible on any other grounds. They must therefore be declared admissible.

### B. Merits

#### 1. The parties' submissions

##### a. The Goverment

226. The Government relied on the Court's rulings in *Kafkaris* and *Léger v. France*, no. 19324/02,ECHR 2006-...,and the United Kingdom court's rulings in *Wellington* and *Bieber* (see paragraphs 64–72 and 144 above). In particular, they submitted that, in *Wellington*,the House of Lords

had been correct to find that, while an irreducible life sentence *might* raise an issue under Article 3, it would not violate Article 3 at the time of its imposition unless it was grossly or clearly disproportionate.

227. The Government further submitted that, unless a life sentence was grossly or clearly disproportionate, an irreducible life sentence would only violate Article 3 if the prisoner's further imprisonment could no longer be justified for the purposes of punishment and deterrence (see *Wellington*, cited above). No court could determine at the outset of the sentence when that point would be reached and, in a particular case, it might never be reached at all. Therefore, in the extradition context, unless a life sentence was grossly or clearly disproportionate, its compatibility with Article 3 could not be determined in advance of extradition.

228. In the present cases, none of the six applicants' sentences were grossly disproportionate and all the sentences were reducible, as required by *Kafkaris*.The Government referred to the four mechanisms for sentence reduction outlined in the Department of Justice's letter of 26 November 2010 (see paragraph 130 above): substantial assistance to the authorities in the investigation of a third party, recommendation for compassionate release by the Director of the Bureau of Prisons, commutation of the sentence by the President or pardon, reduction of the sentence based on the the sentencing guidelines which were subsequently lowered. In the Government's submission, the first three mechanisms separately and all four mechanisms cumulatively, were more than sufficient to establish that any life sentence imposed on the applicants would be both *de jure* and *de facto* reducible.

229. The Government observed that the first, third, fourth and fifth applicants only faced the possibility of discretionary life sentences. In this respect, the Court of Appeal in *Bieber* had correctly concluded that this Court would not find a violation of Article 3 if an irreducible life sentence was deliberately imposed by a judge, when that judge considered that the offence was so serious that punishment and deterrence required the offender to spend the rest of his days in prison (see paragraph 45 of *Bieber*, quoted at paragraph 144 above). In the Government's view, this was especially so when a discretionary life sentence by its very nature avoided the risk of arbitrariness of mandatory life sentences. Accordingly, given the serious nature of the allegations made against these applicants, and the full range of protections available in the United States (including the Eighth Amendment's protection from grossly disproportionate sentences), there were no substantial grounds for believing that the imposition of discretionary life sentences would violate Article 3.

230. For the sixth applicant, the Government submitted that, as a general principle, a mandatory and irreducible life sentence would not violate Article 3, especially if it were imposed on an adult offender following conviction for an offence of the utmost severity. Under United States federal

72     BABAR AHMAD AND OTHERSv. THE UNITED KINGDOMJUDGMENT

law a mandatory life sentence was reserved for a narrow category of offenders and the most serious criminal conduct. Given, therefore, that any mandatory life sentence (even if, for present purposes, it were irreducible) would only be imposed on the sixth applicant if he were convicted of participation in an act which had caused a massive loss of life, such a sentence would not be grossly disproportionate.

### b. The applicants

231. The applicants submitted that a violation of Article 3 would arise, not just because their sentences would in practice be irreducible, but also because the sentences were grossly disproportionate.Their likely sentences were, in effect, mandatory sentences which left no room for consideration of their individual cases. They relied on the views expressed by the House of Lords and Privy Council in *Lichniak*,*Reyes*,*de Boucherville*, as well as the rulings in *Dodo*,*Philibert*, and *Tcoeib*(see paragraphs 142,149 and 151–154 above). They also relied on academic materials detailing the inhumane and degrading effects sentences of life imprisonment without parole had on prisoners, particularly in the United States.[1]In their cases, the effects would be exacerbated by the requirement that they serve the sentences at ADX Florence and by the already poor mental health of some of the applicants.

232. It was not correct that, as the Government had suggested, no Article 3 issue could arise in respect of discretionary life sentences imposed by a judge. As Ms Barrett's evidence showed (see paragraph 133 above),United States trial judges had a limited sentencing discretion and the sentencing guidelines called for any offence involving terrorism to be punished by the available statutory maximum sentence. Therefore, it was highly likely that, where applicable, life sentences would be imposed.Moreover, it was not necessary for a life sentence to be mandatory for it to be disproportionate and thus in violation of Article 3. Several of the applicants risked life sentences for non-murder offences; in those circumstances, their sentences would be disproportionate because they could be imposed for non-murder offences without any real judicial discretion.

233. The applicants did not accept that the four reduction mechanisms relied on by the Government meant that their sentences would be *de facto* reducible. Proper regard had to be given to the practical realities of their situation. First, they were not in a position to provide "substantial assistance" to the authorities. Second, compassionate release would only arise if they became terminally ill and, even then, the Bureau might not

---

1. Johnson and McGunigall-Smith, "Life Without Parole, America's Other Penalty: Notes on Life Under Sentence of Death by Incarceration" 2008 *Prison Journal* 88; Appleton and Grover, "The Pros and Cons of Life Without Parole" 2007 47:4 *British Journal of Criminology*597-615; Amnesty International and Human Rights Watch *The Rest of their Lives: Life without Parole for Child Offenders in the United States*, 2005.

**A.169**

exercise its discretion in favour of release. In any event, hope of release to die of a terminal illness outside prison was not real hope of release. Third, release as a result of a change in the sentencing guidelines was speculative, did not automatically led to reductions, and would not apply if other, consecutive sentences were imposed. Finally, there was no record of any presidential pardon or commutation for a terrorism offence; the pardons issued in respect of the FALN were not comparable.

234. The extradition context was relevant insofar as any applicant sentenced to life imprisonment in a ContractingState could bring repeated applications to the Court complaining about his or her continued incarceration; by contrast, the present applicants had no means of challenging their incarceration once extradited. It was not correct, therefore, that an Article 3 issue could only arise after a substantial part of the sentence had been served and continued detention served no purpose (cf. *Bieber*and *Wellington*, cited above); an Article 3 issue could also arise at the time when the sentence was imposed.Moreover, it was irrelevant at what point a violation of Article 3 would arise in the United States: the principled approach which the Court had always taken to Article 3 meant that, whenever a risk of ill-treatment in the receiving State was clear and foreseeable, there would be a violation of Article 3.

### 2. The Court's assessment

#### a. General considerations

235. The Court takes note of the parties' submissions as to whether the applicants' likely sentences are irreducible within the meaning of that term used in *Kafkaris*. However, given the views expressed by the House of Lords in *Wellington*and the Court of Appeal in *Bieber* in respect of *Kafkaris* (summarised at paragraphs 64–72 and 144 above), the Court considers it necessary to consider first whether, in the context of removal to another State, a grossly disproportionate sentence would violate Article 3 and second, at what point in the course of a life or other very long sentence an Article 3 issue might arise.

236. For the first issue, the Court observes that all five Law Lords in *Wellington* found that, in a sufficiently exceptional case, an extradition would be in violation of Article 3 if the applicant faced a grossly disproportionate sentence in the receiving State. The Government, in their submissions to the Court, accepted that proposition.

Support for this proposition can also be found in the comparative materials before the Court. Those materials demonstrate that "gross disproportionality" is a widely accepted and applied test for determining when a sentence will amount to inhuman or degrading punishment, or equivalent constitutional norms (see the Eighth Amendment case-law summarised at paragraphs 134–136 above, the judgments of the Supreme

Court of Canada at paragraph 148 above, and the further comparative materials set out at paragraphs 151– 156 above).

237. Consequently, the Court is prepared to accept that while, in principle,matters of appropriate sentencing largely fall outside the scope of the Convention (*Léger*, cited above, § 72), a grossly disproportionate sentence could amount to ill-treatment contrary to Article 3 at the moment of its imposition. However, the Court also considers that the comparative materials set out above demonstrate that "gross disproportionality" is a strict test and, as the Supreme Court of Canada observed in *Latimer* (see paragraph 148 above), it will only be on "rare and unique occasions" that the test will be met.

238. The Court also accepts that, in a removal case, a violation would arise if the applicant were able to demonstrate that he or she was at a real risk of receiving a grossly disproportionate sentence in the receiving State. However, as the Court has recalled at paragraph 177 above, the Convention does not purport to be a means of requiring the Contracting States to impose Convention standards on other States.Due regard must be had to the fact that sentencing practices vary greatly between States and that there will often be legitimate and reasonable differences between States as to the length of sentences which are imposed, even for similar offences. The Court therefore considers that it will only be in very exceptional cases that an applicant will be able to demonstrate that the sentence he or she would face in a non-Contracting State would be grossly disproportionate and thus contrary to Article 3.

239. The Court now turns to the second issue raised by the Court of Appeal and House of Lords. It considers that, subject to the general requirement that a sentence should not be grossly disproportionate, for life sentences it is necessary to distinguish between three types of sentence: (i) a life sentence with eligibility for release after a minimum period has been served; (ii) a discretionary sentence of life imprisonment without the possibility of parole; and (iii) a mandatory sentence of life imprisonment without the possibility of parole.

240. The first sentence is clearly reducible and no issue can therefore arise under Article 3.

241. For the second, a discretionary sentence of life imprisonment without the possibility of parole, the Court observes that normally such sentences are imposed for offences of the utmost severity, such as murder or manslaughter. In any legal system, such offences, if they do not attract a life sentence, will normally attract a substantial sentence of imprisonment, perhaps of several decades. Therefore, any defendant who is convicted of such an offence must expect to serve a significant number of years in prison before he can realistically have any hope of release, irrespective of whether he is given a life sentence or a determinate sentence. It follows, therefore, that, if a discretionary life sentence is imposed by a court after due

consideration of all relevant mitigating and aggravating factors, an Article 3 issue cannot arise at the moment when it is imposed. Instead, the Court agrees with the Court of Appeal in *Bieber* and the House of Lords in *Wellington* that an Article 3 issue will only arise when it can be shown: (i) that the applicant's continued imprisonment can no longer be justified on any legitimate penological grounds (such as punishment, deterrence, public protection or rehabilitation); and (ii) as the Grand Chamber stated in *Kafkaris*, cited above, the sentence is irreducible *de facto* and *de iure*.

242. For the third sentence, a mandatory sentence of life imprisonment without the possibility of parole, the Court considers that greater scrutiny is required. The vice of any mandatory sentence is that it deprives the defendant of any possibility to put any mitigating factors or special circumstances before the sentencing court (see, for instance,*Reyes* and *deBoucherville* at paragraphs 151 and 152 above). This is no truer than for a mandatory sentence of life imprisonment without the possibility of parole, a sentence which, in effect, condemns a defendant to spend the rest of his days in prison, irrespective of his level of culpability and irrespective of whether the sentencing court considers the sentence to be justified.

However, in the Court's view, these considerations do not mean that a mandatory sentence of life imprisonment without the possibility of parole is *per se* incompatible with the Convention, although the trend in Europe is clearly against such sentences (see, for example, the comparative study summarised at paragraph 138 above). Instead, these considerations mean that such a sentence is much more likely to be grossly disproportionate than any of the other types of life sentence, especially if it requires the sentencing court to disregard mitigating factors which are generally understood as indicating a significantly lower level of culpability on the part of the defendant, such as youth or severe mental health problems (see, for instance,*Hussain v. the United Kingdom* and *Prem Singh v. the United Kingdom,* judgments of 21 February 1996,*Reports* 1996-I at paragraphs 53 and 61 respectively and the Canadian case of *Burns*, at paragraph 93, quoted at paragraph 74 above).

The Court concludes therefore that, in the absence of any such gross disproportionality, an Article 3 issue will arise for a mandatory sentence of life imprisonment without the possibility of parole in the same way as for a discretionary life sentence, that is when it can be shown: (i) that the applicant's continued imprisonment can no longer be justified on any legitimate penological grounds; and (ii) that the sentence is irreducible *de facto* and *de iure* (*Kafkaris*, cited above).

#### b. The present cases

243. The Court now turns to the facts of each case.It is convenient first to consider the cases of the first, third, fourth and sixth applicants who face, at most, discretionary life sentences.

First, the Court observes that it is by no means certain that, if extradited, these applicants would be convicted of the charges against them. If they are, it is also by no means certain that discretionary life sentences would be imposed, particularly when none of the charges they face carries a mandatory minimum sentence of life imprisonment. Nonetheless, the Court considers that it is appropriate to proceed on the basis that discretionary life sentences are possible.

Second, it is necessary to consider whether such sentences would be grossly disproportionate. In this connection the Court observes that, while the offences with which these applicants are charged vary, all of them concern involvement in or support for terrorism. Given the seriousness of terrorism offences (particularly those carried out or inspired by Al-Qaeda) and the fact that the life sentences could only be imposed on these applicants after the trial judge considered all relevant aggravating and mitigating factors, the Court considers that discretionary life sentences would not be grossly disproportionate in their cases.

Third, as the Court has observed, in respect of a discretionary life sentence, an Article 3 issue will only arise when it can be shown: (i) that the applicant's continued incarceration no longer serves any legitimate penological purpose; and (ii) the sentence is irreducible *de facto* and *de iure*. Given that none of these applicants has been convicted, still less has begun serving any sentences which might be imposed upon conviction (cf. *Kafkaris* and *Léger*, cited above, and *Iorgov v. Bulgaria (no. 2)*, no. 36295/02, 2 September 2010),the Court considers that they have not shown that, upon extradition, their incarceration in the United States would not serve any legitimate penological purpose. Indeed, if they are convicted and given discretionary life sentences, it may well be that, as the Government have submitted, the point at which continued incarceration would no longer serve any purpose may never arise. It is still less certain that, if that point were ever reached, the United States' authorities would refuse to avail themselves of the mechanisms which are available to reduce their sentences (see paragraph 130 above and *Kafkaris*, cited above, § 98).

Accordingly, the Court finds that these applicants have not demonstrated that there would be a real risk of treatment reaching the threshold of Article 3 as a result of their sentences if they were extradited to the United States. The Court therefore finds no violation of Article 3 in their cases.

244. Finally, the Court turns to the case of the fifth applicant. He faces two hundred and sixty-nine counts of murder and thus multiple mandatory sentences of life imprisonment without the possibility of parole. The Court does not find a mandatory life sentence would be grossly disproportionate for such offences, particularly when the fifth applicant has not adduced any evidence of exceptional circumstances which would indicate a significantly lower level of culpability on his part. Indeed, if he is convicted of these charges, it is difficult to conceive of any mitigating factors which would

lead a court to impose a lessersentence than life imprisonment without the possibility of parole, even if it had the discretion to do so. Moreover, for the reasons it has given in respect of the first, third, fourth and sixth applicants, the Court considers that he has not shown that incarceration in the United States would not serve any legitimate penological purpose. Therefore, he too has failed to demonstrate that there would be a real risk of treatment reaching the threshold of Article 3 as a result of his sentence if he were extradited to the United States. Accordingly, the Court finds that there would be no violation of Article 3 in his case.

## V. THE FIFTH AND SIXTH APPLICANTS' REMAINING COMPLAINTS

### A.  The remaining complaints

245.  In their initial application to the Court, the fifth and sixth applicants made ten further complaints.

246. First, they alleged that the diplomatic assurances provided by the United States were not sufficient to remove the risk of their being removed from the federal criminal justice system and designated as enemy combatants in violation of Articles 3, 5, 6 and 8 of the Convention. In particular, they relied on the fact that one of their indicted co-accused, Ahmad Khalfan Ghailani, was detained and brought before a Military Commission at Guantánamo Bay Naval Base (where he was allegedly tortured) only to be later transferred to stand trial in a Federal District Court in New York.

Second, they complained that the diplomatic assurances were not sufficient to remove the risk that they would be subjected to extraordinary rendition.

Third, relying on Article 2 of the Convention the fifth applicant argued that, as a result of his recurrent depressive disorder, his extradition would carry an extremely high risk that he would commit suicide.

Fourth, the fifth and sixth applicants complained that there was a real risk that they would be subjected to "special administrative measures" pre-trial in violation of Articles 3, 6, 8 and 14.

Fifth, the applicants alleged that there would be a real risk of a flagrant denial of justice in violation of Article 6 § 1 of the Convention because the extensive publicity which the United States Government's counter-terrorism efforts had attracted would prejudice any jury, particularly when they were to stand trial in New York. This would be exacerbated by the public controversy surrounding the President's decision to transfer other high profile terrorist suspects such as Khalik Sheikh Mohammed and Ahmed Ahmad Khalfan Ghailani, from Guantánamo to New York for trial.

78        BABAR AHMAD AND OTHERSv. THE UNITED KINGDOMJUDGMENT

Sixth, also under Article 6, the applicants argued that the case against them had been significantly weakened as new evidence had emerged in the course of their extradition proceedings. Notwithstanding this new evidence, their trial would be prejudiced by the fact that any jury would hear evidence linking them to a conspiracy to murder which involved Osama bin Laden and Al Qaeda.

Seventh, the applicants argued that further prejudice would arise if CS/1, Mr Al-Fadl, were to give evidence when it was not clear what pressure had been put on him or inducements given to him by the prosecuting authorities in order to secure his testimony.

Eighth, the sixth applicant alleged that any jury in his case would be further prejudiced by the fact that he had been designated as a global terrorist by the President of the United States.

Ninth, under Article 8 the applicants alleged that there would be a disproportionate interference with their private and family life in the United Kingdom if they were to be extradited. The first applicant relies on the fact that his extradition would result in permanent separation from his wife, children and grandchildren, who were all British residents.

Tenth, the applicants alleged that there would be a violation of Article 13 of the Convention if they were extradited as they would have no effective remedy for the violations of the Convention they would suffer in the United States.

247. In making these complaints, the fifth and sixth applicants considered that it was of some relevance that, rather than extraditing them to the United States in violation of the Convention, it would be possible for them to be tried in the United Kingdom. The crimes of which they were accused were justiciable in the United Kingdom; the vast bulk of the evidence against them had been obtained by the United Kingdom authorities and the majority of defence witnesses were in the United Kingdom but would not travel to the United States to give evidence for fear of arrest; and, despite their representations as to what would happen to the applicants in the United States, the United Kingdom Government had failed to give proper consideration to prosecuting them in the United Kingdom.

### B.  The Court's assessment

248. The Court observes that the first and second complaints, which relate to an alleged risk of designation as enemy combatants and extraordinary rendition, are substantially the same as those made by the first, third and fourth applicants in their applications to the Court. Those complaints were rejected by the Court in its admissibility decision of 6 July 2010: see paragraphs 104-110 and 113-116 of the decision. Having regard to the similar Diplomatic Notes provided by the United States in respect of the fifth and sixth applicants there is no basis to reach a different conclusion

in their case. Accordingly, these complaints must be rejected as manifestly ill-founded, pursuant to Article 35 §§ 3 and 4 of the Convention.

249. In respect of the third complaint, the fifth applicant's risk of suicide, the Court considers it appropriate to distinguish between the risk during pre-trial and post-trial periods of detention.

In respect of the former, the Court notes that the first and third applicants complained that the imposition of special administrative measures pre-trial would have an adverse effect on their mental health. Insofar as they related to their possible conditions of pre-trial detention, the Court rejected those complaints as manifestly ill-founded. It found that it had not been suggested that, prior to extradition, the United Kingdom authorities would not advise their United States counterparts of the applicants' mental health conditions or that, upon extradition, the United States' authorities would fail to provide appropriate psychiatric care to them. The Court also noted that it had not been argued that psychiatric care in United States federal prisons was substantially different to that provided at HMP Long Lartin (where the first and third applicants were being detained). There was also no reason to suggest that the United States' authorities would ignore any changes in the applicants' conditions or that, if they did present any suicidal tendencies or symptoms of self-harm, they would refuse to alter the conditions of their detention to alleviate any risk to them.

The Court finds that similar considerations must apply in respect of the fifth applicant's complaint concerning his pre-trial detention. Accordingly, insofar as it relates to the risk of suicide before his trial would take place, the complaint must be rejected as manifestly ill-founded. Insofar as the complaint relates to the risk of suicide in post-trial detention at ADX Florence, the Court finds that no separate issue arises from the Article 3 complaint considered above.

250. The Court turns to the fourth, fifth, seventh and eighth complaints, which relate, respectively, to the imposition of special administrative measures pre-trial, the prejudicial effect of extensive pre-trial publicity, the prejudice arising from inducements or pressure placed on Mr Al-Fadl to testify against them, and the further prejudicial effect of the sixth applicant's designation as a global terrorist. The Court notes that similar complaints were made by the first, third and fourth applicants and rejected in the admissibility decision (paragraphs 125-135, 159-160, 163 and 166). There are no grounds to distinguish the fifth and sixth applicants' complaints under these headings and, accordingly, these complaints must also be rejected as manifestly ill-founded.

251. As regards the sixth complaint, that the evidence had significantly weakened against the fifth and sixth applicants, the Court recalls that it is not its task to assess the evidence against an accused, still less, in an extradition case, to evaluate the strength of the requesting State's case

against an applicant. This complaint must also be rejected as manifestly ill-founded.

252. For the ninth complaint, that extradition would be a disproportionate inference with their family and private life in the United Kingdom, the Court reiterates that it will only be in exceptional circumstances that an applicant's private or family life in a Contracting State will outweigh the legitimate aim pursued by his or her extradition (see *King v. the United Kingdom* (dec.), no. 9742/07, 26 January 2010). There are no such exceptional circumstances in the fifth and sixth applicants' case, particularly given the gravity of the offences with which they are charged. This complaint is therefore manifestly ill founded.

253. Finally, since none of the above complaints are "arguable", no issues arise under Article 13 of the Convention.The tenth complaint is therefore also manifestly ill founded.

254. The Court's conclusion in respect of the fifth and sixth applicant's ten further complaints make it unnecessary to consider what relevance, if any, should be attached to their submission that they could be prosecuted in the United Kingdom.

## VI.  THE SECOND APPLICANT

255. The Court notes that the second applicant has made similar submissions under Article 3 as to the length of his likely sentence and conditions at ADX Florence. For the latter, he has relied in particular on the fact that his schizophrenia necessitated his transfer from high security conditions at HMP Long Lartin to BroadmoorHospital. There he has significant freedom within the security of the hospital and has participated in group activities as therapeutic measures. He is under the care of a consultant psychiatrist, who considers it necessary to continue his compulsory hospitalisation.

256. The Court considers that it is not in a position to rule on the merits of the second applicant's complaints, particularly in respect of ADX Florence, but requires further submissions from the parties. For that reason, it decides to adjourn the examination of the second applicant's complaints. Those complaints will now be considered under a new application number, no. 17299/12.

## VII.  RULE 39 OF THE RULES OF COURT

257. The Court recalls that, in accordance with Article 44 § 2 of the Convention, the present judgment will not become final until (a) the parties declare that they will not request that the case be referred to the Grand Chamber; or (b) three months after the date of the judgment, if referral of the case to the Grand Chamber has not been requested; or (c) the Panel of

the Grand Chamber rejects any request to refer under Article 43 of the Convention.

258. It considers that the indications made to the Government under Rule 39 of the Rules of Court (see above § 4) must continue in force until the present judgment becomes final or until the Panel of the Grand Chamber of the Court accepts any request by one or both of the parties to refer the case to the Grand Chamber under Article 43 of the Convention.

## FOR THESE REASONS, THE COURT UNANIMOUSLY

1. *Joins* the applications brought by the first, third, fourth, fifth and sixth applicants;

2. *Adjourns* its examination of the application brought by the second applicant;

3. *Declares*admissible the fifth and sixth applicants'complaints concerning detention at ADX Florence, the imposition of special administrative measures post-trial, and the length of their possible sentences, and the remainder of their applications inadmissible;

4. *Holds* that there would be no violation of Article 3 of the Convention as a result of conditions at ADX Florence and the imposition of special administrative measures post-trial if the first, third, fifth and sixth applicants were extradited to the United States;

5. *Holds* that there would be no violation of Article 3 of the Convention as a result of the length of their possible sentences if the first, third, fourth, fifth and sixth applicants were extradited to the United States;

6. *Decides* to continue to indicate to the Government under Rule 39 of the Rules of Court that it is desirable in the interests of the proper conduct of the proceedings that the applicants should not be extradited until further notice.

Done in English, and notified in writing on 10 April 2012, pursuant to Rule 77 §§ 2 and 3 of the Rules of Court.

<table>
<tr><td>Lawrence Early</td><td>Lech Garlicki</td></tr>
<tr><td>Registrar</td><td>President</td></tr>
</table>

**Post-Trial**

301. If Mr. Assange is convicted and sentenced to a term of imprisonment, the BOP will be responsible for designating a post-sentencing facility for his detention.

*Is there a real risk that Mr. Assange will be housed at the ADX Florence?*

302. Mr. Kromberg considerd it "*purely speculative*" to conclude that Mr. Assange would be designated to the ADX. He stated, "*In short, sentencing and facility designations are difficult to predict, and, as a result, it is purely speculative to conclude that Assange would receive a life sentence and/or be designated to the ADX.*" He stated that the philosophy of the BOP is to house all inmates in the least restrictive environment appropriate for the inmate. He stated that the ADX Florence is the most secure prison in the federal system and designed to safely house the BOP's most violent, predatory and escape-prone prisoners with only 300 of the 129,000 prisoners in the BOP's custody housed there.

303. It is an agreed fact that there are currently nine inmates subject to a SAMs for espionage, of which four are housed at the ADX Florence, one at MCC New York, two at FCI Terre Haute, one at FCI Hazelton, and one at FMC Carswell.

304. For the defence, Ms. Baird stated that once a decision is made to impose SAMs post-conviction, there are few choices for where the inmate will be housed: if he is not gravely ill, requiring placement at a Federal Medical Centre ("FMC"), she initially stated the only option is placement at the ADX Florence but later accepted that placement in other parts of the prison system was also possible. She was unaware of the agreed fact that, of the nine individuals who are detained for espionage offences and subject to SAMs, only four are housed at the ADX Florence.

305. The criteria for the imposition of SAMs are the same post-conviction as it is for pre-trial. I have already found there to be a real risk that Mr. Assange will be subject to these restrictive measures. Many inmates subject to SAMs (although not all) are held at the ADX Florence and half of those subject to SAMs and convicted of espionage offences

are housed there. In my judgment there is a real risk that Mr. Assange will be designated to the ADX, Florence.

**Conditions in the ADX Florence for inmates subject to post-trial SAMs**

306. Mr. Kromberg provided the following overview: inmates subject to SAMs are housed on the H-Unit; they receive a minimum of 10 hours of out-of-cell exercise per week; generally, they "*recreate individually*" in secure single recreation areas; they consume their meals in their cells; they receive up to four monthly social telephone calls and may receive up to five social visits. The inmates incarcerated in H Unit have the opportunity to participate in a 3-phase special security unit program (SSU Program). Phase 1 is the baseline phase. An inmate may be permitted 2 non-legal telephone calls per month, access to a commissary list and art and hobby craft items, and escorted shower time on the inmate's range—the common area outside of a cell— 3 times each week. After approximately 12 months, phase 2 can be achieved. In phase 2, an inmate may be permitted 3 non-legal telephone calls per month and access to an expanded commissary list and additional art and hobby craft items and are allowed to be out of their cells without an escort 5 times each week. Phase 3 typically requires a modification of the SAMs to allow inmates to have physical contact with one another. In phase 3, inmates are allowed to be out on the range together; they eat a meal together and engage in recreational activities, including watching television, reading and playing cards; they may shower at any time they are on the range; and they continue to have access to the expanded art and hobby craft list and a further expanded commissary list. Inmates housed in the SSU are reviewed annually by the Attorney General to determine if their SAMs status should be renewed or modified.

307. In *Babar Ahmad v United Kingdom* (2012) 56 E.H.R.R. 1 the ECrtHR conducted a thorough review of the conditions in post-trial detention at the ADX Florence and the effect of SAMs in the context of a challenge under Article 3 of the ECHR. The court accepted that the purpose of the regime in phase 1 on the H-Unit was to prevent all physical contact between an inmate and others, and to minimise social interaction between detainees and staff. It found, however, the resulting isolation to be partial and relative. Mr. Ahmad (the first applicant) had been diagnosed with post-traumatic stress disorder, which had worsened in the prison unit where he was detained. Mr. Ahsan (the third