UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X

UNITED STATES OF AMERICA,

           - against -                          04 Cr. 356 (AT)

MUSTAFA KAMEL MUSTAFA,
a/k/a Mostafa Kamel Mostafa,

                       Defendant.

-----------------------------------------------------X

**DEFENDANT MOSTAFA KAMEL MOSTAFA'S**
**MOTION FOR COMPASSIONATE RELEASE AND/OR REDUCTION IN SENTENCE**

**APPENDIX**

**(Vol. 4 of 4)**

SAM A. SCHMIDT, ESQ.          MICHAEL K. BACHRACH, ESQ.
29 Broadway, Suite 1412        224 West 30th Street, Suite 302
New York, New York 10006     New York, New York 10001
(212) 346-4666              (212) 929-0592

*Attorneys for Defendant Mostafa Kamel Mostafa*

## Table of Contents

*Vol. 1 of 4:*

Letter Request to Warden for compassionate Release, dated, January 12, 2023 ................1

United States v. Abu Hamza (City of Westminster (U.K.) Magistrate's Court)
(Workman, S.DJ.) (November 15, 2007) ...........................................................................3

Affidavit ADX Warden, dated, October 3, 2007 ............................................................19

Mustafa Kamel Mustafa (Otherwise Abu Hamza) v. United States, [2008] EWHC
1357
(High Court, Queen's Bench Div.) (June 20, 2008) .........................................................32

Observations of Foreign and commonwealth Office, dated, November 13, 2008 ...........63

Observations of Foreign and commonwealth Office, dated, October 24, 2011 ................90

Case of Babar Ahmad and Others v. United Kingdom,
Appl. Nos. 24027/07, 11949/08, 66911/09, 67354/09
(European Court of Human Rights) (April 10, 2012) .......................................................97

Excerpt, United States v. Julian Assange (City of Westminster (U.K.) Magistrate's
Court) (Baraitser, DJ.) (January 4, 2021) .......................................................................179

*Vol. 2 of 4:*

Letter for Sentencing from Dr. Kligler, dated, December 4, 2014 .................................181

Exhibit from Government Sentencing Submission – Letter from B.O.P.,
dated, January 2, 2015 ...................................................................................................185

Excerpts from Sentencing Transcript, dated, January 9, 2015 .......................................188

Judgment, dated, January 12, 2015 ................................................................................191

Special Administrative Measures, dated, January 7, 2021 ..............................................196

Letter from Lindsay Lewis, Esq. to B.O.P. counsel, dated, March 21, 2013 ..................214

Email Correspondence from Lindsay Lewis, Esq. to B.O.P., dated April 20, 2016 ........219

Letter from Lindsay Lewis, Esq. to B.O.P. counsel, dated April 20, 2016 .....................221

Email Correspondence from Lindsay Lewis, Esq. to B.O.P., dated May 12, 2016 .........225

Email Correspondence from Lindsay Lewis, Esq. to B.O.P., dated August 19, 2016    226

Letter from Lindsay Lewis, Esq. to B.O.P. counsel, dated April 18, 2016 .....................227

Letter from MCC Counsel to Lindsay Lewis, Esq., dated, May 16, 2013 .....................229

Excerpts from Affidavit of Lindsay Lewis, Esq. re: Assange Extradition Request, Dated, July 17, 2020 ...........................................................................................232

Addendum Report by Lindsay Lewis, Esq. re: Assange Extradition Request, Dated, September 29, 2021 ............................................................................234

*Complaints, Remedy Requests and Responses (BOP complaints and responses including some civil case pro se writings)*

    Partial List Prepared by Mr. Mostafa ..................................................250

    Partial List Prepared by BOP. ...........................................................266

**Vol. 3 of 4:**

    Various Complaints, Remedy Requests and Responses ......................................291

    Letter to Magistrate Judge Hegarty, dated January 16, 2020..............................342

*Documents from <u>Mostafa v. Garland, et al.</u>, Docket No. 20 Cv. 694 (D. Colo)*

    Excerpts, Fourth Amended Complaint, dated, July 11, 2022 (Doc. No. 199)    347

    Excerpt, Complaint, dated, January 10, 2020 (Doc. No. 1).................................373

    Excerpts, First Amended Complaint, dated May 5, 2020 (Doc. No. 9)...............375

    Excerpts, Pro se Motion, dated September 24, 2020 (Doc. No. 43-1)................376

    Declaration of D. McMullen, dated, May 26, 2021 (Doc. No. 96-7) .................380

    Mr. Mostafa's Diagram and Comments on Cells from Pro Se Answer to Motion to dismiss, dated, July 16, 2021 (Doc. No. 119)..................................390

    Excerpt, Pro Se submission, dated, December 6, 2021 (Doc. No. 158) ..............394

*Vol. 4 of 4:*

Statement of Dr. Gregory Johnsen Yemen Re: Yemen (2022)..........................................395

Excerpt, Draft Chapter of Book by Mary Quin (Gov't Bates No. 3502-24) ..................402

Report by Bridget Prince, One World Research, *Restrictions to Sentenced Prisoners on Release in the UK* .......................................................................410

Letters in Support from Mr. Mostafa's Family ...............................................................415

Excerpt, Sentencing Transcript, <u>Regina v. Abu Hamza</u>, dated, February 7, 2006..........423

**Statement of Dr. Gregory Johnsen**

My name is Gregory Johnsen and I am a non-resident fellow at the Brookings Institution as well as a non-resident fellow at the Sanaa Center for Strategic Studies, an international think tank focused on Yemen. I have studied and worked on Yemen and Islamist groups for the past 19 years. I served as a Peace Corps volunteer in Jordan (2001-02), a Fulbright Fellow in Yemen (2003-04), and a Fulbright-Hays Fellow in Egypt (2010-11).

I received a Ph.D. in Near Eastern studies from Princeton University in 2017. I also earned two separate Masters' degrees, both in Near Eastern studies, one from Princeton University and another from the University of Arizona. In 2012 I published a book – *The Last Refuge: Yemen, al-Qaeda, and America's War in Arabia* (WW Norton) – which dealt with the history of Islamists and jihadi groups in Yemen, including the Aden-Abyan Islamic Army.

From 2016 – 2018, I served on the UN Security Council's Panel of Experts on Yemen as an armed groups expert and as a regional expert. As the armed groups expert on the panel I was responsible for tracking all armed groups, including Islamist ones, in Yemen and reporting back to the Security Council.

Over the past 19 years I have published widely on Yemen including things such as op-eds in the New York Times as well as in more specialized academic journals. I have testified before Congress about the situation in Yemen and consulted with a variety of government institutions and agencies regarding Yemen.

I have been asked by the defendant's counsel to provide an expert report on the situation in Yemen in the 1990s, the history of kidnappings in the country, an overview of

relevant jihadi groups at the time, as well as common practices for groups such as the Aden-Abyan Islamic Army. I have provided my responses for each of these areas below.

In May 1990, the former north Yemen and south Yemen united to create the Republic of Yemen. Prior to unification, south Yemen – officially known as the People's Democratic Republic of Yemen (PDRY) – was the only socialist state in the Arab world and, as such, was heavily dependent on aid from the Soviet Union. But with the collapse of the Soviet Union, the two Yemeni states, much like East and West Germany, elected to pursue unification.[1] The north, however, was stronger, more populous, and got the better end of the unification deal.

North Yemeni president, Ali Abdullah Saleh, became president of the newly unified country, while his counterpart from the south, Ali Salem al-Bidh, became vice president. President Saleh, who had been instrumental in sending young Yemenis abroad in the 1980s to fight the Soviet Union in Afghanistan, quickly began to look for ways to defeat his own socialists at home. As part of this strategy, Saleh reached out to a number of individuals, including prominent south Yemeni families who had been forced into exile when the socialists took over in the south in the 1960s. Saleh also asked former jihadi fighters from Afghanistan to come to Yemen to fight the country's local socialist threat.[2] Not surprisingly, given the level of mistrust and covert warfare between Saleh and the socialists, the former south attempted to secede in 1994.

---

[1]      For more background on unification see Paul Dresch, *A History of Modern Yemen*, Cambridge University Press, New York, 2000.

[2]      See Gregory D. Johnsen, *The Last Refuge: Yemen, al-Qaeda, and America's War in Arabia*, WW Norton: New York, 2012.

The civil war was short but bloody. The north and Saleh won, at least partly, thanks to Arab veterans of the war in Afghanistan. In the aftermath of the war, Saleh owed many of these veterans a debt and gave them relatively free reign within Yemen.

Throughout the 1990s, Ali Abdullah Saleh governed through a process of what he often called, "dancing on the heads of snakes."[3] In practice, this meant Saleh played different domestic groups off against one another as way of keeping his potential rivals divided and weak. This also meant, however, that many of these groups were constantly looking for leverage with Saleh as way of ensuring presidential support and financing.

One phenomenon that emerged at this time was the kidnapping of western citizens in Yemen, often by tribes and often as way of pressuring Saleh's government to citizens fulfill a neglected promise such as paving a road, building a hospital, or the release of a prisoner who had been taken by the government.

This phenomenon was well known and well documented at the time by western academic and journalists. In 1997, for example, the *Washington Post* ran a story on kidnappings in Yemen, entitled: "Kidnapping in Yemen is Hospitality."[4] The piece focused on the 1993 kidnapping of US Foreign Service officer, Haynes Mahoney. The captors, the piece explains, slaughtered goats in Mahoney's honor, invited him to chew qat, and tried to keep his spirits up with cookies, tea, and cigarettes. "They were as polite as one can be when one is pointing a gun at someone," Mahoney said. "I was treated pretty much like a compulsory guest."[5]

---

[3]     See, for instance, Victoria Clark, *Yemen: Dancing on the Heads of Snakes*, Yale University Press, New York: 2010.

[4]     John Lancaster, "Kidnapping in Yemen is Hospitality," *Washington Post*, May 16, 1997. https://www.washingtonpost.com/wp-srv/inatl/mideast/may/22/kidnap.htm

[5]     Lancaster, "Kidnapping in Yemen is Hospitality."

Mahoney was eventually released unharmed.[6] As Farea al-Muslimi, a Yemeni writer and analyst, explains: "As soon as the government began to respond to (the tribe's) demands, the hostage would be released, unharmed after something more akin to forced hospitality than a terrifying extended brush with death."[7] Typically, during this period in the 1990s, one or more mediators would act as go-betweens, shuttling back-and-forth between the kidnappers and the government until a deal was reached and the hostages released.

Laura Kasinof, an American journalist who lived in Yemen and wrote a book about her time in the country, agrees, writing: "If a tribe wanted to bribe the government in some way, to get Uncle Mohammed out of prison, for example, then Western foreigners were good bargaining chips."[8]

In the 1990s, for example, kidnappings were so common in Yemen that local journalists joked that the Ministry of Tourism should change its name to the Ministry of Kidnapping.[9]

This, as al-Muslimi writes and my own experience in Yemen confirms, sparked an odd and "poorly thought out" brand of adventure tourism, with some westerners traveling to tribal areas in the hopes of getting kidnapped so that they would have a story to tell back

---

[6]     In my research I found no other examples of hostages being harmed by the hostage takers prior to the December 28, 1998, incident.

[7]     Farea al-Muslimi, "In Yemen, Kidnapping is a Growing Business," *Executive Magazine*, March 31, 2014. https://www.executive-magazine.com/opinion/comment/yemen-kidnapping-growing-business

[8]     Laura Kasinof, "The time I played a kidnapped Westerner on a Yemeni soap opera," *The Atlantic*, November 9, 2014.   https://www.theatlantic.com/international/archive/2014/11/kidnapped-westerner-yemen-soap-opera/382533/

[9]     Lancaster, "Kidnapping in Yemen is Hospitality."

home.[10] As the late Shaykh Abdullah al-Ahmar, the Speaker of Yemen's Parliament and head of the country's largest tribal confederation, put it at one point during the 1990s: "Kidnapping in Yemen is hospitality. Kidnapping is part of tourism; it's an adventure for the tourist, because the tourist will end up learning about the customs of the tribes, as well as their good hospitality."[11]

Most estimates suggest that in the 1990s, between 150 – 200 westerners were kidnapped in Yemen.  To the best of my knowledge and based on my research, other than in this case all the westerners (or foreigners) were released and unharmed. Throughout the 1990s, the operating assumption for most tribes and groups in Yemen was that if you wanted to put pressure on Saleh's government the quickest and most effective way to do so was by kidnapping foreigners. Throughout this period, the Yemeni government typically responded by negotiating, not with military force.[12]

In the mid to late 1990s, the jihadi world was relatively small. Most individuals within this world had experience either fighting in Afghanistan during the 1980s or Bosnia and/or Chechnya during the early and mid 1990s. It was also fairly common for various groups within this world to use official or unofficial spokesmen and news outlets, often in London, to get their message out. For instance, when Osama bin Laden issued his "Declaration of War against America," in 1996, it was published in the pan-Arab daily *al-Quds al-Arabi*, which was based in London. *Al-Quds al-Arabi* was one of three pan-Arab dailies, but the only independently owned one.

---

[10]     Al-Muslimi, "In Yemen, Kidnapping is a Growing Business."

[11]     Lancaster, "Kidnapping in Yemen is Hospitality."

[12]     In my research I found one other incident that government troops clashed with the tribe holding hostages prior to the December 1998 incident.

Other groups, such as the Aden-Abyan Islamic Army, made similar arrangements with contacts and individuals in London, such as Mustafa Kamal Mustafa, also known as Abu Hamza al-Masri.

On December 23, 1998, a group of individuals operating under Zayn al-Abidin al-Mihdhar, the leader of the Aden-Abyan Islamic Army, traveled from their camp in Abyan (west of Aden) to carry out what was intended to be a coordinated attack in Aden on Christmas Day. However, members of the groups were arrested early the next morning (December 24) before they could carry out the attack.[13] In Abyan, al-Mihdhar, who was looking for a way to salvage the plot and get his men out of jail, heard from a local contact about a group of tourists who would be traveling through the area.

On December 28, al-Mihdhar and a group of his followers ambushed the tourist convey and succeeded in capturing 16 tourists as well as four Yemeni drivers and guides. Al-Mihdhar's plan was to hold the tourists and use them to secure the release of his men, who had been arrested on Christmas Eve. However, instead of negotiating with the kidnappers, as the Yemeni government almost always did, the Yemeni military engaged in a rescue operation on December 29. During the operation, four of the tourists were tragically killed.

Al-Mihdhar's kidnapping of the tourists was a reactive and ad hoc plot, formed as a reaction to the arrests of the Aden-Abyan Islamic Army members on Christmas Eve. Given how quickly the kidnapping plot came together as well as the way local Islamists groups such as AAIA functioned at the time it would have been inconsistent for al-Mihdhar to inform anyone outside of Yemen of his plans prior to taking the tourists hostage.

---

[13]     Johnsen, *The Last Refuge*, 58 – 63.

Kidnappings in Yemen in the 1990s were a local response to local events and an attempt to put pressure on Saleh's government, and that is exactly what al-Mihdhar was attempting to do.

Dated: _____, 2022

_____
Dr. Gregory Johnsen

Chapter Seven ~~Five~~ Nine

~~Negotiations~~ *End*

Abu Hassan stared at the passports in frustration and anger. He knew a few words of spoken English but its strange alphabet was incomprehensible to him.  Surely there must be more Americans. Huraira assured him there was only one American passport among the sixteen and it belonged to a woman.  Hassan's disappointment surged up in his throat and for a moment he struggled with a choking sensation, unable to speak. Sixteen hostages and not one American.  A woman didn't count.  No government would bother getting involved over a woman.

"But you have 6 British men," the Tunisian, Abu Huraira, said encouragingly.  "President Salih will not want to risk angering the British government.  And the American woman is worth something.  Americans think differently than us about women."

Hassan's mind worked quickly.  He turned to Osama Al-Masri who was busy trying to get a signal on the satellite phone.

"Osama, call Abu Hamza in London.  He can speak for us to the British and let their newspapers know we have captured 13 of their people.  But first I must talk to Abu Abdullah in Mar'ib. We may need his help."

Osama Al-Masri continued to struggle with the satellite phone. Finally he made a connection to Mar'ib and handed the phone across to Hassan.

"Abu Abdullah? This is Abu al-Hassan. I have good news. The
ordered goods have arrived. It is what we wanted. Sixteen
cartons marked British and American." There was a pause as
Hassan listened to the response then he added, "Be ready for us.
If conditions are difficult here we will need to store some of
the cartons with you." Hassan ended the call quickly and handed
the phone back to al-Masri directing him to place a call to Abu
Hamza in London.

Hamza's phone number was written in graceful Arabic script on the
front page of a notebook Hassan pushed towards him. After some
initial static the voice of a young boy answered the phone.
Again Osama returned the phone to Hassan who, after a minute,
heard Hamza's voice.

"This is Abu al-Hassan. I have big news for you, my friend. The
British and American infidels will sit up and listen to the
Islamic Army now."

Abu Hamza's first reaction was alarm. "Does it concern my son?"

"It is how we will save him, Abu Hamza. You will know that I,
Abu al-Hassan, rescued your son. But you must help us."

"What has happened? Tell me what you have done?"

"We have kidnapped sixteen tourists. Now Salih's government must
give in to our demands."

"Why have you done this? You will bring the Security Forces down
on your Army before you are ready to act. Who are these
foreigners?" Hamza became even more worried. He had never met
Hassan but he knew from his reputation and from past

conversations with the man that he was egotistical and capable of precipitous, ill-considered actions.

"They are tourists, Americans and British. Well, one American at least. I'm not sure." Hassan's voice sounded uncertain and erratic as he continued. " I was told there would be more Americans. I don't know who they are. We have all the passports. Abu Haraira reads the English. He says only one passport is American. Just a woman. It will have to do. You must tell the newspapers and CNN. President Salih will not risk angering the British and Americans by letting these tourists die."

"In the name of Allah, Hassan, you must not harm them." Hamza knew the consequences for his son and stepson, perhaps his whole organization, would be devastating if the tourists were killed. He stopped and thought for a moment. He must appeal to Hassan's interests, keep him calm and assure him of support, to stop him from doing something even more stupid.

"Abu Hassan, you have achieved a great thing. But the hostages are only valuable to you alive. You must be sure to keep them alive so you have power to negotiate. Keep all of them alive, at least until you have freed our brothers."

"I understand you, Abu Hamza. These children of monkeys are nothing to me but, like animals, they can be more useful to us alive than dead. Now I will call Sana'a. And you, tell the world what I have done, thanks be to Allah the most merciful. Many more men will join us and make true the scripture, that we came,

10,000 men out of Aden's Abyan.  This is only the beginning, Abu
Hamza.  We will restore Yemen to the law of God and I, Abu al-
Hassan, will be known as the one who fulfilled the scripture,
inshallah."

Hassan set down the phone and spoke to Ali Al-Haj.

"Take the hostages into a hiding place, where they cannot be seen
from the road. Osama and I will call the government in Sana'a and
tell Salih what we want.  Then we will join you to interrogate
the men.  Make sure no one is harmed."

For the next half hour Hassan used the satellite telephone to try
to reach authorities with whom he could negotiate the release of
the captive tourists.

* * * * * * * * *

Word of the kidnapping quickly reached the office of the Governor
of Abyan.  The number of tourists taken hostage in this incident
surprised him.  Usually a tribal kidnapping involved just one
hostage if it was a foreign oil worker or perhaps between two and
four hostages if they were tourists traveling together by car.
Sixteen hostages was by far the largest group ever kidnapped in
Yemen.  The description of how it happened bothered him too.  The
kidnappers seemed much more heavily armed than necessary to
abduct an unarmed group of civilians, even a group this size.
Like most Governors of Yemen's provinces, Ahmad Ali Mohsen had
military experience.  It was a country where power and control
could not be maintained without the will and the ability to use
force when needed.  The Governor had already contacted the

Security Chief for Abyan and authorized the movement of security forces to the town of Mudiyah, near where the abductions had occurred.  Information was still sketchy but there was something about this kidnapping that instinctively troubled Ahmad Ali Mohsen.  He decided he should stay close to this one until he knew exactly who he was dealing with.  He would go to Mudiyah himself.

The drive to Mudiyah from his office in Zinjibar, capital of Abyan province, took an hour and a half. His vehicle was escorted by two military pick-up trucks, each equipped with machine guns mounted on the back and carrying eight to ten soldiers armed with Israeli-manufactured Kalishnikov assault rifles.  For the first half hour the road closely followed the coastline of the Gulf of Aden.  Gentle surf rolled in to golden sandy beaches and the sand drifted in silky veils across the road.  Occasionally camels could be seen grazing on the accacia trees which sparsely dotted the landscape.  Gradually the road turned inland and the fine sand dunes gave way to more fertile soil and a greater variety of trees.  Fields planted with orange and lemon groves, corn or a variety of green vegetables surrounded each of the small village communities.  They approached a mountain chain and, as the Governor's convoy began the steep zig-zag ascent, the terrain changed again to harsh black volcanic rock on which nothing could grow. Descending down the eastern side of the mountain chain the land was once again fertile and cultivated.  Local farmers waited

patiently at the road side, shaded under makeshift blue plastic
tents, to sell their crop of watermelons.

In Mudiyah the Governor conferred with the Chief of Security.
Already two local men, one of them a well-respected elder of the
tribe, had gone in to talk to the kidnappers.  Local witnesses
pointed out the rough track across the desert where the hijacked
tourists' vehicles had left the main road about 18km east of
Mudiyah.

During the rest of the afternoon and in to early evening the two
negotiators made several trips back and forth between the
Security Forces Field Command in Mudiyah and the kidnappers camp.
The roundtrip took them two hours each time so dialog progressed
slowly.  They confirmed that there appeared to be 16 hostages and
a similar number of kidnappers, perhaps as many as two dozen.
The leader of the kidnap gang called himself Abu Hassan.  He had
threatened to kill the hostages if his demands were not met.

The Governor felt his worst fears were confirmed.  This was no
typical tribal kidnapping.  He knew of Hassan and his small gang
of extremists.  He also knew it was impossible to meet Hassan's
demands.  Even authorities in Sana'a, even the President himself,
could not satisfy Hassan's demands.

The tribal elder described the location of the kidnappers' camp.
It was out in the open, a couple of bare fields set amidst rock-
strewn hills.  There was no village anywhere near the camp and no
shelter of any kind.  A few Bedouin families grazed their goats
in the area and kept beehives.  Otherwise the area was desolate.

Governor Mohsen knew the situation was not sustainable for long.

In typical kidnappings the hostages were taken to a village and

housed with local families.  The conditions were relatively

comfortable for both hostages and kidnappers.  Negotiations could

be spread out over days, even weeks.  Inevitably the kidnappers

modified their demands and the government offered some commitment

to providing better infrastructure for the village or early

release for a convicted and imprisoned member of the tribe.  The

hostages would be freed, often showered with gifts as a show of

hospitality and in recognition for their contribution, albeit

unwilling, to the negotiated settlement.  As part of the deal the

perpetrators of such kidnappings were never arrested nor tried.

In a way the process provided ~~one way~~ a means of allocating the

government's limited development funds between villages.

The Governor of Abyan could authorize a medical clinic, or a

school, or a prisoner to be set free but he had no authority to

satisfy the demands of Abu Hassan even if he wanted to. How long

would Hassan be able to sustain his men and his hostages in this

desolate, waterless camp? Not longer than a day or two.  At least

the local elder and tribesman had gained one concession in their

discussions with the kidnappers.  Hassan had said he would

release the women tomorrow and keep only the men.  Getting the

number of hostages reduced from sixteen to seven was a step in

the right direction.  Probably Hassan already realized he could

not cope with such a large group out in the open.  But the

Governor also knew Hassan was unpredictable and he might feel

differently by morning. As night fell, Governor Mohsin and his Chief of Security began to develop what might be their only viable response.



**REPORT BY BRIDGET PRINCE, ONE WORLD RESEARCH**

**RE: RESTRICTIONS APPLYING TO SENTENCED PRISONERS ON RELEASE IN THE UK**

1. This report is provided by Bridget Prince, Director of One World Research, a public interest research firm based in London and New York.

2. I have worked since 2007 in investigation and research within this organisation before and since becoming the director in 2010. I hold an MSc from the London School of Economics, Centre for the Study of Human Rights and a BA from King's College, London. Prior to working at One World Research I worked as an investigator for the Habeas Corpus Resource Centre focusing on the appeals of men in California's death row; before that, I carried out investigations for criminal defence cases and human rights research as an ethnographer for the University of California.

3. I am a citizen of the United Kingdom and the United States. I regularly provide research and advice to lawyers in the US and the UK, including the provision of reports for courts and relevant data for consideration in those two respective jurisdictions.

4. In February 2021 I was asked by Sam Schmidt, attorney for Mr Mustafa Kamel Mustafa, to provide details of post release limitations in England and their enforcement, in the event of his release on compassionate grounds for which I understand an application is being made.

5. The contents of this report outline the publicly available legislative provisions. I have confirmed the practical workings of that legislation, applied extensively since its introduction in the UK, with defence lawyers familiar with its application in the UK.

6. It is considered that the two most probable options available are provisions under the <u>Counter Terrorism Act 2008</u> (amended by Counter-Terrorism and Border Security Act 2019) which is initiated and carried through by UK police and/or the <u>Terrorism Prevention and Investigation Measures Act 2011</u> (TPIM) and the <u>Counter Terrorism and Sentencing Act 2021</u> which is initiated by the Home Office and policed by UK police.  A third option is a temporary exclusion order - TEO (Counter Terrorism and Security act 2015).

7. The legislation applies to all qualifying individuals whether or not the proceedings or circumstances that have given rise to the legislation's application have taken place in the UK or in other countries.

**A. COUNTER TERRORISM ACT 2008[1]; (PART 4) NOTIFICATION REQUIREMENTS**

8.  The application for a Notification Order must be made by a police chief officer in anticipation of the residence of the relevant individual in the relevant police area (on the basis of information provided, I understand that in the case of Mr Mustafa this would be most likely to be the Metropolitan Police in London). The police officer concerned makes an application to the High Court which must make the Order if the conditions are met. The conditions set out below apply to individuals convicted and sentenced outside the UK and are intended to produce an identical range of supervisory powers to the police, as are in place for application to individuals convicted and sentenced of the same category of offences in the UK.

9.  Below are the three conditions for application of a Notification requirement (Section 57) Counter Terrorism Act 2008 Part (4):
    (i)   (Schedule 4) Paragraph 3 (2) under the law in force in a country outside the UK the defendant must have been
          a.  Convicted of a "corresponding foreign offence"
          b.  Have received a sentence equivalent to those set out at Section 41 1 (a), 41 2 (a) or 41 3(a) Counter Terrorism Act.
    (ii)  (Schedule 4) Paragraph 3 (4) – the defendant must have been sentenced for the corresponding foreign offence after 1st October 2009.
    (iii) (Schedule 4) Paragraph 3 (5) – the notification period must not have expired.
          (I have been made aware of the length of sentence being served by the individual in the case for which this report has been requested; the notification period for that length of sentence is 30 years and will not have expired.)

10. Qualifying Trigger Offences for which convicted
    These are specified in Section 41 of the Counter Terrorism Act 2008 Part 4; almost all offences under the Terrorism Act 2000 and Terrorism Act 2006 are included as well as serious offences not under Terrorism Act provisions.

11. Sentences
    Section 45 Counter Terrorism Act 2008 categorises the types of sentence and the orders which trigger Notification requirements (imprisonment of 12 months or more including life imprisonment). Each band of sentence provides for the Notification period. For a sentence of 10 years or more the notification period is one of 30 years. It cannot be amended or cancelled. It is not subject to review.

12. The individual subject to notification must notify to the police the following information:
    (i)   Name (and any other names when used when dealt with at court)/date of birth/national insurance number
    (ii)  Home address on the date of the notification/the address of any other premises in the UK at the time of notification at which the person regularly resides or stays
    (iii) Contact details including phone numbers and email addresses/Details of all financial accounts

---

[1] https://www.legislation.gov.uk/ukpga/2008/28/part/4

2

(iv) Passport details/Travel notification required to register any foreign travel regardless of the time and length and additional details including departure and arrival points and accommodation details.

(v) identifying information of any motor vehicle of which the person is the registered keeper, or which the person has a right to use (whether routinely or on specific occasions or for specific purposes).

13. Notification of the above must be made to the police each year. In the event of any changes they must be immediately notified.

14. Part 4 Monitoring/Management
The individual subject to Part 4 will be monitored by the relevant Terrorist Offender Management Unit (TOMU) (understood in the case of Mr Mustafa to be the Metropolitan Police in London).

(i) It is understood that monitoring and management would be likely to include what is described by police as "trip wire coverage". This refers to the flagging up of movements beyond specified boundaries.

(ii) TOMU monitoring provides for 24/7 response if triggered by activities of concern being monitored including a triggering of what are described by police as "overt markers".

(iii) Each individual is allocated a dedicated TOMU case officer.

(iv) Frequency of TOMU risk assessment and review dictated by level of risk.

(v) Home visits (announced and unannounced). The police may at any time obtain a warrant to search premises in order to assess the risk posed by that individual. [2]

(vi) Monitoring of compliance and investigation/prosecution of breaches.

(vii) Interaction and liaison with partner agencies and support agencies to promote "desistance and disengagement" and "identify intervention opportunity". [3]

15. Breach of any of the Notification provisions can constitute a criminal offence subject to trial, conviction and imprisonment as well as remand in custody pending trial if charged.

16. The above provisions, Notification Orders, are described as intended to provide police with the ability to manage convicted offenders; in the case of convicted offenders not confined to offences under Terrorist legislation. Schedule 4, Part 3 Counter Terrorism Act 2008 defines and explains what are corresponding Acts – which would have constituted an offence to which the relevant part of the Act applies or took place in the course of an act of terrorism or was done for the purposes of terrorism. (Schedule 4 paragraph 2)(3)(b)).

---

[2] There is no requirement, as with other police search powers, for the relevant officer to have reasonable grounds for suspicion in relation to any offence, or for believing there are items of value to a terrorist organisation. It is also notable that, although the power of entry for the stated purposes and search requires a warrant, it is possible for such a warrant to authorise *"entry to and search of the premises on more than one occasion"* – or even to authorise entry on an unlimited number of such occasions.

[3] This refers to programs designed to rehabilitate individuals who have been involved in terrorism or terrorism-related activity and reduce the risk they pose to the UK.
See https://homeofficemedia.blog.gov.uk/2019/11/05/fact-sheet-desistance-and-disengagement-programme/

**A.412**

**B. TPIM (TERRORISM PREVENTION AND INVESTIGATION MEASURES ACT 2011 and the COUNTER TERRORISM AND SENTENCING ACT 2021[4])**

17. A different form of control is provided under powers given to the Minister for Home Affairs applicable to individuals suspected of involvement in terrorist activity. The power is exercised through the supervision of any challenge to its application by the Special Immigration Appeals Commission, a specialist court designated to consider cases involving national security considerations which can hear evidence in secret (neither the individual concerned nor his defence lawyer are made party to all of the evidence); a security cleared Special Advocate is appointed to protect his interests in closed session).

18. Whereas Notification provisions apply only to individuals who have been convicted and sentenced (those qualifying as set out above) TPIMs below are applied to individuals who have not been imprisoned, but also on occasion to those who have, including on occasion where acquitted of criminal offences. The provisions apply where there is intelligence of new terrorism related activity but where there is insufficient evidence to charge with a criminal offence.

19. The application of the Act provides powers ordered by the Secretary of State for Home Affairs and carried out by the police (subject to the jurisdiction of the High Court). The relevant powers provide for extensive impact upon the actions of the individual. The restrictions provided for include:

    (i) Wearing of electronic tags. (The GPS electronic tagging alerts a tagging company and in turn local police to an individual's moving out of the demarked boundaries).
    (ii) The imposition of curfews
    (iii) Requirement to report (frequently once or even twice a day) in person to police by telephone.
    (iv) Restrictions upon contact with other persons (those in contact requiring to be specifically cleared).
    (v) Access to electronic devices.
    (vi) Restrictions on visitors to residence, on work, on study.
    (vii) Ability to move outside the boundaries demarked including boundaries within relevant cities or towns.

20. Just as breaches of Notification provisions constitute a criminal offence, so too do breaches of TPIM conditions.

21. Under the Counter Terrorism and Sentencing Act 2021, a new regime for TPIMs had royal assent on 29 April 2021 and came into force on 29 June 2021. Part 3 brings in the new regime for TPIMs. The key changes to the above restrictions are:

    (i) the standard of proof for the impositions of a TPIM has been reduced from the SSHD being satisfied on the balance of probabilities, to "reasonable belief"
    (ii) TPIMs can last up to 5 years
    (iii) day-time curfews are now permitted

---

[4] https://www.legislation.gov.uk/ukpga/2011/23/contents/enacted
https://www.legislation.gov.uk/ukpga/2021/11/contents/enacted

**A.413**

(iv) compulsory polygraph testing to assess compliance with measures, or assessing whether a variation of a measure is necessary ( but cannot be used in criminal proceedings)

(v) compulsory drug testing for Class A and B drugs

(vi) a conviction for a breach of TPIM will now be an offence which attracts a Notification requirement

## C. TEMPORARY EXCLUSION ORDER - TEO (COUNTER TERRORISM AND SECURITY ACT 2015)

22. And alternative to the above two regimes would be a Temporary Exclusion Order (TEO). A TEO allows for the entry to the UK of an individual (subject to restrictions he/she is required to agree to,) for whom during the two years that follow, a range of restrictions similar (but in practice normally lesser) to the TPIMs above can be imposed.

5

**A.414**

## Re mostafa kamel mostafa

From: Najat Chaffee

To:   michael@mbachlaw.com

Date: Monday, November 6, 2023 at 04:40 PM EST

Dear Judge

I hope this letter finds you well, and I am writing to you with utmost respect and sincerity regarding my father, Mostafa Kamel Mostafa , who has been incarcerated for the past 20 years.
I understand that my father's conviction has been determined by the court, and I do not wish to contest that decision. Instead, I want to share a personal perspective on the impact of his absence on our family and why I believe he deserves consideration for compassionate release.

I was just 11 years old when my father's presence was taken away from my life due to his incarceration. My youngest sister has never had the opportunity to experience her father's presence at all; she was just a baby when he was imprisoned.

The consequences of his actions have undoubtedly shaped our lives, but it's important to recognize the enduring scars that the absence of a parent can leave on a family. I, a 30-year-old man, still find myself crying myself to sleep at times, struggling with the profound loss and the emotional turmoil it brings.

I know that my brothers and sisters share these feelings, but we often find it difficult to openly discuss our pain, making it even more challenging to cope. My father has instilled in us the importance of education as the key to a successful life. Despite his absence, he ensured we had access to quality education, and it's because of this foundation that I can articulate my thoughts in this letter.

My childhood memories are filled with images of a loving family home and private schooling, all made possible by my father's dedication and commitment. While I acknowledge that my father has made mistakes, as we all do, I firmly believe that his errors should not condemn our entire family to a lifetime of suffering. It is not for me to decide his fate, but I implore the court to consider the human aspect of his situation. My father is at the end of his life, and his time at the ADX supermax prison in Colorado has exacerbated his physical and emotional challenges. His severe disability is evident, and his deteriorating health cannot be overlooked.

I want the court to understand the deep and unwavering love I hold for my father, regardless of the past. I will forever plead for mercy on his behalf, not as an attempt to alter the past but as a request to grant him the compassion and dignity he deserves in the final chapters of his life. Thank you for your time and consideration. I trust in your wisdom and compassion as you review my father's compassionate release application.

Sincerely,

Imran Mostafa Kamel

Dear Sir/Madam,

I am writing to you regarding my father who was imprisoned for 8 years in UK, then deported to USA in 2012 where he received a life sentence.

My father has been incarcerated since I was 8 years old. Although 8 years may appear to others as a brief period in time, this brief period remains forever etched into my heart. I have the fondest of  memories which play in my mind as a motion picture evoking the time I spent with him. The seeds of father-daughter love were sown through those 8 years, and although it was far and few between, every prison visit, every phone call acted as water and sunlight for this withering flower. His most beautiful guidance and spirit has stuck with me throughout my life, through every hardship and ease, it has helped me become the woman I am today.

I can't help but feel that my father was taken away from me; my reoccurring dream is that I finally reunite with him and feel his warm embrace. I never lose hope that one day he returns to me and I tend to his needs like a daughter should when a father reaches old age. As it may already be known to you my father is an old disabled man whom has partially lost two limbs and one eye, he consequently has no hands and is blind in one eye. He suffers from high blood pressure and type 2 diabetes. He is in a facility that does not provide the right level of help and support required by a disabled man with ill health. My father is not well and his family worry for him a lot, he should be returned to us where we can give him the care he requires. We are able to support him physically and financially, and shall not allow him to be burden on the state. I yearn to spend time with my father and that he may spend time with his grandchildren, in his last days. They often inquire about where he is and for those old enough to understand he remains an unknown character in the story of their life.

My father has been vilified by the British tabloid press like so many before him. But the reality is that he's one of the most intellectual and upright men you could come across, being misquoted and marginalised does not allow the majority to see this. Despite his hardships he never fails to make his family smile and laugh, neither does he complain to us of his misfortune. My father wants his family to be positive and productive members of society, he encourages us to pursue further education, to further our careers and to aim high. He influences us to be charitable and helpful to others,Muslims and non-Muslims alike.

My father should not be allowed to remain in such a place where his human rights are being breached daily. My father may not have been faultless but he has served a lengthy time in prison, more than some murderers, rapist and etc; I advocate that he should be released and allowed home, his children and grandchildren are eager to meet him.

Yours Sincerely,
Mariam Mostafa Kamel

**A.416**

November 07, 2023

Othman M Kamal
United Kingdom

Dear Judge,

I hope this letter finds you well. I am writing to you today with a heavy heart, as I kindly request your compassionate consideration and support for the release of my beloved father, Mr. Mostafa Kamel Mostafa, from prison.

It has been over two decades since our father left our home, and the void he left behind remains unfillable. The absence of his presence has been deeply felt by our entire family. His absence has affected not only me but also his grandchildren, who have grown up without the love, guidance, and bond of a grandfather. We miss him terribly, and it is with utmost sincerity and desperation that we implore you to enable our long-overdue reunion.

My father was always a pillar of support in my life, especially during my studies and the challenges I faced. His wisdom, strength, and unconditional love were instrumental in shaping the person I am today. I cannot put into words how much we yearn to have him back by our side, spending quality time with his grandchildren and creating precious memories together.

Additionally, there is something my father is unaware of; he has grandchildren he has never seen or held since their birth. The thought of them not having the opportunity to experience his presence and love devastates us. It is imperative that my father gets the chance to meet these innocent souls and cherish the precious moments that they can share together.

While it is true that my father has made mistakes, it is unjust that his family should suffer for the remainder of their lives. At his age, his health has severely deteriorated, and the passing years in the ADX Superman prison facility in Colorado have only worsened his condition. My father's current state of health and the location of the prison make it increasingly difficult for us to visit him and provide the care and support he deserves during these difficult times.

In conclusion, I plead with you to consider the compassionate release of my father. We understand that accountability is necessary, but we firmly believe that he has served a significant portion of his sentence and that it is time for him to make amends within the comforting arms of his family. The emotional well-being and happiness of his grandchildren, including the recent birth of his granddaughter and the anticipation of another grandchild,

**A.417**

call for his presence more than ever. We would like to keep the news of the upcoming grandchild a surprise, only to be revealed when our beloved father is back home with us.

I genuinely appreciate your time, attention, and empathy in reviewing this application for compassionate release. Our family longs to seek the healing that can only come from the reunion of a father and his loved ones. Thank you for considering our heartfelt plea.


Sincerely,

Othman M Kamal

Dear Sir/Madam,

Since we were little children, our father has ingrained in us a love of reading. He placed such a high emphasis on education that he continued to follow up with each of us every year until we had completed our studies. Despite his disability, he ensured we had all the support we needed during our education.

Every time I completed my homework and studies, I would be allowed to go and play in our garden outside with my friend - who lived right next to us. A friend that my father always advised me to treat well and share my toys and food with. Our families used to exchange food and sweets with one another. She was the same age as me. We had similar interests and enjoyed our time together. Our different beliefs and backgrounds did not cause any barrier between us. In fact, both of our parents were happy that we became friends. She was Christian. I miss those days!

On the other side of our garden lived the Ministry of Defence. He didn't have any children our age to make friends with unfortunately. But he was a nice man whom we got along with, without any issues. I've never seen my father have any disputes or conflicts with him. Despite their differences in religion, background, and a difference in a number of views, both of our families have not faced any issues living next to each other. In fact, if any of us would need something, we would be at each other's service. That's what neighbours do for each other.

Looking back at the relationship we had with our neighbours and the headlines used to describe my father as a "hate-clerik", "dangerous", "scary" person, it seems rather funny and strange at the same time. Wouldn't a so-called "scary", "dangerous" individual cause harm to those who oppose him in his views or even religion?

Up to this day, we strive to continue maintaining a good relationship with our neighbours as that has become a core value in the family that our father has led an example of.

My sister and I have both grown to be fine women and good daughters that every other parent would wish to have. We completed our studies without issues and were one of the best in our class. We lived a peaceful meaningful life and plan to continue doing so. We are grateful for all the good, the bad, and the ugly moments. They were all a part that shaped us to become loving and humane individuals who give back to the community. From feeding the homeless, to checking up on our neighbours. All thanks to our loving and caring parents who led by example.

My father is a 64 year old man with diabetes, extensive psoriasis, both hands amputated, an impaired vision on one eye, and colour blinded on the other.

In the environment and condition he is currently living in, his health will only continue to deteriorate over time. He needs care, has needs that are required to be fulfilled and medical examinations to be done.

**A.419**

Something as simple as having his toenails cut shouldn't take two months. When he strains a muscle, no one is there to assist. It remains strained until somehow the pain magically goes away.

Food in packages delivered to man who is unable to open them. No thought given in how he would open that food. Using his fragile teeth, he tries to rip those packages open. Half of his food goes on the floor and he is left to eat what is within his reach.

Unable to see clearly, unable to navigate around the room safely, metals everywhere, a small mistake can cost him his safety.

All the safeguarding training and guides seem to be thrown out of the window only in the case of mustafa kamel mustafa.

We are not asking for him to be placed in a hotel. We are requesting for him to be treated like a human.

It takes a human heart to give another human their basic needs. I'm sure those reading this definitely have some empathy and human elements left in their hearts. If that is not the case, then which justice system should we believe in?

If he was to get released, the government would be able to save its own money and save their guards the efforts of looking after him. We can do everything for him, with a more quality service.

We still have hope that the justice system will show us some goodness in it and allow our dad back to the UK, close to his family and able to live the remaining years of his life peacefully and in an appropriate, safe place.

We hope we won't get disappointed.

Yours Sincerely,
Marwa Mostafa Kamel

November 07, 2023

Najat Chaffe
United Kingdom

Dear Judge,

I hope this letter finds you well.

I am writing regarding the compassionate release request of my husband, Mr. Mostafa Kamel Mostafa, who has been incarcerated for over 20 agonizing years. Our family has been deeply distressed by his absence, as he has left an irreplaceable void that no one can fill. The yearning to have him back in our lives has only intensified over time, and his grandchildren, myself, and our children have missed him dearly.

As his devoted wife, I have spent countless years alone, shouldering the immense responsibility of raising our children and providing for their day-to-day needs. The toll it has taken on me, both mentally and physically, has been overwhelming. My heart longs for the support and companionship Mr. Mostafa would offer during my difficult moments. It is now time for him to come back home to his family, where he truly belongs.

While it is true that my husband has made mistakes in the past, I firmly believe that his family should not be condemned to suffer for the remainder of our lives. The punishment he has endured over these two decades has been severe, and the time has come for him to reconcile with his loved ones and embrace the opportunity for rehabilitation and redemption.

I would like to emphasize that Mr. Mostafa's current prison, ADX Florence in Colorado, is an unparalleled maximum-security facility that is not conducive to the needs of an individual with his disability. The extensive duration he has spent in this austere environment has undoubtedly exacerbated his condition, rendering him physically and mentally deteriorated. It is imperative that he receive proper care and support to overcome these challenges, which is why a compassionate release is crucial for his well-being.

In closing, I would like to express the emotional toll this extended separation has had on our family, particularly on my own state of mind. I am in desperate need of his presence, love, and unwavering support. To witness his reunion with our precious grandchildren and to enjoy quality time together as a family would be a dream come true. I firmly believe that his return is not just a personal desire but a necessary step towards healing and rebuilding what we have lost during these unbearable years.

**A.421**

Thank you for taking the time to consider our compassionate release request. We trust in your wisdom and understanding of the profound impact this decision holds for our family. We anxiously await your response and hope that you grant Mr. Mostafa Kamel Mostafa the opportunity to rejoin his loved ones and begin a new chapter in his life.

Sincerely,

Najat Chaffe

**A.422**

A United States, and which will be considered to
a limited extent in the extradition proceedings, had
any bearing at all on the sentence that I pass today.

B Those are allegations at this stage; they are in
issue; it remains to be seen whether they can be made
out or not. I have no idea.

I do bear in mind, as an important background factor in

C your case, that when you have finished the sentence
that you are going to have to serve now, you will
probably still face at any rate the real possibility
of extradition and further charges elsewhere. In the

D same way, I bear in mind that you may also face, and
do also face, the possibility that your citizenship of
the United Kingdom may be withdrawn. I take into

E account the fact that you have no previous conviction
of any kind. I take into account the fact that you
are capable of cordial relations with those of other
religions, albeit the evidence which we heard was of

F comparatively brief contacts.

I have no doubt that part of your make-up is the capacity
to behave perfectly well. The trouble is that when
you do not, that makes you all the more worrying.

G I take very much into account that these speeches, for
which I now have to sentence you, were delivered
before the world temperature was raised by the events

H of September 2001, and I take into account that there

4

AH 0000009018

**A.423**

A

is no charge of repeating any similar material since
that date, which would have made it worse.  It is of
course the fact, and relevant, that you were not

B

preaching murder at every or even at the majority of
your speeches.  However hostile you may have been to
other societies, you were not committing these
offences on those occasions.

C

I do not take the view either that you, having been
previously investigated in 1999 for these offences --
I don't think you were and still less that you had any
reason to suppose -- had had any kind of indication

D

from anybody in authority that what you were doing was
lawful.  I make it clear to anybody who is concerned
that I have had to read, and you know that I have had

E

to read, the records of your conversations with the
security officers and with the officers of Scotland
Yard.  I read them in order to see whether you had
been given any kind of idea or assurance that what you

F

were doing was lawful.  I am absolutely clear that
they do not amount to any such assurance, express or
implied, nor were they such as could give rise in you
to any legitimate expectation that you would not be

G

prosecuted.  Those meetings have the clear flavour of
meetings at which you and they both knew that the
other was not taking them at face value.  Each of
them, each side, had some reason to conduct the

H

5

AH 0000009019

**A.424**