UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
UNITED STATES OF AMERICA

    -against-

MUSTAFA KAMEL MUSTAFA,
    a/k/a "Abu Hamza al-Masri,"

                          Defendant.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __3/12/2025__

04 Cr. 356-1 (AT)

**ORDER**

ANALISA TORRES, District Judge:

    Defendant, Mustafa Kamel Mustafa, moves for compassionate release or a reduction of his sentence pursuant to 18 U.S.C. § 3582(c)(1)(A). Mot., ECF No. 615. For the reasons stated below, his motion is denied.

## BACKGROUND

    Mustafa is a 66-year-old British citizen and former cleric who preached violence against non-Muslims and supported terrorist organizations. *See* Mot. at 4, 52–53. He is also a double-arm amputee who is blind in one eye, has limited vision in the other, and suffers from diabetes, hypertension, and skin conditions. *Id.* at 5–6.

    In April 2004, the United States brought terrorism-related charges against Mustafa. *Id.* at 4. The following month, he was arrested in England and remanded to custody pending extradition. *Id.* In October 2012, after serving time for related charges brought by England, Mustafa was extradited to the United States. *Id.* at 4 & n.4; *see also* Opp. at 14–15, ECF No. 623. He was detained at the Metropolitan Correctional Center, where he was placed in solitary confinement subject to Special Administrative Measures ("SAMs"). Mot. at 16. In May 2014, a jury convicted Mustafa of eleven terrorism-related crimes,[1] ECF No. 366; *see also* ECF

---

[1] On appeal, the Second Circuit upheld Mustafa's conviction on all but two of the eleven counts. *United States v. Mustafa*, 753 F. App'x 22, 27 (2d Cir. 2018).

No. 6 (indictment), and on January 9, 2015, the Honorable Katherine B. Forrest sentenced Mustafa to life imprisonment, Judgment at 3, ECF No. 463.  Judge Forrest denied his request that she recommend his designation to a federal medical center ("FMC") but did recommend that the Bureau of Prisons (the "BOP") take into consideration the report of Dr. Benjamin Kligler, a physician whom defense counsel retained to assess Mustafa's medical condition in connection with his sentencing.  Mot. at 16–19; Judgment at 3; *see also* App. at 181–84[2] (Dr. Kligler's report).  Judge Forrest also recommended that "an occupational therapist having experience with double amputees be part of the BOP team which evaluates [Mustafa]" in relation to his ultimate placement.  Judgment at 3.

Despite Judge Forrest's recommendations and the Government's assurances at sentencing that Mustafa would be designated to a BOP facility based in part on an evaluation he would receive at a medical facility, ECF No. 459 at 42–43; ECF No. 459-1, Mustafa was designated to ADX Florence, possibly before receiving a full medical evaluation, *see* Mot. at 20–22; Opp. at 21–22.  Although he was transferred to an FMC in Missouri before arriving at ADX Florence, the purpose of the transfer appears to have been to address issues with Mustafa's prosthetics, not to evaluate him for designation purposes.  Mot. at 21–22; *see* SA at 48–49[3] (physician note that Mustafa was sent to the Missouri FMC "to have his prosthetics repaired/revised" and not "for [the FMC] to create a new list of special accommodations, so the info that P[hysical] T[herapist]/O[ccupational] T[herapist] has already provided for ADX Florence should suffice"); *id.* at 51 (physician note that Mustafa was sent to the Missouri FMC "to adjust his prosthetics (already accomplished), so he is just being housed here while awaiting transfer to his long-term

---

[2] Citations to "App." are to the appendix filed at ECF Nos. 615-1 to -4 and 637-1.

[3] Citations to "SA" are to the sealed special appendix emailed to the Court on December 15, 2023.

2

facility"). Since arriving at ADX Florence, Mustafa has remained in the Special Security Unit ("H Unit") under SAMs. *See* Mot. at 26.

## LEGAL STANDARD

As amended by the First Step Act, 18 U.S.C. § 3582(c)(1)(A)(i) provides that:

> the court, . . . upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment . . . after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

To be entitled to relief under this provision, a defendant must satisfy the exhaustion requirement and demonstrate that "extraordinary and compelling reasons" warrant a reduction of his sentence. In determining whether such extraordinary and compelling reasons exist, a court may consider, as relevant here, whether a defendant "suffer[s] from a serious physical or medical condition . . . that substantially diminishes [his] ability . . . to provide self-care within the environment of a correctional facility and from which he . . . is not expected to recover" and whether he "suffer[s] from a medical condition that requires long-term specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death." U.S.S.G. § 1B1.13(b)(1)(B)–(C). A court may also evaluate whether the defendant "presents any other circumstance or combination of circumstances that, when considered by themselves or together with any of the reasons described [above], are similar in gravity to those described [above]." *Id.* § 1B1.13(b)(5). Importantly, the Court is not bound by the Sentencing Guidelines' interpretation of what constitutes extraordinary and compelling reasons. *See United States v. Brooker*, 976 F.3d 228, 237–38 (2d Cir. 2020).

As applicable, the Court must also consider the sentencing factors listed in 18 U.S.C. § 3553(a), which include "the nature and circumstances of the offense and the history and characteristics of the defendant" and "the need for the sentence imposed—(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed . . . medical care, or other correctional treatment in the most effective manner."  A court may deny a motion for compassionate release "if, in its discretion, compassionate release is not warranted because [the] Section 3553(a) factors override . . . what would otherwise be extraordinary and compelling circumstances."  *United States v. Gotti*, 433 F. Supp. 3d 613, 615 (S.D.N.Y. 2020).

## DISCUSSION

I. <u>Administrative Exhaustion</u>

The first question before the Court is whether Mustafa has exhausted his administrative remedies such that the Court may reach the merits of his motion.  The Government argues that Mustafa has "largely failed" to exhaust his administrative remedies, first, because ADX Florence never received the request for compassionate release that Mustafa claims to have sent the facility's warden on January 12, 2023, and second, because Mustafa's earlier, July 2020 request for compassionate release, while properly exhausted, related only to his concerns surrounding COVID-19.  Opp. at 30–34.

The compassionate release statute provides that a court may not, upon the motion of a defendant, modify a term of imprisonment unless "the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's

4

facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A). This exhaustion requirement is not a jurisdictional limitation, but rather a claim-processing rule. *United States v. Saladino*, 7 F.4th 120, 123 (2d Cir. 2021) (citation omitted).

The Court agrees with the Government that Mustafa does not seem to have exhausted his administrative remedies with regard to the January 2023 letter. Although one of Mustafa's attorneys "believes that the letter was sent on or shortly after [January 12, 2023]," the attorney assertedly "cannot confirm with certainty that it was sent," Reply at 1 n.2, ECF No. 637, and ADX Florence has no record of receiving it around that date, Opp. at 33. Furthermore, in February 2024, defense counsel emailed the January 2023 letter to ADX Florence in response to the Government's inquiry, and although the warden promptly acknowledged receipt and denied the request in writing, Mustafa did not appeal the denial, as required for exhaustion. Opp. at 33; *see* 28 C.F.R. §§ 542.15, 571.63 (BOP regulations describing the appropriate appeals process for a warden's denial of a request for compassionate release); *United States v. Battle*, No. 05 Cr. 377, 2020 WL 2306482, at *2 (S.D.N.Y. May 8, 2020).

Nevertheless, the Court will reach the merits of Mustafa's motion. In his July 2020 request, which was unquestionably exhausted, Opp. at 32, Mustafa explained that "[t]he sudden pandemic" put him "at the top of every vulnerable criteria of getting infected" or "d[ying]," ECF No. 623-4 at 11. In support, he discussed his disabilities and ADX Florence's alleged failure to provide appropriate accommodations: Mustafa described how he has "no hands" and suffers from "psoriasis" and "hyperhidrosis," meaning that he "cannot wear [his] prosthetics for more than 10 minutes every hour" and that he must "use [his] stumps" and "teeth" to do "almost all [his] daily tasks." *Id.* at 12. He also described how, as a result, he suffers from "abrasion of [his] teeth, gums, [and] stumps." *Id.* He explained that he "do[es] not have [a] disabled toilet to

5

clean [him]self" and that he is "in solitary with no help, no fittings or items for safety and hygiene potentially compatible with Covid-19 and [his] very rare type of disability." *Id.* Thus, although Mustafa made COVID-19 the focus of his letter, he also discussed many of the underlying health and accommodation concerns that form the basis of his present motion for compassionate release, putting the BOP on notice of the struggles he faces. Considering this fact, combined with the fact that it is unclear whether § 3582(c) "requires a defendant to exhaust the available BOP procedures with respect to each *issue* he raises," *United States v. Delgado*, 582 F. Supp. 3d 136, 139 (S.D.N.Y. 2022) (emphasis added), exhaustion does not bar relief here.

II.     Extraordinary and Compelling Reasons

Accordingly, the Court considers whether any "extraordinary and compelling reasons" exist that would warrant compassionate release. 18 U.S.C. § 3582(c)(1)(A)(i). Mustafa argues that his conditions of confinement at ADX Florence, combined with his disabilities and medical problems, meet the extraordinary and compelling standard.[4]

A. Medical Treatment and Accommodations

Mustafa contends that his cell is not equipped for a person with his specific disabilities and that he does not otherwise receive the accommodations he requires. Mot. at 31–41. For his first six years at ADX Florence, Mustafa was forced to rotate between two cells, both of which are larger than the average cell at ADX Florence. *Id.* at 31–32. Although neither cell was set up

---

[4] Mustafa also contends that the fact of his incarceration at ADX Florence constitutes an extraordinary and compelling circumstance warranting release because his designation to that facility violates representations the Government made to English courts and the European Court of Human Rights in connection with Mustafa's extradition to the United States. *See* Mot. at 6–14. The Second Circuit has previously held that the Government made no commitment that Mustafa would not be held at ADX Florence, and that even if the Government had made such a commitment, federal courts lack the authority to direct that a convicted defendant be designated to a certain facility. *Mustafa*, 753 F. App'x at 42–43; *see Levine v. Apker*, 455 F.3d 71, 83 (2d Cir. 2006). Furthermore, although it is not inconceivable that statements or promises made in relation to extradition proceedings could support the existence of extraordinary and compelling circumstances justifying release, the Court is not aware of any cases that make such a finding, nor does Mustafa identify any. The Court, therefore, declines to find that the Government's statements made in the course of Mustafa's extradition proceedings justify release here.

for inmates with double-arm amputations, Mustafa suffered more frequent injury in one of the cells, Cell 300, which was darker and had sink and shower handles with sharp edges. *See id.*; App. at 227–28. In 2021, ADX Florence allowed Mustafa to remain permanently in the less hazardous cell, Cell 511. App. at 329. However, the prison forced Mustafa to return to Cell 300 in early 2024, and it was not until Mustafa undertook a hunger strike that he was allowed to return to Cell 511, where he still struggles with issues like balancing, using the toilet, and turning on his shower. Reply at 17–18; Mot. at 33.

At ADX Florence, Mustafa is not provided with assistance from a nurse or aide who could help him with daily activities, such as opening food pouches, cleaning himself, and applying cream to treat his psoriasis. Mot. at 33–34, 40–41. In addition, the facility has declined to fulfill many of Mustafa's requested accommodations. For instance, Mustafa has not been given an electric toothbrush or water-pick to clean his teeth or a hole puncher to open food packets, nor has he received frequent toenail cuttings by a trained professional, all of which have been recommended by his physicians. *Id.* at 34–38; *see also* Gov't Ex. A at 306, 502, 806.[5] The prison has also failed to provide him with a chair in his recreation cage, which would allow him to more comfortably use the outdoor space, or a hairbrush that allows him to reach all parts of his head. Mot. at 37, 39; *see also* Gov't Ex. A at 197, 1047.

The Court has no doubt that Mustafa receives substantially fewer accommodations and medical and therapeutic services than he would receive were he not incarcerated and subject to SAMs. Nevertheless, the record reflects that Mustafa's complaints generally do not go unattended, even if the prison takes a long time to fulfill his requests and he does not receive much of what he asks for. For example, when Mustafa complained about not being able to open

---

[5] Citations to "Gov't Ex. A" are to the Government's sealed Exhibit A emailed to the Court on April 17, 2024.

the packaging on his meals, the BOP provided him with "safety scissors," which, although not perfect, make opening meals easier for him. *See* Gov't Ex. A at 125, 303. When he alerted staff that he was unable to brush his teeth, the BOP provided him with an oversized toothbrush better suited to his needs. *See, e.g.*, *id.* at 83, 126, 128, 130, 297, 303. When Mustafa requested special foot care for diabetes-related issues, the BOP provided him with diabetic socks and toenail trims, albeit less frequently than recommended by his treating physician. *See, e.g.*, *id.* at 9, 180–81, 183, 186, 202, 236, 351, 354, 361, 381, 535. And when he requested to be seen by an occupational therapist, the BOP facilitated a few sessions. *See id.* at 846, 1047.

On the occasions that the BOP has denied Mustafa's requests, it has generally cited security concerns or explained that the requested accommodations are medically unnecessary from the standpoint of Mustafa's treating physicians. *See id.* at 306, 414, 502; Opp. at 52. These are decisions to which courts generally defer. *See Bell v. Wolfish*, 441 U.S. 520, 547 (1979) (describing the "wide-ranging deference" that prison administrators should be afforded in "adopt[ing] and execut[ing] . . . policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security"); *United States v. Needham*, 460 F. Supp. 3d 323, 326 (S.D.N.Y. 2020) (stating that "[t]he question of appropriate medical care for a prisoner is entrusted to the judgment of the [BOP]" (citation omitted)). This fact, when considered alongside the evidence that Mustafa continues to receive medical treatment and accommodations that allow him to engage in the most basic aspects of self-care, suggests that no extraordinary and compelling circumstances warrant release.[6] *See United States v. Andrews*, No. 04 Cr. 1232, 2024 WL 2959310, at *4 (S.D.N.Y. June 11, 2024) ("[W]here

---

[6] Even if the Court were to determine that such circumstances existed, as explained below, the Court finds that the § 3553(a) factors counsel against release.

defendants have had serious medical conditions but are receiving appropriate care within a BOP facility[,] . . . such defendants have not carried their burden of proving extraordinary and compelling reasons for release.").

      B. Religion

In addition to his health concerns, Mustafa also cites restrictions on the practice of his religion as an extraordinary and compelling circumstance warranting release. Mot. at 41–42. Mustafa explains that he has previously been denied the opportunity to worship with other inmates or to have his outdoor recreation cage turned toward Mecca, and he has been provided no accommodations to assist with the ritual cleaning and shaving required in Islamic practice. *Id.* at 42. Although a recent amendment to all SAMs allows group prayer during recreation time, Mustafa does not participate because he is not provided with a chair in his recreation cage, and his disabilities make standing and sitting on the ground difficult. *Id.* at 42 n.46. Lastly, Mustafa asserts that he does not receive appropriate ritual counseling, as the imam who used to stop by monthly no longer visits on a regular basis. *Id.* at 42.

In response, the Government contends that Mustafa has previously stated that he does not require an imam, and although ADX Florence does not presently have one on staff, the facility "is prepared to make reasonable efforts to solicit a visit by an imam." Opp. at 52 & n.21. In his reply, Mustafa does not challenge this statement, so the Court accepts it as true. As regards group prayer, Mustafa argues that the lack of a chair in his recreation cage prevents him from participating, but given the fact that Mustafa seems to have substantial, if limited, mobility, the Court does not view the lack of a chair as an extraordinary and compelling reason warranting release.

### C. Solitary Confinement

Mustafa also contends that the extreme isolation he faces at ADX Florence justifies release. As an inmate subject to SAMs and solitary confinement, Mustafa spends the vast majority of each day in isolation. Mot. at 43–44. He is given three fifteen-minute calls per month, during which he may call his wife, daughters, grandchild, and pastor friend. *Id.* at 44. He is not permitted to speak to his sons and children under the age of nine, and he is limited to mailing three pieces of paper to one person once per week. *Id.* at 45. Mustafa observes that, during his extradition proceedings, the English courts deemed such isolation intolerable. *Id.* at 42–43.

The Court cannot find that solitary confinement, imposed subject to valid SAMs, is an extraordinary and compelling circumstance justifying release. Caselaw establishes that the BOP may impose SAMs when such measures serve "legitimate penological interests," such as the "non-punitive objective of protecting national security" and "curtailing the defendant's dangerousness." *United States v. Alimehmeti*, No. 16 Cr. 398, 2024 WL 4880197, at *7 (S.D.N.Y. Nov. 25, 2024) (alteration adopted) (first quoting *United States v. Hashmi*, 621 F. Supp. 2d 76, 86 (S.D.N.Y. 2008); and then quoting *Basciano v. Lindsay*, 530 F. Supp. 2d 435, 446 (E.D.N.Y. 2008)). In a recent decision, the U.S. District Court for the District of Colorado found that Mustafa failed to allege facts suggesting that the SAMs barring communication with certain of his children are not reasonably related to a legitimate penological interest, here, the interest in preventing future terrorist activity. *Mostafa v. Garland*, No. 20 Civ. 694, 2024 WL 37977, at *10 (D. Colo. Jan. 3, 2024); *see also* App. at 198–99 (Mustafa's 2021 SAMs, which conclude, based on Mustafa's past involvement in terrorist activity, that "there is substantial risk that [Mustafa's] communications or contacts with persons could result in death or serious bodily

10

injury to persons"). Furthermore, Mustafa does not identify any cases holding that his type of isolating conditions constitute extraordinary and compelling circumstances warranting early release. *See Cross v. McGinnis*, No. 05 Civ. 504, 2006 WL 1788955, at *4 (S.D.N.Y. June 28, 2006) (stating that "[s]olitary confinement and the restrictions associated with it are not an extraordinary circumstance" and collecting cases). The Court concludes that Mustafa has failed to demonstrate the existence of such conditions.

   III.   § 3553(a) Factors

Even were the Court to find that extraordinary and compelling circumstances existed, the Court would not grant Mustafa compassionate release because the § 3553(a) factors counsel strongly against reducing his sentence.

Mustafa's offenses of conviction are of the most serious kind: He assisted a hostage kidnapping that resulted in the deaths of four people, ECF No. 474 at 72:14–73:6, 75:19–76:13; Opp. at 5–8, and attempted to organize a camp to train future terrorists, ECF No. 474 at 76:14–25; Opp. at 8–12. Beyond these offenses, Mustafa spent years preaching uncompromising violence against non-Muslims. *See* Opp. at 2–3; ECF No. 474 at 79:19–82:19. Importantly, Mustafa never expressed regret for his statements or crimes, maintaining his innocence even after he was convicted. ECF No. 474 at 59:15–17; 82:25–83:4. In his motion, Mustafa argues that he is no longer dangerous because he made the worst of his statements before 9/11 and because a psychological examination conducted by the BOP in 2019 found that Mustafa does not have antisocial personality disorder. Mot. at 51. These facts are relevant, but considering that Mustafa never renounced his hateful statements or admitted to his crimes, they prove little.

Ultimately, the sentencing court's analysis of the § 3553(a) factors remains persuasive today. The Court agrees with Judge Forrest that, because Mustafa "believe[d] [his] actions were

11

proper when [he] undertook them" and "ha[s] not had a change of heart since," the Court has "every reason to believe that if [he] were free," he would continue to "support and inspire others to acts of violence." ECF No. 474 at 73:7–12. Although the Court recognizes that Mustafa's disabilities make life in an exceedingly difficult place even more trying, Mustafa has not demonstrated that he no longer poses a danger to the public, so the Court cannot in good conscience order his release.

That said, the Court is disturbed by the BOP's failure to provide Mustafa with certain treatments and accommodations that appear medically necessary and that do not seem to pose a security concern. In particular, Mustafa makes a strong case that, given the serious deterioration of his teeth and the fact that his lack of hands makes the use of dentures dangerous and difficult, and given the fact that he often relies on his teeth as a tool to open his meals and perform other daily tasks, he should be provided with dental implants. Mot. at 35–37; Reply at 21–22; *see* Supp. App. at 596–601;[7] *see also* Mot. at 36 (describing how staff at ADX Florence inconsistently follow the directive that Mustafa's meals be opened for him). Indeed, this is the conclusion reached by Dr. Andrew Brafman, an experienced prosthodontist hired by Mustafa to consult on the issue. Reply at 21–22; App. at 579–86. The Government does not argue that such implants would pose a security threat or that they are prohibited by BOP policy. *See* Reply at 21–23; Opp. at 49–50. Rather, the Government and Mustafa's BOP dentists appear to take for granted that, because dental implants are not typically offered to inmates, they should not be given to Mustafa. Such a conclusion, of course, disregards Mustafa's unusual disabilities and the compelling reasons justifying a departure from the BOP's usual treatment plan.

---

[7] Citations to "Supp. App." are to the sealed supplemental appendix emailed to the Court on November 15, 2024.

Although this Court lacks the power, on a motion for compassionate release, to direct the provision of specific medical relief, it nonetheless urges the BOP to reconsider whether the provision of dental implants is warranted here; if the BOP fails to take action, and should Mustafa exhaust his administrative remedies, he may have a strong case that the failure to provide him with dental implants violates federal law and the Constitution.

## CONCLUSION

For the foregoing reasons, Mustafa's motion is DENIED. The Clerk of Court is respectfully directed to terminate the motions at ECF Nos. 615, 626, and 632.

SO ORDERED.

Dated: March 12, 2025
New York, New York

_____
ANALISA TORRES
United States District Judge